# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 10-CV-00032 (JFB) (WDW)

————————————

## JULIET ANILAO, ET AL.,

Plaintiffs,

VERSUS

## THOMAS J. SPOTA, III, INDIVIDUALLY AND AS DISTRICT ATTORNEY OF SUFFOLK COUNTY, ET AL.,

Defendants.

————————————

MEMORANDUM AND ORDER
March 31, 2011

————————————

JOSEPH F. BIANCO, District Judge:

Juliet Anilao, Harriet Avila, Mark Dela Cruz, Claudine Gamaio, Elmer Jacinto, Jennifer Lampa, Rizza Maulion, James Millena, Theresa Ramos, Ranier Sichon (the "nurse plaintiffs" or "nurses"), and Felix Q. Vinluan ("Vinluan") (collectively "plaintiffs") brought this action against Thomas J. Spota, III, individually and as District Attorney of Suffolk County ("District Attorney Spota" or "Spota"); the Office of the District Attorney of Suffolk County ("the DA's Office"); Leonard Lato, individually and as an Assistant District Attorney of Suffolk County ("Lato"); and the County of Suffolk (collectively the "County defendants"), as well as against Sentosa Care, LLC ("Sentosa Care"); Avalon Gardens Rehabilitation and Health Care Center ("Avalon Gardens"); Prompt Nursing Employment Agency, LLC ("Prompt"); Francris Luyun ("Luyun"); Bent Philipson ("Philipson"); Berish Rubenstein[1] ("Rubenstein")[2]; Susan O'Connor ("O'Connor"); and Nancy Fitzgerald ("Fitzgerald")[3] (collectively the "Sentosa

---

[1] The caption of the complaint names Berish "Rubensten" as a defendant, but it is clear from the papers that this defendant's correct last name is "Rubenstein."

[2] According to the Amended Complaint, Avalon Gardens is a "Skilled Nursing Facility" in New York State. (Am. Compl. ¶ 8.) Philipson is a principal of Sentosa Care, Avalon Gardens, and Prompt. (*Id.* ¶ 11.) Luyun and Rubinstein are also principals of Prompt. (*Id.* ¶¶ 10, 12.)

[3] O'Connor was the "duly appointed administrator of Avalon Gardens," (Am. Compl.

defendants"), alleging that the County defendants and the Sentosa defendants violated plaintiffs' constitutional rights pursuant to 42 U.S.C. § 1983.[4]

The claims in this case stem from what was originally a contractual employment dispute between the nurse plaintiffs and the Sentosa defendants.[5] According to the Amended Complaint, the nurse plaintiffs, who had been recruited to work in the United States by Sentosa-affiliated entities, were displeased with their employment conditions upon arriving here and believed that the Sentosa defendants had breached the promises they had made to the nurses during the nurses' recruitment. The nurses sought the advice of Vinluan, an attorney, who advised the nurses that the Sentosa defendants had breached their employment contracts with the nurses in a variety of respects and that, accordingly, the nurses could terminate their employment with

¶ 13), and Fitzgerald was the Director of Nursing at Avalon Gardens. (*Id.* ¶ 14.)

[4] With regard to the individual defendants sued in their official capacities, these claims are duplicative of the municipal liability claim lodged against the County of Suffolk under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), discussed *infra*. *See, e.g.*, *Tsotesi v. Bd. of Educ.*, 258 F. Supp. 2d 336, 338 n.10 (S.D.N.Y. 2003) (dismissing claims against officials sued in their official capacities where plaintiff also sued municipality (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985))). Therefore, the Court dismisses all claims brought against defendants Spota and Lato in their official capacities. For the reasons discussed *infra*, however, certain of the claims against these individual defendants in their individual capacities survive defendants' motions.

[5] The Court notes that the brief summary set forth herein does not constitute findings of fact by the Court, but rather merely sets forth the facts as they are alleged by plaintiffs.

Avalon Gardens. After the nurses resigned, however, the Sentosa defendants allegedly took a series of retaliatory actions against plaintiffs, including reporting the nurse plaintiffs to the New York State Education Department (which is in charge of licensing for nurses), seeking a preliminary injunction against plaintiffs, and attempting to report plaintiffs to the Suffolk County Police Department. However, each of these actions taken by the Sentosa defendants ultimately was unsuccessful. In particular, the Education Department's investigation exonerated plaintiffs of any wrongdoing, the preliminary injunction was denied for failure to prove a likelihood of success on the merits, and the Police Department refused to take action because, according to the Amended Complaint, the police did not believe that any crimes had been committed. Consequently, the Sentosa defendants approached the DA's Office and met with District Attorney Spota to induce him to prosecute plaintiffs. As a result of this pressure from the Sentosa defendants, Spota allegedly entered into an agreement with the Sentosa defendants to prosecute plaintiffs for the benefit of the Sentosa defendants. Plaintiffs claim that, pursuant to this agreement, Spota assigned one of his Assistant District Attorneys, defendant Lato, to investigate plaintiffs. There appears to be no dispute that the investigation was conducted in the absence of any police involvement and, accordingly, was conducted solely at the direction of the DA's Office. Ultimately, ADA Lato presented the case to the Grand Jury—including a presentation of allegedly false testimony by defendant Philipson and possibly others—and procured an indictment charging plaintiffs with endangering the welfare of a child, endangering the welfare of a physically disabled person, conspiring to do the same, and solicitation. This indictment was returned by a Grand Jury approximately

one year after the nurse plaintiffs' resignations.

The prosecution of plaintiffs was halted, however, when the New York State Appellate Division granted plaintiffs' Article 78 petition for a writ of prohibition based upon the fact that plaintiffs were being "threatened with prosecution for crimes for which they cannot constitutionally be tried." *Matter of Vinluan v. Doyle*, 873 N.Y.S.2d 72, 83 (App. Div. 2009). Specifically, the Appellate Division found that the prosecution sought to punish the nurse plaintiffs for resigning from their employment at will and to punish Vinluan for providing legal advice to the nurses in connection with their resignation, and, as such, the court found that the prosecution violated plaintiffs' First and Thirteenth Amendment rights. After the prosecution of plaintiffs was accordingly prohibited, plaintiffs commenced this action in federal court, alleging that defendants violated their constitutional rights in a variety of respects. Specifically, plaintiffs have claimed not only that defendants violated plaintiffs' First and Thirteenth Amendment rights, but also that the indictment was procured in violation of plaintiffs' Fourteenth Amendment due process rights "in that the Grand Jury was not properly charged on the law, was given false evidence, and was not presented with exculpatory evidence." (Am. Compl. ¶ 112.) Moreover, plaintiffs allege that the prosecutors also engaged in unconstitutional conduct during the investigative stage prior to the presentation of evidence to the Grand Jury. Accordingly, plaintiffs have brought this § 1983 action to vindicate the violation of the above-mentioned constitutional rights. Moreover, plaintiffs also have brought state-law claims for malicious prosecution and false arrest.

Before the Court now are the County defendants' and the Sentosa defendants' motions to dismiss plaintiffs' Amended Complaint. As a threshold matter, the County defendants contend that they are absolutely immune for the actions they took in prosecuting plaintiffs. Also as a threshold matter, the Sentosa defendants contend that they were not acting under color of state law at any point and that, accordingly, they cannot be held liable under § 1983. Additionally, the Sentosa defendants argue that plaintiffs have failed to plead essential elements of their malicious prosecution and false arrest claims.

For the reasons set forth herein, defendants' motions are granted in part and denied in part. Specifically, as to the County defendants, the Court concludes: (1) the individual County defendants are entitled to absolute immunity for conduct taken in their role as advocates in connection with the presentation of the case to the Grand Jury; (2) the individual County defendants are not entitled to absolute immunity for alleged misconduct during the investigation of plaintiffs, and the Court cannot determine at the motion to dismiss stage, given the allegations in the Amended Complaint, whether the individual County defendants are entitled to qualified immunity for their actions in the investigation phase; (3) plaintiffs have sufficiently pled § 1983 claims against the individual County defendants for alleged Due Process violations in the investigative stage; and (4) plaintiffs have sufficient pled a claim for municipal liability against the County of Suffolk. As to the defendants Philipson, Luyun, Rubenstein, Sentosa Care, Prompt, and Avalon Gardens, the Court concludes: (1) plaintiffs have sufficiently alleged that they were acting under color of state law, and (2) plaintiffs have sufficiently pled claims for malicious prosecution and false arrest under both § 1983 and state law, as well as a § 1983 conspiracy claim. As to defendants O'Connor and Fitzgerald, the

Court dismisses the claims against them without prejudice for: (1) failure to plead that they were acting under color of state law, and (2) failing to set forth allegations to properly plead the state-law malicious prosecution and false arrest claims as to these two individual defendants. Finally, as to the § 1983 conspiracy claim against all defendants, the Court finds that plaintiffs have sufficiently pled a claim against all defendants except O'Connor and Fitzgerald, who, as noted *supra*, were not alleged to have been acting under color of state law for purposes of the § 1983 claims.

With respect to the individual County defendants, the Court emphasizes that, although the Amended Complaint contains a panoply of serious allegations of misconduct by prosecutors in connection with the Grand Jury presentation and initiation of the prosecution of the plaintiffs, there is no question, as a matter of law, that the prosecutors are cloaked with absolute immunity for their role in presenting that case to the Grand Jury and, thus, the constitutional claims arising from that alleged conduct (although extremely troubling, if true) cannot form the basis for a Section 1983 claim for false arrest or malicious prosecution. Moreover, under well-settled Second Circuit jurisprudence, the fact that this prosecution was halted by a New York State appellate court via a writ of prohibition does not eviscerate the existence of absolute immunity in connection with their advocacy role in the Grand Jury. Based upon the allegations in the Amended Complaint and the New York State's writ of prohibition, it is clear that, even if the prosecutors' charges constituted an impermissible infringement upon the constitutional rights of the nurses and their attorney, the charges were still brought within the defendants' prosecutorial duties and, thus, the individual County defendants remain absolutely immune. As a result, the false arrest and malicious prosecution claims cannot proceed against the County defendants. However, there is no absolute immunity for any alleged unconstitutional acts violating due process (including any alleged fabrication of evidence) during the investigative stage, not undertaken in preparation for the Grand Jury presentation or in the prosecutors' role as an advocate. Although the individual County defendants argue that everything was done in preparation for the Grand Jury presentation, the allegations in the Amended Complaint are that the Suffolk County Police Department declined to be involved in the investigation because the police did not believe a crime had been committed and that the prosecutors thus performed the role of investigators in the gathering of evidence *prior to the presentation to the Grand Jury*. Given these allegations, in the context of all of the allegations in the Amended Complaint, this factual issue cannot be resolved at the motion to dismiss stage. Moreover, although qualified (rather than absolute) immunity still exists for prosecutors in their investigative role, the Court cannot resolve that issue at this juncture because of the factual allegations in the Amended Complaint, which must be accepted as true for purposes of this motion. Therefore, a plausible (but limited) Section 1983 claim against the individual County defendants—based upon the alleged violation of due process in the investigative stage prior to the preparation of the case for the Grand Jury (including the alleged fabrication of evidence) which resulted in a subsequent deprivation of liberty—survives a motion to dismiss, as does a Section 1983 conspiracy claim to do the same with the Sentosa defendants. Similarly, for the reasons discussed below, the *Monell* claim against the County also withstands defendants' motion to dismiss.

4

Finally, with respect to the Sentosa defendants, they do not have the benefit of absolute or qualified immunity as private actors. Moreover, although the Sentosa defendants argue that the fact that they are private actors precludes a Section 1983 claim against them, the Court disagrees given the factual allegations in the Amended Complaint. In other words, the Amended Complaint sufficiently alleges that these private actors engaged in a conspiracy with the state actors to jointly deprive plaintiffs of their constitutional rights. For example, the Amended Complaint goes beyond simply alleging that information was supplied to the prosecutors by the Sentosa defendants; rather, it alleges that the Sentosa defendants agreed with the County defendants to procure an indictment through knowingly presenting false testimony to the Grand Jury and withholding exculpatory evidence, and that the prosecution would not have taken place but for the pressure and influence of the Sentosa defendants on the County defendants. The allegations, taken as a whole, are sufficient to state a plausible Section 1983 claim against the Sentosa defendants (except defendants O'Connor and Fitzgerald)—for engaging in joint action with the County defendants in connection with an alleged false arrest and malicious prosecution of plaintiffs, as well as a violation of plaintiffs' due process rights, and conspiring to do the same with the County defendants—which survives a motion to dismiss.

## I. BACKGROUND

### A. Facts[6]

Each of the nurse plaintiffs is a citizen of the Philippines and a legal resident of the United States. (Am Compl. ¶ 1.) In addition, each nurse plaintiff was trained as either a nurse or a physician in the Philippines and was duly licensed in his or her profession in the Philippines. (*Id.* ¶ 21.) As set forth in the Amended Complaint, due to a severe shortage of trained nurses in the United States, many health care providers recruit nurses in the Philippines to come and work as nurses in the United States. (*Id.* ¶ 22.) Among the entities engaged in such recruitment activities is Sentosa Recruitment Agency, Inc. ("Sentosa Recruitment"), which is owned by, or is related to entities owned or controlled by, defendant Philipson and which has the sole purpose of recruiting nurses for facilities affiliated with Sentosa Services LLC. (*Id.* ¶¶ 24, 26-27.) Sentosa Recruitment, operating through individual defendant Luyun, recruited the nurse plaintiffs in this case and, "[i]n order to induce each Nurse Plaintiff to sign a contract," Sentosa Recruitment made a number of promises, including that the nurse plaintiffs would be "direct hire" nurses rather than "agency" nurses[7] and that they would have eight-hour shifts, night shift differentials, medical and dental benefits,

---

[6] The following facts are taken from the Amended Complaint and are not findings of fact by the Court. Instead, the Court assumes these facts to be true for purposes of deciding the pending motions to dismiss and will construe them in a light most favorable to plaintiffs, the non-moving party.

[7] Plaintiffs note in the Amended Complaint that "direct hire" nurses are employed by the facility in which they work, while agency nurses are employed by an agency and assigned to a facility. (Am. Compl. ¶ 30.)

malpractice insurance, two months of free housing, and a competitive salary. (*Id.* ¶¶ 25, 29-31.) The nurse plaintiffs claim that the Sentosa defendants (namely, Philipson, Luyun, Rubinstein, Sentosa Care, and Prompt) made the above-mentioned promises with the knowledge that these promises were false and without the intention to fulfill them. (*Id.* ¶ 32.) Acting in reliance on these promises, each nurse plaintiff signed a contract to work at a specific facility affiliated with Sentosa; none of the nurses, however, signed a contract with Avalon Gardens. (*Id.* ¶¶ 33-34, 39) The contracts provided, *inter alia*, that the nurse plaintiffs would be required to work at the facilities with which they contracted for a period of three years, and that if they resigned prior to that time, they would be required to pay a $25,000 penalty. (*Id.* ¶¶ 35-36.)

Upon arriving in the United States, the nurse plaintiffs were employed by Prompt and assigned to work at Avalon Gardens. (*Id.* ¶ 40.) Soon thereafter, the nurses began to complain both about the conditions at Avalon Gardens—including complaints that, *inter alia*, their housing was inadequate and overcrowded, they did not receive promised time off, and they were not paid their correct hourly and overtime wages—and about the fact that they were not direct hires. (*Id.* ¶¶ 41-43.) Their complaints, however, failed to resolve any of these alleged problems. (*Id.* ¶ 44.) Indeed, the nurse plaintiffs allege that the Sentosa defendants breached the promises made to the nurses in a variety of respects. (*Id.* ¶ 37.) For example, as indicated *supra*, not only were the nurse plaintiffs employed as agency nurses, rather than direct hires, but they also did not receive insurance as they were promised, were not permitted to work eight-hour shifts, and did not receive vacation, time off, and pay. (*Id.*)

In order to ascertain their rights, the nurse plaintiffs contacted the Philippine Consulate in New York to provide them with a referral to an attorney who could advise them. (*Id.* ¶ 45.) The Consulate referred the nurse plaintiffs to Felix Vinluan, who advised the nurse plaintiffs that their employment contracts had already been breached in multiple ways by the Sentosa defendants and that, accordingly, the nurse plaintiffs were not bound under those contracts to continue their employment. (*Id.* ¶¶ 46-47.) Based upon this advice of counsel, and upon the fact that the Sentosa defendants refused to remedy the aforementioned breaches, the nurse plaintiffs resigned their employment on April 7, 2006. (*Id.* ¶ 48.) In addition, at or around the same time, other nurses who had been recruited in the Philippines by Sentosa Recruitment, were employed by Prompt, and were working at Sentosa-affiliated facilities also resigned their employment based on the same complaints about their employment. (*Id.* ¶ 49.) To prevent additional nurses from resigning, Philipson threatened that the nurse plaintiffs and the others who resigned would be prosecuted, deported, faced with license revocation, and subjected to a civil suit if they did not return. (*Id.* ¶ 50.) Philipson also threatened nurses who had not yet resigned that they would face these same consequences if they resigned. (*Id.* ¶ 51.) Plaintiffs allege that, insofar as all upcoming shifts had been covered and there were no legitimate future concerns about patient care, these threats were made solely to coerce the nurses to remain as Sentosa employees. (*Id.*)

Avalon Gardens, Prompt, and other Sentosa-affiliated entities then began taking a series of retaliatory actions against plaintiffs, including filing a complaint in Nassau County Supreme Court alleging, *inter alia*, breach of contract and tortious interference with contract and seeking to

enforce the $25,000 penalty in the nurse plaintiffs' contracts and $50,000 in punitive damages. (*Id.* ¶ 52.) These Sentosa entities also sought a preliminary injunction to enjoin plaintiffs from speaking with other nurses about resigning. (*Id.* ¶ 53.) Additionally, in April 2006, Avalon Gardens, through defendants O'Connor and Fitzgerald, filed a complaint with the New York State Education Department (the "Education Department"), which is responsible for licensing nurses and governing their conduct. (*Id.* ¶ 54.) Furthermore, approximately three weeks after the nurse plaintiffs resigned, defendant O'Connor, or another person acting at her behest and on behalf of Avalon Gardens, called the Suffolk County Police Department to file a complaint. (*Id.* ¶ 59.)

According to the Amended Complaint, these retaliatory actions ultimately failed. For example, the Suffolk County Police Department refused to take any action against plaintiffs because, "in their stated opinion, no crime had been committed." (*Id.*) Moreover, in June 2006, Justice Stephen Bucaria of the New York State Supreme Court denied the Sentosa entities' motion for preliminary injunction on the ground that they had failed to establish a likelihood of success on the merits. (*Id.* ¶ 55.) Finally, in September 2006, the Education Department sent an email to Vinluan stating that the nurse plaintiffs had been fully exonerated of any wrongdoing. (*Id.* ¶ 57.) In particular, the Education Department determined that the nurses had not committed abandonment and had not engaged in unprofessional or immoral conduct in connection with their resignations. (*Id.*)

At this point, the attorney for Sentosa Care, Howard Fensterman ("Fensterman"), arranged to have a private meeting with District Attorney Spota and defendants Philipson, Luyun, and others. (*Id.* ¶ 60.) Plaintiffs assert that Fensterman and the principals of Sentosa have made substantial contributions to various politicians and, as such, have "amassed political power and influence" that enable them to obtain favorable actions from elected officials. (*Id.* ¶¶ 61-62.) According to plaintiffs, the meeting between the Sentosa defendants, their attorneys, and defendant Spota had the effect of pressuring Spota to file an indictment against plaintiffs that he would not otherwise have filed. (*Id.* ¶ 64.) Specifically, plaintiffs claim that, as a result of the meeting, Spota assigned the case to one of his deputies, defendant Lato, "for the purpose of gathering evidence and securing an indictment." (*Id.* ¶ 70.) In or around early November 2006, Lato interviewed Vinluan and assured Vinluan that he was not a target of the investigation. (*Id.* ¶ 71.) Vinluan then provided Lato with "significant exculpatory information," including the Education Department's decision, Justice Bucaria's order denying the motion for a preliminary injunction against plaintiffs, and information regarding the fact that none of the nurse plaintiffs had ceased working during a shift. (*Id.* ¶ 72.) Plaintiffs claim that "[n]onetheless[,] Lato, with the consent and at the urging of Spota, presented the case to a Grand Jury." (*Id.*) Plaintiffs further claim that Lato and other unidentified investigators from the DA's Office interviewed the nurse plaintiffs and similarly informed them that they were not the targets of a criminal investigation. (*Id.* ¶ 73.) Plaintiffs assert that, had they known they were targets, they "would have chosen other courses of conduct, including not participating in the interviews, or demanding to testify before the Grand Jury." (*Id.* ¶ 74.)

Plaintiffs make numerous allegations of wrongdoing involving the presentation of evidence to, and the procuring of the indictment from, the Grand Jury. For

example, plaintiffs allege that Lato "deliberately used lurid photographs of children on ventilators to inflame the passions of the grand jurors and to procure a constitutionally invalid indictment for the benefit of the Sentosa defendants." (*Id.* ¶ 75.) In addition, plaintiffs claim that the allegations in the indictment against Vinluan—that Vinluan "advised the defendant Nurses to resign" and that the purpose of the conspiracy was to obtain alternative employment for the nurses— were baseless and were founded upon the false testimony of Philipson and possibly other Sentosa employees or principals. (*Id.* ¶¶ 80-82.)[8] Likewise, plaintiffs assert that "the indictment was further based upon knowingly false testimony by Philipson or other Sentosa principals . . . that one or more of the Nurse Plaintiffs had walked off during a shift, that shifts were inadequately covered, and that patients, including the children on ventilators . . . were endangered." (*Id.* ¶ 84.) Plaintiffs claim that not only did the Sentosa witnesses know that this information was false, but also the County defendants "knew that this testimony was false, but nonetheless presented it to the Grand Jury pursuant to their agreement with the Sentosa

Defendants." (*Id.* ¶¶ 85-86.) Finally, plaintiffs allege that the Grand Jury was not properly charged on the law, was falsely informed that one or more of the nurses had resigned during their shifts, and was not told that the Education Department had determined that the nurse plaintiffs had not violated the Education Law. (*Id.* ¶ 83.) The Education Department's determination, according to plaintiffs, would have been fatal to the indictment insofar as the indictment was "based entirely upon the duty to patients created by the Education Law." (*Id.*) Approximately one year after the nurse plaintiffs' resignations, the Grand Jury returned an indictment charging the nurse plaintiffs and Vinluan with endangering the welfare of a child, endangering the welfare of a physically disabled person, conspiring to do the same, and solicitation (for allegedly requesting and attempting to cause the nurses to resign).[9] (*Id.* ¶¶ 78-79.) Plaintiffs were arrested as a result of their indictment. (*Id.* ¶ 87.)

Plaintiffs moved to dismiss the indictment on the grounds that, *inter alia*, the prosecution violated the nurse plaintiffs' Thirteenth Amendment rights and Vinluan's First Amendment rights. (*Id.* ¶ 94.) Their motion was denied by the state trial court judge on September 27, 2007. (*Id.* ¶ 95.) Plaintiffs thereafter filed an application for a writ of prohibition with the Appellate Division, which stayed all proceedings pending a determination on plaintiffs' petition. (*Id.* ¶¶ 96-97.) In their petition, plaintiffs argued that the prosecution against them was "not a proper proceeding because it contravenes the Thirteenth Amendment proscription against involuntary servitude by seeking to impose criminal sanctions upon the nurses for resigning their positions, and

---

[8] Plaintiffs state that Vinluan was "a particular target of Defendant Philipson's wrath." (*Id.* ¶ 65.) For example, Philipson allegedly testified at his deposition in the civil action against plaintiffs that Vinluan "orchestrated" the resignation of the nurses, that Vinluan's "fingerprints" were "all over" the nurses' actions, and that Vinluan was acting in the interests of "Juno," an organization that competes with Sentosa Care in the Philippines. (*Id.* ¶¶ 66-67.) Plaintiffs assert that these assumptions regarding Vinluan's motivations and associations were false, and they plead, upon information and belief, that "it was at Philipson's instance [sic] that Spota took the unusual step of indicting an attorney for giving advice to his clients." (*Id.* ¶ 69.)

[9] Only Vinluan was charged in the solicitation count of the indictment. (Pls.' Opp. at 8.)

attempts to punish Vinluan for exercising his First Amendment right of free speech in providing the nurses with legal advice." *Vinluan*, 873 N.Y.S.2d at 78. On January 13, 2009, the Appellate Division issued a writ of prohibition against further prosecution of the indictment, finding that the criminal prosecution "constitute[d] an impermissible infringement upon the constitutional rights of these nurses and their attorney, and that the insurance of a writ of prohibition to halt these prosecutions is the appropriate remedy in this matter." *Id.* at 75. (*See also* Am. Compl. ¶ 98.) The court noted that, under New York law, "[t]he primary function of prohibition is to prevent 'an arrogation of power in violation of a person's rights, particularly constitutional rights.'" *Vinluan*, 873 N.Y.S.2d at 78 (quoting *Matter of Nicholson v. State Comm'n on Judicial Conduct*, 50 N.Y.2d 597, 606 (1980)). Thus, where plaintiffs were alleging violations of their First and Thirteenth Amendment rights, prohibition was an available remedy because if the court determined that "the prosecution impermissibly infringe[d] upon these constitutional rights, the act of prosecuting [plaintiffs] would be an excess in power, rather than a mere error of law." *Vinluan*, 873 N.Y.S.2d at 78.

Turning to the merits of plaintiffs' petition, the Appellate Division found, as an initial matter, that "the Penal Law provisions relating to endangerment of children and the physically disabled, which all the petitioners are charged with violating, do not on their face infringe upon Thirteenth Amendment rights . . . ." *Id.* at 80. Moreover, the court noted that "Thirteenth Amendment rights are not absolute, and that 'not all situations in which labor is compelled by . . . force of law' are unconstitutional." *Id.* at 81 (quoting *United States v. Kozminski*, 487 U.S. 931, 943 (1988)). However, because the indictment explicitly made "the nurses'

conduct in resigning their positions a component of each of the crimes charged . . . the prosecution ha[d] the practical effect of exposing the nurses to criminal penalty for exercising their right to leave their employment at will." *Id.* at 80-81. In addition, "although an employee's abandonment of his or her post in an 'extreme case' may constitute an exceptional circumstance which warrants infringement upon the right to freely leave employment, the respondent District Attorney proffer[ed] no reason why this [was] an 'extreme case.'" *Id.* at 81. Indeed, the court noted that the nurses did not abandon their posts in the middle of their shifts, but instead resigned after the completion of their shifts. *Id.* Accordingly, although the nurses' resignation may have made it difficult for Sentosa to find skilled replacement nurses in a timely fashion, it was "undisputed that coverage was indeed obtained, and no facts suggesting an imminent threat to the well-being of the children [were] alleged." *Id.* at 82. Thus, the court explained:

> [W]e cannot conclude that this is such an 'extreme case' that the State's interest in prosecuting the petitioners for misdemeanor offenses based upon the speculative possibility that the nurses' conduct could have harmed the pediatric patients at Avalon Gardens justifies abridging the nurses' Thirteenth Amendment rights by criminalizing their resignations from the service of their private employer.

*Id.*

As to Vinluan, the court found that his prosecution "impermissibly violate[d] [his] constitutionally protected rights of expression and association in violation of the First and Fourteenth Amendments." *Id.*

9

In so holding, the court relied upon the Supreme Court's instruction that "'[t]he First and Fourteenth Amendments require a measure of protection for advocating lawful means of vindicating legal rights including advising another that his legal rights have been infringed.'" *Id.* (quoting *In re Primus*, 436 U.S. 412, 432 (1978) (additional quotation marks and alterations omitted)). The Appellate Division found that the indictment impermissibly sought to punish Vinluan for exercising his First Amendment right to provide legal advice, and held that "it would eviscerate the right to give and receive legal counsel with respect to potential criminal liability if an attorney could be charged with conspiracy and solicitation whenever a District Attorney disagreed with that advice." *Id.* at 83.

Accordingly, the court concluded that "[w]here, as here, the petitioners are threatened with prosecution for crimes for which they cannot constitutionally be tried, the potential harm to them is 'so great and the ordinary appellate process so inadequate to redress that harm' that prohibition should lie." *Id.* (quoting *Matter of Rush v. Mordue*, 68 N.Y.2d 348, 354 (1986)). The court analogized the situation to one in which a defendant was about to be prosecuted in violation of his constitutional right against double jeopardy or in violation of his Fifth Amendment right against self-incrimination—which would likewise present situations in which a defendant was being prosecuted for a crime for which he could not be constitutionally tried—and, thus, granted plaintiffs' petition and prohibited District Attorney Spota from prosecuting plaintiffs under the indictment. *Id.* at 78, 83.

B. Procedural History

Plaintiffs filed their complaint on January 6, 2010. The County defendants

filed their motion to dismiss on March 23, 2010 ("County Mem."), as did the Sentosa defendants ("Sentosa Mem."). On May 10, 2010, plaintiffs filed their opposition ("Pls.' Opp."). The Sentosa defendants filed their reply ("Sentosa Reply") on June 14, 2010, and the County defendants filed their reply on June 15, 2010 ("County Reply"). On July 8, 2010, the Court held oral argument and gave plaintiffs leave to file an Amended Complaint. Plaintiffs filed their Amended Complaint on July 29, 2010. On August 19, 2010, the Sentosa defendants and the County defendants filed supplemental letters in support of their motion to dismiss the Amended Complaint (respectively, "Sentosa Supp." and "County Supp."). Plaintiffs filed supplemental responses in opposition on September 7, 2010 ("Pls.' Supp." and "Vinluan Supp."). Finally, the County defendants and the Sentosa defendants filed supplemental replies on September 21 and September 22, 2010, respectively ("County 2d Supp." and "Sentosa 2d Supp."). These motions are fully submitted and the Court has considered all of the parties' arguments.

II. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief

that is plausible on its face." *Twombly*, 550 U.S. at 570.

The Supreme Court recently clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth a two-pronged approach for courts deciding a motion to dismiss. --- U.S. ----, 129 S. Ct. 1937 (2009). The Court instructed district courts to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." 129 S. Ct. at 1950. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949 (quoting and citing *Twombly*, 550 U.S. at 556 (internal citations omitted)).

### III. DISCUSSION

Plaintiffs have asserted six causes of action in their Amended Complaint. In their first cause of action, plaintiffs allege that the County defendants "acted in concert with, and at the behest of" the Sentosa defendants to secure the indictment of plaintiffs in violation of plaintiffs' First, Thirteenth, and Fourteenth Amendment rights. (Am. Compl. ¶ 107; *see also id.* ¶¶ 88-93.) Plaintiffs claim not only that defendants knew or should have known that plaintiffs could not legally be prosecuted for their actions, but also that the County defendants would not have prosecuted plaintiffs but for

the pressure from "the politically powerful Sentosa Defendants." (*Id.* ¶¶ 109-10.) Plaintiffs assert that the motivation for the prosecution was to punish plaintiffs for their part in the nurses' resignation and to discourage other nurses from resigning. (*Id.* ¶ 108.) Moreover, plaintiffs allege that the improperly procured indictment violated their Fourteenth Amendment due process rights. (*Id.* ¶ 112.)

The Court construes plaintiffs' second cause of action as alleging claims against defendant Spota for failure to supervise and against defendant County of Suffolk for municipal liability under *Monell*. (*See id.* ¶¶ 123-27.) In their third cause of action, plaintiffs allege that the County defendants and the Sentosa defendants conspired to violate plaintiffs' constitutional rights. (*See id.* ¶¶ 134-38.) Plaintiffs's fourth and fifth causes of action allege claims for malicious prosecution (*see id.* ¶¶ 139-47) and false arrest. (*See id.* ¶¶ 148-51.) Finally, in their sixth cause of action, plaintiffs allege a claim against only the Sentosa defendants for conspiring to deprive plaintiffs of their civil rights. (*See id.* ¶¶ 152-72.)

As noted *supra*, plaintiffs have brought their claims pursuant to 42 U.S.C. § 1983.[10]

---

[10] Plaintiffs have brought their claims for malicious prosecution and false arrest under both § 1983 and state law, but this distinction is inapposite to the Court's analysis given that § 1983 claims for either malicious prosecution or false arrest adopt the applicable state law standards for these causes of action. *See Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) ("Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (false arrest) and *Conway v. Vill. of*

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). For claims under § 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted). Here, for purposes of their motion to dismiss, the County defendants do not dispute that they were acting under color of state law. Thus, to the extent that the County defendants are not immune from liability for their conduct, the question presented with regard to the County defendants is whether their conduct deprived plaintiffs of the various rights they assert under the Constitution. However, the Sentosa defendants contend that they were not acting under color of state law and that they therefore cannot be held liable under § 1983. As discussed *infra*, the Court finds that plaintiffs have sufficiently pled that the Sentosa defendants were acting under color of state law and, accordingly, the Court will assess whether plaintiffs have stated claims against the Sentosa defendants for deprivation of plaintiffs' constitutional rights.

### A. The County Defendants

The County defendants move to dismiss the Amended Complaint on a number of grounds. As a threshold matter, the County defendants argue that defendants Lato and Spota are entitled to absolute immunity for their actions insofar as "[e]ach of the claims

*Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984) (malicious prosecution))).

alleged by the plaintiffs against the [County] defendants relate to the decision to 'secure an indictment' . . . , the means or manner in which evidence was presented to the grand jury, or the conduct of the defendants after the indictment was handed up." (County Mem. at 2.) These actions, according to the County defendants, were "within the scope of their duties in initiating and pursuing the criminal prosecution, or taken in preparation for those functions," and, as such, are actions for which the County defendants are immune from liability. (*Id.*) However, for the reasons set forth herein, the Court finds that while certain of plaintiffs' allegations relate to actions taken by the County defendants in their role as advocates—*i.e.*, actions covered by the absolute immunity doctrine[11]—other allegations relate to the County defendants' conduct in connection with their investigation of plaintiffs prior to the initiation of any prosecution. As to this latter type of investigatory conduct, the Court concludes that, based upon the allegations in the Amended Complaint, it cannot grant absolute immunity to the County defendants at this juncture under the motion to dismiss standard. Additionally, the Court concludes that, at this stage of the litigation, it also cannot grant the County defendants qualified immunity as a matter of law, given the allegations in the Amended Complaint.

---

[11] Plaintiffs argue that the County defendants should not be absolutely immune even for actions taken in their role as advocates because, according to plaintiffs, the New York State Appellate Division decision issuing a writ of prohibition demonstrates that the County defendants were acting in clear absence of all jurisdiction and, thus, are not protected by the doctrine of absolute immunity. The Court, however, rejects this argument for the reasons discussed *infra*.

In the alternative, the County defendants move to dismiss the Amended Complaint for failure to state a claim. Specifically, the County defendants argue: (1) plaintiffs have failed to state a conspiracy claim because they have not pled facts sufficient to establish that the Sentosa defendants were state actors;[12] (2) plaintiffs cannot establish a lack of probable cause in connection with their malicious prosecution or false arrest claims because the indictment serves as presumptive evidence of probable cause; (3) plaintiffs' allegations fail to satisfy Rule 8; and (4) the County cannot be held liable because plaintiffs have failed to allege that a County custom or policy caused a violation of plaintiffs' civil rights.[13] The Court will address each of these arguments in turn.

## 1. Absolute Immunity

### a. Legal Standards

"It is by now well established that 'a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution' 'is immune from a civil suit for damages under § 1983.'" *Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005) (quoting

---

[12] Because both the County defendants and the Sentosa defendants have argued that plaintiffs have failed to allege that the Sentosa defendants were state actors, the Court will address these arguments together in Section III.B. The conspiracy claims will be addressed in Section III.C.

[13] The County defendants also argue that the claims against District Attorney Spota for failure to supervise should be dismissed under the doctrine of absolute immunity. To the extent that certain claims are subject to absolute immunity, the Court agrees and, for the reasons set forth *infra*, finds that, where it applies, the absolute immunity doctrine would shield both defendant Lato and District Attorney Spota (acting as Lato's supervisor) from liability.

*Imbler v. Pachtman*, 424 U.S. 409, 410, 431 (1976)). "[D]istrict courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery. This is because '[a]n absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity.'" *Deronette v. City of New York*, No. 05-CV-5275, 2007 U.S. Dist. LEXIS 21766, at *12 (E.D.N.Y. Mar. 27, 2007) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) and quoting *Imbler*, 424 U.S. at 419 n.13 (additional citations omitted)). However, the Second Circuit has held that in the context of a motion to dismiss under Rule 12(b)(6), "when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss." *Hill v. City of New York*, 45 F.3d 653, 663 (2d Cir. 1995).

"In determining whether absolute immunity obtains, we apply a 'functional approach,' looking to the function being performed rather than to the office or identity of the defendant." *Hill*, 45 F.3d at 660 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). In applying this functional approach, the Second Circuit has held that prosecutors are entitled to absolute immunity for conduct "'intimately associated with the judicial phase of the criminal process.'" *Fielding v. Tollaksen*, 257 F. App'x 400, 401 (2d Cir. 2007) (quoting *Imbler*, 424 U.S. at 430); *Hill*, 45 F.3d at 661 (same). In particular, "[s]uch immunity . . . extends to 'acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as advocate for the State.'" *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998). On the other hand,

"[w]hen a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent. Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings." *Hill*, 45 F.3d at 661; *see also Carbajal v. Cnty. of Nassau*, 271 F. Supp. 2d 415, 421 (E.D.N.Y. 2003) ("[W]hen a prosecutor supervises, conducts, or assists in the investigation of a crime, or gives advice as to the existence of probable cause to make a warrantless arrest—that is, when he performs functions normally associated with a police investigation—he loses his absolute protection from liability." (citation omitted)).

The Second Circuit has noted that "[t]he line between a prosecutor's advocacy and investigating roles might sometimes be difficult to draw." *Zahrey v. Coffey*, 221 F.3d 342, 347 (2d Cir. 2000). The Court, however, may rely on certain established distinctions between these roles. For example, the Supreme Court has explained that "[t]here is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Buckley*, 509 U.S. at 273. In addition, the Second Circuit has identified the juncture in the criminal process before which absolute immunity may not apply. Specifically, "[t]he majority opinion in [*Buckley*] suggests that a prosecutor's conduct prior to the establishment of probable cause should be considered investigative: 'A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.'" *Zahrey*, 221 F.3d at 347 n.2 (quoting *Buckley*, 509 U.S. at 274); *see also Hill*, 45 F.3d at 661 ("Before any

formal legal proceeding has begun and before there is probable cause to arrest, it follows that a prosecutor receives only qualified immunity for his acts."). Thus, in interpreting *Buckley*, the Second Circuit has distinguished between "preparing for the presentation of an existing case," on the one hand, and attempting to "furnish evidence on which a prosecution could be based," on the other hand—only the former entitles a prosecutor to absolute immunity. *Smith*, 147 F.3d at 94. Notably, the mere fact that a prosecutor might later convene a grand jury and obtain an indictment does not automatically serve to cloak his prior investigatory actions with the protection of absolute immunity. As the Supreme Court stated in *Buckley*:

> That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial. A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial . . . .

*Buckley*, 509 U.S. at 275-76. Furthermore, "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Id.* at 274 n.5; *see Zahrey*, 221 F.3d at 347 n.2 ("All members of the Court [in *Buckley*] recognized . . . that a prosecutor's conduct even after probable cause exists might be investigative.").

Once a court determines that a prosecutor was acting as an advocate, "a defendant's motivation in performing such advocative functions as deciding to prosecute is irrelevant to the applicability of absolute immunity." *Shmueli*, 424 F.3d at 237 (citation omitted); *see also Bernard v. Cnty. of Suffolk*, 356 F.3d 495, 503 & 507 (2d Cir. 2004) (noting that "once a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused" and holding that "a political motive does not deprive prosecutors of absolute immunity from suit for authorized decisions made in the performance of their function as advocates").

However, a prosecutor may lose absolute immunity even for acts performed in his role as an advocate if the prosecutor acts in the "clear absence of all jurisdiction" or "without any colorable claim of authority." *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987). In determining whether a prosecutor has acted beyond the scope of any colorable authority in such a manner, "a court will begin by considering whether relevant statutes authorize prosecution for the charged conduct. If they do not, absolute immunity must be denied." *Bernard*, 356 F.3d at 504. However, "if the laws do authorize prosecution for the charged crimes, a court will further consider whether the defendant has intertwined his exercise of authorized prosecutorial discretion with other, unauthorized conduct," including tying the exercise of his discretion "to an unauthorized demand for a bribe, sexual favors, or the defendant's performance of a religious act." *Id.* Ultimately, a prosecutor "will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to

liability only when he has acted in the 'clear absence of all jurisdiction.'" *Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978) (citation omitted).[14]

### b. Application

#### i. Functional Test

##### (1) Advocatory Conduct

Applying the functional test to this case, defendants are correct that plaintiffs have made a number of allegations regarding both the initiation of the prosecution against plaintiffs and defendants' presentation of evidence before the grand jury. For example, plaintiffs repeatedly allege that the County defendants' presented false or otherwise improper evidence to the Grand Jury, procured the indictment through false testimony, and conspired with the Sentosa defendants to present false evidence. (*See, e.g.*, Am. Compl. ¶ 75 ("Defendant Lato deliberately used lurid photographs of children on ventilators to inflame the passinos of the grand jurors . . . ."); *id.* ¶ 82 (noting that the allegations in the indictment were "based upon the false testimony of Philipson, and/or other Sentosa employees or principals, before the Grand Jury"); *id.* ¶ 83 ("[T]he presentation of evidence to the Grand Jury was improper, in that . . . the Grand Jury was falsely informed that one or

---

[14] Although *Stump* involved judicial, rather than prosecutorial, immunity, the Court notes that the concepts underlying the two doctrines are the same. *See Barr*, 810 F.2d at 361 (applying *Stump* to issue of prosecutorial immunity and explaining "[s]ince it is well settled that the immunity of prosecutors is based on the same considerations that underlie the immunity of judges, and since there is no functional basis for according a greater degree of protection to prosecutors than to judges, a dissimilar standard would be incongruous" (internal citations omitted)).

more of the nurses had resigned and left the facility before completing his or her shift."); *id.* ¶¶ 84-85 ("[T]he indictment was further based upon knowingly false testimony by Philipson or other Sentosa principals and employees . . . ."); *id.* ¶ 86 ("[T]he [County] Defendants knew that this testimony was false, but nonetheless presented it to the Grand Jury pursuant to their agreement with the Sentosa Defendants.").) Plaintiffs also claim that the County defendants presented the case to the Grand Jury despite having knowledge of exculpatory information and that they failed to present this exculpatory information to the Grand Jury. (*Id.* ¶¶ 72, 83.) Furthermore, plaintiffs allege that the County defendants failed to properly instruct the Grand Jury on the law. (*Id.* ¶¶ 83, 112.) While these allegations are certainly troubling (if true), these alleged actions were all undertaken as part of the prosecutor's role as an advocate and undoubtedly fall within the scope of the absolute immunity doctrine. *See Peay v. Ajello*, 470 F.3d 65, 67-68 (2d Cir. 2006) ("Plaintiff's claims against [his prosecutor], which encompass activities involving the initiation and pursuit of prosecution [including fabricating evidence used at trial, withholding exculpatory evidence, suborning perjury, and attempting to intimidate him into accepting a guilty plea], are foreclosed by absolute prosecutorial immunity, regardless of their alleged illegality."); *see Hill*, 45 F.3d at 661 (Assistant District Attorney's alleged acts of, *inter alia*, "conspiring to present falsified evidence to, and to withhold exculpatory evidence from, a grand jury" were "clearly protected by the doctrine of absolute immunity as all are part of his function as an advocate"); *Fields v. Soloff*, 920 F.2d 1114, 1120 & n.2 (2d Cir. 1990) (absolute immunity applied where plaintiff challenged actions undertaken by ADAs in their role as legal advisors to the Grand Jury because "[i]nforming the grand jury of the

judge's orders and overseeing the wardens in confiscating [unauthorized material from grand jurors] were actions undertaken pursuant to their legal obligation to supervise the jury" and "constituted activity within the scope of their judicial duties"); *Urrego v. United States*, No. 00 CV 1203, 2005 WL 1263291, at *2-3 (E.D.N.Y. May 27, 2005) (finding prosecutor was entitled to absolute immunity where he was alleged to have presented false evidence in order to obtain a superseding indictment); *Storck v. Suffolk Cnty. Dep't of Soc. Servs.*, 62 F. Supp. 2d 927, 943 (E.D.N.Y. 1999) ("A prosecutor is also absolutely immune from charges alleging the withholding of exculpatory evidence from a grand jury and suppressing *Brady* material. An allegation of conspiracy to perform the foregoing acts does not change the conclusion that the acts are entitled to absolute immunity." (internal citations omitted)).

In addition, plaintiffs take issue with the motivation underlying defendants' decision to prosecute plaintiffs. Specifically, plaintiffs allege that the County defendants decided to prosecute plaintiffs only after being pressured to do so by the "politically powerful" Sentosa defendants. (*See, e.g.*, Am. Compl. ¶¶ 62-64 ("As a result of their amassed political power and influence, the Sentosa defendants are able to obtain favorable actions from elected officials, which would not be taken . . . without Sentosa's influence. . . . [T]he meeting between the Sentosa defendants, their attorneys, and Defendants Spota . . . had the effect of[] pressuring Spota to file an indictment that he would not otherwise have filed . . . ."); *id.* ¶ 69 ("[I]t was at Philipson's instance [sic] that Spota took the unusual step of indicting an attorney for giving advice to his clients."); *id.* ¶ 108 ("The reason for the indictment was to assist the Sentosa Defendants in their quest to punish the Plaintiffs for their part in resigning, and

to discourage other nurses . . . from resigning . . . .").) However, as noted *supra*, it is well-settled that a prosecutor's motivation for initiating a prosecution has no impact on a determination of whether the prosecutor should be protected by absolute immunity. Indeed, both the Second Circuit and the Third Circuit have specifically found that allegations of improper political motives—similar to the allegations here—are not sufficient to remove the prosecutor's actions from scope of absolute immunity where the prosecutor otherwise was acting in his role as an advocate in initiating the prosecution. *See Bernard*, 356 F.3d at 502 (holding that "district court erred in ruling that an improper political motive could take [prosecutors'] decisions to prosecute plaintiffs and their conduct before the grand jury outside the scope of official functions shielded by absolute prosecutorial immunity" because "a defendant's motivation in performing such advocative functions is irrelevant to the applicability of absolute immunity"); *Kulwicki v. Dawson*, 969 F.2d 1454, 1464 (3d Cir. 1992) ("In this case, [plaintiff] alleges that [the prosecutor] had charges brought against him because [plaintiff] was [the prosecutor's] political rival. [The prosecutor] allegedly knew that [plaintiff's actions] did not amount to a conspiracy or an attempt to deal in infant children, yet he directed Detective Loutzenhiser to file the baseless charges. . . . Consideration of personal motives is directly at odds with the Supreme Court's simple functional analysis of prosecutorial immunity, however. The Court has explicitly stated that even groundless charges are protected, in the interest of maintaining vigorous prosecution of crime. . . . . Functionally, [the prosecutor's] actions are absolutely immune. [He] was performing a core prosecutorial function in causing [the detective] to file criminal charges against [plaintiff]." (footnote and

citations omitted)). Although plaintiffs object to the fact that the County defendants allegedly undertook this prosecution because of political reasons (*i.e.*, to appease the politically connected Sentosa defendants), this motivation does not change the fact that "the initiation and pursuit of a criminal prosecution are quintessential prosecutorial functions" that fall squarely within the scope of the absolute immunity doctrine. *Shmueli*, 424 F.3d at 237. This conclusion does not change even if the County defendants shared a desire with the Sentosa defendants to "punish" plaintiffs for resigning. Stated simply, "as long as a prosecutor acts with colorable authority, absolute immunity shields his performance of advocative functions regardless of motivation." *Bernard*, 356 F.3d at 498.[15]

Likewise, the County defendants are also shielded from liability for their decision to prosecute Vinluan in retaliation for exercising his First Amendment rights.[16] Indeed, the Supreme Court has explicitly stated that an "action for retaliatory

---

[15] The Court addresses plaintiffs' allegations that the County defendants were, in fact, acting without colorable authority *infra* in Section III.A.1.b.ii.

[16] Although Vinluan does not label his claim regarding the First Amendment as a "retaliatory prosecution" claim, it is clear from the Amended Complaint that his allegations should be construed as such. (*See* Am Compl. ¶ 69 ("[I]t was at Philipson's instance [sic] that Spota took the unusual step of indicting an attorney *for giving advice to his clients*." (emphasis added)); *id.* ¶ 91 ("By prosecuting Vinluan *for exercising his constitutional rights* of free speech and free association the criminal action violated the First Amendment." (emphasis added)); *see also Vinluan*, 873 N.Y.S.2d at 78 (noting that the indictment "attempts to punish Vinluan for exercising his First Amendment right of free speech in providing the nurses with legal advice").)

prosecution will not be brought against the prosecutor, who is absolutely immune from liability for the decision to prosecute. Instead, the defendant will be a nonprosecutor, an official . . . who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute." *Hartman v. Moore*, 547 U.S. 250, 261-62 (2006) (internal citation omitted)). Thus, to the extent that plaintiffs' claims are based upon the County defendants' initiation of the prosecution against plaintiffs or their conduct in front of the Grand Jury, the County defendants are absolutely immune from liability on these claims.[17]

However, construing the allegations in the Amended Complaint in plaintiffs' favor for purposes of this motion to dismiss, plaintiffs have also alleged improper investigatory conduct on the part of the County defendants. The County defendants argue that plaintiffs have done no more than merely label defendants' conduct as "investigatory," but, as set forth below, the

Court disagrees and finds that plaintiffs have alleged conduct that, if true, would not be protected by the absolute immunity doctrine.[18]

### (2) Investigatory Conduct[19]

Based upon the allegations in the Amended Complaint, the Court is not presented here with a scenario in which the police conducted an investigation and the prosecutors merely took the evidence that the police uncovered and presented it to a Grand Jury. Instead, plaintiffs have alleged

---

[17] The Court notes that this absolute immunity protection shields the actions of both defendant Lato, who presented the case to the Grand Jury, and defendant Spota, who acted as Lato's supervisor regarding the initiation of the prosecution and the presentation to the Grand Jury. *See Bodie v. Morgenthau*, 342 F. Supp. 2d 193, 205 (S.D.N.Y. 2004) ("To the extent the supervision or policies concern the prosecutorial decisions for which the ADAs have absolute immunity, then those derivative allegations against supervisors must also be dismissed on the ground that the supervising district attorneys have absolute immunity for the prosecution-related decisions of their subordinates and because Section 1983 supervisory liability depends upon the existence of an underlying constitutional violation." (internal quotation marks omitted)).

[18] The Court notes that defendants are correct that, as a threshold matter, plaintiffs' labeling of various actions as "investigative" or "administrative" in the Amended Complaint is of no moment. *See Wilson v. Barcella*, No. H-05-3646, 2007 U.S. Dist. LEXIS 22934, at *59 (S.D. Tex. Mar. 29, 2007) ("[T]he use of labels in the complaint, such as 'investigative' or 'administrative,' as opposed to 'advocacy,' [does not] resolve the immunity issue."); *Belot v. Wieshaupt*, No. 96 Civ. 3005, 1997 U.S. Dist. LEXIS 5772, at *7 (S.D.N.Y. Apr. 29, 1997) ("[I]t is not enough for plaintiff to allege simply that defendants 'performed investigative functions' or that they were 'involved' in the criminal investigation, plaintiff must also identify wrongdoing by defendants in their investigative capacity."). However, the Court here has looked beyond the labels plaintiffs have used and has examined the conduct alleged to determine whether it took place in the course of "administration or investigation not undertaken in preparation for judicial proceedings." *Hill*, 45 F.3d at 661. As set forth *infra*, this functional analysis of the conduct at issue reveals that, at this stage of the litigation, plaintiffs have provided sufficient factual allegations regarding investigatory misconduct on the part of the County defendants to allow them to survive defendants' motion to dismiss.

[19] The Court addresses the County defendants' argument that they are entitled to qualified immunity for any alleged investigatory conduct *infra* in Section III.A.2.

a highly unusual set of circumstances in which the police not only lacked involvement in the investigation of plaintiffs, but also had *expressly declined* to investigate plaintiffs because they felt that no crime had been committed. (*See* Am. Compl. ¶ 59 ("Approximately three weeks after the resignations of the Nurse Plaintiffs . . . O'Connor . . . called the Suffolk Police Department to file a complaint. Upon information and belief, the Police Department refused to take any action as, in their stated opinion, no crime had been committed.").) Indeed, drawing all reasonable inference in plaintiffs' favor, plaintiffs allege that it was only after the police took no action on the Sentosa defendants' complaints about plaintiffs that the Sentosa defendants approached the District Attorney's office. (*See id.* ¶ 60.) In other words, it was only after the police declined to get involved that District Attorney Spota allegedly decided to have his staff investigate plaintiffs' conduct. (*See id.* ¶ 70 ("As a result of [the meeting with the Sentosa defendants], Defendant Spota assigned the case to one of his deputies, defendant Leonard Lato, chief of the Insurance Crimes Bureau, *for the purpose of gathering evidence* and securing an indictment." (emphasis added)).) Construing these allegations in the light most favorable to plaintiffs—as the Court must on a motion to dismiss—plaintiffs have pled sufficient facts to support a reasonable inference that the County defendants not only were involved in the investigation of plaintiffs but also were, by necessity, spearheading the investigation of plaintiffs due to the police's decision not to take action. (*See also* Vinluan Supp. at 2 (noting that the investigation was conducted entirely by the County defendants and not the police).)

The County defendants argue in response that, even if their conduct could be deemed investigatory, plaintiffs have not alleged any *wrongdoing* during the investigatory stage that could support a § 1983 action. The Court, however, disagrees. Assuming the allegations in the Amended Complaint to be true and construing them in plaintiffs' favor, plaintiffs' claims are clearly premised upon an allegation that the County defendants manufactured false evidence and testimony during their investigation of plaintiffs. In other words, if there was fabrication of evidence by prosecutors in the Grand Jury, and the same prosecutors conducted the investigation prior to the Grand Jury presentation, it is certainly reasonable to infer that fabrication also took place in the investigative stage. Thus, the Court finds that plaintiffs have sufficiently pled allegations that the County defendants violated plaintiffs' "constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty." *Zahrey*, 221 F.3d at 344. In *Zahrey*, the Second Circuit addressed similar allegations that the defendant prosecutor had "joined a conspiracy that coerced two witnesses . . . to falsely accuse Zahrey of crimes."[20] *Id.* at 345. The defendant prosecutor argued—as

---

[20] The Court notes that in *Zahrey*, the Second Circuit only addressed the issue of qualified immunity, because the prosecutor conceded for purposes of the appeal that the alleged misconduct occurred while he was acting in an investigative capacity. However, the Second Circuit's reasoning is still relevant to the absolute immunity analysis here because it refutes the County defendants' argument that there are no allegations of any "wrongdoing" (*i.e.* that they did not violate any of plaintiffs' constitutional rights) during their investigation of plaintiffs.

do the County defendants here[21]—that "nothing he did *before* presenting evidence to the grand jury violated [the plaintiff's] rights or affected him in any way." *Id.* at 351 n.6 (emphasis in original). The Second Circuit, however, rejected the defendant's arguments and held that the plaintiff's allegations were sufficient to state a claim for a violation of the plaintiff's constitutional rights. As an initial matter, the *Zahrey* court explained that "if Zahrey had claimed only that Coffey [the prosecutor] fabricated evidence and did nothing to precipitate the sequence of events that resulted in a deprivation of Zahrey's liberty, no constitutional violation would have been alleged." *Id.* at 348. Instead, what propelled the plaintiff's claim into the realm of constitutional violation was his allegation that he had been deprived of his liberty (because of his post-arrest confinement) without due process of law (because of the alleged manufacturing of evidence). *Id.* The court thus framed the constitutional right at issue as "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity. . . . provided that the deprivation of liberty . . . can be shown to be the result of [the prosecutor's] fabrication of evidence." *Id.* at 349.

As to causation, the court explained that the plaintiff had sufficiently pled that deprivation of the plaintiff's liberty interest was the legally cognizable result of the prosecutor's claimed misconduct. In so holding, the court noted that the case involved "the unusual circumstance" in which "the same person took both the initial act of alleged misconduct and the subsequent intervening act." *Id.* at 352. When faced with analogous circumstances, other courts "have squarely sustained a claim of liability where the same person initiated a liberty deprivation by misconduct and subsequently took a further step in the chain of causation in an immunized capacity." *Id.* at 353. Accordingly, the Second Circuit explained:

> Coffey acknowledged at oral argument that if he had fabricated evidence and handed it to another prosecutor who unwittingly used it to precipitate Zahrey's loss of liberty, Coffey would be liable for the initial act of fabrication. It would be a perverse doctrine of tort and constitutional law that would hold liable the fabricator of evidence who hands it to an unsuspecting prosecutor but exonerate the wrongdoer who enlists himself in a scheme to deprive a person of liberty. If, as alleged, Coffey fabricated evidence in his investigative role, it was at least reasonably foreseeable that in his advocacy role he would later use that evidence before the grand jury, with the likely result that Zahrey would be indicted and arrested. The complaint adequately alleges that the deprivation of Zahrey's liberty was the legally cognizable result of Coffey's alleged misconduct in fabricating evidence.

*Id.* at 353-54 (footnotes omitted).

Likewise, plaintiffs in this case have alleged that the County defendants entered

---

[21] The County defendants argue that even if certain conduct was investigatory in nature, the ultimate harm that plaintiffs complain of here relates to events that occurred in relation to the Grand Jury, and thus "relates to conduct that is advocacy in nature and again falls within the ambit of absolute immunity." (County Supp. at 3.) For the reasons set forth *supra*, the Court disagrees.

"a scheme to deprive a person of liberty" during the investigative stage (prior to the presentation of evidence to the Grand Jury), and that the County defendants' actions pursuant to this scheme deprived plaintiffs of their due process rights.[22] Specifically, insofar as plaintiffs have alleged that the DA's office was in charge of (and was allegedly solely responsible for) the investigation of plaintiffs, plaintiffs' claims are necessarily predicated upon the defendant prosecutors' involvement in the underlying fabrication of evidence against plaintiffs pursuant to the County defendants' illicit agreement with the Sentosa defendants. In other words, drawing all reasonable inferences in plaintiffs' favor, plaintiffs' claims here go beyond a mere allegation that the County defendants conspired to present to the Grand Jury false evidence that they played no role in gathering or fabricating. Instead, reading the Amended Complaint as a whole, plaintiffs have alleged that the prosecutors orchestrated the investigation of plaintiffs after the police declined to get involved, and reached an agreement with the Sentosa defendants to manufacture testimony from the Sentosa defendants that the County defendants knew to be false. (*See, e.g.*, Am. Compl. ¶ 70 ("As a result of [the meeting with the Sentosa defendants], Defendant Spota assigned the case to one of his deputies, defendant Leonard Lato . . . for the purpose of gathering evidence . . . ."); *id.* ¶ 86 ("[T]he Suffolk Defendants knew that [the Sentosa witnesses'] testimony was false . . . ."); *id.* ¶ 113 ("[T]he Suffolk Defendants and the Sentosa Defendants agreed that the indictment would be procured, in part, through the use of false testimony by the Sentosa Defendants . . . ."); ¶ 125 ("Spota knew or had reason to know about the improprieties in the investigation . . . ."); *id.* ¶¶ 135-36 ("The Suffolk Defendants agreed among themselves . . . and with the Sentosa Defendants . . . to deprive the Plaintiffs of their constitutional rights . . . . The overt acts in furtherance of this conspiracy . . . begin[] with the meeting among Spota and the Sentosa Defendants . . . .").) Thus, as was the case in *Zahrey*, this case "involves the unusual circumstance" in which "the same person took both the initial act of alleged misconduct [fabrication of evidence] and the subsequent intervening act [of presenting the evidence to the grand jury]." *Id.* at 352. Accordingly, the Court disagrees with the County defendants that plaintiffs have not alleged that any wrongdoing occurred during the investigation of plaintiffs and, instead, finds that plaintiffs have sufficiently alleged, for purposes of defendants' motion to dismiss, that the deprivation of plaintiffs' due process rights was caused by the County

---

[22] Although plaintiffs have not specifically stated what kind of due process violation they are alleging, given plaintiffs' claim that they were arrested and detained as a result of the allegedly improper indictment, the Court construes their due process claim as one alleging a deprivation of plaintiffs' Fourteenth Amendment liberty rights. Moreover, the Court notes that the fabrication of evidence claims are a core element of not only of plaintiffs' § 1983 due process claim, but also of their § 1983 malicious prosecution and false arrest claims. However, the malicious prosecution claim against the County defendants is predicated entirely upon their conduct before the Grand Jury, which is covered by absolute immunity and, therefore, cannot serve as the subject of an independent claim. Likewise, the false arrest claim suffers from the same defect. Instead, as explained in *Zahrey*, where a claim is based upon the alleged unconstitutional acts of a prosecutor during the investigative stage (including the fabrication of evidence), such a claim is properly classified as a due process violation, so long as the due process violation (*i.e.* the investigatory misconduct) causes a subsequent deprivation of liberty, which, in this case, was plaintiffs' arrest following their indictment.

defendants' alleged investigatory conduct.[23] The County defendants are not entitled to absolute immunity for such conduct. *See Walker v. McGinnis*, No. 10-2236, 2011 WL 213475, at *1 (3d Cir. Jan. 24, 2011) (district attorney not entitled to absolute immunity where "complaint concern[ed] [DA's] pre-indictment investigation of the allegations against [plaintiff]," including allegations that the DA "manufactured evidence against [plaintiff] in order to establish probable cause to arrest [plaintiff]").

The County defendants respond that their alleged investigatory activity should be construed as mere preparation for the Grand Jury, which would be covered by absolute immunity. However, the Supreme Court has explicitly stated that "[a] prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial . . . ." *Buckley*, 509 U.S. at 275-76; *see also Kent v. Cardone*, No. 10-818-cv, 2011 WL 13906, at *1 (2d Cir. Jan. 5, 2011) ("Although the duties of the prosecutor in his role as advocate for the State involve

actions preliminary to the initiation of a prosecution and actions apart from the courtroom, absolute prosecutorial immunity is afforded only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." (internal quotation marks and citations omitted)); *Zahrey*, 221 F.3d at 353 ("[A] subsequent immunized act of a single official does not break the chain of causation traceable to his initial misconduct occurring in another capacity."). Defendants here cannot retroactively shield their actions with the protection of absolute immunity, at the motion to dismiss stage, by simply asserting in a conclusory fashion that their investigation was "preparation" for their eventual presentation of evidence to the Grand Jury. Indeed, it is not clear from the current record that a Grand Jury had even been empanelled at the time that the County defendants allegedly conspired with the Sentosa defendants and opened their investigation of plaintiffs. As noted *supra*, "when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss." *Hill*, 45 F.3d at 663.

\* \* \*

In sum, although the Court is cognizant that the issue of absolute immunity should be resolved at the earliest possible stage of the litigation, the Court declines to rule as a matter of law at this stage, given the allegations of investigative misconduct in the Amended Complaint, that the County defendants are absolutely immune from liability for their conduct in investigating plaintiffs. The County defendants are entitled to renew this argument at the summary judgment stage. As to the

---

[23] The County defendants focus their arguments almost exclusively on plaintiffs' allegations that defendant Lato lied to plaintiffs that they were not targets of an investigation, which therefore induced plaintiffs to come in for interviews and led them to not demand that they testify before the Grand Jury. However, the County defendants ignore the fact that plaintiffs' allegations, construed in plaintiffs' favor, state a claim for the falsification of evidence and testimony during the investigation of plaintiffs. Because the Court finds that this manufacturing of evidence claim is sufficient to survive defendants' motion to dismiss, the Court need not address whether lying to plaintiffs about their status as targets would also state an independent constitutional violation.

remainder of plaintiffs' allegations, however, the Court finds that they pertain solely to activity that was undertaken in the County defendants' advocacy role and falls squarely within the scope of the absolute immunity doctrine.

Nonetheless, as to this latter type of "advocacy" conduct, plaintiffs contend that the County defendants are not protected by absolute immunity because, in prosecuting plaintiffs for constitutionally protected activity, the County defendants were acting in a "clear absence of all jurisdiction." For the reasons set forth below, the Court disagrees and finds that the County defendants are absolutely immune for actions that they took in their role as advocates in connection with the Grand Jury proceeding.

ii. The County Defendants Were Not Acting in a Clear Absence of All Jurisdiction

Plaintiffs argue that, because they were "threatened with prosecution for crimes for which they [could not] constitutionally be tried," *Vinluan*, 873 N.Y.S.2d at 83, the County defendants here should be deemed to have acted in a "clear absence of all jurisdiction," thereby removing their conduct from the protection of absolute immunity. In other words, because the indictment against plaintiffs was dismissed on the ground that, as charged, the prosecution violated the plaintiffs' constitutional rights, plaintiffs claim that the statutes at issue did not authorize prosecution for the "charged conduct." (Pls.' Opp. at 14-15.) In support of this argument, plaintiffs rely on the decision of the New York State Appellate Division, which, as described *supra*, granted a writ of prohibition in plaintiffs' favor. Plaintiffs assert that, in issuing the writ, "[t]he Second Department . . . has already undergone [the] analysis" for whether the prosecutors were

acting outside the scope of their jurisdiction. (Pls.' Opp. at 14.) However, for the reasons set forth below, the Court finds that the Appellate Division's decision does not necessitate the conclusion that the County defendants acted without any colorable authority in initiating the prosecution of plaintiffs for purposes of federal absolute immunity law. Instead, the Court concludes, based upon the allegations in the Amended Complaint, that the County defendants were acting with "at least a semblance of jurisdiction," *Shmueli*, 424 F.3d at 237 (internal quotation marks omitted), and, as such, should be protected by absolute immunity for actions taken in their role as advocates.

As an initial matter, a close reading of the Appellate Division's decision reveals that the issuance of a writ of prohibition does not automatically indicate that a prosecutor was acting without any jurisdictional basis. Instead, "prohibition lies to prevent a body or officer . . . from proceeding, or threatening to proceed, without *or in excess of* jurisdiction." *Vinluan*, 873 N.Y.S.2d at 77 (internal quotation marks omitted) (emphasis added). In other words, while the issuance of a writ *may* indicate that the official was acting "without" any authority, it may also indicate that the official was merely acting "in excess of" his jurisdiction. While acting in excess of jurisdiction may be sufficient to warrant granting a petition for prohibition, the Supreme Court has made clear that, for absolute immunity purposes under federal law, it is not enough for the official to have acted "in excess of his authority." *Stump*, 435 U.S. at 356. Instead, the official "will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.'" *Id.* at 356-57.

In this case, the Appellate Division found only the prosecution of plaintiffs

"would be an excess in power." *Vinluan*, 873 N.Y.S.2d at 78. This excess of power was more than "a mere error of law," but the court did *not* find that it indicated that the County defendants were acting without any jurisdiction. *Id.* In fact, the Appellate Division explicitly stated that "the Penal Law provisions relating to endangerment of children and the physically disabled, which all the petitioners are charged with violating, do not on their face infringe upon Thirteenth Amendment rights. . . ." *Id.* at 80. Moreover, the court noted that "an employee's abandonment of his or her post in an 'extreme case' may constitute an exceptional circumstance which warrants infringement upon the right to freely leave employment. . . ." *Id.* at 81. Similarly, as to the violation of Vinluan's First Amendment rights, at no point did the Appellate Division hold that the DA's Office was without any jurisdiction to initiate a prosecution for the crimes charged in the indictment. Instead, the court's decision focused on the facts of the instant case and held that, under these circumstances, prohibition was warranted to vindicate the threatened violation of plaintiffs' constitutional rights.

Although plaintiffs attempt to paint this situation as a "case of first impression," (Pls.' Opp. at 12), the Court's research has revealed other situations in which individuals were prosecuted in violation of their constitutional rights, but where courts nevertheless found the prosecutors to be absolutely immune from liability. For example, in *Barr*, 810 F.2d 358, the plaintiff had been charged in state court with criminal contempt after he invoked his Fifth Amendment privilege against self-incrimination and refused to produce any documents or answer any questions at an examination conducted by the New York Attorney General's Office. *Id.* at 360. The state criminal court judge, however, dismissed the criminal information "on the ground that Barr had a fifth amendment right to refuse to answer questions . . . and to produce the requested documents." *Id.* Barr then filed a § 1983 action against the Assistant Attorneys General, among other people, alleging that defendants had "maliciously, without jurisdiction, and for the improper purpose of punishing him for exercising his fifth amendment rights, instigated criminal contempt proceeding against him . . . ." *Id.* In rejecting Barr's argument that "a prosecutor initiating a prosecution loses the protection of *Imbler* where state law did not empower the prosecutor to bring the charges," the Second Circuit explained:

> [A] crabbed reading of *Imbler*, and a holding that a prosecutor is without absolute immunity the moment he strays beyond his jurisdictional limits, would do violence to its spirit. The purpose of the immunity rule is to give to public officials entrusted with sensitive tasks a protected area of discretion within which to carry out their responsibilities. Because we believe that the rule Barr proposes would cause a deflection of the prosecutor's energies from his public duties, and force him to shade his decisions instead of exercising the independence of judgment required by his public trust, we reject it.

*Id.* at 361 (internal quotation marks and citations omitted).

The Second Circuit explained further that the prosecutors had not acted in the clear absence of jurisdiction because the statutes in question, "'if properly charged,'" authorized the Attorney General to bring contempt charges for "'an underlying act of continuous concealment directly related to the securities fraud investigation.'" *Id.* at

361-62 (quoting criminal court judge's determination that contempt prosecution fell within the jurisdiction of the Attorney General).

The Court finds that *Barr* is directly on-point here and requires the Court to reject plaintiffs' argument that the County defendants in this case were acting beyond the scope of any colorable authority. Specifically, as in *Barr*, plaintiffs here claim that the state laws in question did not empower the prosecutors to bring the charges alleged in the indictment. However, the Second Circuit's decision in *Barr* clearly precludes the argument that a prosecutor is not jurisdictionally empowered to bring particular charges simply because those charges are predicated upon constitutionally protected conduct. Instead, the question is whether the statutes at issue, *if properly charged*, would authorize the prosecutor to initiate a criminal case. Here, there is no question that the Penal Law criminalizes conspiracy, solicitation, and endangerment, and that the District Attorney's Office is empowered to bring charges for those offenses. *See* N.Y. Penal Law § 105.00 ("A person is guilty of conspiracy in the sixth degree when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct."); N.Y. Penal Law § 100.00 ("A person is guilty of criminal solicitation in the fifth degree when, with intent that another person engage in conduct constituting a crime, he solicits, requests, commands, importunes or otherwise attempts to cause such other person to engage in such conduct."); N.Y. Penal Law § 260.10 (endangering the welfare of a child); N.Y. Penal Law §§ 260.25, 260.32, 260.34 (defining various levels of offenses for endangering the welfare of a physically disabled person); Suffolk Cnty. Law § C19-2, L.L. No. 25-1975 ("The District Attorney shall have and exercise all the powers and duties now or hereafter conferred or imposed by any applicable law, including the power to hire assistants, clerical help, and such investigative personnel as the County Legislature may allow in the budget.").[24] Thus, the County defendants were not acting without any colorable claim of authority in initiating the prosecution of plaintiffs. *See Shmueli*, 424 F.3d at 238 (where plaintiff was alleged to have made several dozen harassing phone calls to victim in New York County, prosecutor had absolute immunity for bringing case where state laws prohibited harassment, granted jurisdiction to Criminal Court in New York County, and gave the District Attorney authority to prosecute offenses within that County and to appoint assistant district attorneys to assist him); *Schloss v. Bouse*, 876 F.2d 287, 289, 292 (2d Cir. 1989) (after charges against plaintiffs were not pursued when "it became apparent . . . that in fact plaintiffs had committed no crime," prosecutor was entitled to absolute immunity for demanding that plaintiffs sign forms releasing police and municipalities from liability because a demand for a release is analogous to plea bargaining, which "may be a valid part of the government attorney's function," and thus "is not beyond the prosecutor's jurisdiction"); *Rudow v. City of New York*, 822 F.2d 324, 326, 329 (2d Cir. 1987) (Human Rights Commission prosecutor entitled to absolute immunity because although she failed to obtain prior HRC permission to participate in the case beyond the state Supreme Court stage, which "may

[24] The Court notes that the parties do not specify which provisions of the Penal Law plaintiffs were charged with in connection with the endangerment offenses. In any event, it is undisputed that the Penal Law authorizes charges for endangering the welfare of a child and endangering the welfare of a physically disabled person.

have exceeded the specific jurisdictional authority delegated to her" and "carried her beyond the bureaucratic boundaries of her position," her conduct "[n]evertheless . . . remained within the general jurisdiction of the HRC and its staff" and thus her "practice before the appellate courts was not undertaken in the clear absence of jurisdiction").

Other courts have similarly found that absolute immunity still applies where a prosecutor brought a case in violation of a defendant's constitutional rights but was otherwise acting within his role as an advocate. For example, in *Nivens v. Gilchrist*, 444 F.3d 237, 250 (4th Cir. 2006), plaintiffs brought a § 1983 action alleging that the indictment and pending prosecution of plaintiffs violated their double jeopardy rights. In holding that the prosecutor was entitled to absolute immunity, the Fourth Circuit explained that, despite the alleged constitutional violation, "[t]here is no doubt that the actions complained of in this case form the essence of [the defendant's] prosecutorial duties," and, accordingly, "he is plainly afforded absolute immunity from Appellant's claim for damages." *Id. See also Alvarez v. Haley*, No. 10-cv-4263 (PAM/JJG), 2011 WL 825694, at *2 (D. Minn. Feb. 9, 2011) (recommending that, where plaintiff alleged that the county attorney violated the double jeopardy clause by bringing new charges against plaintiff, complaint should be summarily dismissed because "Defendant [was] being sued for purely prosecutorial activities" for which she was "clearly entitled to prosecutorial immunity"); *Thomas v. Cnty. of Hawaii*, No. 07-00251 (JMS/LEK), 2008 WL 4483792, at *5-6 (D. Hawaii Oct. 1, 2008) (where plaintiff alleged that prosecutors violated his constitutional rights by, *inter alia*, instituting prosecution in violation of the double jeopardy clause, prosecutors were entitled to absolute immunity because the "decision to file the criminal charge goes to the essence of Defendants' prosecutorial duties" and "[p]laintiff's argument misses the point of absolute immunity," which "protects a prosecutor from civil liability 'whether or not he or she violated the civil plaintiff's constitutional rights'" (quoting *Broam v. Bogan*, 320 F.3d 1023, 1029 (9th Cir. 2003))). As an additional example, in *Smith*, 147 F.3d 91, plaintiff alleged that the defendant prosecutor had violated plaintiff's First Amendment rights by, *inter alia*, presenting a bribery case to the grand jury in alleged retaliation for plaintiff's exercise of his free speech rights. *Id.* at 92-93. Although the Second Circuit did not address the issue, the district court held that the prosecutor was entitled to absolute immunity for the institution of criminal proceedings, and the Second Circuit affirmed on appeal. *Id.* at 93, 95. Likewise, in *Walker*, 2011 WL 213475, the Third Circuit held that the defendant prosecutor was entitled to absolute immunity from monetary liability based on the decision to prosecute, even where prosecutor was alleged to have violated plaintiffs "First Amendment rights by prosecuting him based on false evidence in retaliation for his decision to seek political office." *Id.* at *1.

In fact, the Supreme Court spoke to this issue in *Hartman*, 547 U.S. 250, and explicitly stated that a § 1983 "action for retaliatory prosecution will not be brought against the prosecutor, who is absolutely immune from liability for the decision to prosecute." *Id.* at 261-62. Instead, such a claim—which is premised upon a violation of the First Amendment—must be brought against "a nonprosecutor, an official . . . who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute." *Id.* at 262.

Accordingly, given the allegations in the Amended Complaint, this Court concludes that the County defendants were not acting in a clear absence of jurisdiction merely because the prosecution here was allegedly commenced to punish plaintiffs for engaging in constitutionally protected conduct. To hold otherwise "would totally abrogate the immunity doctrine because any allegation that an official, acting under color of law, has deprived someone of his rights necessarily implies that . . . the official exceeded his authority." *Ybarra v. Reno Thunderbird Mobile Home Vill.*, 723 F.2d 675, 678 (9th Cir. 1984) (internal quotation marks omitted) (rejecting plaintiff's argument that prosecutor's "action cannot fall within his scope of authority because it [was] unconstitutional" under *Brady*). Thus, the County defendants are entitled to absolute immunity for actions that they took in their role as advocates (*i.e.*, their decision to initiate the prosecution of plaintiffs and their presentation of evidence to the Grand Jury).

Moreover, the fact that this prosecution was halted via the issuance of a writ of prohibition does not distinguish this case from other cases where prosecutors were found to be insulated from liability. Although the issuance of a writ of prohibition may be an unusual occurrence, the Appellate Division provided examples of other constitutional violations that would warrant prohibition, namely: a prosecution in violation of the Fifth Amendment privilege against self-incrimination or a prosecution in violation of an individual's right against double jeopardy. *Vinluan*, 873 N.Y.S.2d at 78. The Court notes that these were precisely the rights at issue in *Barr* (Fifth Amendment), *Nivens* (double jeopardy), *Alvarez* (double jeopardy), and *Thomas* (double jeopardy) and, as described *supra*, each of those courts found that the prosecutor was nonetheless entitled to

absolute immunity. Thus, despite plaintiffs' claims to the contrary, the mere fact that the Appellate Division found prohibition to be appropriate here does not make this case so unique in the realm of constitutional violations as to warrant depriving the County defendants of absolute immunity for their conduct as advocates.[25]

\* \* \*

In sum, having carefully reviewed the allegations in the Amended Complaint, the Court rejects plaintiffs' argument that the County defendants were acting without any colorable claim of authority when they initiated the prosecution of plaintiffs and presented the case to the Grand Jury. Accordingly, given that it is undisputed that the County defendants had the authority, as a general matter, to initiate prosecutions for endangerment, solicitation, and conspiracy, the Court finds that the County defendants are entitled to absolute immunity for such actions.

## 2. Qualified Immunity

In the alternative to their absolute immunity argument, the County defendants assert that they should be entitled to qualified immunity for any alleged investigatory activity. As set forth below, the Court concludes that the Amended Complaint does not provide a sufficient basis at this juncture for the Court to determine whether defendants are entitled to qualified immunity. Again, the motion to dismiss is denied without prejudice to renew such motion at the summary judgment stage.

---

[25] The Court notes that there are no allegations here that the defendants "intertwined [their] exercise of authorized prosecutorial discretion with other, unauthorized conduct," such as accepting bribes or other inappropriate personal favors. *Bernard*, 356 F.3d at 504.

### a. Legal Standard

If absolute immunity does not apply, government actors may be shielded from liability for civil damages by qualified immunity, *i.e.*, if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *see also Fielding*, 257 F. App'x at 401 ("The police officers, in turn, are protected by qualified immunity if their actions do not violate clearly established law, or it was objectively reasonable for them to believe that their actions did not violate the law."). As the Second Circuit has also noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999)). Thus, qualified immunity, just like absolute immunity, is not merely a defense, but rather is also "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Accordingly, the availability of qualified immunity should similarly be decided by a court "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

Nonetheless, the Second Circuit has emphasized that "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004); *see also McCray v. City of New York*, Nos. 03-cv-9685, 03-cv-9974, 03-cv-10080, 2007 U.S. Dist. LEXIS 90875, at *66 (S.D.N.Y. Dec. 11, 2007) ("A defendant asserting a qualified immunity defense at the 12(b)(6) stage . . . faces a formidable hurdle. Because the evidence supporting a finding of qualified immunity is normally adduced during the discovery process and at trial, the defense of qualified immunity [usually] cannot support the grant of a Fed.R.Civ.P. 12(b)(6) motion for failure to state a claim upon which relief can be granted." (internal citations and quotation marks omitted)). In particular, the facts supporting the defense must be clear from the face of the complaint. In addition, in such situations, "plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.*

"The availability of the defense depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst*, 101 F.3d 845, 858 (2d Cir. 1996) (internal quotation marks and alterations omitted). In the context of false arrest and malicious prosecution claims, an arresting officer is entitled to qualified immunity if either: (a) the arresting officer's belief that probable cause existed was objectively reasonable; or (b) officers of reasonable competence could disagree on whether the test for probable cause was met. *See Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007). The Second Circuit has defined this standard, which is often referred to as "arguable probable cause," as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law. It is inevitable that law enforcement

officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they believe to be lawful—should not be held personally liable.

*Cerrone v. Brown*, 246 F.3d 194, 202-03 (2d Cir. 2001) (internal quotation marks and citations omitted) (emphasis in original). In particular, the Second Circuit has affirmed that "'[a]rguable' probable cause should not be misunderstood to mean 'almost' probable cause . . . . If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Jenkins v. City of New York*, 478 F.3d 76, 87 (2d Cir. 2007). Under this standard, an arresting officer is entitled to qualified immunity, as a matter of law, only "if the *undisputed facts* and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met." *McClellan*, 439 F.3d at 147-48 (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)) (emphasis in original).

Although qualified immunity typically is asserted by police officers, the qualified immunity standard of arguable probable cause also applies to prosecutors. *See Murphy v. Neuberger*, No. 94 Civ. 7421, 1996 U.S. Dist. LEXIS 11164, at *37-38 (S.D.N.Y. Aug. 6, 1996) (applying arguable probable cause standard to prosecutor's actions after determining that prosecutor was not entitled to absolute immunity); *Hickey v. City of New York*, No. 01-CV-6506 (GEL), 2002 U.S. Dist. LEXIS 15944, at *14-15 (S.D.N.Y. Aug. 26, 2002) ("There is no question that the right not to be arrested and subjected to lengthy involuntary detention in police custody without probable cause to support the arrest is firmly established, and any reasonable police officer, let alone prosecutor, would reasonably be expected to know that." (internal citations omitted)).

b. Application

In the instant case, plaintiffs have alleged various violations of their constitutional rights against the County defendant prosecutors, including, for example, that the County defendants: (1) prosecuted plaintiffs despite the fact that plaintiffs had not committed a crime and that defendants knew or should have known that plaintiffs could not constitutionally be prosecuted for their conduct; (2) "agreed to do what was necessary to procure the indictment, for the sole benefit of the Sentosa defendants" (Am. Compl. ¶ 114); (3) maliciously prosecuted plaintiffs to punish them for exercising their constitutional rights; and (4) fabricated evidence that was ultimately used in the Grand Jury as a basis for plaintiffs' indictment and, consequently, resulted in a deprivation of plaintiffs' liberty. Moreover, plaintiffs allege that the County defendants were aware of significant exculpatory evidence prior to plaintiffs' indictment but that the County defendants nonetheless initiated an investigation of plaintiffs and presented knowingly false evidence to the Grand Jury. Specifically, plaintiffs allege that Vinluan provided ADA Lato with evidence regarding the State Education Department's decision exonerating plaintiffs of any wrongdoing, Justice Bucaria's decision denying Sentosa's application for a preliminary injunction due to a failure to prove a likelihood of success on the merits, and information demonstrating that none of the nurse plaintiffs had resigned during a shift. (*Id.* ¶ 72.) Further, plaintiffs allege

that the Suffolk County Police Department declined to take any action against plaintiffs in response to a complaint from defendant O'Connor because "in [the police's] stated opinion, no crime had been committed." (*Id.* ¶ 59.)

Although the County defendants dispute these allegations, there is simply insufficient information at this early stage to determine whether the conduct of the County defendants is protected by qualified immunity. In particular, if plaintiffs prove their allegations that defendants Spota and Lato falsified evidence during the investigation of plaintiffs and such falsification lead to the deprivation of plaintiffs' liberty in the form of an arrest, defendants would not be entitled to qualified immunity. *See Zahrey*, 221 F.3d at 357 (where plaintiff put forth sufficient allegations that he was deprived of liberty as a result of prosecutor's fabrication of evidence during the investigation of plaintiff, court could not grant defendant prosecutor qualified immunity as a matter of law on a motion to dismiss). Accordingly, the Court is presently unable to make a determination, as a matter of law, that plaintiffs do not have a plausible claim that would enable them to overcome the defense of qualified immunity and entitle them to relief. *See, e.g.*, *McCray*, 2007 U.S. Dist. LEXIS 90875, at *69 (where plaintiffs "made broad, general claims including that Defendants intentionally suppressed material, exculpatory evidence, . . . fabricated evidence wholesale, and . . . engaged in impermissibly coercive interrogation tactics," court denied qualified immunity on a motion to dismiss because "[i]f a jury were to believe Plaintiffs' accounts of what transpired in the course of their arrests and prosecution, then officers would not be able to establish that they had arguable probable cause to arrest and prosecute Plaintiffs. . . . Further factual

determinations are clearly prerequisite to determining whether [defendants] are entitled to a qualified immunity bar from Plaintiffs' suit."); *Bostic v. City of Binghamton*, No. 3:06-CV-540, 2006 U.S. Dist. LEXIS 73948, at *13 (N.D.N.Y. Oct. 11, 2006) ("While the facts that may be established through discovery might lead to the conclusion that the individual defendants possessed actual or arguable probable cause to arrest Plaintiff and commence his prosecution . . . that determination will have to await a summary judgment motion or trial."); *Murphy*, 1996 U.S. Dist. LEXIS 11164, at *39-40 (finding that because "[i]t is unclear from the undeveloped record before the Court whether it was objectively reasonable for the defendants to believe that they had probable cause to arrest plaintiff," police officers and prosecutor were not entitled to qualified immunity); *Hickey*, 2002 U.S. Dist. LEXIS 15944, at *16 (denying qualified immunity to police and prosecutors because "the fact-intensive question of what the defendants knew or reasonably believed, or indeed whether there is any material dispute about that question, can only be addressed on a fuller factual record, at summary judgment or trial").[26]

In sum, while the Court again recognizes that the qualified immunity issue should be decided at the earliest juncture where possible, the County defendants' motion to dismiss plaintiffs' claims on the basis of qualified immunity is denied, given the

---

[26] The Court is aware, as argued by defendants in their motion to dismiss, that a grand jury indictment gives rise to a presumption of probable cause. However, as discussed *infra*, the Court finds that plaintiffs have put forth sufficient allegations to overcome this presumption and, accordingly, the Court cannot, for purposes of the pending motions, rely on the indictment to infer probable cause for plaintiffs' prosecution.

allegations in the complaint. *See Posr v. Court Officer Shield # 207*, 180 F.3d 409, 416 (2d Cir. 1999) (finding insufficient factual basis to grant motion to dismiss on qualified immunity grounds); *Caidor*, 2006 U.S. Dist. LEXIS 22980, at *53 (denying motion to dismiss on qualified immunity grounds with leave to renew because "at this juncture, the complaint provides insufficient facts to make a determination regarding this issue"). *Cf. Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994) ("Although a defense of qualified immunity should ordinarily be decided at the earliest possible stage in litigation . . . some limited and carefully tailored discovery may be needed before summary judgment will be appropriate." (internal citations and quotation marks omitted)).

### 3. Failure to State a Claim

#### a. Probable Cause

The County defendants argue that they had probable cause to prosecute and arrest plaintiffs, as demonstrated by the existence of the indictment, and that any alleged investigatory misconduct did not result in any deprivation of plaintiffs' liberty rights. Thus, the Court must examine whether, in this case, the existence of the indictment creates a presumption of probable cause that defeats the causation element of plaintiffs' § 1983 due process claim against the County defendants. For the reasons set forth below, the Court concludes that the allegations in the Amended Complaint are sufficient to overcome the presumption of probable cause that normally attaches to an indictment.

As a threshold matter, defendants are correct that a grand jury indictment does give rise to a presumption of probable cause for purposes of a malicious prosecution claim. *See Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994). However, a showing of "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith" can overcome this presumption. *Id.* (citation omitted); *see also Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 421 (S.D.N.Y. 2002) ("An indictment by a grand jury creates a presumption of probable cause that can only be overcome by establishing that the indictment itself was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" (quoting *Bernard*, 25 F.3d at 104)). Where the perjury was alleged to have been committed by a civilian witness, a plaintiff must show that "the prosecuting authorities were complicit in the perjury" in order to overcome the presumption. *Watson v. Grady*, No. 09-cv-3055 (KMK), 2010 WL 3835047, at *9 (S.D.N.Y. Sept. 30, 2010) (internal quotation marks omitted). According to the Amended Complaint, the Grand Jury indicted plaintiffs based upon falsified evidence and testimony that was presented to the Grand Jury after the County defendants had been provided with significant exculpatory evidence regarding plaintiffs' conduct. Plaintiffs also allege that the Sentosa defendants and the County defendants agreed to present this false evidence to the Grand Jury in order to procure the indictment of plaintiffs, despite the fact that defendants knew or should have known that plaintiffs could not be constitutionally prosecuted for their conduct. These allegations, taken as true for purposes of this motion, are sufficient to overcome the presumption of probable cause that the Grand Jury indictment might otherwise afford. Thus, the County defendants' motion to dismiss plaintiffs' claims because of the existence of probable cause is denied.

#### b. Rule 8

Rule 8 of the Federal Rules of Civil Procedure requires that pleadings present a

"short and plain statement of the claim showing that the pleader is entitled to relief." *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 512 (2002). Pleadings are to give "fair notice of what the plaintiff's claim is and the grounds upon which it rests" in order to enable the opposing party to answer and prepare for trial, and to identify the nature of the case. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (quoting *Conley v. Gibson*, 335 U.S. 41, 47 (1957), *overruled in part on other grounds by Twombly*, 550 U.S. 554).

In *Twombly*, the Supreme Court clarified this pleading standard, declaring that:

> While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant "set out *in detail* the facts upon which he bases his claim," Rule 8(a)(2) still requires a "showing," rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests.

550 U.S. at 556 n.3 (emphasis in original) (quoting *Conley*, 355 U.S. at 47, and citing 5C, Wright & A. Miller, Federal Practice & Procedure § 1202, at 94, 95 (3d ed. 2004)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570).

Plaintiffs' claims here are clearly sufficient to satisfy the notice pleading requirements of Rule 8. Specifically, the Amended Complaint gives defendants' notice of plaintiffs' claims and sets forth sufficient detailed allegations, as outlined herein, to describe the bases for their claims. Indeed, there is no confusion as to the specific events that allegedly giving rise to plaintiffs' claims, including plaintiffs' resignation from Avalon Gardens, the subsequent retaliatory conduct by the Sentosa defendants, the County defendants' alleged agreement with the Sentosa defendants to maliciously prosecute plaintiffs, and the County defendants' alleged misconduct during their investigation of plaintiffs. Accordingly, the County defendants' motion to dismiss the Amended Complaint under Rule 8 is denied.

c. Municipal Liability

The County defendants move to dismiss the claim of municipal liability against the County of Suffolk on the ground that the Amended Complaint is "void of any . . . facts sufficient to establish that a custom and/or policy of the County caused a violation of plaintiffs' constitutional rights. . . ." (Cnty. Defs. Mem. at 14.) For the reasons set forth below, the Court disagrees and denies their motion to dismiss at this juncture.

Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipal entity may be held liable under Section 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Id.* at 694-95; *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004); *Abreu v. City of New York*, No. 04-CV-1721, 2006 WL 401651, at *4 (E.D.N.Y. Feb. 22, 2006) ("A municipality will not be held liable under Section 1983 unless the

plaintiff can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom officially adopted and promulgated by that [municipality's] officers." (internal quotation marks omitted)). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). Instead, a policy, custom, or practice of the municipal entity may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson*, 375 F.3d at 226 (quoting *Kern*, 93 F.3d at 44). Likewise, a municipality's failure to supervise its officers "can rise to the level of an actionable policy or custom where it amounts to 'deliberate indifference' to the constitutional rights of its citizens." *Hall v. Marshall*, 479 F. Supp. 2d 304, 315-16 (E.D.N.Y. 2007) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) and *Thomas v. Roach*, 165 F.3d 137, 145 (2d Cir. 1999) ("A municipality may be liable under § 1983 . . . where the City's failure to supervise or discipline its officers amounts to a policy of deliberate indifference.")). However, "the mere assertion . . . that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (internal quotation marks omitted).

Furthermore, a municipal entity may only be held liable where the entity itself commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691 (emphasis in original); *see also Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir.

2006) ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." (emphasis in original)); *Zahra*, 48 F.3d at 685 ("A municipality may not be held liable in an action under 42 U.S.C. § 1983 for actions alleged to be unconstitutional by its employees below the policymaking level solely on the basis of *respondeat superior*."); *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that the municipality was, in the language of the statute, the 'person who . . . subjected, or cause[d] [him] to be subjected,' to the deprivation of his constitutional rights, 42 U.S.C. § 1983.").

The Court finds that plaintiffs have alleged sufficient facts to state a plausible claim for municipal liability based upon a failure to supervise.[27] Specifically, plaintiffs allege that District Attorney Spota, acting on behalf of the County of Suffolk, was obligated to supervise his employees at the District Attorney's Office but failed to do so "in that this indictment was procured through improper means and in violation of the constitutional rights of the Plaintiffs." (Am. Compl. ¶¶ 123-24.) Plaintiffs further

_____

[27] The Court notes that, given the many allegations in the Amended Complaint regarding the personal involvement of the District Attorney, municipal liability in this case against the County can also be based upon District Attorney Spota's alleged role as the final policymaker. *See Gronowski v. Spencer*, 424 F.3d 285, 296 (2d Cir. 2005) ("Municipal liability may attach under § 1983 when a [municipal] policymaker takes action that violates an individual's constitutional rights.").

allege that Spota "knew or had reason to know about the improprieties in the investigation," and about the fact that plaintiffs could not constitutionally be tried for their conduct, "but did not take any steps to terminate the prosecution." (*Id.* ¶ 125; *see also id.* ¶¶ 110-11.) In the context of the entire complaint, including allegations that Spota initiated the investigation of plaintiffs only after his meeting with the Sentosa defendants (who had been unable to spur the police to take any action against plaintiffs), the Court finds that these allegations provide "enough facts to state a claim to relief that is plausible on its face" and is, therefore, sufficient to avoid dismissal. *Twombly*, 550 U.S. at 570.[28]

### B. The Sentosa Defendants

As a threshold matter, the Sentosa defendants have moved to dismiss the claims against them in the Amended Complaint on the ground that the Sentosa defendants were not acting "under color of state law" for purposes of § 1983 liability. However, for the reasons set forth below, the Court finds that, with the exception of

___

[28] The Court is aware that a county cannot be liable for the acts of a district attorney related to the decision to prosecute or not prosecute an individual. *See Myers v. Cnty. of Orange*, 157 F.3d 66, 77 (2d Cir. 1998); *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1153-54 (2d Cir. 1995) (finding no municipal liability for actions of ADA unless related to management of office or history of negligence). However, investigatory activity by a DA's office can subject the County to *Monell* liability. *See Myers*, 157 F.3d at 77. Here, as noted above, plaintiffs have alleged misconduct during the investigation of plaintiffs and that Spota was aware of that misconduct but took no action and, consequently, failed to supervise his employees. Construing the Amended Complaint in plaintiffs' favor, these allegations are sufficient at this juncture to survive a motion to dismiss.

defendants O'Connor and Fitzgerald, plaintiffs have alleged sufficient joint action between the Sentosa defendants and the County defendants to survive the Sentosa defendants' motion to dismiss.

Alternatively, the Sentosa defendants argue that plaintiffs have failed to state a claim under § 1983 and state law for malicious prosecution and false arrest. For the reasons set forth below, the Court disagrees, and finds that, except as to defendants O'Connor and Fitzgerald, plaintiffs have provided sufficient factual allegations to plead a claim for both malicious prosecution and false arrest. Accordingly, the motion to dismiss filed by defendants Philipson, Luyun, Rubenstein, Sentosa Care, Prompt, and Avalon Gardens is denied in its entirety. However, as to defendants O'Connor and Fitzgerald, the Court dismisses the claims against them without prejudice for failure to state a claim, and will provide plaintiffs with an opportunity to re-plead.

#### 1. Color of State Law

##### a. Legal Standard

As noted *supra*, in order to prevail on a federal civil rights action under Section 1983, a plaintiff must demonstrate: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). However, even if a plaintiff has adequately alleged a constitutional injury, a Section 1983 claim cannot be successful unless it can be demonstrated that such injury was caused by a party acting under the "color of state law," and thus the central

question is whether the alleged infringement of federal rights is "fairly attributable to the State." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982); *see also Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."); *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) ("A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action.").

It is axiomatic that private citizens and entities are not generally subject to Section 1983 liability. *See Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002); *Reaves v. Dep't of Veterans Affairs*, No. 08-CV-1624 (RJD), 2009 WL 35074, at *3 (E.D.N.Y. Jan. 6, 2009) ("Purely private conduct is not actionable under § 1983, 'no matter how discriminatory or wrongful.'" (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999))). However, as the Second Circuit has explained:

> [T]he actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test').

*Sybalski v. Indep. Gr. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001)); *see also Luciano v. City of New York*, No. 09-CV-0539 (DC), 2009 WL 1953431, at *2 (S.D.N.Y. July 2, 2009) (stating that a private entity may only be considered a state actor for the purposes of § 1983 if the private entity fulfills one of the "state compulsion," "public function" or "close nexus" tests); *accord Faraldo v. Kessler*, No. 08-CV-0261 (SJF), 2008 WL 216608, at *4 (E.D.N.Y. Jan. 23, 2008). In addition, liability under § 1983 may also apply to a private party who "conspires with a state official to violate the plaintiff's constitutional rights . . . ." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 378 (S.D.N.Y. 2005) (report and recommendation), *adopted in relevant part by Fisk v. Letterman*, 401 F. Supp. 2d 362 (S.D.N.Y. 2005). A plaintiff "bears the burden of proof on the state action issue." *Hadges v. Yonkers Racing Corp.*, 918 F.2d 1079, 1083 n.3 (2d Cir. 1990).

In this case, plaintiffs have only put forth allegations related to either "joint action" or a conspiracy between the Sentosa defendants and the County defendants. Under the "joint action" doctrine, a private actor can be found "to act 'under color of' state law for § 1983 purposes . . . [if the private party] is a willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980). "The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the police." *Forbes v. City of New York*, No. 05-CV-7331 (NRB), 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)). "To establish joint action, a plaintiff must show that the private citizen and the state official

shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law." *Bang v. Utopia Restaurant*, 923 F. Supp. 46, 49 (S.D.N.Y. 1996); *see also Burrell v. City of Mattoon*, 378 F.3d 642, 650 (7th Cir. 2004) (under joint action requirement, plaintiff must show that "both public and private actors share a common, unconstitutional goal" (internal quotation marks omitted)). The provision of information to, or the summoning of, police officers is not sufficient to constitute joint action with state actors for purposes of § 1983, even if the information provided is false or results in the officers taking affirmative action. *See Ginsberg*, 189 F.3d at 272 ("Healey's provision of background information to a police officer does not by itself make Healey a joint participant in state action under § 1983 . . . [and] Officer Fitzgerald's active role in attempting to resolve the dispute after Healey requested police assistance in preventing further disturbance also does not, without more, establish that Healey acted under color of law." (internal citations omitted)). Similarly, if a police officer's actions are due to the officer's own initiative, rather than the directive of a private party, the private party will not be deemed a state actor. *See Shapiro v. City of Glen Cove*, 236 F. App'x 645, 647 (2d Cir. 2007) ("[N]o evidence supports Shapiro's contention that Weiss-Horvath acted jointly with the Glen Cove defendants to deprive her of her constitutional rights, and ample evidence shows that the Glen Cove officials who searched her house exercised independent judgment rather than acting at Weiss-Horvath's direction."); *Serbalik v. Gray*, 27 F. Supp. 2d 127, 131-32 (N.D.N.Y.1998) ("[A] private party does not act under color of state law when she merely elicits but does not join in an exercise of official state authority." (quoting *Auster Oil*

*& Gas Inc. v. Stream*, 764 F.2d 381, 388 (5th Cir. 1985))). When the private actor takes a more active role, however, and jointly engages in action with state actors, he will be found to be a state actor. *See, e.g.*, *Lugar*, 457 U.S. at 942 (finding that, when a supplier sought prejudgment attachment of a debtor's property, supplier was a state actor because it "invok[ed] the aid of state officials to take advantage of state-created attachment procedures"); *Dennis*, 449 U.S. at 27-28 (holding that defendants who conspired with and participated in bribery with federal judge acted under color of state law).

Alternatively, to demonstrate that a private party defendant was a state actor engaged in a conspiracy with other state actors under § 1983, a plaintiff must allege: (1) an agreement between the private party and state actors, (2) concerted acts to inflict an unconstitutional injury, and (3) an overt act in furtherance of the goal. *See Carmody v. City of New York*, No. 05-CV-8084 (HB), 2006 WL 1283125, at *5 (S.D.N.Y. May 11, 2006) (citing *Ciambriello*, 292 F.3d at 324-25). Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *See Ciambriello*, 292 F.3d at 325 (dismissing conspiracy allegations where they were found "strictly conclusory"); *see also Robbins v. Cloutier*, 121 F. App'x 423, 425 (2d Cir. 2005) (dismissing a § 1983 conspiracy claim as insufficient where plaintiff merely alleged that defendants "acted in a concerted effort" to agree not to hire plaintiff and to inform others not to hire plaintiff). "A plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy, but the pleadings must present facts tending to show agreement and concerted action." *Fisk*, 401 F. Supp. 2d at 376 (internal citations and quotation marks omitted).

Thus, if a plaintiff has sufficiently pled either the existence of joint activity between the private actor and the state or the existence of a conspiracy between the private actors and the government actors, he will have sufficiently alleged state action by the private party defendants for purposes of § 1983. In other words, although pleading sufficient facts to demonstrate that a conspiracy exists will suffice to establish that a private entity was acting under color of state law, "[t]he formal requirements of a conspiracy . . . are not required to fulfill the joint engagement theory." *Weintraub v. Bd. of Educ. of New York*, 423 F. Supp. 2d 38, 57 (E.D.N.Y. 2006).

### b. Application

In the instant case, the Court concludes that plaintiffs' allegations of conspiracy and joint action between the Sentosa defendants and the County defendants are sufficient to survive a motion to dismiss with respect to all defendants except for O'Connor and Fitzgerald. As to O'Connor and Fitzgerald, the Court finds that plaintiffs have not alleged a sufficient factual basis to support a plausible claim that these two individual defendants were state actors.

When analyzing allegations of state action, the Court must begin "'by identifying the specific conduct of which the plaintiff complains.'" *Tancredi*, 316 F.3d at 312 (quoting *Am. Mfrs. Mut. Ins. Co.*, 526 U.S. at 51). Here, plaintiffs have alleged that the Sentosa defendants (defined in the Amended Complaint to include defendants Philipson, Luyun, Rubinstein, Sentosa Care, and Prompt) and Avalon Gardens conspired with the County defendants, who were state actors, to deprive plaintiffs of their constitutional rights and then acted jointly

with those state actors to effectuate the conspiracy.[29]

[29] The Amended Complaint defines "the Sentosa defendants" to include Philipson, Luyun, Rubinstein, Sentosa Care, and Prompt. (Am. Compl. ¶ 32.) Thus, the Court reads all allegations in the Amended Complaint involving "the Sentosa defendants" to be lodged against these defendants. Defendants respond that, although there may be allegations made against Philipson, Luyun, Rubinstein, Sentosa Care, and Prompt, there are no individual allegations against Avalon Gardens, O'Connor, or Fitzgerald. (Sentosa Mem. at 14.) (In contradiction to their original moving papers, the Sentosa defendants also argue in their supplemental submission that there are no individual allegations made against Rubinstein. However, the Court rejects this argument, given the clear definition in the Amended Complaint that "the Sentosa defendants" includes Rubinstein.) As to Avalon Gardens, plaintiffs allege that Philipson is a principal of Avalon Gardens. (Am. Compl. ¶ 11.) Under the fundamental principles of agency law, "the misconduct of managers within the scope of their employment will normally be imputed to the corporation." *In re CBI Holding Co., Inc.*, 529 F.3d 432, 448 (2d Cir. 2008) (internal quotation marks omitted). "This principle is itself based on the presumption that an agent will normally discharge his duty to disclose to his principal all the material facts coming to his knowledge with reference to the subject of his agency, and thus any misconduct engaged in by a manager is with—at least—his corporation's tacit consent." *Id.* (internal quotation marks and alterations omitted). This presumption may be rebutted by "adverse inference exception," however, which provides a narrow exception pursuant to which "management misconduct will not be imputed to the corporation if the officer acted entirely in his own interests and adversely to the interests of the corporation." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000). Here, at the motion to dismiss stage where all of plaintiffs' allegations are accepted as true and construed in plaintiffs' favor, the Court see no reason why it should not apply

Specifically, plaintiffs claim that, after the Sentosa defendants' initial efforts to retaliate against plaintiffs were unsuccessful (including their attempts to obtain a preliminary injunction against plaintiffs and to have the Education Department and the Police Department take action against plaintiffs), they arranged a meeting with defendant Spota. (Am. Compl. ¶ 60.) This meeting, which was attended by Spota, the Sentosa defendants, and the Sentosa defendants' attorneys, allegedly "was for the purpose of, and had the effect of, pressuring Spota to file an indictment that he would not otherwise have filed, against the plaintiffs, who were simply acting in a manner that they were constitutionally privileged to act." (*Id.* ¶ 64.) In particular, after the meeting, Spota allegedly assigned ADA Lato to the case "for the purpose of gathering evidence and securing an indictment." (*Id.* ¶ 70.) Further, plaintiffs claim that the Sentosa defendants and the County defendants "agreed that the indictment [of plaintiffs] would be procured, in part, through the use of false testimony by the Sentosa Defendants, as well as by the withholding of exculpatory evidence, the existence of which was known to the Sentosa defendants and the [County] Defendants . . . ." (*Id.* ¶ 113.) Pursuant to this alleged agreement,

traditional agency law principles and impute Philipson's alleged misconduct to Avalon Gardens. Thus, the Court will construe all allegations involving "the Sentosa defendants" to be made not only against the above-mentioned defendants (*see* Am. Compl. ¶ 32) but also against Avalon Gardens. However, as to O'Connor and Fitzgerald, the Court finds for the reasons discussed *supra* that plaintiffs have not plead sufficient allegations to support an inference that O'Connor and Fitzgerald were acting under color of state law. Accordingly, the Court dismisses the § 1983 claims against O'Connor and Fitzgerald without prejudice for failure to state a claim, and will provide an opportunity for plaintiffs to re-plead.

Philipson, and possibly other Sentosa employees or principals, allegedly provided false testimony before the Grand Jury, including that nurses had walked off a shift, that shifts were inadequately covered, or that patients were endangered, all of which the Sentosa witnesses allegedly knew was not true. (*Id.* ¶¶ 82, 84-85.) Also pursuant to the agreement, the County defendants allegedly presented such false testimony to the Grand Jury despite knowing that it was not true, (*id.* ¶ 86), and, as a general matter, "agreed to do what was necessary to procure the indictment, for the sole benefit of the Sentosa defendants." (*Id.* ¶ 114.) Moreover, plaintiffs claim that "this prosecution was begun and continued at the behest of the Sentosa defendants," and "had it not been for the influence and/or interference of the Sentosa defendants, Spota would not have initiated the prosecution and/or would have discontinued it when he learned of the impropriety of the indictment." (*Id.* ¶¶ 126-27; *see also id.* ¶ 109 ("[T]he [County] Defendants procured an indictment, and prosecuted an alleged crime, that they would not otherwise have prosecuted, because of the procurement by and pressure from the politically powerful Sentosa Defendants."); *id.* ¶ 69 ("[I]t was at Philipson's instance [sic] that Spota took the unusual step of indicting an attorney for giving advice to his clients.").) Indeed, plaintiffs claim that "[t]he reason for the indictment was to assist the Sentosa Defendants in their quest to punish the Plaintiffs for their part in resigning, and to discourage other nurses employed by Prompt and working at Sentosa facilities from resigning . . . ." (*Id.* ¶ 108.)

Plainly, plaintiffs have alleged that the Sentosa defendants did more than "merely elicit" an exercise of state authority. Instead, plaintiffs have alleged that the Sentosa defendants incited the exercise of state authority by pressuring the County

defendants to take action to satisfy the Sentosa defendants' goals and for the Sentosa defendants' sole benefit, and then joined and participated in the exercise of that authority by agreeing with the County defendants to present false testimony and thereafter giving such false testimony[30] before the Grand Jury.[31]

Defendants[32] are correct that a private party will not be deemed a state actor merely because he communicated with a state actor, reported a crime, or cooperated with state officials. However, plaintiffs' allegations here go beyond mere assertions of "communications" or "cooperation" and instead involve claims that the Sentosa defendants were actively involved in the investigation and prosecution of plaintiffs. In fact, plaintiffs have alleged that, given that plaintiffs could not constitutionally have been prosecuted for their conduct, the County defendants would not have pursued the prosecution of plaintiffs at all but for the pressure and influence of the Sentosa defendants. In other words, despite defendants' argument to the contrary, plaintiffs allege that the County defendants did not exercise independent judgment here, but instead acted at the direction of the Sentosa defendants and substituted the judgment of the Sentosa defendants for their own.[33] In support of their assertion that the County defendants would not have acted but for the direction of the Sentosa defendants, plaintiffs point to significant exculpatory

---

[30] The Sentosa defendants' argument that they should be entitled to witness immunity for their testimony in the Grand Jury is addressed *infra* in Section III.B.2.a.i.

[31] The Court notes that, although plaintiffs' allegations regarding false testimony before the Grand Jury only mention Philipson and other unidentified Sentosa witnesses, (Am. Compl. ¶¶ 82, 84), plaintiffs plainly allege that all of "the Sentosa defendants" met with defendant Spota and entered into an agreement with the County defendants to procure the indictment of plaintiffs through false testimony (*id.* ¶¶ 64, 113-14), and that the County defendants were acting "for the sole benefit of the Sentosa defendants." (*Id.* ¶ 114; *see also id.* ¶¶ 160-65 (describing false information provided by the Sentosa defendants to Spota).) Furthermore, plaintiffs allege that the sole reason for the indictment was to assist "the Sentosa Defendants" in their attempt to retaliate against plaintiffs, and that the prosecution would not have been brought— given the significant exculpatory evidence and the fact that plaintiffs' conduct was constitutionally protected—were it not for pressure from "the Sentosa defendants." (*Id.* ¶¶ 108-09, 126-27.) Thus, for the reasons stated *supra*, the Court finds that, accepting these allegations as true and construing them in plaintiffs' favor for purposes of the motion to dismiss, plaintiffs have plausibly alleged that the Sentosa defendants (as defined in note 29) were acting under color of state law.

[32] The County defendants incorporated by reference in their papers the Sentosa defendants' arguments regarding the insufficiency of plaintiffs' allegations regarding conspiracy and joint action. (*See* County Supp. at 2.)

[33] The Sentosa defendants argue that plaintiffs' assertion that defendant Lato interviewed the nurses and Vinluan indicates that the County defendants "conducted an independent investigation." (Sentosa Mem. at 12.) However, the Court disagrees that this allegation, in light of all the other allegations in the Amended Complaint, would allow the Court to find, as a matter of law, that the Sentosa defendants were not acting under color of state law. The Court again emphasizes that it is faced here with a motion to dismiss—not a motion for summary judgment—and that at this stage of the litigation, plaintiffs need only allege a plausible claim that there was either a conspiracy or other joint action between the Sentosa defendants and the County defendants. As set forth *supra*, plaintiffs' Amended Complaint is sufficient in this regard, and defendants' motion to dismiss must therefore be denied.

evidence that the County defendants allegedly were aware of prior initiating the prosecution of plaintiffs, including evidence regarding the State Education Department's decision exonerating plaintiffs of any wrongdoing, Justice Bucaria's decision denying Sentosa's application for a preliminary injunction due to a failure to prove a likelihood of success on the merits, and information demonstrating that none of the nurse plaintiffs had resigned during a shift. (*Id.* ¶ 72.) Accepting all of these allegations as true and construing them in favor of plaintiffs, the Court finds that these allegations are sufficient, at the motion to dismiss stage, to support an inference that the County defendants were acting under the control and influence of the Sentosa defendants and, as such, that the Sentosa defendants were acting under color of state law. *See Watson*, 2010 WL 3835047, at *8 (plaintiff plausibly alleged that private party was state actor where defendant allegedly met with co-defendant to frame allegations against plaintiff and other co-defendants ignored exculpatory information in order to protect defendant); *Friedman v. N.Y.C. Admin. for Children's Servs.*, No. 04-cv-3077 (ERK), 2005 WL 2436219, at *8 (E.D.N.Y. Sept. 30, 2005) ("[Defendant] Dr. Cohen provided ACS with false and malicious information, leading to the curtailment of plaintiff's substantive due process rights. . . . [A]ssuming the allegations of the complaint to be true, Dr. Cohen was a willing participant in the scheme which [was] set in motion by his false oral and written reports to ACS and caused the initiation of the Neglect Proceeding that resulted in the suspension of plaintiff's parental rights over the course of more than half a year. In order to curry favor with [his girlfriend and her sister, who was plaintiff's ex-wife], Dr. Cohen invoked the aid of the ACS defendants to deny plaintiff his substantive due process rights to

family integrity by using state-created procedures for the investigation of child abuse. Accordingly, . . . at least on this motion to dismiss, plaintiff has sufficiently pled the joint participation of Dr. Cohen and the ACS defendants to justify treating Dr. Cohen as a state actor . . . ."); *Coakley v. Jaffe*, 49 F. Supp. 2d 615, 624 (S.D.N.Y. 1999) ("[P]laintiffs allege[d] that defendants . . . wilfully caused defendant Driscoll, an Assistant District Attorney, to violate plaintiffs' rights by manipulating the evidence presented to the Grand Jury. Drawing every reasonable inference in favor of the plaintiffs, the Court concludes that the plaintiffs have, at least for present purposes, sufficiently pled the existence of joint action that warrants treating defendants . . . as state actors for purposes of assessing plaintiffs' federal false arrest claim."). *Cf. Alexis v. McDonald's Rest. of Mass., Inc.*, 67 F.3d 341, 345, 352 (1st Cir. 1995) (restaurant manager was not a state actor, although manager told police she "would like [an unruly customer] to leave" and officer thereafter forcibly removed customer from restaurant, because there was no evidence that the officer substituted the manager's judgment for his own); *Fisk*, 401 F. Supp. 2d at 377 ("[A] private party who calls the police for assistance does not become a state actor unless the police were influenced in their choice of procedure or were under the control of a private party.").[34]

_____

[34] The Court notes that the fact that the County defendants' are immune for some of this conduct does not change the Court's conclusion that plaintiffs have sufficiently alleged, for present purposes, that the Sentosa defendants were acting under color of state law. *See Coakley*, 49 F. Supp. 2d at 624 ("'[P]rivate persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 [claims],' even if the state actor himself is immune from liability." (quoting *Dennis*, 449 U.S. at 27-28)).

However, the Court finds that the allegations with respect to defendants O'Connor and Fitzgerald are not sufficient and cannot survive a motion to dismiss. Specifically, the only allegations against O'Connor are that she filed complaints against plaintiffs with the New York State Education Department and the Suffolk County Police Department. (Am. Compl. ¶¶ 54, 59.) Similarly, the only complaint against Fitzgerald is that she filed the complaint, along with O'Connor, with the Education Department. (*Id.* ¶ 54.) Both of these actions are alleged to have occurred prior to the formation of the conspiracy, which allegedly began when the Sentosa defendants had their meeting with District Attorney Spota. (*Id.* ¶ 136 ("The overt acts in furtherance of this conspiracy include the events described above in paragraphs 69-86 hereof, beginning with the meeting among Spota and the Sentosa Defendants . . . .").) As noted *supra*, merely reporting suspected criminal activity to law enforcement or other government officials is not sufficient to render a private party a "state actor" for purposes of § 1983 liability. Accordingly, in the absence of any allegations that O'Connor or Fitzgerald were more directly involved in the investigation and prosecution of plaintiffs or took any steps in furtherance of the alleged conspiracy, the § 1983 claims against O'Connor and Fitzgerald are dismissed without prejudice for failure to state a claim, and the Court will provide plaintiffs with an opportunity to re-plead these claims.

### 2. Failure to State a Claim

The Sentosa defendants also argue that plaintiffs' malicious prosecution and false arrest claims must be dismissed for failure to state a claim.[35] For the reasons set forth

---

35 As a threshold matter, as noted *supra*, plaintiffs have asserted a § 1983 claim for

deprivation of their Fourteenth Amendment "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity." *Zahrey*, 221 F.3d at 349. However, the Fourth Amendment, rather than the Fourteenth Amendment, provides the source of constitutional liberty rights upon which a § 1983 malicious prosecution or false arrest claim can be based. See *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997); *Mayer v. City of New Rochelle*, No. 01 Civ. 4443(MBM), 2003 WL 21222515, at *8 (S.D.N.Y. May 27, 2003) (holding that a section 1983 claim of malicious prosecution without probable cause may not be based upon a denial of due process rights, but only upon denial of Fourth Amendment rights). Here, plaintiffs have not cited to the Fourth Amendment in their Amended Complaint. Nevertheless, insofar as defendants have addressed plaintiffs' malicious prosecution and false arrest claims on the merits as Fourth Amendment claims, and given that plaintiffs' have plainly asserted that these claims are based upon a deprivation of their liberty rights, the Court will construe these claims as alleging Fourth Amendment violations. See *Watson* 2010 WL 3835047, at *5 n.1 ("[A]lthough Plaintiff characterizes his malicious prosecution claims as violations of the Fourteenth Amendment Due Process Clause, such claims are cognizable only under the Fourth Amendment's guarantees against unlawful seizure . . . . [However,] [c]onsidering that Defendants address Plaintiff's malicious prosecution claims on the merits as Fourth Amendment claims, the Court is willing . . . to construe [Plaintiff's] claims as alleging Fourth Amendment violations."); *accord Landon v. Cnty. of Orange*, No. 08-cv-8048, 2009 WL 2191335, at *4 (S.D.N.Y. July 23, 2009) (construing complaint as asserting a malicious prosecution claim under the Fourth Amendment where plaintiff alleged that defendants violated his "liberty interests and Fourteenth Amendment right to due process of law"). Again, as noted *supra*, the reason that the malicious prosecution and false arrest claims do not also exist against the County defendants is that the County

below, the Court finds that plaintiffs have pled sufficient allegations to state a claim for both of these causes of actions and, accordingly, the motion to dismiss these claims is denied.

### a. Malicious Prosecution

"Claims for . . . malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for . . . malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (citations omitted)). "Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 U.S.C. § 1988 to turn to state law . . . for such rules." *Alicea v. City of New York*, No. 04-CV-1243 (RMB), 2005 WL 3071274, at *6 (S.D.N.Y. Nov. 15, 2005) (internal quotation marks omitted)). "A malicious prosecution claim under New York law requires the plaintiff to prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Jocks*, 316 F.3d at 136 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)). Moreover, in addition to the state law elements of malicious prosecution, "to sustain a § 1983 malicious prosecution claim, there must be a seizure or other 'perversion of proper legal procedures' implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." *Washington v. Cnty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004)

(quoting *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 117 (2d Cir. 1995)).

The Sentosa defendants argue that plaintiffs have failed to plead sufficient facts regarding the first three elements of their malicious prosecution claim. The Court will address each of these arguments in turn.

### i. Initiation

"Initiation" in the context of a malicious prosecution claim "is a term of art." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000). As with the state actor analysis, a person who merely reports to law enforcement that a crime has been committed has not "initiated" a prosecution and, thus, will not be exposed to liability for malicious prosecution. *Id.* Instead, "in order for an individual to 'initiate' a prosecution for these purposes . . . [']it must be shown that [the] defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Id.* (quoting *DeFilippo v. Cnty. of Nassau*, 583 N.Y.S.2d 283, 284 (App. Div. 1992)); *see also Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010) ("A jury may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared an alleged false confession and forwarded it to prosecutors." (internal quotation marks and alterations omitted)). Thus, for example, "[a] defendant may be said to commence or continue a prosecution if that defendant knowingly provides false information or fabricated evidence that is likely to influence the prosecutors or the grand jury." *Watson*, 2010 WL 3835047, at *5.

In this case, as explained in detail *supra*, plaintiffs have alleged that the Sentosa

_____

defendants are absolutely immune from liability for these claims.

defendants[36] not only met with the District Attorney's Office to report a complaint about plaintiffs (Am. Compl. ¶ 64), but also pressured the DA's Office to file charges (*id.* ¶¶ 69, 109, 126-27), provided knowingly false information and testimony (*id.* ¶¶ 82, 84, 113, 160-64), and conspired and agreed with the County defendants to procure the indictment of plaintiffs through false testimony and the withholding of exculpatory information. (*Id.* ¶¶ 86, 113-14.) Indeed, plaintiffs allege that the Sentosa and County defendants knew that plaintiffs had not committed any crime, and that the sole reason for the prosecution was to benefit the Sentosa defendants and assist them "in their quest to punish" plaintiffs. (*Id.* ¶¶ 86, 108, 114.) In fact, plaintiffs claim that the County defendants would never have initiated the prosecution of plaintiffs, or at least would have abandoned the prosecution once the improprieties in the investigation became clear, were it not for the pressure and influence of the Sentosa defendants. (*Id.* ¶¶ 109, 127.)[37]

The Sentosa defendants claim that, even if they "brought Plaintiffs' conduct to the attention" of the County defendants, the independent decision of the DA's office to prosecute plaintiffs and the fact that the Grand Jury returned an indictment were "intervening acts" that severed the chain of causation between the Sentosa defendants' conduct and the prosecution of plaintiffs. (Sentosa Mem. at 17-18.) However, given the allegations cited *supra*, the Court finds that, at the motion to dismiss stage, the Sentosa defendants cannot hide behind the decision of the DA to prosecute and the subsequent indictment of plaintiffs when it was the Sentosa defendants who allegedly spurred the County defendants to act and fed them with false testimony in pursuit of that endeavour. *See, e.g.*, *Zahrey*, 221 F.3d at 352 ("[I]t is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty."); *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.

---

[36] As noted *supra* in note 29, for purposes of the malicious prosecution claim, the Sentosa defendants are defined to include Philipson, Luyun, Rubenstein, Sentosa Care, and Prompt (Am. Compl. ¶ 32), as well as defendant Avalon Gardens. As to defendants O'Connor and Fitzgerald, the Court construes the malicious prosecution claim against them as arising only under state law, given that neither O'Connor nor Fitzgerald can be deemed state actors for purposes of § 1983 based upon the current allegations in the Amended Complaint. However, there are no allegations that O'Connor or Fitzgerald did anything other than report plaintiffs' activities to the New York State Education Department and the Suffolk County Police Department. (*Id.* ¶¶ 54, 59.) Such activity does not constitute initiation of a prosecution under state law, and, accordingly, the state-law malicious prosecution claim against O'Connor and Fitzgerald is dismissed without prejudice for failure to plead initiation.

[37] The Court notes that, while the County defendants may be shielded from liability for some of this conduct, insofar as it involves quintessentially prosecutorial functions, the Sentosa defendants (who are not prosecutors) would not share in this protection under the absolute immunity doctrine. *Cf. Hartman*, 547 U.S. at 261-62 ("[An] action for retaliatory prosecution will not be brought against the prosecutor, who is absolutely immune from liability for the decision to prosecute. Instead, the defendant will be a nonprosecutor, an official . . . who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute." (internal citation omitted)).

1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision."); *Adonis v. Coleman*, No. 08-cv-1726 (MGC), 2009 WL 3030197, at *5 (S.D.N.Y. Sept. 23, 2009) ("[T]he public prosecutor's role in a criminal prosecution will not necessarily shield a complaining witness from subsequent civil liability where the witness's testimony is knowingly and maliciously false."). Thus, the Court finds that plaintiffs have put forth sufficient allegations to support an inference that the Sentosa defendants initiated the prosecution of plaintiffs. *See Watson*, 2010 WL 3835047, at *9 (where plaintiff alleged that defendant provided false information to prosecutors about plaintiff and fabricated information in order to cover up her own involvement, plaintiff had sufficiently alleged initiation of prosecution).

Furthermore, the Court notes that this conclusion also precludes a finding at this stage of the litigation that the Sentosa defendants are entitled to witness immunity as a matter of law. As an initial matter, defendants are correct that, standing alone, an allegation that the Sentosa defendants gave perjured testimony would not be sufficient to render the Sentosa defendants liable under § 1983.[38] *See Sykes*, 13 F.3d at

519 ("In *Briscoe*, the Supreme Court answered in the negative the question 'whether 42 U.S.C. § 1983 authorizes a convicted person to assert a claim for damages against a police officer for giving perjured testimony at his criminal trial.'" (quoting *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983))); *San Filippo v. U.S. Trust Co. of New York, Inc.*, 737 F.2d 246, 254 (2d Cir. 1984) (extending "*Briscoe* grants" of immunity for perjurious trial testimony to also cover perjured grand jury testimony). However, witness immunity is lost when the witness acts as a "complaining witness"— that is, when the witnesses' role was not limited to merely providing testimony, but instead involved initiating the prosecution such that the witness can be deemed to have commenced or continued the proceedings against the plaintiff within the meaning of malicious prosecution law. *See White v. Frank*, 855 F.2d 956, 958-59 (2d Cir. 1988) ("[There is a] subtle but crucial distinction between two categories of witnesses with respect to their immunity for false testimony. Those whose role was limited to providing testimony enjoyed immunity; those who played a role in initiating a prosecution—complaining witnesses—did not enjoy immunity."); *Cipolla v. Rensselaer*, 129 F. Supp. 2d 436, 451 (N.D.N.Y. 2001) ("The question of whether a witness is a complaining witness is a factual one, resting on the determination of whether the witness played such a role in initiating the proceedings that it can be said the witness commenced or continued proceedings against the plaintiff within the meaning of the law of malicious prosecution." (internal citations and quotation marks omitted)); *see also Mejia v. City of New York*, 119 F. Supp. 2d 232, 272 (E.D.N.Y. 2000) ("Whether a witness is a

---

[38] The Court notes that the Sentosa defendants raised this argument in connection with their argument that they should not be considered state actors. However, since the determination of whether a witness will be immune from liability for his testimony hinges upon a determination of whether that witness can be deemed to have "initiated" a prosecution under malicious prosecution law, the Court finds that it is more appropriate to address the witness

immunity issue in this section rather than in the prior section.

complaining witness a fact-based question that coincides with the determination of whether the witness played such a role in initiating the proceedings that it can be said the witness commenced or continued proceedings against the plaintiff within the meaning of the law of malicious prosecution."). In this case, as explained *supra*, plaintiffs have alleged sufficient facts to support an inference that the Sentosa defendants "initiated" the prosecution against plaintiffs for purposes of plaintiffs' malicious prosecution claim. Accordingly, the Court cannot grant the Sentosa defendants witness immunity as a matter of law at this juncture. *See Coggins v. Cnty. of Nassau*, No. 07-cv-3624 (JFB) (AKT), 2008 WL 2522501, at *8-9 (E.D.N.Y. June 20, 2008) (Court could not determine as a matter of law whether defendant acted as a complaining witness where plaintiff alleged that, *inter alia*, defendants "actively instigated and encouraged the prosecution of plaintiff," "'ordered and directed' plaintiff's arrest and detention," and "withheld information which would have exonerated Plaintiff").

ii. Termination in Favor

New York law does not require a malicious prosecution plaintiff to prove his innocence, or even that the termination of the criminal proceeding was indicative of innocence. Instead, the plaintiff's burden is to demonstrate a final termination that is not inconsistent with innocence. *See, e.g.*, *Cantalino v. Danner*, 754 N.E.2d 164, 168 (N.Y. 2001) ("[T]he question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused."). Under certain circumstances, a dismissal is considered to be a termination in a plaintiff's favor. For example, "the state's effective abandonment of a prosecution, [resulting] in a dismissal for violation of the accused's speedy trial

rights, without an adjudication of his guilt or innocence, constitute[s] a favorable termination." *Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002) (citing *Murphy*, 118 F.3d at 949-50); *see also Smith-Hunter v. Harvey*, 734 N.E.2d 750, 755 (N.Y. 2000) (noting that a dismissal under New York Criminal Procedure Law § 30.30, based on New York's speedy trial statute, that is "sought and granted as a matter of statutory right based on the prosecutor's inaction" is a favorable termination in the absence of circumstances inconsistent with innocence).

The Second Circuit has identified certain types of dispositions that will not constitute a favorable termination, including: "dismissals for lack of subject matter jurisdiction, dismissals . . . for failure to allege sufficient facts to support the charge, . . . adjournment[s] in contemplation of dismissal, . . . [and] dismissals by the prosecution 'in the interests of justice.'" *Murphy*, 118 F.3d at 948-49 (internal citations and quotation marks omitted). As a general matter, "[d]ismissals that have been found to be inconsistent with innocence . . . fall into three categories: (1) misconduct on the part of the accused in preventing the trial from going forward, (2) charges dismissed or withdrawn pursuant to a compromise with the accused, and (3) charges dismissed or withdrawn out of mercy requested or accepted by the accused." *Armatas v. Maroulleti*, No. 08-cv-310 (SJF) (RER), 2010 WL 4340437, at *13 (E.D.N.Y. Oct. 19, 2010) (internal citations omitted). However, "abandonment [of a prosecution] brought about by the accused's assertion of a constitutional or other privilege, . . . such as the right to a speedy trial, does not fall within these categories, for the accused should not be required to relinquish such a privilege in order to vindicate his right to be free from malicious prosecution." *Murphy*, 118 F.3d at 949. Finally, a termination will be deemed favorable only when "there can

be no further proceeding upon the complaint or indictment, and no further prosecution of the alleged offense." *Smith-Hunter*, 734 N.E.2d at 753 (internal quotation marks omitted).

As a threshold matter, defendants do not dispute that, as a result of the Appellate Division's ruling, the prosecution of plaintiffs was final for purposes of the malicious prosecution claim. (*See* Sentosa Mem. at 19 (acknowledging dismissal of indictment and resulting "permanent stay" of proceedings against plaintiffs).) Instead, the Sentosa defendants contend that the issuance of the writ of prohibition was not an "acquittal" or a determination on the merits of plaintiffs' case and, as such, should not be considered a termination in plaintiffs' favor. However, for the reasons set forth below, the Court disagrees.

First, the New York Court of Appeals has explicitly rejected the notion that a plaintiff "must demonstrate innocence in order to satisfy the favorable termination prong on the malicious prosecution action." *Smith-Hunter*, 734 N.E.2d at 755 (plaintiff need not demonstrate innocence where prosecution was abandoned for lack of merit and charges were dismissed on statutory speedy-trial grounds). Instead, all that is required is that the plaintiff show the disposition was not "inconsistent with innocence." *Id.* Accordingly, defendants' assertion that plaintiffs' claim fails solely because the Appellate Division's decision was not formally an "acquittal" that "reached the merits of the case," (Sentosa Mem. at 19) is simply an incorrect statement of the applicable law in this field.

Moreover, the termination of plaintiffs' prosecution clearly was "brought about by [plaintiffs'] assertion of a constitutional . . . privilege," which brings plaintiffs' claim within the ambit of the favorable termination

doctrine. *Murphy*, 118 F.3d at 949 ("An abandonment brought about by the accused's assertion of a constitutional or other privilege . . . such as the right to a speedy trial, does not fall within these categories [of cases that do not constitute favorable terminations] . . . ."). Indeed, this case is clearly distinguishable from other cases in which a termination was found to not be in the accused's favor. Here, plaintiffs' prosecution was not dismissed because of a procedural flaw or because of misconduct on the part of plaintiffs that prevented the case from proceeding to trial. Instead, the prosecution was prohibited because it was based upon the exercise of plaintiffs' constitutional rights and, thus, "threatened [plaintiffs] with prosecution for crimes for which they cannot constitutionally be tried." *Vinluan*, 873 N.Y.S.2d at 83. Under these circumstances, the Court finds the reasoning of the New York Court of Appeals in *Smith-Hunter*, 734 N.E.2d 750, to be persuasive. In that case, the charges against the plaintiff were dismissed on statutory speedy-trial grounds pursuant to New York Criminal Procedure Law Section 30.30. Although this dismissal did not, on its face, indicate the plaintiff's innocence, the Court of Appeals held that the termination was in plaintiff's favor:

> [R]equiring that a plaintiff demonstrate innocence after a prosecution has been dismissed on speedy trial grounds would have the anomalous effect of barring recovery for an innocent accused whose prosecution was abandoned for lack of merit. Moreover, an individual improperly charged with a criminal offense would be compelled to waive speedy trial rights in order to preserve a civil remedy. The law should not require one who is falsely and maliciously accused to proceed to trial—incurring additional

financial and emotion costs—as a prerequisite to recovery for malicious prosecution.

*Id.* at 755. Similarly, given the Appellate Division's decision, there is no doubt here that plaintiffs were "improperly charged with a criminal offense." Under these circumstances, the Court finds that requiring plaintiffs to demonstrate their innocence of crimes for which they could not constitutionally be tried would have the "anomalous effect" of barring plaintiffs' recovery even though their prosecution was prohibited on constitutional grounds. The Court agrees with the New York Court of Appeals that plaintiffs should not be required to waive their constitutional rights and proceed to trial on charges for which they cannot constitutionally be tried for the sole purpose of preserving their civil remedies. *See also Murphy*, 118 F.3d at 949 ("[T]he accused should not be required to relinquish [a constitutional or other] privilege in order to vindicate his right to be free from malicious prosecution.").

Furthermore, the disposition of plaintiffs' criminal case is not inconsistent with a finding of plaintiffs' innocence. To the contrary, the court noted that the nurses did not abandon their posts in the middle of their shifts, but instead resigned after the completion of their shifts. *Vinluan*, 873 N.Y.S.2d at 81. Thus, although the nurses' resignation may have made it difficult for Sentosa to find skilled replacement nurses in a timely fashion, it was "undisputed that coverage was indeed obtained, and no facts suggesting an imminent threat to the well-being of the children [were] alleged." *Id.* at 82. Moreover, not only did the Appellate Division find that plaintiffs' conduct was constitutionally protected, but it also noted that while "the relevant Penal Law sections underlying these prosecutions proscribe the creation of risk to children and the

physically disabled[,] [u]nder the facts as presented herein, the greatest risk created by the resignation of these nurses was to the financial health of Sentosa." *Id.* Accordingly, insofar as plaintiffs' prosecution was terminated in order to vindicate plaintiffs' constitutional rights and in a manner that was not inconsistent with plaintiffs' innocence, the Court finds that the prosecution terminated in plaintiffs' favor for purposes of their malicious prosecution claim.

### iii. Probable Cause

The Sentosa defendants argue that the Grand Jury indictment returned against plaintiffs creates a presumption of probable cause that defeats plaintiffs' malicious prosecution claim. As explained *supra*, however, plaintiffs have presented sufficient evidence, at the motion to dismiss stage, to overcome the presumption of probable cause that the indictment would otherwise create.

In response, the Sentosa defendants contend that, because it was ADA Lato who made the presentation of evidence to the Grand Jury, any allegations of bad faith conduct should pertain only to him and should not preclude a finding of probable cause as to the Sentosa defendants. (Sentosa Reply at 8-9.) This argument is unpersuasive. As exhaustively described *supra*, plaintiffs have alleged that the Sentosa defendants agreed with the County defendants to procure the indictment of plaintiffs by false testimony and, furthermore, that the prosecution of plaintiffs would never have occurred were it not for pressure from the Sentosa defendants. Thus, despite the Sentosa defendants' arguments to the contrary, the allegations of bad faith here do not relate solely to defendant Lato and the County defendants. Accordingly, construing the allegations in the Amended Complaint in

plaintiffs' favor, the Court finds that it cannot rely on the indictment to infer probable cause and, thus, rejects the Sentosa defendants argument that plaintiffs cannot pursue their malicious prosecution claim solely because of the Grand Jury indictment.

\* \* \*

Accordingly, the Sentosa defendants' motion to dismiss plaintiffs' malicious prosecution claim for failure to state a claim is denied.

### d. False Arrest

In New York, the claim colloquially known as "false arrest" is a variant of the tort of false imprisonment, and courts use that tort to analyze an alleged Fourth Amendment violation in the Section 1983 context. See *Singer*, 63 F.3d at 118. To prevail, a plaintiff must prove four elements: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not contest the confinement, and (4) the confinement was not otherwise privileged." *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975).

In the instant case, the Sentosa defendants challenge the sufficiency of plaintiffs' allegations regarding the first element (intent to confine) and the last element (that the confinement was privileged). For the reasons set forth below, the Court finds that plaintiffs have set forth sufficient allegations regarding both of these elements and, accordingly, the Sentosa defendants' motion to dismiss this claim is denied, except as to defendants O'Connor and Fitzgerald.

#### i. Intent to Confine

The Second Circuit has explained that "[t]o hold a defendant liable as one who affirmatively instigated or procured an arrest, a plaintiff must show that the defendant or its employees did more than merely provide information to the police." *King v. Crossland Sav. Bank*, 111 F.3d 251, 257 (2d Cir. 1997). Merely identifying a potential culprit or erroneously reporting a suspected crime, without any other action to instigate the arrest, is not enough to warrant liability for false arrest. *Id.* Instead, "a successful false arrest claim requires allegations that the private defendant 'affirmatively induced or importuned the officer to arrest . . . .'" *Delince v. City of New York*, No. 10 Civ. 4323 (PKC), 2011 WL 666347, at \*4 (S.D.N.Y. Feb. 7, 2011) (quoting *LoFaso v. City of New York*, 886 N.Y.S.2d 385, 387 (App. Div. 2009)). Thus, where an individual instigates an arrest and does so based on knowingly false information, that individual may be held liable for false arrest. *Weintraub*, 423 F. Supp. 2d at 56 ("Contrary to defendants' argument, even where there is no claim that a defendant actually restrained or confined a plaintiff, a claim of false arrest or false imprisonment may lie where a plaintiff can 'show that . . . defendants instigated his arrest, thereby making the police . . . agents in accomplishing their intent to confine the plaintiff.'" (quoting *Carrington v. City of New York*, 607 N.Y.S.2d 721, 722 (App. Div. 1994))).

Here, as already described in detail, plaintiffs have alleged that the Sentosa defendants (*i.e.*, Philipson, Luyun, Rubenstein, Sentosa Care, Prompt, and Avalon Gardens), instigated the District Attorney's Office to indict plaintiffs (which led to plaintiffs' arrest) and provided knowingly false testimony in order to procure plaintiffs' indictment. Again, as explained *supra*, plaintiffs have alleged that the Sentosa defendants entered into an agreement with the County defendants to procure plaintiffs' indictment through false testimony and withholding exculpatory

evidence (Am. Compl. ¶ 113) and that the County defendants substituted the Sentosa defendants' judgment for their own. (*Id.* ¶¶ 69, 109, 114, 127.) Construing the allegations in the Amended Complaint in plaintiffs' favor, the Court finds that plaintiffs have provided sufficient allegations regarding the Sentosa defendants' intent to confine plaintiffs to survive a motion to dismiss.[39]

### ii. Privileged Confinement

The Sentosa defendants' sole argument with respect to this element is that plaintiffs' confinement was privileged as a matter of law because plaintiffs' arrest, according to defendants, was made pursuant to an arrest warrant issued after an indictment. As an initial matter, defendants are correct that "[w]here an arrest is effected pursuant to an arrest warrant, a presumption of probable cause is created." *Mason v. Vill. of Babylon, N.Y.*, 124 F. Supp. 2d 807, 815 (E.D.N.Y. 2000). A plaintiff who seeks to overcome this burden "faces a heavy burden" and "must make a 'substantial preliminary showing' that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was 'necessary to the finding of probable cause.'" *Golino v. City of New Haven*, 950 F.2d 864, 870-71 (2d Cir. 1991)

---

[39] However, as with the malicious prosecution claim, the only allegations regarding O'Connor and Fitzgerald involve their reports to the Education Department and Police Department. As noted *supra*, even if these reports were erroneous, they are not sufficient to render O'Connor and Fitzgerald liable for false arrest under state law. Thus, the Court dismisses the state-law false arrest claim against O'Connor and Fitzgerald without prejudice for failure to state a claim.

(quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)).

However, the Court need not reach this issue because, based upon the pleadings, it is not clear that plaintiffs were, in fact, arrested pursuant to an arrest warrant as defendants claim. In support of their argument that plaintiffs must have been arrested pursuant to a warrant, the Sentosa defendants point to New York Criminal Procedure Law Section 210.10, which provides, in part:

> If the defendant has not previously been held by a local criminal court for the action of the grand jury and the filing of the indictment constituted the commencement of the criminal action, the superior court must order the indictment to be filed as a sealed instrument until the defendant is produced or appears for arraignment, and must issue a superior court warrant of arrest.

N.Y. C.P.L. § 210.10(3). Taken in isolation, this provision would appear to support defendants' argument. However, the Sentosa defendants ignore the following provisions of this section, which state:

> Upon the request of the district attorney, *in lieu of a superior court warrant of arrest*, the court may issue a summons if it is satisfied that the defendant will respond thereto. Upon the request of the district attorney, *in lieu of a warrant of arrest or summons*, the court may instead authorize the district attorney to direct the defendant to appear for arraignment on a designated date if it is satisfied that the defendant will so appear.

*Id.* (emphasis added). Accordingly, based upon the plain language of the statute upon

which defendants rely, the mere fact that plaintiffs were indicted does not mean that they were arrested pursuant to an arrest warrant. Indeed, plaintiffs argue in their opposition papers that no arrest warrant was ever issued for plaintiffs. (Pls.' Opp. at 38.) Thus, construing the pleadings in the light most favorable to plaintiffs, the Court cannot conclude as a matter of law at this juncture that plaintiffs' arrest was privileged solely for purposes of their false arrest claim.

Furthermore, to the extent the Sentosa defendants are seeking to rely upon the existence of the indictment to establish a presumption of probable cause, the Court notes that, as discussed *supra*, plaintiffs have put forth sufficient allegations here to overcome the presumption of probable cause that might otherwise attach to the indictment.

\* \* \*

Accordingly, the Sentosa defendants' motion to dismiss the false arrest claim is denied.

### C. Conspiracy[40]

As noted *supra*, "[i]n order to survive a motion to dismiss on a § 1983 conspiracy

claim, the plaintiff must allege (1) an agreement between two or more state actors, (2) concerted acts to inflict an unconstitutional injury, and (3) an overt act in furtherance of the goal." *Carmody*, 2006 U.S. Dist. LEXIS 25308, at *16 (citing *Ciambriello*, 292 F.3d at 324-35). Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *See Ciambriello*, 292 F.3d at 325 (dismissing conspiracy allegations where they were found "strictly conclusory"); *see also Robbins*, 121 F. App'x at 425 (dismissing a Section 1983 conspiracy claim as insufficient where plaintiff merely alleged that defendants "acted in a concerted effort" to agree "not to hire [p]laintiff and to inform others not to hire plaintiff"). "A plaintiff is not required to list the place and date of defendant[']s meetings and the summary of their conversations when he pleads conspiracy, . . . but the pleadings must present facts tending to show agreement and concerted action." *Fisk*, 401 F. Supp. 2d at 376 (internal citations and quotations omitted).

As already described in detail *supra*, the Court finds that plaintiffs have sufficiently alleged the elements of a Section 1983 conspiracy. In particular, plaintiffs have alleged that the Sentosa defendants met with defendant Spota and entered into an agreement with the County defendants to procure the indictment of plaintiffs through false testimony (*id.* ¶¶ 64, 113-14). Plaintiffs further claim that the County defendants were acting "for the sole benefit of the Sentosa defendants," (*id.* ¶ 114), and that the only reason for the indictment was "to assist the Sentosa Defendants in their quest to punish the Plaintiffs" and to discourage other nurses from resigning. (*Id.* ¶ 109.) Moreover, plaintiffs allege that the prosecution would not have been brought— given the significant exculpatory evidence and the fact that plaintiffs' conduct was

---

[40] Although defendants subsumed their arguments regarding the insufficiency of plaintiffs' conspiracy claims within their arguments regarding the Sentosa defendants' status as state actors, the Court construes their motion papers as raising a separate argument that the conspiracy claims should be dismissed for failure to state a claim. The County defendants also incorporated the Sentosa defendants' arguments regarding the insufficiency of the conspiracy claims into their moving papers, so the Court also construes the motion to dismiss this claim as being raised jointly by both sets of defendants.

constitutionally protected—were it not for pressure from the Sentosa defendants. (*Id.* ¶¶ 108-09, 126-27.) At this stage of the litigation, plaintiffs have alleged more than enough facts to survive the minimal requirements for surviving a motion to dismiss on their § 1983 conspiracy claim. *See Twombly*, 550 U.S. at 563 ("[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."). Thus, defendants' motion to dismiss the conspiracy claim is denied.[41]

## IV. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motions to dismiss. Specifically, as to the County defendants, the Court concludes: (1) the individual County defendants are entitled to absolute immunity for conduct taken in their role as advocates in connection with the presentation of the case to the Grand Jury; (2) the individual County defendants are not entitled to absolute immunity for alleged misconduct during the investigation of plaintiffs, and the Court cannot determine at the motion to dismiss stage, given the allegations in the Amended Complaint, whether the individual County defendants are entitled to qualified

immunity for their actions in the investigation phase; (3) plaintiffs have sufficiently pled § 1983 claims against the individual County defendants for alleged Due Process violations in the investigative stage; and (4) plaintiffs have sufficient pled a claim for municipal liability against the County of Suffolk. As to the defendants Philipson, Luyun, Rubenstein, Sentosa Care, Prompt, and Avalon Gardens, the Court concludes: (1) plaintiffs have sufficiently alleged that they were acting under color of state law, and (2) plaintiffs have sufficiently pled claims for malicious prosecution and false arrest under both § 1983 and state law, as well as a § 1983 conspiracy claim. As to defendants O'Connor and Fitzgerald, the Court dismisses the claims against them without prejudice for: (1) failure to plead that they were acting under color of state law, and (2) failing to satisfy the elements of the state-law malicious prosecution and false arrest claims as to these two individual defendants. Finally, as to the § 1983 conspiracy claim against all defendants, the Court finds that plaintiffs have sufficiently pled a claim against all defendants except O'Connor and Fitzgerald, who, as noted *supra*, were not alleged to have been acting under color of state law for purposes of the § 1983 claims.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Date: March 31, 2011
      Central Islip, NY
                * * *

Plaintiffs are represented by James Druker of Kase & Druker, Esqs., 1325 Franklin Avenue, Suite 225, Garden City, NY 11530. Plaintiff Vinluan is also represented by Oscar Michelen of Cuomo LLC, 200 Old

---

[41] The Court notes that plaintiffs have also alleged a cause of action for conspiracy against the Sentosa defendants only. (*See* Am. Compl. ¶¶ 152-72.) Plaintiffs have not stated what statute this claim arises under, or how this claim is different from their conspiracy claim against the County defendants and the Sentosa defendants jointly. Indeed, the allegations that this additional conspiracy claim is based on appear to be the same allegations upon which the § 1983 conspiracy is based. Accordingly, the Court treats this additional conspiracy claim as duplicative of the § 1983 conspiracy claim and, thus, need not address whether it, too, states a claim.

Country Road, Suite 2 South, Mineola, NY 11501. The County defendants are represented by Brian C. Mitchell, Suffolk County Department of Law, County Attorney, 100 Veterans Memorial Highway, P.O. Box 6100, Hauppauge, NY 11788. The Sentosa defendants are represented by Sarah C. Lichtenstein of Abrams, Fensterman, Fensterman, Flowers, Greenberg & Eisman, 1111 Marcus Avenue, Suite 107, Lake Success, NY 11042.