**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
JULIET ANILAO, HARRIET AVILA, MARK
DELA CRUZ, CLAUDINE GAMAIO, ELMER
JACINTO, JENNIFER LAMPA, RIZZA
MAULION, JAMES MILLENA, THERESA
RAMOS, RANIER SICHON and
FELIX Q. VINLUAN,

           Plaintiffs,

        - against -

THOMAS J. SPOTA, III, Individually and as District
Attorney of Suffolk County, OFFICE OF THE
DISTRICT ATTORNEY OF SUFFOLK COUNTY,
LEONARD LATO, Individually and as an
Assistant District Attorney of Suffolk County,
COUNTY OF SUFFOLK, SENTOSA CARE, LLC,
AVALON GARDENS REHABILITATION AND
HEALTH CARE CENTER, PROMPT NURSING
EMPLOYMENT AGENCY, LLC., FRANCRIS
LUYUN, BENT PHILIPSON; BERISH
RUBINSTEN, SUSAN O'CONNOR, and
NANCY FITZGERALD,

           Defendants.
-----------------------------------------------------------X

**MEMORANDUM**
**AND ORDER**

CV 10-32 (JFB) (AKT)

        :

## I.   PRELIMINARY STATEMENT

Plaintiffs Juliet Anilao, Harriet Avila, Mark Dela Cruz, Claudine Gamaio, Elmer Jacinto,

Jennifer Lampa, Rizza Maulion, James Millena, Theresa Ramos, and Ranier Sichon ( "the Nurse

Plaintiffs"), and Felix Q. Vinluan (collectively, "Plaintiffs") bring this 42 U.S.C. § 1983 civil

rights action against Defendants Thomas J. Spota, III, individually and as District Attorney of

Suffolk County ("D.A. Spota" or "Spota"); the Office of the District Attorney of Suffolk County

("the D.A.'s Office"); Leonard Lato, individually and as an Assistant District Attorney

1

("A.D.A.") of Suffolk County ("former A.D.A. Lato" or "Lato"); and the County of Suffolk (collectively, the "County Defendants"), as well as against a number of private entities and individuals associated with the Nurse Plaintiffs' employment in the United States ("the Sentosa Defendants") (collectively with the County Defendants, "Defendants").  Plaintiffs allege claims of false arrest, malicious prosecution, and § 1983 conspiracy against Defendants, as well as violations of their constitutional rights arising out of, *inter alia*, the County Defendants' alleged investigatory misconduct during Plaintiffs' criminal prosecution.  *See generally* Amended Complaint ("Am Compl.") [DE 23].

Presently before the Court is the Nurse Plaintiffs' letter motion to compel D.A. Spota and former A.D.A. Lato to answer certain deposition questions which they refused to answer on the basis of the attorney work-product privilege, the deliberative process privilege, and the attorney-client privilege.  *See generally* Pls.' Mot. [DE 87].  The County Defendants oppose the motion. *See generally* Defs.' Opp'n [DE 90].  In response to the Court's October 24, 2014 Electronic Order, counsel for the Nurse Plaintiffs submitted the complete deposition transcripts to the Court for *in camera* review.  *See* Confidential Deposition Transcript of Defendant Leonard Lato ("Lato Dep. Tr."); Confidential Examination Before Trial of Defendant Thomas J. Spota, III ("Spota Dep. Tr.").  The Court thereafter held oral argument on the motion to compel and reserved decision.  *See* January 28, 2015 Civil Conference Minute Order [DE 95]; Transcript of January 28, 2015 Oral Argument ("Oral Arg. Tr.") [DE 96].

Based on the Court's review of the disputed deposition questions, the arguments advanced by counsel, and the applicable law, the motion to compel is GRANTED, in part, and DENIED, in part, to the extent sort forth in this Memorandum and Order.

II.   **B**ACKGROUND

   A.   **Allegations in the Amended Complaint**

   The Court assumes the parties' familiarity with the facts alleged in the Amended

Complaint and described in substantial detail in Judge Bianco's March 31, 2011 Memorandum

and Order granting, in part, and denying, in part, Defendants' motions to dismiss ("March 31,

2011 Order").  *See* DE 31; *see also Anilao v. Spota*, 774 F. Supp. 2d 457 (E.D.N.Y. 2011).  The

Court summarizes the relevant alleged facts to provide appropriate context for the rulings

contained in this Memorandum and Order.

   The Nurse Plaintiffs are citizens of the Philippines and legal residents of the United

States.  Am Compl. ¶ 1.  According to the Amended Complaint, the Nurse Plaintiffs, who had

been recruited to work in the United States by and for certain Sentosa Defendants, were

displeased with their employment conditions upon arriving here and believed that the Sentosa

Defendants had breached the promises they had made during the Nurse Plaintiffs' recruitment.

*See id.* ¶¶ 35-37, 42-43.  When their complaints to the Sentosa Defendants failed to resolve these

alleged problems, the Nurse Plaintiffs sought the advice of Felix Vinluan ("Vinluan"), an

attorney, who advised them that their employment contracts had already been breached in

multiple respects and, accordingly, the Nurse Plaintiffs were not bound under those contracts to

continue their employment.  *Id.* ¶¶ 46-47.  The Nurse Plaintiffs thereafter resigned from their

nursing positions.  *Id.* ¶ 48.

   After the Nurse Plaintiffs resigned, the Sentosa Defendants allegedly took a series of

retaliatory actions.  These actions included (1) commencing a state court litigation based on the

Nurse Plaintiffs' alleged breach of their employment contracts; (2) seeking a preliminary

injunction against the Nurse Plaintiffs to enjoin them from speaking with other nurses about resigning; (3) reporting the Nurse Plaintiffs to the New York State Education Department (the "State Education Department") which is responsible for licensing nurses and governing their conduct; and (4) attempting to report the Nurse Plaintiffs to the Suffolk County Police Department ("SCPD"). *See id.* ¶¶ 52-54, 59.

Each of these retaliatory actions ultimately failed, however. In particular, the SCPD refused to take any action against Plaintiffs, the motion for a preliminary injunction was denied in New York State Supreme Court, and the Education Department sent an email to Vinluan stating that the Nurse Plaintiffs had been fully exonerated of any wrongdoing. *Id.* ¶¶ 55, 57, 59. In particular, the Education Department determined that the nurses had not committed abandonment and had not engaged in unprofessional or immoral conduct in connection with their resignations. *Id.* ¶ 57.

Plaintiffs allege that, at that point, certain principals of the Sentosa Defendants and their attorney arranged to have a private meeting with D.A. Spota. *Id.* ¶ 60. Plaintiffs assert that the principals of Sentosa and their attorney had made substantial contributions to various politicians and, as such, have "amassed political power and influence" which enable them to obtain favorable actions from elected officials. *Id.* ¶¶ 61-62. According to Plaintiffs, the meeting between the Sentosa Defendants, their attorney, and D.A. Spota had the effect of pressuring Spota to file an indictment against plaintiffs that he would not otherwise have filed. *Id.* ¶ 64. Specifically, plaintiffs claim that, as a result of the meeting, D.A. Spota assigned the case to former A.D.A. Lato, the Chief of the D.A.'s Office Insurance Crimes Bureau, "for the purpose of gathering evidence and securing an indictment." *Id.* ¶ 70.

Around early November 2006, Lato interviewed Vinluan and assured him that he was not a target of the investigation. *Id.* ¶ 71. Vinluan then provided Lato with "significant exculpatory information," including the Education Department's email, the Supreme Court's Order denying the motion for a preliminary injunction against the Nurse Plaintiffs, and information regarding the fact that none of the Nurse Plaintiffs had ceased working during a shift. *Id.* ¶ 72. Plaintiffs allege that "[n]onetheless[,] Lato, with the consent and at the urging of Spota, presented the case to a Grand Jury." *Id.* Plaintiffs further claim that Lato and other unidentified investigators from the D.A.'s Office interviewed the Nurse Plaintiffs and similarly informed them that they were not the targets of a criminal investigation. *Id.* ¶ 73. Plaintiffs assert that, had they known they were targets, they "would have chosen other courses of conduct, including not participating in the interviews, or demanding to testify before the Grand Jury." *Id.* ¶ 74.

Nearly one year after the Nurse Plaintiffs resigned, a Grand Jury in Supreme Court Suffolk County returned an indictment against them and Vinluan. *Id.* ¶ 87. The indictment charged the Nurse Plaintiffs and Vinluan with (i) conspiracy in the sixth degree, for allegedly conspiring to challenge the welfare of a child and a physically disabled person; (ii) solicitation in the fifth degree, for allegedly requesting and attempting to cause the nurses to resign; (iii) endangering the welfare of a child; and (iv) endangering the welfare of a physically disabled person. *Id.* ¶¶ 78-79. Plaintiffs moved to dismiss the indictment against them on the grounds, *inter alia*, that the prosecution violated the First and Thirteenth Amendments to the United States Constitution. *Id.* ¶ 94. On January 13, 2009, the Appellate Division, Second Department issued a writ of prohibition against further prosecution of the indictment, finding that the criminal prosecution "constitute[d] an impermissible infringement upon the constitutional

rights of these nurses and their attorney, and that the insurance of a writ of prohibition to halt these prosecutions is the appropriate remedy in this matter." *Matter of Vinluan v. Doyle*, 60 A.D.3d 237, 240, 873 N.Y.S.2d 72, 75 (2d Dep't 2009), *as amended* (July 21, 2009); *see* Am. Compl. ¶ 98. The Second Department determined that "[w]here, as here, the petitioners are threatened with prosecution for crimes for which they cannot constitutionally be tried, the potential harm to them is so great and the ordinary appellate process so inadequate to redress that prohibition should lie." *Vinluan*, 873 N.Y.S.2d at 83. On October 29, 2009, the indictment was dismissed by the Supreme Court Suffolk County. Am Compl. ¶ 103.

Plaintiffs filed their Amended Complaint on July 29, 2010 alleging causes of action pursuant to § 1983: (1) against the County Defendants for (i) violating Plaintiffs' First, Thirteenth, and Fourteenth Amendment rights in connection with the prosecution, and for (ii) municipal liability under *Monell*, (2) against Spota for failure to supervise; (3) against the County Defendants and the Sentosa Defendants for (i) conspiring to violate Plaintiffs' constitutional rights, (ii) malicious prosecution, and (iii) false arrest; and (4) against the Sentosa Defendants for conspiring to deprive plaintiffs of their civil rights. *See* Am. Compl. ¶ 107; ¶¶ 123-27; 134-72.

**B.      The March 31, 2011 Order**

The County Defendants and the Sentosa Defendants separately moved to dismiss the Amended Complaint. *See* DE 14, 15, 25. On March 31, 2011, Judge Bianco issued an Order granting, in part, and denying, in part, the Defendants' motions. *See Anilao*, 774 F. Supp. 2d at 466. As to the County Defendants, the Court concluded:

> (1) the individual County defendants are entitled to absolute
> immunity for conduct taken in their role as advocates in connection

with the presentation of the case to the Grand Jury; (2) the
individual County defendants are not entitled to absolute immunity
for alleged misconduct during the investigation of plaintiffs, but
the Court cannot determine at the motion to dismiss stage, given
the allegations in the Amended Complaint, whether the individual
County defendants are entitled to qualified immunity for their
actions in the investigation phase; (3) plaintiffs have sufficiently
pled § 1983 claims against the individual County defendants for
alleged Due Process violations in the investigation phase; and (4)
Plaintiffs have sufficiently pled a claim for municipal liability
against the County of Suffolk.

*Id.*[1]

In determining whether the claims against the County Defendants should be dismissed on

the grounds of absolute immunity, Judge Bianco held that "to the extent that plaintiffs' claims

are based upon the County defendants' initiation of the prosecution against plaintiffs or their

conduct in front of the Grand Jury, the County defendants are absolutely immune from liability

on these claims." *Anilao*, 774 F. Supp. 2d at 480-81. Judge Bianco noted that "this absolute

immunity protection shields the actions of both defendant Lato, who presented the case to the

Grand Jury, and defendant Spota, who acted as Lato's supervisor regarding the initiation of the

prosecution and the presentation to the Grand Jury." *Id.* at 481 n.17.

However, Judge Bianco declined to rule as a matter of law, at the motion to dismiss

stage, whether the County Defendants are absolutely immune from liability for their conduct in

---

[1]     As to the Sentosa Defendants, Judge Bianco concluded that: (1) Plaintiffs have
sufficiently alleged that they were acting under color of state law, and (2) Plaintiffs have
sufficiently pled claims for malicious prosecution and false arrest under both §1983 and state
law, as well as a § 1983 conspiracy claim. *Anilao*, 774 F. Supp. 2d at 466. However, Judge
Bianco dismissed, without prejudice, the claims against two individual Sentosa Defendants,
Susan O'Connor and Nancy Fitzgerald, based on (1) Plaintiffs' failure to plead that the two
defendants were acting under color of state law, and (2) Plaintiffs' failure to satisfy the elements
of the state-law malicious prosecution and false arrest claims against the two defendants. *Id.*

investigating Plaintiffs.  *Id.* at 485.  Noting that "plaintiffs' claims are clearly premised upon an allegation that the County defendants manufactured false evidence and testimony during their investigation of plaintiff," Judge Bianco determined that "plaintiffs have sufficiently pled allegations that the County defendants violated plaintiffs' constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity . . . ." *Id.* at 482 (quotation marks omitted).  Moreover, Judge Bianco found that, "insofar as plaintiffs have alleged that the D.A.'s Office was in charge of (and was allegedly solely responsible for) the investigation of plaintiffs, plaintiffs' claims are necessarily predicated upon the defendant prosecutors' involvement in the underlying fabrication of evidence against plaintiffs pursuant to the County defendants' illicit agreement with the Sentosa defendants." *Id.* at 484.  Judge Bianco explained:

> In other words, drawing all reasonable inferences in plaintiffs' favor, plaintiffs' claims here go beyond a mere allegation that the County defendants conspired to present to the Grand Jury false evidence that they played no role in gathering or fabricating. Instead, reading the Amended Complaint as a whole, plaintiffs have alleged that the prosecutors orchestrated the investigation of plaintiffs after the police declined to get involved, and reached an agreement with the Sentosa defendants to manufacture testimony from the Sentosa defendants that the County defendants knew to be false. . . . Accordingly, the Court disagrees with the County defendants that plaintiffs have not alleged that any wrongdoing occurred during the investigation of plaintiffs and, instead, finds that plaintiffs have sufficiently alleged, for purposes of defendants' motion to dismiss, that the deprivation of plaintiffs' due process rights was caused by the County defendants' alleged investigatory conduct.  The County defendants are not entitled to absolute immunity for such conduct.

*Id.* (footnote omitted).

Turning to the County Defendants' alternative theory that they are entitled to qualified immunity for any alleged investigatory misconduct, Judge Bianco held that "the Amended Complaint does not provide a sufficient basis at this juncture for the Court to determine whether defendants are entitled to qualified immunity." *Id.* at 490. In making this determination, Judge Bianco looked to the Plaintiffs' allegations of investigatory misconduct against the County Defendants, namely, that the County Defendants:

> (1) prosecuted plaintiffs despite the fact that plaintiffs had not committed a crime and that defendants knew or should have known that plaintiffs could not constitutionally be prosecuted for their conduct; (2) "agreed to do what was necessary to procure the indictment, for the sole benefit of the Sentosa defendants" (Am. Compl. ¶ 114); (3) maliciously prosecuted plaintiffs to punish them for exercising their constitutional rights; and (4) fabricated evidence that was ultimately used in the Grand Jury as a basis for plaintiffs' indictment and, consequently, resulted in a deprivation of plaintiffs' liberty. Moreover, plaintiffs allege that the County defendants were aware of significant exculpatory evidence prior to plaintiffs' indictment but that the County defendants nonetheless initiated an investigation of plaintiffs and presented knowingly false evidence to the Grand Jury. Specifically, plaintiffs allege that Vinluan provided ADA Lato with evidence regarding the State Education Department's decision exonerating plaintiffs of any wrongdoing, Justice Bucaria's decision denying Sentosa's application for a preliminary injunction due to a failure to prove a likelihood of success on the merits, and information demonstrating that none of the nurse plaintiffs had resigned during a shift. (*Id.* ¶ 72.) Further, plaintiffs allege that the Suffolk County Police Department declined to take any action against plaintiffs in response to a complaint from defendant O'Connor because "in [the police's] stated opinion, no crime had been committed." (*Id.* ¶ 59.)

*Id.* at 492. Judge Bianco concluded that, "[a]lthough the County defendants dispute these allegations, there is simply insufficient information at this early stage to determine whether the conduct of the County defendants is protected by qualified immunity." *Id.* Judge Bianco further noted that, "[i]n particular, if plaintiffs prove their allegations that defendants Spota and Lato

falsified evidence during the investigation of plaintiffs and such falsification lead to the deprivation of plaintiffs' liberty in the form of an arrest, defendants would not be entitled to qualified immunity." *Id.*

C.      **Former A.D.A. Lato's Deposition**

Former A.D.A. Lato was deposed on May 12, 2014 and May 29, 2014.  During the deposition, Lato's counsel, Garrett W. Swenson, Esq. and counsel for the County Defendants objected to the following questions on the grounds that Lato's answers are protected by the attorney work-product privilege and the attorney-client privilege:

> What were you told [by Spota] that your duties or responsibilities were to be with regard to the Avalon nurses case?  Lato Dep. Tr. at 46:21-23.
>
> Were you told why you were to report to him [Spota] on this [the Avalon nurses case]?  *Id.* at 47:24-25.
>
> Initially was it your understanding that what you were looking at were felonies or misdemeanors or you didn't know?  *Id.* at 50:12-15.
>
> Were you told by anyone that there were any politicians who were interested in this case?  *Id.* at 52:3-5.
>
> Would you agree that this definition of nurse-patient relationship should have been presented to the grand jury?  *Id.* at 144:22-24.[2]

---

[2]      Prior to asking Lato this question, counsel for the Nurse Plaintiffs showed Lato a document from his investigative file on Plaintiffs' case.  *See* Lato Dep. Tr. at 142:12-22.  The document was entered as an exhibit and counsel for the Nurse Plaintiffs' read into the record the following definition of the nurse-patient relationship: "A nurse-patient relationship begins when the nurse accepts responsibility for providing nursing care based upon a written or oral report of patient needs.  A nurse-patient relationship ends when that responsibility has been transferred to another nurse and a report of the patient needs has been communicated."  *Id.* at 143:17-23.

Additionally, counsel objected to the following questions solely on the grounds that they are protected by the work-product privilege:

> Did it concern you at all that the Department of Education has exonerated the nurses and that the Suffolk County Police Department has declined to take any action prior to you getting the [Avalon nurses] case? *Id.* at 75:15-19.

> Why did you tell him [Spota] [that there should be an indictment]? *Id.* at 458:7.

Finally, Lato's counsel objected to the following question without articulating specific grounds for the objection:

> Would [it] have been permissible under the criminal laws, in your opinion, if instead of resigning if they [the Nurse Plaintiffs] had gone on strike and not worked after the completion of their shifts? *Id.* at 234:6-10.

**D.     D.A. Spota's Deposition**

D.A. Spota's deposition was held on August 14, 2014.  Spota, too, was represented by Garrett W. Swenson, Esq.  Mr. Swenson objected to the following questions on the grounds that D.A. Spota's answers are protected by the attorney work-product privilege and the deliberative process privilege, and he directed D.A. Spota not to answer:

> Can you tell me what your discussion was with Mr. Lato about the assignment of the [Avalon nurses] case?  Spota Dep. Tr. at 62:17-19.

> What, if any, crimes do you believe were committed by the nurses? *Id.* at 69:19-20.

> What goes into a decision whether a misdemeanor case should be presented to the grand jury?  *Id.* at 72:5-7.

Did there come a time when there was any discussion about your office appealing the Article 78 decision [in the Martin Tankleff case]?[3] *Id.* at 90:11-13.

Understanding that [Mr. Swenson is] going to direct the witness not to answer, I am going to ask about the process that went into determining whether to appeal or not to appeal [in Tankleff]? *Id.* at 90:19-23.

I want to know whether the substance of the [Tankleff] decision caused any concern regarding Mr. Lato's conduct in this or other cases and I would ask the same questions about the decision in the [Mona] Kanciper case, the reversal and whether that caused any concern and what [Spota's] discussions were with Mr. Lato about the decision in the Kanciper case?[4] *Id.* at 107:7-14.

Now in this particular instance, when the matter was handed over to Mr. Lato, was Mr. Lato also instructed to look at any wrongful conduct on behalf of the nursing home? *Id.* at 120:5-9.

Was Mr. Lato also there or instructed to look into Mr. Vinluan's conduct? *Id.* at 124:18-19.

---

[3]     This and other questions refer to the criminal prosecution of Martin Tankleff, who was convicted in the County Court, Suffolk County of two counts of second-degree murder. Tankleff filed a C.P.L. § 440 motion to set aside the verdict. *See* Lato Dep. Tr. at 25:3-9. Lato testified during his deposition that Spota asked him to review and investigate the claims Tankleff raised in the C.P.L. § 440 motion. *See id.* at 24:7-9; 25:12. The County Court denied Tankleff's motion, but the Appellate Division ultimately reversed and vacated Tankleff's conviction. *See id.* at 27:3-5; *People v. Tankleff*, 49 A.D.3d 160, 182-83, 848 N.Y.S.2d 286, 303 (2d Dep't 2007). The D.A.'s Office declined to retry Tankleff. *See* Lato Dep. Tr. at 25:5-7. Tankleff subsequently brought a § 1983 action (currently pending before Judge Seybert) against Suffolk County and various individual defendants based on his alleged wrongful conviction. *See Tankleff v. County of Suffolk, et al.*, No. 09-cv-1207 (JS)(SIL). Neither Lato nor Spota are named as defendants in Tankleff's § 1983 case.

[4]     This and other deposition questions refer to the criminal prosecution of Mona Kanciper. The Appellate Division reversed Kanciper's conviction for endangering the welfare of a child on the grounds that the conviction was not supported by legally sufficient evidence. *People v. Kanciper*, 100 A.D.3d 778, 778-779, 954 N.Y.S.2d 146 (2d Dep't 2012). Kanciper has since filed a § 1983 action against Lato and Spota, among others, based on her alleged wrongful and malicious prosecution in the state court action. That § 1983 action is currently pending before Judge Azrack. *See Kanciper v. Lato, et al.*, No. 13-cv-00871 (JMA)(SIL).

Did you ever specifically instruct [investigators] Mr. Warkenthien or Mr. Burke to look into that [Vinluan's association with another recruitment agency]before Mr. Lato was assigned? *Id.* at 125:16-18.

Additionally, counsel objected to the following questions solely on the grounds that D.A.

Spota's answers are protected by the attorney work-product privilege:

Did that [the Department of Education finding that the Nurse Plaintiffs committed no wrongdoing] affect your determination whether a crime had been committed . . . ? *Id.* at 65:9-11.

Prior to Mr. Lato seeking an indictment, what, if any, discussions did you with him about the case? *Id.* at 76:6-8.

Did there come a time when you considered the bringing of this indictment a mistake? *Id.* at 88:10-12.

At any time prior to the bringing of this indictment, what, if any, discussions did you have with Mr. Lato or another member of your staff regarding the 13th Amendment of the United States Constitution? *Id.* at 89:20-24.

Same question with regard to the 1st Amendment of the United States Constitution. *Id.* at 90:6-8.

Did you have any occasion to review that decision, Tankleff, an Appellate Division decision? *Id.* at 106:16-18.

So, what were the total factors that led you to believe that there was probable cause that a crime was committed [in this case]? *Id.* at 121:22-25.

With respect to the determination that you told us you made that it appeared to be probable cause [in this case], probable cause of what crime? *Id.* at 122:7-10.

Finally, counsel objected to the following questions solely on the grounds that the

answers are protected by the deliberative process privilege:

Is that normally within the scope of the job of a bureau chief to do that [interview witnesses]? *Id.* at 73:25-74:1.

Did he [Lato] give a reason for his resignation?  *Id.* at 91:20-21.

Did Mr. Lato's resignation have anything to do with his handling of this case?  *Id.* at 92:8-9.

Is ethics one of the topics that they [new ADAs] are trained on? *Id.* at 94:23-24.

Can you tell me the substance of these conversations [with others in the D.A.'s Office, including supervisors, regarding Lato's conduct]?  *Id.* at 102:11-12.

In regard to the Kanciper case that we have discussed, were you aware of whether there were investigators assigned to work with Mr. Lato on that case?  *Id.* at 103:15-18.

The same question regarding the Tankleff case.  *Id.* at 103:23-24.

## III.   THE PARTIES' CONTENTIONS

The Nurse Plaintiffs argue that none of the asserted privileges apply to the deposition

testimony sought to be elicited here.  Pls.' Mot. at 2.  According to the Nurse Plaintiffs, the

investigation and prosecution of the underlying criminal case against them "was initiated by

politically powerful individuals and entities" (*i.e.*, the Sentosa Defendants) in order to punish and

make an example of the Nurse Plaintiffs when they legally left from their employment due to

deplorable conditions.  *Id.*  Plaintiffs further contend that D.A. Spota failed to supervise former

A.D.A. Lato in the investigation and prosecution of the underlying action, allowing Lato to act in

a manner that violated Plaintiffs' constitutional rights.  *Id.*  Moreover, Plaintiffs maintain that

"the only direct evidence of the genesis of this investigation and prosecution," and how it was

conducted by the D.A.'s Office in general and by D.A. Spota specifically, "emanates from the

testimony of Mr. Spota and Mr. Lato."  *Id.*  According to Plaintiffs, "there is no other source of

this evidence" and "answers to these questions will supply necessary evidence in Plaintiffs' case

against all Defendants." *Id.* Consequently, Plaintiffs argue that the County Defendants' assertion of privilege should not be sustained, and that Spota and Lato should be compelled to answer the disputed questions. *Id.*

The County Defendants oppose Plaintiffs' motion to compel in its entirety. Defs.' Opp'n at 1. In the County Defendants' view, each of the deposition questions at issue "call[s] for either the mental impressions, conclusions, opinions, or legal theories" of Lato and Spota, or would tend to show how the DA Office "decisions are made or its policies formulated." *Id.* at 2. The County Defendants assert that "this is the very kind of 'intangible' information that the work product and deliberative process privileges were designed to protect." *Id.* Moreover, the County Defendants asserted during oral argument that Judge Bianco's March 31, 2011 Order on the motion to dismiss narrowed the scope of the remaining claims against the County Defendants, and that the Nurse Plaintiffs should not be permitted to question Lato and Spota about matters which have been dismissed from the case. *See* Oral Arg. Tr. at 10:11-22; 11:22-25.

IV. **DISCUSSION**

A. **Scope of Judge Bianco's March 31, 2011 Decision on the Motion to Dismiss**

Before considering the deposition testimony at issue on this motion, the Court will first address the County Defendants' contention, raised for the first time during oral argument, that Judge Bianco's March 31, 2011 Order narrowed the scope of the remaining claims against the County Defendants. *See* Oral Arg. Tr. at 10:11-22. Specifically, the County Defendants assert that, although Judge Bianco declined to determine whether the County Defendants were entitled to absolute immunity or qualified immunity for their allegedly improper investigatory conduct and allowed those claims to proceed, he "narrowed" those claims to two discrete theories:

15

(1) that the County Defendants conspired with the Sentosa Defendants to bring the indictment against Plaintiffs; and (2) that former A.D.A. Lato fabricated false evidence and testimony by the Sentosa Defendants during his investigation of Plaintiffs. *See id.* 10:11-18. The County Defendants therefore contend that the Nurse Plaintiffs are not entitled to question Lato and Spota about their investigatory conduct preceding the presentation of Plaintiffs' criminal case to the Grand Jury unless it concerns whether the County Defendants conspired with the Sentosa Defendants or whether Lato fabricated evidence. *See id.*

The Court disagrees with this interpretation of Judge Bianco's March 31, 2011 Order. For one, nothing in Judge Bianco's decision expressly limits Plaintiffs' allegations of investigatory misconduct to the abovementioned two theories. The County Defendants correctly point out that, in declining to decide whether the County Defendants were entitled to absolute immunity for their investigatory conduct on the motion to dismiss, Judge Bianco confined his analysis to Plaintiffs' allegations that the County Defendants (1) "manufactured false evidence and testimony during their investigation of plaintiffs," and (2) "reached an agreement with the Sentosa defendants to manufacture testimony from the Sentosa defendants that the County defendants knew to be false." *Anilao*, 774 F. Supp. 2d at 482, 484. However, the County Defendants overlook the fact that Judge Bianco relied on a much broader set of allegations from the Amended Complaint when he addressed the County Defendants' alternative theory of qualified immunity. *Id.* at 490. Specifically, Judge Bianco declined to decide the issue of qualified immunity based on Plaintiffs' allegations that the County Defendants: (1) prosecuted them "despite the fact that plaintiffs had not committed a crime and that defendants knew or should have known that plaintiffs could not constitutionally be prosecuted for their conduct;"

(2) "agreed to do what was necessary to procure the indictment, for the sole benefit of the Sentosa defendants;" (3) "maliciously prosecuted plaintiffs to punish them for exercising their constitutional rights;" (4) "fabricated evidence that was ultimately used in the Grand Jury as a basis for plaintiffs' indictment and, consequently, resulted in a deprivation of plaintiffs' liberty;" and (5) "were aware of significant exculpatory evidence prior to plaintiffs' indictment but . . . nonetheless initiated an investigation of plaintiffs and presented knowingly false evidence to the Grand Jury." *Id.* at 492 (internal quotation marks and citations omitted). Since Judge Bianco expressly relied on these allegations when he declined to dismiss the Plaintiffs' investigatory misconduct claims based on qualified immunity, this Court finds that these allegations remain in the case and present theories which Plaintiffs were entitled to explore during the depositions of Lato and Spota.

In light of the foregoing circumstances, the Court concludes that Judge Bianco's March 31, 2011 Order did *not* limit the scope of Plaintiffs' claims of investigatory misconduct to the two theories described by the County Defendants. However, the Court is mindful that Judge Bianco *did* dismiss Plaintiffs' allegations of prosecutorial misconduct, finding that "to the extent that plaintiffs' claims are based upon the County defendants' initiation of the prosecution against plaintiffs or their conduct in front of the Grand Jury, the County defendants are absolutely immune from liability on these claims." *Anilao*, 774 F. Supp. 2d at 480-81. The Nurse Plaintiffs therefore have no basis to question Lato and Spota about these latter allegations.

**B.      Application of the Privileges Asserted by Lato and Spota**

The Court turns now to address the various privileges asserted by Lato and Spota during their depositions, whether those privileges were properly invoked, and whether Lato and Spota should be compelled to answer each of the disputed deposition questions.

### 1.      *Attorney-Client Privilege*

It well-settled that the attorney-client privilege applies only if all of the essential elements of that privilege are met, including, *inter alia*, that "the asserted holder of the privilege is or sought to become a client." *Go v. Rockefeller Univ.*, 280 F.R.D. 165, 173 (S.D.N.Y. 2012) (collecting cases). "[T]he burden is on a party claiming the protection of a privilege to establish those facts that are the essential elements of the privileged relationship." *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987) (internal quotation marks omitted). "Thus, the party seeking to invoke the privilege must establish all elements of the privilege." *Go*, 280 F.R.D. at 173.

The County Defendants have failed to meet their burden of showing that the attorney-client privilege applies to the specific questions at issue here which were posed to former A.D.A Lato at his deposition. As the Nurse Plaintiffs' point out in their motion, Lato is "a public prosecutor" who "do[es] not have a client," nor could he be considered the client-holder of the attorney-client privilege. Pls. Mot. at 3. Significantly, the County Defendants did not advance any arguments, either in their opposition or during oral argument, in support of upholding the attorney-client privilege as to these questions. Accordingly, the Court finds that the attorney-client privilege is inapplicable and was improperly invoked during Lato's deposition.

## 2. Attorney-Work Product Privilege

### a. Legal Standard

The attorney-work product privilege "provides qualified protection for materials prepared by or at the behest of counsel in anticipation of litigation or for trial.'" *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 183 (2d Cir. 2007) (quoting *In re Grand Jury Subpoenas Dated Mar. 19, 2002 & Aug. 2, 2002*, 318 F.3d 379, 383 (2d Cir. 2003)). The source of the doctrine is *Hickman v. Taylor*, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947), in which the United States Supreme Court held that notes taken by the defendant's attorney concerning witness interviews were protected from discovery by the plaintiff. *Id.* at 510. In *Hickman*, the court reasoned "it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel," and that "[p]roper preparation of a client's case demands that [a lawyer] assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference." *Id.* at 510-511. *Hickman* further states that a lawyer's "work is reflected . . . in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways," and that such "work product," when prepared "with an eye toward litigation," should not be available to opposing counsel "on mere demand." *Id.* at 511.

Since *Hickman*, the work product doctrine has been "codified in part in Rule 26(b)(3) of the Federal Rules of Civil Procedure." *In re Grand Jury Subpoenas*, 318 F.3d at 383. Rule 26(b)(3) states, in pertinent part:

> **(A)** *Documents and Tangible Things.* Ordinarily, a party may not discover documents and tangible things that are prepared in

anticipation of litigation or for trial by or for another party or its representative . . . . But, subject to Rule 26(b)(4), those materials may be discovered if: (i) they are otherwise discoverable . . . ; and (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

**(B)** *Protection Against Disclosure*. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other legal representative concerning the litigation.

Fed. R. Civ. P. 26(b)(3).

By its terms, "Rule 26(b)(3) protects only 'documents and tangible things.'" *Abdell v. City of New York*, No. 05 CIV. 8453, 2006 WL 2664313, at *3 (S.D.N.Y. Sept. 14, 2006). Thus, the Rule does not apply to the "intangible" discovery such as the deposition questions and answers at issue here. *See id.* (collecting cases holding that Rule 26(b)(3) only applies to tangible rather than "intangible" discovery).

The Court's inquiry does not end there, however, "because the work product doctrine as articulated in *Hickman* . . . is broader than Rule 26(b)(3)." *Id.* (citing *e.g. In re Grand Jury Subpoenas*, 318 F.3d at 383); *see Crosby v. City of New York*, 269 F.R.D. 267, 277 (S.D.N.Y. 2010); *Haus v. City of New York*, No. 03-CV-4915, 2006 WL 3375395, at *3 (S.D.N.Y. Nov. 17, 2006) ("The inapplicability of Rule 26(b)(3) does not preclude granting similar immunity under the common-law work-product doctrine."). Where, as here, the work-product privilege is asserted to protect the disclosure of intangible discovery, such as deposition testimony, courts look to the common law doctrine outlined in *Hickman* and its progeny in deciding whether to compel disclosure. *Abdell*, 2006 WL 2664313, at *3 (collecting cases).

"The purposes underlying the doctrine, gleaned from *Hickman . . .* , include protecting an attorney's ability to formulate legal theories and prepare cases, preventing opponents from 'free-loading' off their adversaries' work, and preventing interference with ongoing litigation." *Jean v. City of New York*, No. CV-09-801, 2010 WL 148420, at *2 (E.D.N.Y. Jan. 12, 2010); *see Crosby*, 269 F.R.D. at 277; *Abdell*, 2006 WL 2664313, at *4. Moreover, intangible work product will fall within the scope of the work product doctrine only if "in light of the nature of the [intangible work product] and the factual situation in the particular case, the [work product] can fairly be said to have been prepared or obtained because of the prospect of litigation." *United States v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998) (internal quotation marks and emphasis omitted). The party asserting the attorney-work product privilege bears the "heavy burden of establishing its applicability." *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F. 3d at 183.

"Of course even where work product protection applies, the protection is not absolute. Disclosure of work product may be ordered if the party seeking it can demonstrate substantial need for the information and an inability to obtain the information, or a substantial equivalent of it, by other means without undue hardship." *Jean*, 2010 WL 148420, at *2 (citing *In re Grand Jury Proceedings*, 219 F.3d 175, 190–91 (2d Cir. 2000); *Abdell*, 2006 WL 2664313 at *6–7)). Such a showing is sufficient to compel the disclosure of "factual work product," which is "tangible work product that includes facts but not the lawyer's mental impressions." *Crosby*, 269 F.R.D. at 277 (quoting Black's Law Dictionary 1746 (9th ed. 2009)); *see Jean*, 2010 WL 148420, at *2. However, greater protections are afforded to "core work product" (also called "opinion work product"), "which includes the mental impressions, conclusions, opinions, or

21

legal theories of an attorney.'" *Crosby*, 269 F.R.D. at 277 (quoting *Abdell*, 2006 WL 2664313 at

*6); *see Jean*, 2010 WL 148420, at *2. The Second Circuit has held that, "at a minimum[,] such

material is to be protected unless a highly persuasive showing [of need] is made." *In re Grand*

*Jury Proceedings*, 219 F.3d at 190–91 (quoting *Adlman*, 134 F.3d at 1204). Moreover, the party

asserting the privilege to protect opinion work product "must show 'a real, rather than

speculative, concern' that the work product will reveal counsel's thought processes 'in relation to

pending or anticipated litigation.'" *In re Grand Jury Subpoena*, 510 F.3d at 183 (quoting *In re*

*Grand Jury Subpoenas*, 318 F.3d at 386).

>    **b.**     **Analysis as to Lato's Deposition Questions**

Former A.D.A. Lato was directed not to answer the following deposition questions based

on attorney-work product privilege:

> (1) What were you told [by Spota] what your duties or
> responsibilities were to be with regard to the Avalon nurses
> case? Lato Dep. Tr. at 46:21-23.

> (2) Were you told why you were to report to him [Spota] on
> this [the Avalon nurses case]? *Id.* at 47:24-25.

> (3) Initially was it your understanding that what you were
> looking at were felonies or misdemeanors or you didn't
> know? *Id.* at 50:12-15.

> (4) Were you told by anyone that there were any politicians
> who were interested in this case? *Id.* at 52:3-5.

> (5) Did it concern you at all that the Department of Education
> has exonerated the nurses and that the Suffolk County
> Police Department has declined to take any action prior to
> you getting the [Avalon nurses] case? *Id.* at 75:15-19.

> (6) Would you agree that this definition of nurse-patient
> relationship should have been presented to the grand jury?
> *Id.* at 144:22-24.

(7) Why did you tell him [Spota] [that there should be an indictment]?  *Id.* at 458:7.

In light of the parties' arguments and the applicable case law, the Court makes the following rulings.  Questions (1), (2), and (4) seek factual information, not legal theories, strategies, or mental impressions which may be protected by the attorney work-product privilege. The Court understands the County Defendants' view, discussed at length during oral argument, that any questions which concern Lato's preparation for Plaintiffs' prosecution necessarily "reveal[] the legal process at the D.A.'s office" and therefore should be protected by the attorney work-product privilege.  Oral Arg. Tr. 15:16.  However, the Court simply does not agree that the factual information sought by these three questions – two of which required merely a "yes" or "no" answer – reveal legal processes and theories which warrant protection under the privilege. Accordingly, Plaintiffs' motion to compel is granted as to Questions (1), (2), and (4) and Mr. Lato will be required to answer these questions.

As to Question (3), the Court finds that the issue is moot because Lato actually answered the question when one looks at the context of the testimony:

> Q.      What was your understanding about what it was that you were going to be looking into, what kind of conduct?
>
> Mr. Swenson:  Same objections.
>
> The Witness:   I think I can answer this without there being a problem with privilege.
>
> A.      Just whether there was any criminality.
>
> Q.      By whom?
>
> A.      By the nurses, for want of a better term.  Again, when I was first given this I had never heard of Avalon Gardens, I didn't know anything about it.

Q.     Were you told that – by anyone that a bunch of nurses had resigned for Avalon Gardens?

Mr. Swenson:          Same objections.

Ms. O'Donnell:          You can answer.

A.     Probably.  I don't know whether it was initially Mr. Spota, Walter Warkenthein, or both.  I was given some background on what I'm supposed to be looking at.

. . . .

Q.     Initially, was it your understanding that what you would be looking at were felonies or misdemeanors or you didn't know?

[Objection by Mr. Swenson]

. . . .

Ms. O'Donnell:          Can you answer the question?

A.     The way you framed it, it can't be answered.  I can answer it in my own words.

Q.     Would you, please?

A.     It was just to look at whether there was anything criminal here.  I was not told whether there were potential felonies or potential misdemeanors, violations, et cetera.

Lato Dep. Tr. at 49:5-50:3; 50:12-15; 51:18-52:2.

Regarding Questions (5), (6), and (7), these questions seek Lato's mental impressions, conclusions, and opinions regarding his investigation of Plaintiffs' case and his decision to bring an indictment.  Lato's answers to these questions therefore fall within the ambit of "opinion work product."  *Crosby*, 269 F.R.D. at 277.  As discussed, the Court is required to shield opinion work product – as distinct from fact work product – from disclosure absent a highly persuasive

showing of need made by the Nurse Plaintiffs.  *See In re Grand Jury Proceedings*, 219 F.3d at 190–91.

The Court concludes that with regard to Questions (5) and (7), the Nurse Plaintiffs have met this heightened showing of need.  Judge Bianco specifically stated in his March 31, 2011 Order that the County Defendants are not, at this time, protected by qualified immunity (or absolute immunity) for Plaintiffs' allegations that, as relevant here, (1) the County Defendants "prosecuted plaintiffs despite the fact that plaintiffs had not committed a crime and that defendants knew or should have known that plaintiffs could not constitutionally be prosecuted for their conduct" and (2) the County Defendants "were aware of significant exculpatory evidence prior to plaintiffs' indictment," including "the State Education Department's decision exonerating plaintiffs of any wrongdoing," but that the County Defendants "nonetheless initiated an investigation of plaintiffs and presented knowingly false evidence to the Grand Jury."  *Anilao*, 774 F. Supp. 2d at 492.  Questions (5) and (7) go to the heart of these allegations.  *See Tri-State Hosp. Supply Corp. v. United States*, No. CIV.A. 00-1463, 2005 WL 3447890, at *6 (D.D.C. Dec. 16, 2005) (holding that "opinion work product may be discoverable when it goes to the heart of the issues in the litigation.") (citing *Sec. and Exch. Comm'n v. Nat'l Student Mktg. Corp.*, 1974 WL 415, at *3-4 (D.D.C. 1974) (when counsel's activities are at issue in an action, there is cause for production of documents that deal with such activities though they are opinion work product)).  Because Questions (5) and (7) may reveal information which is central to Plaintiffs' allegations, the Court finds that the Nurse Plaintiffs have a sufficient need to discover that information.  The Court further notes that, although the County Defendants have provided Plaintiffs with copies of the complete and unredacted D.A.'s Office files – including internal

memoranda between the D.A.'s Office investigators and Lato, *see* Defs.' Opp'n at 2 – the Nurse Plaintiffs have represented there was nothing in those files which addresses the allegations set forth above, *see* Oral Arg. Tr. 8:1-6.  Accordingly, Plaintiffs' motion to compel is granted as to Questions (5) and (7), and Mr. Lato is directed to answer these questions.

However, the Nurse Plaintiffs have not met the heightened standard for compelling production of the opinion work product sought by Question (6).  As discussed, Judge Bianco held that Lato is absolutely immune from Plaintiffs' claims arising out of his "conduct in front of the Grand Jury." *Anilao*, 774 F. Supp. 2d at 480, 480 n.17.  In the Court's view, Question (6) attempts to explore Lato's conduct before the Grand Jury by implying that he erred in failing to present a particular definition of "nurse-patient relationship" to the Grand Jurors.  The Nurse Plaintiffs also have not shown how this question relates to the allegations of investigatory misconduct which Judge Bianco concluded remain in the case.  *See id.* at 492.  Accordingly, the Nurse Plaintiffs' motion to compel is denied as to Question (6).

Finally, as noted, Attorney Swenson did not articulate any grounds for his objection to the following question:

> Would [it] have been permissible under the criminal laws, in your opinion, if instead of resigning if they [the Nurse Plaintiffs] had gone on strike and not worked after the completion of their shifts? Lato Dep. Tr. at 234:6-10.

The Court finds that, although this question seeks Lato's opinion, it does not implicate the attorney work-product privilege.  Moreover, by failing to articulate a basis for the objection, the County Defendants have not met their "heavy burden" of showing that the privilege applies.  Accordingly, the Nurse Plaintiffs' motion to compel is granted as to this question and Lato is directed to answer it.

### c. Analysis of Spota's Deposition Questions

Spota declined to answer the following deposition questions based on attorney work-product privilege (as well as the deliberative process privileges for some questions):

(1) Can you tell me what your discussion was with Mr. Lato about the assignment of the [Avalon nurses] case? Spota Dep. Tr. at 62:17-19.

(2) Did that [the Department of Education found that the Nurse Plaintiffs committed no wrongdoing] affect your determination whether a crime had been committed . . . ? *Id.* at 65:9-11.

(3) What, if any, crimes do you believe were committed by the nurses? *Id.* at 69:19-20.

(4) What goes into a decision whether a misdemeanor case should be presented to the grand jury? *Id.* at 72:5-7.

(5) Prior to Mr. Lato seeking an indictment, what, if any, discussions did you have with him about the case? *Id.* at 76:6-8.

(6) Did there come a time when there was any discussion about your office appealing the Article 78 decision [in Tankleff]? *Id.* at 90:11-13.

(7) Did there come a time when you considered the bringing of this indictment a mistake? *Id.* at 88:10-12.

(8) At any time prior to the bringing of this indictment, what, if any, discussions did you have with Mr. Lato or another member of your staff regarding the 13th Amendment of the United States Constitution? *Id.* at 89:20-24.

(9) Same question with regard to the 1st Amendment of the United States Constitution. *Id.* at 90:6-8.

(10) Did you have any occasion to review that decision, Tankleff, an Appellate Division decision? *Id.* at 106:16-18.

(11) Understanding that [Mr. Swenson is] going to direct the witness not to answer, I am going to ask about the process that went into determining whether to appeal or not to appeal [in Tankleff]? *Id.* at 90:19-23.

(12) I want to know whether the substance of the [Tankleff] decision caused any concern regarding Mr. Lato's conduct in this or other cases and I would ask the same questions about the decision in the Kanciper case, the reversal and whether that caused any concern and what [Spota's] discussions were with Mr. Lato about the decision in the Kanciper case? *Id.* at 107:7-14.

(13) Now in this particular instance, when the matter was handed over to Mr. Lato, was Mr. Lato also instructed to look at any wrongful conduct on behalf of the nursing home? *Id.* at 120:5-9.

(14) So, what were the total factors that led you to believe that there was probable cause that a crime was committed [in this case]? *Id.* at 121:22-25.

(15) With respect to the determination that you told us you made that it appeared to be probable cause [in this case], probable cause of what crime? *Id.* at 122:7-10.

(16) Was Mr. Lato also there or instructed to look into Mr. Vinluan's conduct? *Id.* at 124:18-19.

(17) Did you ever specifically instruct [investigators] Mr. Warkenthien or Mr. Burke to look into that [Vinluan's association with another recruitment agency] before Mr. Lato was assigned? *Id.* at 125:16-18.

With regard to Question (1), the court finds that the issue raised here is moot. There is no basis to compel D.A. Spota to answer this question because he has already done so. After Plaintiffs' counsel asked Question (1), Mr. Swenson immediately objected on grounds of deliberative process privilege and attorney work-product privilege and directed Spota not to

answer.  *See* Spota Dep. Tr. at 62:20-63:2.  At that point, the following exchange took place between counsel for the parties:

> [Mr. Swenson:]  If you want to know what factual information was discussed with Mr. Lato, I am not so sure that the work product privilege applies, but beyond that, it is clearly work product.
>
> Q.      Without waiving my objection to your objection, can you tell me what factual information was discussed with Mr. Lato?

*Id.* at 63:3-10.  Spota responded with various examples over the course of a full page of testimony.  *Id.* at 63-64.  Therefore, Plaintiffs' counsel obtained exactly what she was entitled to – the facts recited by D.A. Spota.  The Nurse Plaintiffs' motion as to this question is therefore moot.

Read in context, Spota's response to Question (2) is not protected by attorney work-product privilege.  Spota acknowledged that he was not only aware of the State Education Department's investigation, but he was able to describe what had been related to him about the investigation, how the matter had been reviewed up the line, and that the decision maker had determined that there was no abandonment by the Nurse Plaintiffs.  *Id.* at 64-65.  Asking the question whether the State Education Department's finding affected D.A. Spota's opinion whether a crime had been committed called for a simple "yes" or "no" answer – one that did not ask for the opinion itself, but only whether Spota's opinion was affected by the State Education Department's findings.  Therefore, the question and answer are not protected by the attorney work-product privilege.  Mr. Spota will be required to answer that question.

Likewise, Question (3) is not protected by the attorney work-product privilege.  The Court directs attention to the actual questioning:

29

Q.      What, if any, commitments did you make to Mr. Fensterman [Sentosa's attorney] regarding what you were

--

A.      That we would be fair in our investigation.

Q.      What, if any, crimes did you believe were committed by the nurses?

        Mr. Swenson: Objection. Privileged, attorney work product. I respectfully direct the witness not to answer.

Q.      Do you know if any of the crimes committed by the nurses or potential crimes were felonies as opposed to misdemeanors?

        Mr. Swenson: Same objection.

*Id.* at 69:14-70:4. The question posed here calls for a fact-based response, and, as such, is not privileged.

Many of the other assertions of privilege here are unwarranted for the same or similar reasons. In addition, a number of them go directly Plaintiffs' *Monell* claim (*e.g.*, Questions (4), (11), (12) and (14). As for Questions (6), (10), (13), (14), (15), (16) and (17), these questions seek factual information and the attorney work-product privilege is therefore inapplicable. As discussed previously with respect to Mr. Lato's deposition questions, the Court declines to shield the factual information sought by these questions – most of which require a "yes" or "no" answer – based on the County Defendants' belief that the information will somehow reveal the general "legal process" employed by the D.A.'s Office concerning its decision to prosecute a case. However, the Court finds also that Questions (8) and (9) are overbroad in that they seek information about discussions Spota had with Lato and other A.D.A.s "[a]t any time prior to the indictment." Spota Dep. Tr. at 89:20-24. Accordingly, the Nurse Plaintiffs' motion to compel is

granted as to Questions (6), (10), (13), (14), (15), (16) and (17), and D.A. Spota is directed to answer those questions. The Court will address whether the deliberative process privilege applies as to all of those questions in the next section.

As for Question (4), the Court finds that the County Defendants have not met their burden of showing that the general question "[w]hat goes into a decision whether a misdemeanor case should be presented to the Grand Jury?" is protected by the attorney work-product privilege. Spota Dep. Tr. at 72:5-7. This question does not seek Spota's opinion about whether Plaintiffs should have been charged with misdemeanor crimes nor does it even reference Plaintiffs' prosecution. *See generally Adlman*, 134 F.3d at 1202 (intangible work product will only fall within the scope of the work product doctrine only if it "can fairly be said to have been prepared or obtained because of the prospect of litigation."). Accordingly, the attorney work-product privilege does not apply. As noted, this question has some relevance to the *Monell* claim asserted here.

The Court further finds that Questions (11) and (12) do not implicate the attorney work-product privilege. Question (11) asks about the "process" that went into the decision of the D.A.'s Office whether to take an appeal in the *Tankleff* case. Spota Dep. Tr. at 90:19-23. It does not demand that Spota divulge any work product regarding that case. Question (12) inquires whether the *Tankleff* and *Kanciper* decisions caused Spota "any concern" about Lato's conduct in this and other cases, as well as what discussions Spota had with Lato about the Appellate Division's decision in *Kanciper*. *Id.* at 107:7-14. Notwithstanding the compound nature of the question, Spota's opinion of Lato's conduct in the wake of the *Tankleff* and *Kanciper* decision is not protected by the attorney work-product privilege because that opinion does not go to any

"legal theories" behind those cases – nor was his opinion of Lato "prepared" as part of that litigation." *Adlman*, 134 F.3d at 1202. The question is also relevant to the asserted *Monell* claim. Whether the deliberative process privilege applies to Questions (11) and (12) is discussed below.

As for Questions (5) and (7), the Court finds that these questions implicate the attorney work-product privilege. The issue then becomes whether the Nurse Plaintiffs have made a sufficient showing to overcome that privilege.

Because Question (5) is so broadly worded, the Court cannot be sure that this question is squarely aimed at the County Defendants' investigatory conduct rather than their "initiation of the prosecution against plaintiffs," which Judge Bianco determined is privileged. *Anilao*, 774 F. Supp. 2d at 480. The Court therefore concludes that the Nurse Plaintiffs' have not met their burden of overcoming the attorney work-product privilege as to this question. Accordingly, the Nurse Plaintiffs' motion to compel is denied as to Question (5).

However, Questions (7) seeks information which is central to the Nurse Plaintiffs' allegations that, *inter alia*, (1) the County Defendants "prosecuted plaintiffs despite the fact that plaintiffs had not committed a crime and that defendants knew or should have known that plaintiffs could not constitutionally be prosecuted for their conduct" and (2) the County Defendants "were aware of significant exculpatory evidence prior to plaintiffs' indictment," including "the State Education Department's decision exonerating plaintiffs of any wrongdoing," but that the County Defendants "nonetheless initiated an investigation of plaintiffs and presented knowingly false evidence to the Grand Jury." *Anilao*, 774 F. Supp. 2d at 492. The Court therefore finds that the Nurse Plaintiffs have met the heightened showing of need to compel

Spota's testimony in response to this question.  *See Tri-State Hosp.*, 2005 WL 3447890, at *6.

Accordingly, Plaintiffs' motion to compel is granted as to Question (7), and D.A. Spota will be

required to answer the question.

### 3. *Deliberative Process Privilege*

#### a. **Legal Standard**

The deliberative process privilege "covers documents reflecting advisory opinions,

recommendations, and deliberations that are part of a process by which Government decisions

and policies are formulated."  *Dep't of the Interior and Bureau of Indian Affairs v. Klamath

Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  The privilege is "designed to promote the

quality of agency decisions by preserving and encouraging candid discussion between officials.

It is based on 'the obvious realization that officials will not communicate candidly among

themselves if each remark is a potential item of discovery and front page news.'"  *Nat'l Council

of La Raza v. Dep't of Justice*, 411 F.3d 350, 356 (2d Cir. 2005) (quoting *Klamath*, 532 U.S. at

8-9); *see A. Michael's Piano, Inc. v. FTC*, 18 F.3d 138, 147 (2d Cir. 1994).  It follows, therefore,

that "the deliberative process privilege may only be claimed 'by the head of the agency which

has control over the material, after personal consideration of the allegedly privileged nature of

the information.'"  *Conte v. Cnty. of Nassau*, No. CV 06-4746, 2009 WL 1362784, at *5

(E.D.N.Y. May 15, 2009) (quoting *Rao v. N.Y. City Health and Hosp. Corp.*, No. 89 Civ. 2700,

1993 WL 465342, at *1 (S.D.N.Y. Nov. 8, 1993)); *see Burbar v. Inc. Vill. of Garden City*, 303

F.R.D. 9, 14 n.2 (E.D.N.Y. 2014); *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab.

Litig.*, 643 F. Supp. 2d 439, 443 (S.D.N.Y. 2009).

The deliberative process privilege "applies to depositions of government employees as well as discovery requests for documents." *E.E.O.C. v. Venator Grp.*, No. 99 CIV 4758, 2000 WL 1059033, at *2 (S.D.N.Y. Mar. 27, 2000); *In re World Trade Center Disaster Site Litig.*, No. 21 MC 100 et al., 2009 WL 4722250, at *3 (S.D.N.Y. Dec. 9, 2009) (holding that testimony was protected by deliberative process privilege); *ACORN v. County of Nassau*, No. 05–CV–2301, 2009 WL 2923435, at *4 n. 3 (refusing to distinguish between privilege as applied to documents and testimony); *New York City Managerial Employee Ass'n v. Dinkins*, 807 F. Supp. 955, 957 (S.D.N.Y. 1992) (noting that "the purpose of the privilege is to ensure that the quality of government decisions is not compromised by subjecting all government discussion to public scrutiny" and holding that "the disputed deposition questions are protected"); *see also E. End Ventures, LLC v. Inc. Vill. of Sag Harbor*, No. CV 09-3967, 2011 WL 6337708, at *2 (E.D.N.Y. Dec. 19, 2011) (noting that legislative privilege and deliberative process privilege are functionally the same, and addressing whether the legislative privilege was properly invoked as to 12 deposition questions); *Ingles v. City of New York*, No. 01 CIV. 8279, 2004 WL 2274653, at *1 (S.D.N.Y. Oct. 8, 2004) (denying the plaintiff's motion to compel discovery of documents and deposition testimony relating to the New York City Department of Correction's issuance of a revised use of force policy directive on the grounds that "the requested discovery is protected by the deliberative process privilege").

"The party seeking to invoke the deliberative process privilege bears the burden of demonstrating two requirements: (1) the document [or testimony] is 'predecisional' and (2) it is 'deliberative.'" *Conte*, 2009 WL 1362784, at *4 (quoting *Tigue v. United States*, 312 F.3d 70, 76 (2d Cir. 2002)); *see Nat'l Council of La Raza*, 411 F.3d at 356. Material "is predecisional

when it is prepared in order to assist an agency decisionmaker in arriving at his decision." *Tigue*, 312 F.3d at 80 (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 2000)). "Accordingly, 'the privilege protects recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency.'" *Conte*, 2009 WL 1362784, at *4 (quoting *Nat'l Congress for Puerto Rican Rights v. City of New York*, 194 F.R.D. 88, 92 (S.D.N.Y. 2000); *see Tigue*, 312 F.3d at 80. Material is considered "deliberative" where it is "actually related to the process by which policies are formulated." *Nat'l Council of La Raza*, 411 F.3d at 356 (internal quotation marks and alterations omitted); *see Hopkins v. HUD*, 929 F.2d 81, 84-85 (2d Cir. 1991). In other words, "an agency document must be 'indicative of the agency's thought processes.'" *Burbar*, 303 F.R.D. at 13 (quoting *Local 3, Int'l Broth. of Elec. Workers, AFL-CIO v. N.L.R.B.*, 845 F.2d 1177, 1179 (1988)). The privilege does not apply to material that is "purely factual and not reflective of the agency's deliberative process." *Id.*; *see Schomburg v. New York City Police Dep't*, 298 F.R.D. 138, 144 (S.D.N.Y. 2014); *MacNamara v. City of New York*, 249 F.R.D. 70, 78 (S.D.N.Y. 2008) (quoting *Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 482 (2d Cir. 1999)).

Notably, the deliberative process privilege is a qualified privilege. *Natural Resources Defense Council, Inc. v. Fox*, No. 94-CV-8424, 1998 WL 158671, at *5 (S.D.N.Y. Apr. 6, 1998) (citing *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997)). Once the privilege is established, the court must balance the interests supporting and opposing the disclosure. *Mr. and Mrs. "B" v. Bd. of Educ. of Syosset Cent. Sch. Dist.*, 35 F. Supp. 2d 224, 228 (E.D.N.Y. 1998). In determining whether to apply the qualified privilege, courts weigh the following five factors:

> (I) the relevance of the evidence sought to be protected; (II) the availability of other evidence; (III) the 'seriousness' of the litigation and the issues involved; (IV) the role of government in the litigation; and (V) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

*Id.* at 229 (quoting *In re Franklin Nat'l. Bank Secs. Litig.*, 478 F. Supp. 577, 582 (E.D.N.Y. 1979)). "In balancing these interests, foremost is the interest of the litigants, and ultimately of society, in accurate judicial fact finding." *Id.* at 229 (internal quotations and alteration omitted).

The privilege, however, may be inapplicable where the deliberations are among the central issues in the case. *Conte*, 2009 WL 13624784, at *5; *Ebbert v. Nassau County*, No. 05-5445, 2007 WL 674725, at *11 (E.D.N.Y. Mar. 5, 2007); *Mr. and Mrs. "B,"* 35 F. Supp. 2d 224 at 230; *see also ACORN v. County of Nassau*, No. CV 05-2301, 2008 WL 708551, at *4 (E.D.N.Y. Mar. 14, 2008) ("When the decision making process is itself at issue, particularly in a civil rights action, the deliberative process privilege and other privileges designed to shield that process from public scrutiny may not be raised as a bar against disclosure of relevant information; it must yield to the overriding public interest in challenging discrimination.'") (citing *Torres v. City Univ. of New York*, No. 90 Civ. 2278, 1992 WL 380561, at *8 (S.D.N.Y. Dec. 3, 1992)); *Children First Found., Inc. v. Martinez*, No. 04-0927, 2007 WL 4344915, at *7 (N.D.N.Y. Dec. 10, 2007) (holding that the privilege only protects the government's deliberative process from inquiry if it is collateral to the litigation); *Azon v. LIRR*, No. 00 CIV 6031, 2001 WL 1658219, at *3 (S.D.N.Y. Dec. 26, 2001) ("[W]hen the subject of the litigation . . . is the very nature of the decision-making process, the privilege should not foreclose the production of critical information."). Government information is "protected from discovery so that the public

will benefit from more effective government; when the public's interest in effective government would be furthered by disclosure, the justification for the privilege is attenuated. Thus, [when the information] sought may shed light on alleged government malfeasance, the privilege is denied." *In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. at 582. As noted in *Children First Foundation*, the "historical and overwhelming consensus and body of law within the Second Circuit is that when the decision-making process itself is the subject of the litigation, the deliberative process privilege cannot be a bar to discovery" and the privilege "evaporates." 2007 WL 4344915, at *7 (collecting cases and holding that privilege was inapplicable where plaintiff alleged that government defendants acted in an arbitrary manner in rendering a policy decision).

### b. Analysis of Spota's Deposition Questions

Spota invoked the deliberative process privilege in response to the following questions, some of which overlap with the previously stated questions:

(1) What, if any, crimes do you believe were committed by the nurses? Spota Dep. Tr. at 69:19-20.

(2) What goes into a decision whether a misdemeanor case should be presented to the grand jury? *Id.* at 72:5-7.

(3) Is that normally within the scope of the job of a bureau chief to do that [interview witnesses]? *Id.* at 73:25-74:1.

(4) Did there come a time when there was any discussion about your office appealing the Article 78 decision [in Tankleff]? *Id.* at 90:11-13.

(5) Understanding that [Mr. Swenson is] going to direct the witness not to answer, I am going to ask about the process that went into determining whether to appeal or not to appeal [in Tankleff]? *Id.* at 90:19-23.

(6) Did he [Lato] give a reason for his resignation? *Id.* at 91:20-21.

(7) Did Mr. Lato's resignation have anything to do with his handling of this case? *Id.* at 92:8-9.

(8) Is ethics one of the topics that they [new ADAs] are trained on? *Id.* at 94:23-24.

(9) Can you tell me the substance of these conversations [with others in the D.A.'s Office, including supervisors, regarding Lato's conduct]? *Id.* at 102:11-12.

(10) In regard to the Kanciper case that we have discussed, were you aware of whether there were investigators assigned to work with Mr. Lato on that case? *Id.* at 103:15-18.

(11) The same question regarding the Tankleff case. *Id.* at 103:23-24.

(12) I want to know whether the substance of the [Tankleff] decision caused any concern regarding Mr. Lato's conduct in this or other cases and I would ask the same questions about the decision in the Kanciper case, the reversal and whether that caused any concern and what [Spota's] discussions were with Mr. Lato about the decision in the Kanciper case? *Id.* at 107:7-14.

(13) Now in this particular instance, when the matter was handed over to Mr. Lato, was Mr. Lato also instructed to look at any wrongful conduct on behalf of the nursing home? *Id.* at 120:5-9.

(14) Was Mr. Lato also there or instructed to look into Mr. Vinluan's conduct? *Id.* at 124:18-19.

(15) Did you ever specifically instruct [investigators] Mr. Warkenthien or Mr. Burke to look into that [Vinluan's association with another recruitment agency] before Mr. Lato was assigned? *Id.* at 125:16-18.

In light of the parties' arguments and the applicable law, the Court concludes that the deliberative process privilege is inapplicable to the majority of these questions. First and foremost, these questions go to the essence of the claims raised in this case, namely, the decision

making process involved in the determination to prosecute the Plaintiffs.  Moreover, the Court disagrees with the County Defendants, as it did with regard to with the attorney work-product privilege, that the deliberative process privilege is intended to shield from disclosure any information which reflects the inner workings of the D.A.'s Office and the choices made by D.A. Spota as the head of that agency.  "The deliberative process privilege does not provide a blanket basis upon which to withhold [material] that an agency has created during its decision-making process . . . Indeed, if that were the case, the deliberative process privilege would provide an exemption from the discovery rules for decision-making agencies generally-and that, of course, is not the law." *Auto. Club of New York, Inc. v. Port Auth. of New York & New Jersey*, No. 11 CIV. 6746, 2014 WL 2518959, at *4 (S.D.N.Y. June 4, 2014), *aff'd sub nom.* 2015 WL 3404111 (S.D.N.Y. May 27, 2015) (internal quotation marks and citation omitted).

To that end, the Court concludes that deliberative process privilege was improperly invoked in response to Questions (3), (4), (6), (7), (8), (10), (11), (13), (14) and (15).  The Plaintiffs' claims as to the violation of their First, Thirteenth and Fourteenth Amendment rights in connection with their prosecution, their assertions of the related municipal liability under *Monell*, the conspiracy to violate their constitutional rights, and their malicious prosecution and false arrest claims all place in issue the deliberative process of the County Defendants in prosecuting the Plaintiffs here.  *See Conte*, 2009 WL 13624784, at *5; *see also MacNamara*, 249 F.R.D. at 78 (holding that material "is not 'deliberative' where it concerns 'purely factual' information regarding, for example, investigative matters or factual observations" (quoting *Grand Cent. P'Ship*, 166 F.3d at 482)).

The same is true of Questions (1), (2), (9) and (12). Although Question (1) seeks Spota's opinion about what crimes he believes the Nurse Plaintiffs' committed, Spota Dep. Tr. at 69:19-20, the County Defendants have not demonstrated that his response would necessarily "bear on the formulation or exercise of policy-oriented judgment." *MacNamara*, 249 F.R.D. at 78 (quoting *Tigue*, 312 F.3d at 80) (internal quotation marks omitted). Similarly, Question (2) generally asks Spota to describe "what goes into a decision whether a misdemeanor case should be presented to the grand jury[.]" Spota Dep. Tr. at 72:5-7. The Court finds that Spota's response to this general question would, at most, reveal information that is "merely peripheral to actual policy formation," not his deliberation on a particular policy or decision itself. *MacNamara*, 249 F.R.D. at 78 (quoting *Tigue*, 312 F.3d at 80) (internal quotation marks omitted). As to Questions (9)[5] and (12), the Court appreciates that D.A. Spota may be loath to reveal the information called for by these questions – *i.e.*, the substance of his conversations with others in the D.A.'s Office about Lato's conduct as a district attorney, his conversations with Lato about the decisions in *Tankleff* and *Kanciper*, and whether those decisions caused him to be concerned about Lato's conduct. Spota Dep. Tr. at 102:11-12; 107:7-14. However, "'materials are not to be withheld on the basis of the deliberative process privilege simply because the agency deems them confidential and would prefer not to disclose them.'" *Auto. Club of New York*, 2014 WL 2518959, at *4 (quoting *Toney–Dick v. Doar*, 12 Civ. 9162, 2013 WL 5549921, at *2 (S.D.N.Y. Oct. 3, 2013)). Moreover, this information is relevant to Plaintiffs' *Monell* claim. The Court has no basis to conclude, on this record, that Spota's responses to Questions

---

[5]     The Court notes that this question is also phrased (perhaps unartfully) as calling for a "yes" or "no" response.

(9) and (12) would reveal anything "deliberative" in nature.  Accordingly, the Nurse Plaintiffs' motion to compel is granted as to Questions (1), (2), (3), (4), (6), (7), (8), (9), (10), (11), (12), (13), (14) and (15), and D.A. Spota will be required to answer these questions.

The only question to which the deliberative process privilege arguably applies is Question (5), which asks D.A. Spota to describe the "process that went into determining whether to appeal or not to appeal" in the *Tankleff* case.  Spota Dep. Tr. at 90:19-23.  The Court finds that Spota's testimony on this issue is both pre-decisional and deliberative.  Moreover, the balance of factors tips in favor of applying the privilege to prevent disclosure of this testimony.  *See Mr. and Mrs. "B,"* 35 F. Supp. 2d at 229.  Ultimately, the testimony sought here has lesser relevance to Plaintiffs' case.  The Nurse Plaintiffs' assert that Spota's decisions regarding the *Tankleff* case are relevant to their claims that he failed to properly supervise Lato during the underlying prosecution.  While that argument may establish relevance, unlike the instant case, Lato did not present the *Tankleff* case to the Grand Jury; rather, according to Lato's deposition testimony, his role in *Tankleff* was confined to reviewing and investigating the claims raised in the post-conviction motion.  Lato Dep. Tr. at 25:3-4.  The Court further notes that the Nurse Plaintiffs' need for the information does not outweigh Spota's interest in keeping secret the deliberative process behind the decision of the DA Office not to appeal in *Tankleff*.  Finally, Spota's decision whether to appeal in *Tankleff* is not a "central issue" in this case which would possibly render the privilege inapplicable.  *See Conte*, 2009 WL 13624784, at *5.  Accordingly, the Nurse Plaintiffs' motion to compel is denied as to Question (5).

**V.**     <u>C</u>ONCLUSION

For the foregoing reasons, the Nurse Plaintiffs' motion to compel is GRANTED, in part,

and DENIED, in part, to the extent set forth in this Memorandum and Order.  The parties are to

complete the re-opened depositions of Lato and Spota, if they elect to do so, by November 30,

2015.  This case is set down for an in-person conference on December 4, 2015 at 11 a.m.


                                        **SO ORDERED.**

Dated: Central Islip, New York
         September 30, 2015


                                        /s/ A. Kathleen Tomlinson
                                        A. KATHLEEN TOMLINSON
                                        U.S. Magistrate Judge