UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x

JULIET ANILAO, HARRIET AVILA, MARK
DELA CRUZ, CLAUDINE GAMAIO, ELMER          10-cv-0032 (JFB)(AKT)
JACINTO, JENNIFER LAMPA, RIZZA MAULION,
JAMES MILLENA, THERESA RAMOS, RANIER
SICHON and FELIX Q. VINLUAN,

                    Plaintiffs,


          -against-


THOMAS J. SPOTA, III, Individually and
as District Attorney of Suffolk County;
OFFICE OF THE DISTRICT ATTORNEY OF
SUFFOLK COUNTY; LEONARD LATO,
Individually and as an ASSISTANT
DISTRICT ATTORNEY OF SUFFOLK COUNTY;
COUNTY OF SUFFOLK; SENTOSA CARE, LLC;
AVALON GARDENS REHABILITATION AND
HEALTH CARE CENTER; PROMPT NURSING
EMPLOYMENT AGENCY, LLC.; FRANCRIS
LUYUN; BENT PHILIPSON; BERISH RUBINSTEN,
SUSAN O'CONNOR and NANCY FITZGERALD,

                    Defendants.

------------------------------------------------------------x

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT


JAMES O. DRUKER, ESQ.(JOD5944)          OSCAR MICHELEN ESQ. (OM5199)
KASE & DRUKER, ESQS.                    CUOMO LLC
Attorneys for Plaintiffs                Attorneys for Plaintiff VINLUAN
JACINTO, ANILAO, AVILA,                 200 Old Country Road
DELA CRUZ,GAMAIO, LAMPA,                Suite 2 South
MAULION, MILLENA, RAMOS                 Mineola NY 11501-4242
And SICHON                              516-741-3222
1325 Franklin Avenue
Garden City, New York 11530
(516) 746-4300

# TABLE OF CONTENTS

Table of Authorities.................................................................. ii

Preliminary Statement............................................................. 1

FACTS................................................................................ 5

    Background.................................................................. 5

    The Plaintiff Nurses Sign Contracts with Various Facilities
    But Work for Prompt Agency Instead......................................... 7

    The Plaintiff Nurses Consult Felix Vinluan.................................. 14

    The Resignations........................................................... 17

    Sentosa Retaliates......................................................... 23

    Involvement of DA Spota's Office........................................... 29

    The Grand Jury............................................................. 35

    Post-Indictment Proceedings................................................ 49

ARGUMENT............................................................................ 53

POINT I

    THE SENTOSA DEFENDANTS ARE NOT
    ENTITLED TO SUMMARY JUDGMENT............................................. 53

    Standards for Summary Judgment............................................. 53

    Sentosa is Liable as a State Actor......................................... 54

    The Sentosa Defendants are Liable for Malicious Prosecution............... 69

POINT II

    THE COUNTY DEFENDANTS ARE NOT
    ENTITLED TO EITHER ABSOLUTE
    OR QUALIFIED IMMUNITY...................................................... 76

Absolute Immunity.................................................... 76

Qualified Immunity................................................... 81

POINT III

AS THE EVIDENCE SHOWES THAT DEFENDANT
SPOTA HAD DIRECT PERSONAL INVOLVEMENT
IN THIS MATTER HE AND THE COUNTY ARE NOT
ENTITLED TO SUMMARY JUDGMENT...................................... 83

CONCLUSION................................................................. 95

TABLE OF AUTHORITIES

**Cases**

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . 55, 56

*Amato v. Hartnett,* 936 F.Supp.2d 416 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . 53

*Anilao v. Spota,* 774 F.Supp.2d 457, 507-509 (E.D.N.Y. 2011) . . . . . . . . . . . . . . 74

*Babi–Ali v. City of New York,* 979 F.Supp. 268 (S.D.N.Y. 1997). . . . . . . . . . . . . 85

*Baez v. Hennessy,* 853 F.2d 73, 76 (2d Cir. 1988) *cert. denied* 488 U.S. 1014. . . . 84

*Bailey v. City of New York,* 70 F.Supp.3d 424, 453-454 (E.D.N.Y. 2015), . . . . . . . 85

*Bang v. Utopia Restaurant,* 923 F.Supp. 46 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . 56

*Blake v. Race,* 487 F.Supp.2d 187 (E.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . . 54

*Board of the County Commissioners of Bryan County v. Brown,* 520 U.S. 397 (1997).
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Boyd v. City of New York,* 336 F.3d 72, 77 (2d Cir. 2003) . . . . . . . . . . . . . . . . 73

*Buckley v. Fitzsimmons,* 509 U.S. 259, 269 (1993) . . . . . . . . . . . . . . . . . . . . 77

*Carbajal v. County of Nassau,* 271 F.Supp.2d 415, 421 (E.D.N.Y. 2003). . . . . . . 77

*Carrillos v. Incorporated Village of Hempstead,* 87 F.Supp.3d 357 (E.D.N.Y. 2015);
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Cerrone v. Brown,* 246 F.3d 194, 199 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . 82

*Ciambriello v. County of Nassau,* 292 F.3d 307, 323 (2d Cir. 2002) . . . . . . . . . . 55

*City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989). . . . . . . . . . . . . . . . . 83

*City of St. Louis v.* Praprotnik, 485 U.S. 112, 123–25, 108 S.Ct. 915 (1988). . . . . 87

*Claude H. v. County of Oneida,* 214 A.D.2d 964 (4th Dept. 1995). . . . . . . . . . . . 85

*Coakley v. Jaffe,* 49 F.Supp.2d 615 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . 55

*Coggins v. Buonora,* 776 F.3d 108 (2d Cir. 2015). . . . . . . . . . . . . . . . . . . . . . 68

*Collins v. City of New York,* 923 F.Supp.2d 462, 477-478 (E.D.N.Y. 2013) . . . . . . 92

*Conte v. County of Nassau,* 2008 W.L. 905879 (E.D.N.Y. March 31, 2008) . . . . . 57

*Cox v. County of Suffolk,* 827 F. Supp. 935, 940 (E.D.N.Y. 1993). . . . . . . . . . . . 70

*Crews v. County of Nassau,* 2007 W.L. 4591325 (E.D.N.Y. Dec. 27, 2007) . . . . . . 73

*Dennis v. Sparks,* 449 U.S. 24, 27 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Douglas v. City of New York,* 595 F.Supp.2d 333, 342 (S.D.N.Y. 2009) . . . . . . . . 72

*Fields v. Wharrie,* __ F.3d __, 2014 WL 243246 (7th Cir. Feb. 23, 2014). . . . . . . 68

*Fisher v. State,* 10 N.Y.2d 60 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Fisk v. Letterman,* 401 F.Supp. 2d 362, 376 (S.D.N.Y. 2005). . . . . . . . . . . . . . 55

*Friedman v. NYC Administration for Children's Services,* 2005 WL 2436219
 (E.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Gentile v. County of Suffolk,* 926 F.2d 142 (2d Cir. 1991) . . . . . . . . . . . . . . . . 84

*Grandstaff v. City of Borger,* 767 F.2d 161, 170 (5th Cir. 1985) . . . . . . . . . . . . 92

*Harrison v. State of New York,* 95 F.Supp.3d 293, 322-323 (E.D.N.Y. 2015) . . . . 56

*Hickey v. City of New York,* 2002 W.L. 1974058 (S.D.N.Y. August 26, 2002). . . . 76

*In re Partnership 92 LP v. New York State Division of Housing and Community
 Renewal,* 46 A.D.3d 425, 849 N.Y.S.2d 43 (1st Dept. 2007) . . . . . . . . . . . . . . . 67

ii

*Jett v. Dallas Independent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Mandell v. County of Suffolk,* 316 F.3d 268, 385 (2d Cir. 2003). . . . . . . . . . . . . 84

*Maskantz v. Hayes,* 39 A.D.3d 211 (3d Dept. 2007) . . . . . . . . . . . . . . . . . . . . . . . 57

*Matthews v. City of New York,* 889 F.Supp.2d 418, 438-439 (E.D.N.Y. 2012) . . . 73

*McClellan v. Smith,* 439 F3d 137, 145 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 73

*Mesiti v. Wegman,* 307 A.D.2d 339 (2d Dept. 2003) . . . . . . . . . . . . . . . . . . . . . . . 57

*Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690–691 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*People v. Blake,* 139 A.D.2d 110, 530 N.Y.S.2d 578 (1st Dept. 1988). . . . . . . . . . 66

*People v. Donohue,* 229 A.D.2d 396, 645 N.Y.S.2d 60 (2d dept. 1996) . . . . . . . . 66

*People v. Faison,* 46 A.D.3d 425, 847 N.Y.S.2d 527 (1st Dept. 2007); *Isabella Geriatric Center, Inc. v. Novello,* 38 A.D.3d 356, 833 N.Y.S.3d 5 (1st Dept. 2007) 67

*People v. McGee,* 49 N.Y.2d 48, 56-57, 399 N.E.2d 1177 (1979) . . . . . . . . . . . . . 67

*People v. Stevens,* 76 N.Y.2d 833, 559 N.E.2d 1278 (1990) . . . . . . . . . . . . . . . . . 66

*Pierre v. City of New York,* 2007 W.L. 2403573 (E.D.N.Y. August 17, 2007) . . . . . 54

*Queens Boulevard Extended Care Facility v. Whalen,* 15 A.D.3d 378, 790 N.Y.S.2d 59 (2d Dept. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

*Rehberg v. Paulk,* 132 S.Ct. 1497 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*Rothstein v. Carriere,* 373 F.3d 275, 282-284 (2d Cir. 2004) . . . . . . . . . . . . . . . 73

*Rounseville v. Zahl,* 13 F.3d 625, 632 (2d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . 75

*Samtani v. Cherukuri,* 2015 W.L. 64671 (E.D.N.Y. Jan. 15, 2015) . . . . . . . . . . . 70

*Sankar v. City of New York,* 897 F.Supp.2d 297, 309 (E.D.N.Y. 297 (E.D.N.Y. 2012), *reconsideration denied,* 2012 WL 2923236 (E.D.N.Y. July 18, 2012) . . . . . . . . 70

*Shmueli v. City of New York,* 424 F3d 231, 236 (2d Cir. 2005) . . . . . . . . . . . . . . 76

*Smith v. Garretto,* 147 F.3d 91, 94 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 77

*Sutton v. Duguid,* 2007 W.L. 1456222 (E.D.N.Y. May 16, 2007) . . . . . . . . . . . . . 73

*United States v. Gordon,* 987 F.2d 902, 906-907 (2d Cir. 1993) . . . . . . . . . . . . . 55

*United States v. Pica,* 692 F.3d 79, 87 (2d Cir. 2012); . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Price,* 383 U.S. 787 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*United States v. Urena,* 73 F.Supp.3d 291, 298 (S.D.N.Y. 2014) . . . . . . . . . . . . . 55

*v. S.H. Kress & Co.,* 398 U.S. 144 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Vinluan v. Doyle,* 60 A.D.3d 237, 247–51, 873 N.Y.S.2d 72, 80–83 (2009), *as amended* (July 21, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 67

*Walker v. City of New York,* 94 F.2d 293, 301 (2d Cir. 1992) *cert. denied* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Walker v. City of New York,* 974 F.2d 293 (2d Cir. 1992), *cert. denied* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762), . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

*Walker v. City of New York,* 974 F.2d 293, 296 (1992) *cert. denied* 507 U.S. 961 84

*Walker v. Clearfield County District Attorney,* 413 Fed. Appx. 481 (3d Cir. 2011) 81

*Weintraub v. Board of Education of City of New York,* 423 F.Supp.2d 38 (E.D.N.Y. 2006), *vacated in part on other grounds* 489 F.Supp.2d 209 (E.D.N.Y. 2007) . 55, 57

*Weintraub v. Board of Education of City of New York, supra* at 55-56 (E.D.N.Y. 2006) *vacated in part on other grounds* 489 F.Supp.2d 209 (E.D.N.Y. 2007), . . 57

*Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Zahrey v. Coffey,* 221 F3d 341, 347 (2d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . 77

**Statutes**

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Public Officers Law § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

**Regulations**

Rule 29.2 of the Rules of the NYS Board Of Regents . . . . . . . . . . . . . . . . . . . . . . . 46

<u>Preliminary Statement</u>

Each defendant herein has moved for summary judgment dismissing the complaint.  Plaintiffs submit this memorandum in opposition to those motions.

This case evolves from the indictment of ten Filipino Nurses and their attorney, based upon the nurses' resignation from employment by defendant Prompt Nursing Employment Agency, which had assigned them to work at defendant Avalon Gardens.  Even a cursory reading of the charges demonstrates that the prosecution violated the First and Thirteenth Amendment of the United States Constitution; indeed, the Appellate Division so found when, in a highly unusual action, it granted a Writ of Prohibition preventing the District Attorney from continuing this abusive prosecution.  Once they were free of indictment, the plaintiffs commenced this action for damages stemming from the clear violation of their rights.

Based solely upon their self-serving denials that they engaged in a conspiracy to deprive the plaintiffs of their civil rights, the defendants now move for summary judgment.  The objective evidence, however, presents a quite different picture from that portrayed by the defendants.  It shows a District Attorney's Office that based many of its prosecutorial decisions upon political expediency rather than the legal or factual merits of the prosecution.  It shows a politically-powerful group of Nursing Home owners, the Sentosa organization, whose principals were able to use their influence to subvert the criminal justice system to their own ends.  This combination led to the unjust prosecution of the plaintiffs herein.

As will be more fully shown hereinafter, the resignations of the plaintiff nurses, and others working at other Sentosa facilities, although entirely legal, threatened the Sentosa defendants with the loss of a low-cost and easily exploited cadre of workers imported by them from the Philippines. The Sentosa organization made multiple promises to these nurses in the Philippines which their principals felt free to disregard once the nurses arrived in the United States. When nurses decided to leave their employment, they were faced with a $25,0000 penalty, which constituted the only part of the contract that the Sentosa defendants respected; for instance, they were not even hired by their contract employer.

Unable to bear their ill treatment any longer, the nurses sought help from their consulate, who referred them to an attorney, Felix Vinluan. Mr. Vinluan informed them that Sentosa's multiple breaches of their contracts entitled them to resign without fear of penalty, and they did so.

These resignations caused the Sentosa defendants to fear a wider rebellion. Thus, they quickly acted to suppress any further resignations. Bent Philipson, a principal of Sentosa, met with nurses from other facilities, to announce that the nurses who resigned would be prosecuted, be unable to work as nurses anywhere in the United States, and be deported, and that those who followed them risked the same fate. Philipson also targeted Mr. Vinluan, stating that Mr. Vinluan's "fingerprints" were "all over it," that Sentosa would be going after him as well, and his license to practice law would be revoked.

However, Sentosa's efforts did not initially result in the punishment of the plaintiffs herein.  The Suffolk County Police Department declined to take any action.  The Department of Education, which licenses nurses, found, after investigation, that the nurses did not violate the Education Law, either by abandoning patients, abandoning their employment, or acting unprofessionally or immorally.  The Nassau County Supreme Court, in a civil suit brought by the Sentosa entities against all of the plaintiffs herein (and others), declined to issue an injunction declaring that Sentosa was unlikely to prevail on the merits of their breach of contract claim.

Sentosa did, however, experience success outside the United States, based entirely upon Sentosa's ability to bring political pressure to bear on Philippine officials.  An investigation by Philippine authorities into their recruitment agency was stopped by the intervention of a United States Senator for whom Sentosa's attorney, Howard Fensterman, was a top fundraiser.  At the behest of Fensterman and Philipson, the Senator wrote three separate letters to ever-higher officials of the Philippine government, finally succeeding in getting the investigation quashed by the President of the Philippines.

From these contrasting experiences, the Sentosa defendants concluded that the plaintiffs would go unpunished unless political influence was brought to bear.  With one telephone call, Mr. Fensterman secured a meeting for himself and several key members of Sentosa with Suffolk County District Attorney Spota.  After the meeting, Spota assigned Assistant DA Leonard Lato to prosecute the case.  Spota

also introduced Lato to Fensterman at a meeting that was followed by a luncheon with all of those involved to discuss the prosecution of the nurses and their attorney.

Lato, as Spota knew or should have known, was a "loose cannon" with a penchant for crusading rather than prosecuting. Lato had a history of conducting his crusades with a stunning disregard for facts, the law, and the ethical obligations of a prosecutor. Lato kept Spota apprised of the progress of the investigation, including showing him a draft of the proposed indictment.

Lato, in his "investigation," studiously ignored any information that did not fit into Sentosa's mission to punish the nurses and their attorney. Despite requests to Lato by defense counsel, he refused to apprise the grand jury of the adverse rulings by the Nassau Supreme Court and the Department of Education. He did this despite the fact that the plaintiffs were indicted under regulations which the Department of Education's investigation found had not been violated. Moreover, the purportedly inculpatory evidence presented does not support any of the charges in the indictment.

Lato ignored a plethora of evidence, provided by the plaintiffs in interviews at which he was present, showing justification for the nurses' resignations as well as provocation by Avalon. He disregarded the fact that Avalon failed to address the needs of its vulnerable patients, understaffing the pediatric units in an effort to save money, forcing nurses to work in conditions unsafe to them and their patients. He drafted an indictment alleging that the nurses resigned in order to avoid paying

a $25,000 penalty, ignoring the fact that, among other things, the nurses' employer was Prompt Employment Agency, with which they had no contract. He ignored the grand jurors' several requests for exculpatory or explanatory evidence, and confused them by stating repeatedly that the nurses had "walked out." He did this without clarifying that no one walked off a shift. Lato even avoided a direct question from a grand juror about that issue. He indicted Mr. Vinluan based exclusively upon inadmissible hearsay testimony, which, in any event, did not support any of the charges against Mr. Vinluan. He gave inaccurate and inadequate charges on the law, and refused exculpatory charges that grand jurors themselves requested.

These intentional acts and errors by Lato are coupled with multiple lies told to the grand jury by witnesses affiliated with the Sentosa defendants.

In short, it is clear that an honest investigation would have quickly cleared the plaintiffs herein, consistent with the honest and unbiased investigation completed by the Department of Education and the holding of the Supreme Court. Based upon the evidence of conspiracy presented in more detail hereinafter, the Court should deny the motions for summary judgment.

## FACTS

Background

The plaintiffs are ten nurses and their former attorney, all of whom are natives of the Philippines.

A nursing shortage in the United States, combined with a job shortage in the Philippines, led to the establishment of multiple agencies in the Philippines that

recruited nurses to work in the United States.  The agencies helped the nurses to navigate the United States immigration system.  One such agency is defendant Sentosa Recruitment, ostensibly owned by defendant Francris Luyun.  That agency recruited nurses for facilities affiliated with defendant Sentosa Care, LLC.  At the time of the events that gave rise to this action, there were eleven such facilities, including defendant Avalon Gardens.

To distinguish itself from other agencies, and to encourage nurses to utilize its services, representatives of Sentosa Recruitment made numerous promises to potential nursing recruits  These pledges were embodied in brochures created and disseminated by Sentosa Recruitment, and included in group lectures to prospective recruits by Barish Rubenstein, Bent Philipson and Francris Luyun.  Among other things, the nurses were told:  (1) that Sentosa Recruitment was a "direct hire" agency, meaning that the nurses would be working directly for their sponsoring facilities and not for an agency; (2) that the nurses would be provided with free housing for their first two months in the United States; (3) that they would receive competitive pay ranging from $21 to $35 per hour; (4) that they would receive medical and dental coverage, as well as paid holidays and paid sick days; (5) that they would be reimbursed for processing fees;  (6) that they would receive generous shift differentials; (7) that they would receive  paid study leave; (8) that they would work, and be paid for, a 37.5 hour week.   (Exhibit A).

### The Plaintiff Nurses Sign Contracts with Various Facilities But Work for Prompt Agency Instead

Many nurses, including ten plaintiffs in this action, relied upon Sentosa Recruitment's promises and agreed to work for facilities affiliated with Sentosa Care. Each signed a contract with a specific facility; none signed a contract with Avalon. (See Exhibits B, C). It should be noted that each plaintiff signed his or her contract in the Philippines, and that the contracts were fraudulently notarized by a Brooklyn, New York notary, Mayer Fischl, either prior to the signatures being affixed by the nurses or after they had been affixed, but not in their presence (Exhibit B). None of the nurses ever met or saw Mr. Fischl. Defendant Philipson professed not to know whether Fischl had ever traveled to the Philippines (Exhibit PP 103-104). None of the plaintiff nurses signed a contract with Prompt.

The contract that all of the nurses signed obligated them to work for their employer for three years. If they left their jobs, they would be liable to the contract employer for $25,000 in "liquidated damages." (Exhibit B). In an action commenced by the Sentosa entities against the nurses who resigned, Justice Bucaria of the Nassau County Supreme Court declared this clause to be an illegal penalty and refused to enforce it. (Exhibit D).

After their contracts were signed and their immigration forms completed, the plaintiffs came to the United States in essentially two waves: the first arrivals were plaintiffs Theresa Ramos, Juliet Anilao, Rizza Maulion and Ranier Sichon; the remaining plaintiffs arrived approximately a year later (Exhibits E 12, F 26-27).

The plaintiffs quickly encountered a large gap between what Sentosa Recruitment had promised and what was delivered.

First and foremost, the nurse plaintiffs learned that they would not be working at the facilities with which they contracted.[1]  Rather, they were assigned to Avalon, despite not having contracted with it.  The initial nurse plaintiffs were given facility identification badges that identified them as "Agency Nurses," although they were later provided with Avalon Badges (Exhibit O).  Their pay checks were not from Avalon.  Instead, the checks were from the Prompt Agency (Exhibit P); Prompt was also the entity obligated to provide their health insurance (which did not include dental insurance despite the promises in the brochures), workers' compensation, and unemployment insurance (Exhibits H 30, Q 25-26).  All directives regarding changes in work and hours also emanated from Prompt.  Interestingly, when the nurses complained to Avalon about issues with their pay or hours, they were told to call their agency, as they were agency nurses (Exhibits F 29, G 35, H 33-34, J 39, K 29, L 52-53).

All of the nurses asked Luyun why they were not working for their petitioning employer.  Luyun replied that Avalon was jointly owned with that facility, and they were "all the same" (Exhibits H 23, J 31, L 37-38, N 45).  Luyun summarily denied all requests by the nurses to be moved to their petitioning employers, or to another facility (Exhibits J 31-32, N46-47, M 38-39).

---

[1] Some of the contracts of the nurse plaintiffs allowed them to be assigned to another facility, and some did not.  None of the contracts permitted them to be assigned to an agency.

The fact that they were agency nurses was not the only complaint made by the plaintiffs regarding the conditions of their employment. The "free housing" provided was a two-bedroom, one-bathroom staff house in Smithtown with as many as thirteen residents crowded in at the same time. The windows were broken. The toilet was frequently clogged. People slept in the living room, dining room and on the kitchen floor. (Exhibits I 37-38, J 58) One of the nurses described their existence as "living like animals." (Exhibit J 58-59).

Frequently, plaintiffs were not properly paid for the time that they worked. They were shorted hours; they were not paid overtime when due; they were not paid shift differential (Exhibits E 36-37, F 28-29, G 29-31, H 33, I 46, J 38-39, 42, K 28-29, M 42, 47., N 55). Their complaints to Avalon's staff were uniformly met with directions to "call your agency." They were specifically and repeatedly told that Prompt was their employer, not Avalon. When they complied by telephoning Prompt, they were often left on hold, or otherwise thwarted in their attempts to communicate the issues. They occasionally were able to obtain the pay that Prompt had cheated them out of, but the problems recurred during their entire tenure as Prompt employees (Exhibit H34, I 53-54, J 42-43, 45, K29, 35, L 47, 52-53, M 47-48, N 55, 57-58, 134).

Plaintiffs also were not allowed to work the promised shifts. The contracts specifically provided that the plaintiffs were to work one of three designated 8-hour shifts, and that they would have alternate weekends off (Exhibit A). Nonetheless, they were compelled to work 12-hour shifts.

In addition, upon their arrival in the United States, plaintiffs quickly learned that Prompt had not prepared for their arrival, and was unprepared to file their application for limited permits (Exhibit H 25, K20-21). A limited permit allows a nurse to work until he or she passes nursing tests and otherwise fulfills requirements for full licensing. Limited permittees must be supervised by the facilities at which they work. The nurses, in an unfamiliar country and without money, were eventually permitted to work as clerks at Avalon, for $12 per hour, far less than the $21 dollars they had been guaranteed under their contracts (Exhibit H 24-25, L 59). This situation generally extended for several months.

Avalon Gardens maintained a pediatric unit for children with chronic illnesses. Nine of the plaintiff nurses were assigned to that unit. Some of the children were on ventilators to aid in their breathing; others were not, but suffered from other serious medical issues. Plaintiffs Maulion, Ramos, Anilao, Sichon, Gamaio and Lampa worked with the ventilator patients, along with two Korean nurses. Plaintiffs Avila, Jacinto, and Millena worked with non-vented pediatric patients, along with seven other nurses in the rotation (Exhibits R, S). Plaintiff DelaCruz was assigned to the geriatric units, and did not work with pediatric patients (Exhibit EE).

The pediatric units began to operate at about the time that the first group of nurses arrived in the United States. The units were staffed by nurses. The vent unit also required a full-time respiratory therapist for each shift. The respiratory therapist was primarily responsible for the care of the ventilators, including

clearing patient secretions that blocked the ventilators (Exhibit J 33-34, T 2/13 13-14).  From the beginning, the nurses in the pediatric unit, particularly those in the vent unit, complained about inadequate staffing of the units.  At all times relevant to this lawsuit, there were approximately 11 patients on the vent unit and eight patients on the non-vent unit (Exhibit N 179).  As Nancy Fitzgerald, at the time the Avalon Director of Nursing, testified, the minimum staffing required was two RNs per unit per shift.  Thus, there should have been, at a minimum, four nurses for the pediatric unit on each shift (Exhibit U 16).  However, the plaintiffs also needed several aides to properly staff the units.  One of the patients in the vent unit was an ambulatory toddler, who frequently detached her vent.  Thus, one person was required to be with her at all times.  This left the other nurse in the untenable position of handling the needs of ten other patients.  Their duties included, among other things, medication administration, diaper changes, dressing, cleaning, and all other needs of the patients.  Without an aide assigned to the toddler, this workload was dangerous for both the nurse and the patients (Exhibit E 36-37, F 25, G 30, I 34-35, 46, J 35-38, K 24-25, L 43, M 42-44, 50-51, N 52-53).  Plaintiffs' frequent complaints about staffing brought them no relief, and they continued to work with dangerously inadequate staffing.  Their attempts to discuss this issue with Nancy Fitzgerald were met with hostility, and with no change to the staffing (Exhibit J 36-37, K 25-26, M 46).  In fact, Ms. Fitzgerald told James Millena that if the staff was inadequate for medication to be given in a timely manner, he should discard the medication (Exhibit L 45).

Without any valid reason, certain nurses were given badges that designated them as "RN Supervisors" (Exhibit V). Such badges were given to Elmer Jacinto, Ranier Sichon, Harriet Avila and Juliet Anilao. There was no explanation for this change, which did not result in any changes to the nurses' duties or rates of pay. In addition, several recipients of the supervisor badges were holders of limited permits, who, under the regulations of the Department of Health, were required to be supervised. Consequently, they were legally ineligible to be supervisors (Exhibit W).

In February 2006, following an increase in the prevailing wage rate mandated to be paid to foreign nurses, the plaintiff nurses were informed that their pay would be increased to comport with the new legal requirements, but that the number of hours worked by each would be reduced. Although the Sentosa defendants claimed that this would result in "the same" pay for the nurses, this was not the case. Prior to this change the plaintiff nurses had been paid for the contractually-mandated 37.5 hours at the rate of $22 per hour, or $825 per week (Exhibit A). Under the February 2006 directive, although their rate of pay was increased to $24 per hours, their hours were reduced to three 12-hour shifts, each of which would now contain a one-hour unpaid break. Thus the plaintiffs were only paid for 33 hours per week, making their new weekly compensation $792, less than they had been making, and less than they had been guaranteed in the contract. The plaintiff nurses noted that their paychecks were lower after the change

(Exhibits A, E 36-37, J 40-41, M 71-72). Their efforts to rectify this and other issues
were rebuffed by the staff at Avalon, Prompt and Sentosa.

First, on February 16, 2006, the nurses jointly authored a letter to Mr.
Philipson, on of Sentosa's principals, that aired complaints regarding the reduction
in salary, the difficult working relationship with administration, and the general
indifference to the concerns of the nurses. (Exhibit X). As a result of this letter,
they secured a meeting with Luyun at which they aired their grievances, to no avail
(Exhibit L 47). On March 3, the nurses wrote letters to Bent Philipson and to
Susan O'Connor, the administrator of Avalon. After again noting that their
grievances had not been addressed, the plaintiffs stated: "We hope to have positive
results by **Monday, March 6, 2006** or we will have to opt not to work until we are
treated with fairness and respect" (Exhibits Y, Z) [Emphasis in original].

The procedures in effect at Avalon required all of the nurses to schedule their
own shifts and to submit the schedules for approval on the 20th of each month. In
March 2006, the plaintiff nurses were told that they were to limit themselves to
only three shifts per week, and that they were no longer permitted to schedule
themselves for overtime. These new requirements led to gaps in the schedules for
both pediatric units (Exhibits R, S). Specifically, the schedules left the vent units
with no staff whatsoever on the Wednesday 7 am to 7 pm shift and the Friday 7 pm
to 7 am shift, throughout the month. The non-vent unit also lacked staff on the
April 1 morning shift, and on the evening shifts for April 3, 7, 10, 14, 21, 23 and 24.
All of these dangerous staffing shortages were the obvious product of cost-cutting

measures by Avalon, a for-profit entity.  The schedule also reflects that one nurse in the non-vent unit was on maternity leave, and that others were scheduled for shifts in each week; no vacations were noted.  These schedules were provided to the nursing administration at Avalon on or about March 20, ten days before they were to take effect.  Thus, the Avalon staff was on notice that there were uncovered shifts, for which Avalon was solely responsible (Exhibits K 46, M 69-70, N 72-75).  On a handwritten notice dated March 15, 2006, confirming the reduction in hours, the nurses were told: "The nursing office will cover 'missing' shifts." (Exhibit AA).

### The Plaintiff Nurses Consult Felix Vinluan

At this point, the plaintiff nurses decided to learn exactly what rights they had.  They were distressed by the fact that they were agency nurses, and not permitted to work for their petitioning employers.  They believed that this put their immigration status at risk.  This was in addition to the myriad complaints regarding their employment detailed above, none of which was mitigated by Prompt, Avalon or Sentosa.

Some of the plaintiff nurses were in contact with other Filipino nurses who worked in different Sentosa-affiliated facilities.  Plaintiffs, Elmer Jacinto discussed the situation with his friend Alipio Esguerra, who worked at Franklin.  The two sought the advice of plaintiff Felix Vinluan, an immigration attorney from the Philippines (Exhibits I 49, BB 24-26).  At the same time other Filipino nurses working in Sentosa-affiliated facilities independently contacted the Philippine

Consulate in New York, to request assistance from their home country. The officials at the Consulate also referred them to Mr. Vinluan. (Exhibit BB 32).

In 2006, Mr. Vinluan maintained a successful practice specializing in immigration and corporate issues (Exhibit BB 19). He neither owned nor was employed by any agency that employed immigrant nurses. He was retained by several agencies purely for immigration issues, but had no financial or ownership interest in the agencies that were his clients (Exhibit BB 211-212). Juno Health Care was not one of his clients at the time of the events in this case (Exhibit BB 212).

Mr. Vinluan graciously decided to charge each nurse a nominal fee of $100 (Exhibit BB 54). At the behest of a concerned Consulate, Mr. Vinluan undertook an investigation of the nurses' complaints so that he could report his findings to them (Exhibit BB 34, 54-55).

Numerous Filipino nurses employed at Sentosa-affiliated facilities, including the plaintiffs, met with Mr. Vinluan, either in his office in Manhattan or in Smithtown, where the plaintiff nurses resided. The plaintiffs retained him to assist with their ongoing issues with Sentosa (Exhibit BB 33-36). After they described their situation to Mr. Vinluan, he advised them about their rights and responsibilities. They did not seek his counsel because they wanted to resign, but to learn of their options (Exhibit BB 106-107).

First and foremost, Mr. Vinluan advised the nurses that in his opinion, their contract had been breached by their contracted employer. The nurses did not work

for any facility, including Avalon. Rather, they were employed by Prompt, with which they had not contracted. Mr. Vinluan advised that, if they elected to resign, they would not be liable for the penalties set forth in their contracts (Exhibit BB 28-29, 39-40). The nurses specifically testified that Mr. Vinluan did not advise them to resign, nor did he advise them of how to resign (Exhibits E 74-75, H 48-49). To the contrary, he advised them that, although they were legally free to resign, they should not immediately do so, because he intended to file legal proceedings on their behalf that, he hoped, might lead to a less drastic resolution of the issues (Exhibit BB 46-47). The nurses expressed skepticism about Mr. Vinluan's hope for change, stating that their own complaints produced, at most, a temporary solution. Their view of reality was that the situation always reverted to the unacceptable conditions about which they complained (Exhibit BB 55).

Mr. Vinluan correctly advised the nurses that if they chose to exercise their right to resign, under the Rules of the Department of Education, they must complete their shifts before any resignation could be effective (Exhibits BB 45, 183-184, 202, 235, DDD).

In addition to listening to Mr. Vinluan, the plaintiff nurses conducted their own internet research to determine their rights and obligations as nurses. They learned that, as Mr. Vinluan had informed them, their responsibility to patients began when they commenced their shifts, and ended when another qualified individual took over. It was the non-delegable duty of the facility to assure that

there were adequate arrangements for the care of the patients (Exhibits G 55-56, M 76).

In addition to advising the nurses of their legal rights, Mr. Vinluan offered to represent them in filing a complaint with the Office of the Chief Administrative Hearing Officer (OCAHO) concerning what he regarded as discrimination against the Prompt-employed nurses by Sentosa (Exhibit BB 177-178). Mr. Vinluan traveled to Smithtown to have the nurses sign complaints early on April 5, 2006. On the following day, he drove to Washington to personally file the complaints (Exhibit BB 48-49). He did this to ensure that the complaints were properly received and filed, because the documents in support of the complaints were extremely voluminous, and because of the importance of this case in the Filipino community (Exhibit BB 178-180). Mr. Vinluan hoped that the filing of the complaint would encourage the Sentosa-related facilities, or Prompt, to properly address the nurses' complaints (Exhibit BB 244-245).

### The Resignations

Independent of their consultations with Mr. Vinluan, the plaintiff nurses met with each other, and spoke to nurses from other Sentosa-affiliated facilities, regarding how to best improve their situation. Late in the evening of April 6, 2006, approximately ten nurses at the Brookhaven facility in Far Rockaway resigned their employment (Exhibits I 59, 62, BB 59-60). The plaintiff Avalon nurses considered whether to follow suit.

The next morning, April 7, 2006, a situation arose in the facility that brought many of the nurses' decisions to a head. Both Theresa Ramos and Rizza Maulion were scheduled to work the 7 a.m. to 7 p.m. shift in the pediatric vent unit. They arrived at the facility to begin this shift. At that point, Nancy Fitzgerald, the director of nursing, informed them that one of them had to go home, and return later to work an uncovered night shift. Both nurses protested vociferously (Exhibits K 46-47 M 67-68). They pointed out that the facility had been on notice for more than two weeks that the shift would be uncovered, and that the facility could have arranged coverage at any time. They stated that it was dangerous for the patients to have only one nurse per shift. Fitzgerald's response was that they would receive help from the nurses on the non-vent unit. This, the plaintiffs stated, was inadequate, because the patients required a high level of care, and a single nurse, even with the promised help of others who had their own patients and own units to tend to, would not be able to provide the required level of patient care (Exhibits K 47-48, M 67-68, 70, 79). Ms. Maulion also stated that she was not familiar with the nighttime routine, and that she was therefore uncomfortable working the night shift alone (Exhibit K 48-49, M 79). Both nurses pointed out that the schedule would lead to three shifts covered only by one nurse – the Friday morning shift, the Friday evening shift, and the Saturday morning shift, since Ms. Maulion, who was scheduled for that shift, could not work it if she worked all night (Exhibit CC). To those objections, Ms. Fitzgerald repeatedly stated that she was the "victim here," not the nurses (Exhibit M 82).

Upset by these developments, Ms. Ramos and Ms. Maulion asked Ms. Fitzgerald to sign a letter that they had drafted, detailing their objections. When she refused to provide her signature as an acknowledgement of receipt, it was signed by another supervisor (Exhibits K 50-52, CC).

Both nurses refused to work the night shift. Ms. Maulion asked if she could stay and work her assigned shift, only to be told by Ms. Fitzgerald that Ms. Ramos, who agreed to stay, must work alone. Ms. Maulion asked what would happen if she refused, only to be told that she could no longer work there (Exhibit K 46-47). Ms. Maulion, refused the shift and was sent home. Thus, at 7 a.m., the Avalon staff was aware that the 7 p.m. to 7 a.m. shift on the vent unit would not be covered, and that they had approximately 12 hours to arrange coverage (Exhibit K 52).

Ms. Maulion stated that this was the last straw. It had become clear to her, and to the other Avalon nurses, that the already bad conditions in the facility were worsening. The new schedule mandated by Avalon resulted in inadequate staffing, and showed that rather than hiring temporary staff, the administration at Avalon was insisting on maintaining dangerously low staffing levels in the pediatric unit and greatly overworking the nurses. The nurses were being paid less than the amount they had contracted for, and were not even consistently being paid that amount. In general, they were ignored and mistreated by the facility. Ms. Maulion, Ms. Ramos, and the other nurses assigned to the vent unit could no longer tolerate the situation, and refused to work under those conditions anymore (Exhibit H 54-55, J 64). Moreover, the remaining nurses who did not work regularly on the vent

units but who were afraid that they would be pressed into service on the vent units, similarly concluded that they could no longer work at Avalon (Exhibit E 87).

The nurses had extensive discussions about whether they should resign immediately or give notice (Exhibit J 73). For several reasons, they decided to resign immediately. First, they had been told repeatedly by Mr. Luyun that many replacement nurses were available to the facility, all of whom were waiting for positions to open up (Exhibit H 73, M 24, N 191-193). In addition, Avalon had access to nursing agencies that supplied nurses to facilities that needed shifts covered (Exhibit I 135), and the nurses had been affirmatively told in writing that the nursing office at Avalon would cover shifts (Exhibit AA). Also, the research conducted by both Mr. Vinluan and the nurses disclosed that, as long as the nurses did not walk off during a shift, they were under no legal obligation to give notice. In addition, Mr. Vinluan had informed them that they were agency nurses, and "at-will" employees. Thus, again, notice was not required (Exhibit F 61, L 17-18, N 113). Finally, based upon the mistreatment they had already endured, the nurses feared that, if they gave notice, the administration of Sentosa/Prompt would retaliate by asserting false allegations of misconduct as retaliation for their resignation, and to deter other unhappy nurses from taking similar action. The plaintiffs learned that the nurses who resigned at Brookhaven were immediately threatened with prosecutions and deportation (Exhibits F 69, H 85-86, I 62, 67-68, 127, L 85-86). Therefore, they determined that their resignations must be effective immediately.

All of the nurses signed uniform resignation letters (Exhibit DD). No nurse could clearly remember the source of the letter (Exhibit E 81, H 60). Each nurse stated that he or she would resign that day, and arranged for a letter to be prepared. Ms. Ramos called from the facility and requested that a letter be prepared on her behalf (Exhibit H 70-71). The letters were addressed to Prompt, Avalon, and Mr. Philipson, whom they correctly understood to be a principal of the facility.

The nurses proceeded to Avalon, where they handed their letters to Nancy Fitzgerald. Ms. Ramos, whose shift had at least three remaining hours, briefly left her unit to hand in her notice, and immediately returned to her duties (Exhibit M 74). Ms. Fitzgerald, after reviewing the letters, returned them to the nurses. She told them that they were not permitted to resign, and that they would be "in trouble" for what they were doing (Exhibit I 85-86, J 74-75). She then told Ms. Ramos that she would have to stay four hours after her shift ended to await replacements. Ms. Ramos readily acceded, remaining for the full four hours even though her replacement arrived several hours earlier (Exhibit M 84-85).

Thus, the resignation of the nurses on Friday took place at a time when the next shift was easily filled by the facility. The soonest that any of the resigning nurses was next scheduled to work was the 7 a.m. to 7 p.m. shift on Saturday; the longest time between resignation and schedule was four days (Exhibit EE)[2]. it should also be noted that, contrary to what the Sentosa defendants falsely

---

[2] To this date, none of the plaintiff nurses was paid for the final week of work, a criminal violation of the New York State Labor Law. *See,* New York Labor Law §§191(3), 197, 198-a.

21

represented to the Supreme Court of Nassau County, or (apparently) to Mr. Spota, it was not Good Friday; nor was it Passover. Passover began Wednesday, April 12, six days after the resignations. Regardless, the plaintiffs were unfamiliar with Jewish holidays, rituals and obligations.

The shifts in the pediatric unit were all covered by Avalon, and no patient was harmed or endangered by the resignations (Exhibit FF 97, 103-104, 118). Indeed, the facility did not notify the Department of Health that any patient was in imminent danger, as was their obligation had shifts been uncovered or patients actually endangered (FF 103-104). The shifts were covered by nurses from some of the eleven other Sentosa facilities (at least one of which had a vent unit) and nurses within the facilities (Exhibit T 1/30 14, 2/1 4-5, 81). It cannot be emphasized strongly enough that no nurse walked off a shift. This is undisputed.

The nurses all left their jobs without any prospect of alternative employment. They resigned because they could no longer tolerate the mistreatment that they and their patients suffered at the hands of the Sentosa entities (Exhibit M 149, N 113-114). None asked Mr. Vinluan for assistance with employment; nor did any secure employment through Mr. Vinluan or through any alleged client of Mr. Vinluan. The Philippine Nurses' Association suggested that they apply to St. Vincent's Downtown Hospital, which needed nurses (Exhibit BB 213). A number of the plaintiff nurses were hired by St. Vincent's; others obtained employment at the Carillon Nursing Home and other facilities (Exhibit E 12-13, F 13, G 11, H 9, I 11, J 9-10, K 9, L 13-14, M 9).

**Sentosa Retaliates**

The fact that all shifts were covered did not lessen the need of Sentosa defendants to ensure that the plaintiffs, and the others who resigned, were punished, in order to deter remaining nurses from similarly exercising their rights. On the night of the resignations, Philipson and Luyun telephoned Theresa Ramos at the facility and threatened that, if she did not rescind her resignation, she would lose her license, be deported, and be jailed. Philipson stated that the resignation was a spit in his face, and they would be sorry when he "pulled the trigger." (Exhibit J 88-90, M 22-25). In addition, Philipson or Luyun persuaded a friend and fellow countryman of Ranier Sichon, one Michael Piccio, to threaten Mr. Sichon via a telephone call. Piccio stated that Sentosa was very powerful and would ensure that Mr. Sichon was deported if he did not immediately "go back to Philipson" (Exhibit N 123-126).

The Sentosa defendants also filed a lawsuit in the New York State Supreme Court, Nassau County (Exhibit GG) against all of the nurses, Felix Vinluan, and Juno Healthcare Staffing Systems, Inc., a former client of Vinluan's in the nurse recruitment business. Explaining why Mr. Vinluan was included, Mr. Philipson asserted, in an Examination Before Trial in that action:

> Somebody did [induce the resignations] and <u>we believe</u> that he had his fingerprints all over it. And being that he was and still is in direct competition with us in trying to recruit nurses from the Philippines, <u>we believe</u> he had an ulterior motives [sic] here as well and, you know, that's what we believe. (Exhibit HH 106-107). [Emphasis added].

In that lawsuit, the Sentosa plaintiffs applied for an injunction to prevent Mr. Vinluan from soliciting any employees of those entities to resign their employment. On July 5, 2006, the Nassau County Supreme Court (Bucaria, J.) denied the motion. The Court stated:

> Plaintiffs' <u>unsubstantiated</u> assertion that the manner and timing of defendant Nurses' resignations constitutes professional misconduct does not establish, as plaintiffs suggest, their likelihood of prevailing on the merits of the breach of contract claim. Moreover, under the circumstances extant, where defendant Nurses requested the assistance of the Philippine consulate in April, 2006, requesting help in dealing with various violations of the promises made to them by Mr. Philipson during the recruitment seminars in the Philippines, and were referred to defendant Vinluan, the head of a group of volunteer Filipino lawyers, plaintiffs have failed to demonstrate either a likelihood of success on the merits <u>or a balancing of the equities in their favor on either their breach of contract or tortious interference claim against defendants</u>. Exhibit  II 4) (emphasis supplied).

On December 12, 2006, the complaint was dismissed as to Juno (without opposition from plaintiffs) on the ground that there was "no legal basis to sustain the claims asserted against them"[3] (Exhibit JJ)

Simultaneously with the filing of the complaint, and at the direction of counsel, Ms. O'Connor wrote a letter to the Department of Education complaining about the resignations and seeking to have the nurses' licenses and/or limited permits revoked (Exhibit W). In the course of the investigation, a Department of Education investigator asked about the supervisor badges that were given to some limited permittees. The investigator stated that Ms. O'Connor "advised that subject

---

[3] It should be noted that Philipson's sworn testimony regarding Mr. Vinluan's part in the resignations was made well after the two decisions above had called that theory into question, and despite the fact that the plaintiffs had not opposed the dismissal of the case against the entity Mr. Vinluan allegedly used to compete with the Sentosa entities.

nurses were given the title of nursing supervisor because of the union contract.

However, she advised that the nurses did not act or perform supervisory tasks; that

their tasks or responsibilities did not change." (Exhibit LL).  After investigation,

the Department of Education determined that the nurses had not abandoned a

patient or their employer, and had not committed any professional misconduct.  The

nurses were completely exonerated, and the complaints against them were

dismissed.  (Exhibit MM).

Shortly after the resignations, Mr. Philipson held meetings with Filipino

nurses in various facilities, in order to assure that none of the nurses still working

planned to resign.  A recording was made of this address by one of the nurses, a

copy of which will be supplied to the Court.  Mr. Philipson stated, in part:

> BP: u/i walked off shifts and abandoned u/i one, two, three just for your
> information, and if you have an open communication with them, it's good to
> get their words back to them because I know they just, they're young.  They
> just started off their careers here in the United States.  They took a wrong
> turn.  Somebody misled them.  Who—we know already who misled them.  We
> are fully aware.  And we are going to go after that person as well.  They took
> a wrong turn, but they have a chance 'til—basically, I told them, 'til
> tomorrow, u/i deadline, because by tomorrow u/i we'll be filing summonses
> against them.  They'll all have to appear in court to defend themselves.  First
> of all, there is a clause in the contracts that deals with these kind of things.
> But u/i we will be contacting the District Attorney tomorrow because what
> they did is actually a criminal offense, abandoning the patients the way they
> did.  It's irresponsible of them to just walk off.  You have to give—even if
> there was no contract—you have to give notice, and the way they did it,
> actually, they'll probably be losing their licenses u/i practice as nurses, which
> covers both New York, and anywhere in the United States.  We will be also
> filing grievances against them, back in the Philippines.  Why am I u/i?  Well,
> first of all, I want you to realize, in case u/i looking to make a fast buck off u/i.
> I know these nurses have paid to their lawyer five hundred dollars each, they
> know exactly what's going on.  And I'm sure some of you might have been
> approached or will be approached, and I want to caution you, first of all, not
> to take that stupid move, to do something silly as that.  I think you've seen

already, yeah, u/i you know that the director of nurses is a Filipino u/i also Filipino u/i just like yourselves, she came three years ago, started working at u/i. So you can see that there's room to grow here. Instead, what these have done, these nurses have done, is they've taken and thrown away their whole career, their whole future. If they're lucky enough to stay in the United States—which I don't know, because we will go after them for their Green Cards as well—if they're lucky enough to stay here, they will never work as nurses anywhere in the United States. They will be lucky to become domestic helpers. They'll be lucky. They might not even be able to stay here at all, because u/i if you're found to be criminal, to have done something criminal, which we feel they've done and will be going after them, you automatically lose your Green Card. It gets revoked. It's been very strictly enforced since 9/11, the United States has—it's been a law which has been on the books for many years, but has been very strictly enforced since 9/11. And so I'm telling you this to caution you. And if you have any concerns, the way you deal u/i is you talk to us, you don't do these stupid mistakes that they have done. And I think it's important that you know. If you can get the message over to them, u/i, because tomorrow afternoon, once we u/i, once we file with the Department of Education to get their license revoked, even if I want to be a Mr. Nice Guy and pull that back, I can't. Once I take that step, I have to go all the way towards u/i. I can't just play games with these things. I feel sorry for them because I know u/i the way you work, in Manila, the Philippines, some of you guys are from Manila, or where are you from?

UF: u/i

BP: I know how it goes with a lot of—you know how it goes yourselves over there, with a lot of unscrupulous recruitment agencies charging you money. We've had all this, we've been through that many times, I know exactly how it, how it works over there. You know, we were the first agency in the Philippines that didn't charge anybody a penny. And since then, a lot of people have—you know, in order to compete with us—have followed suit. Here you're dealing with, actually, another Filipino agency and a lawyer who is trying to recruit these nurses and is just trying to make money off them. And this lawyer himself is going to be in trouble because he's interfering with our contract—which is, again, illegal. And for a lawyer to do that is stupid because he can lose his license to practice law in the United States as well, which I don't know why they're doing that, quite frankly speaking. So, and I feel bad for them, because they're throwing away their entire future and easily u/i just for a few dollars for somebody else, and it's very, very similar u/i. And so that's my message to you, and to them, is that if you are in contact with them, to give this message to them. They have basically until tomorrow morning to call either myself, u/i and call us and let us know. There's already several nurses, mind you, who called us, u/i their fellow countrymen have done to them. But I feel we can extend an amnesty until

26

tomorrow, as I've said, because after, after that time, I cannot do anything to pull it back. <u>Once we pull the trigger, it's done</u>. We cannot, cannot turn back. I cannot tell the District Attorney, "I'm sorry, I made a mistake". It doesn't work that way. So if any of you have any concerns, want to discuss it with u/i I suggest you tell us as well, u/i feel comfortable, you know, in these kind of things. Um, that's really it. Have I made myself clear?

Exhibit NN (Emphasis supplied).

During this period, the Philippine Consulate attempted to assist the nurses. When the Consular officials received Mr. Vinluan's report regarding the nurses' complaints, they contacted their government to initiate an investigation of Sentosa Recruiting. Sentosa's license was temporarily suspended, pending the outcome of the investigation (Exhibit BB 214). Francris Luyun, the ostensible owner of Sentosa Recruiting, took no action whatsoever regarding the investigation (Exhibit OO 58). Rather, Philipson and his attorney, Howard Fensterman, Esq., contacted Senator Charles Schumer, for whom Fensterman was a major fundraiser. Philipson also contributed money to Senator Schumer's campaigns, for which Fensterman was the Long Island Fundraising chair (Exhibits PP 40; QQ 16, 73). In fact, Mr. Fensterman's website touted his "connections" in the political world as a lure to new clients, implicitly promising "influence" that could obtain results unobtainable by those without "connections." (Exhibit RR).[4] Fensterman further indicated that he was aware that a former partner of his, Mark Zafrin, was quoted in Newsday as saying that Fensterman's "special relationship" with politicians, including Schumer and Spota, had certain benefits. Fensterman denied that this was said (QQ 15-16).

---

[4] The firm has since removed this material from its website.

Fensterman's influence enabled him to secure a personal meeting for him and Philipson with Senator Schumer regarding the suspension of Sentosa Recruitment, although Philipson professed to not recall that meeting. Luyun did not attend that meeting (Exhibits OO 117, PP 206, QQ 72-73). As a result of the meeting, Senator Schumer intervened in the investigation in the Philippines, writing four letters over the course of two months to officials of the Philippine government, including President Gloria Macagapal-Arroyo. After initially being rebuffed by the Philippine minister, the Senator successfully pressured the Philippine President to restore Sentosa's license, and terminate the investigation (Exhibit SS). According to Newsday (Exhibit TT), over the next two months, Schumer received nearly $75,000 from investors, attorneys, and vendors for Sentosa-affiliated nursing homes.

In an interview with a Philippine newspaper in early June, 2006, Philipson bragged about his ability to punish the nurses who had resigned. He stated: "When all this is over, we will file slander cases against them, and they will know what slavery means." (Exhibit HH 157).

In addition, as part of his retaliatory campaign, Philipson unsuccessfully attempted to persuade the American Consul General to deport the nurses. (Exhibit T 2/1 38-39).

At the behest of counsel, Susan O'Connor went to the local police precinct to file a report, seeking to have the nurses arrested (Exhibit FF 111, QQ 60). Although the police report reflects that Mr. Fensterman accompanied her, both O'Connor and Fensterman denied that this was the case (Exhibit UU). The police

took no action in response to the complaint.  Although Fensterman told Newsday that the police "did not understand the gravity of this case," he later denied recollection of this interview.  However, he admitted that it was his belief that the Police Department did not understand the situation (Exhibit QQ 62-63). Defendant Spota testified that the police had assigned the complaint to the crime control unit, which also took no action.   (Exhibit VV 55-57, 63).  Leonard Lato testified that one of the DA investigators, Walter Warkenthein, confirmed to him that the police department declined to investigate the matter (Exhibit XX 74-75).

### The Involvement of DA Spota's Office

Having been thwarted in every attempt to carry out the threats made to the other Philippine nurses, the Sentosa defendants decided to flex their political muscle to make an example of the nurses.  With a telephone call to the District Attorney's Office, Mr. Fensterman was able to schedule a personal meeting with the District Attorney of Suffolk County (Exhibit VV 48).  Prior to scheduling the meeting, nobody asked why Fensterman wished to speak with the DA (Exhibit QQ 115-116).  The meeting lasted about 45 minutes (Exhibit VV 49).

As has recently been reported in the news, the Office of the District Attorney of Suffolk County has been misused by its current occupant for reasons other than the legitimate prosecution of guilty individuals.  Rather, the office has protected those whom Mr. Spota favors, while prosecuting those whom he does not favor.  Mr. Spota and members of his office are currently under criminal investigation by the United States Attorney for actions that include wrongful prosecution of individuals.

29

Newsday has reported various instances in which Mr. Spota's office has abused the criminal justice system by prosecuting, or refusing to prosecute, individuals based upon political considerations.   One series of allegations related to Mr. Spota's cover-up of allegations against his protégé, James Burke.  (Exhibit FFF).  These include allegations of wiretapping aimed at political enemies.  Another set of allegations concern one Robert Macedonio, an attorney probed for both drug use and political corruption.  After many hours of eavesdropping and overhearing compelling evidence of corruption and drug use, Mr. Spota's office participated in a deal that allowed Macedonio to plead guilty to a later-vacated felony and retain his license to practice law (Exhibit GGG).  A motion filed by federal prosecutors in March revealed that Spota refused to issue a subpoena to aid the Sheriff's internal affairs investigation of Edward Walsh, then chairman of the Conservative Party of Suffolk County, who was convicted later that month on federal charges of theft of government funds and wire fraud. Spota's actions forced the Sheriff to seek assistance from the United States Attorney's Office to address the wider issue of corruption in the DA's office.  Suffolk County Officials, and Newsday, have called for defendant Spota's resignation.  (See Exhibits HHH, III).

The meeting with Mr. Spota took place on May 31, 2006.  Howard Fensterman, Esq., Mr. Philipson and his business partner, Ben Landa,[5] Francris Luyun and Susan O'Connor attended the meeting (Exhibits FF 120, WW).  All participants claim to lack any meaningful recollection of what transpired in that

---

[5] Mr. Landa was not involved in the events of this case, but is involved in politics and political fundraising.

meeting. What little they did recollect was inconsistent with other participants' reports; for example, Susan O'Connor had a specific recollection of not speaking at the meeting until the end, while Mr. Spota recalled she was the most talkative person at the meeting (Exhibits FF 122, VV49-50, 125).

The individuals from Sentosa made a point of mentioning Felix Vinluan's purported role in the resignation of the nurses. They claimed that he was instrumental in the resignation of the nurses, and that he was in the parking lot at Avalon on the day of the resignations (Exhibit VV 52). This implied to Mr. Spota that Mr. Vinluan was involved in or advocated the resignations.

All participants in the meeting, who collectively remembered almost nothing else, were certain, however, that nothing improper occurred at the meeting.

Mr. Spota assigned Walter Warkenthein to undertake preliminary investigation, and then assigned Leonard Lato to the investigation and prosecution of the nurses and Mr. Vinluan. Mr. Lato had been hired by Spota from the United States Attorney's office, to be the head of Spota's Insurance Fraud Bureau, a position specially created for Lato. According to Mr. Spota, he hired Lato to be a liaison with the United States' Attorney's Office, with which his predecessor had a bad relationship (Exhibit VV 25-26). According to Lato, he was hired to do "special projects," and the title of Insurance Fraud Bureau Chief was simply a technicality to allow him to undertake these "special" investigations and to have the title of Bureau Chief (Exhibit XX 23). Mr. Spota and the other members of his office observed, during Lato's tenure as an Assistant District Attorney, that Lato did not

behave in a manner that was appropriate for an Assistant District Attorney. Mr. Spota explained that Lato was "virtually unsupervisable." He did not follow instructions and was rarely in the office because he spent much of his time in the United States Attorneys' office. Prosecutors in his bureau were significantly behind in their investigations because he was unavailable to supervise. They also observed that he made unsupported allegations of wrongdoing against others. As an example, Spota recounted that Lato falsely informed the United States Attorneys' Office that another Assistant District Attorney had committed a Federal crime (Exhibit VV169-171). Moreover, that erratic behavior was on display in the two cases based upon his prosecutorial misconduct now pending in this Court. In *Kanciper v. Lato,* 13-cv-871, Mr. Lato was sued, *inter alia*, for violating the policy of the District Attorney's Office against "DA Shopping," personally prosecuting a case after it had been rejected by another ADA. In explaining why he personally prosecuted the case, Lato characterized the Bureau Chief who originally rejected the case as "lazy and stupid," a charge that he repeated, and amplified, in his deposition testimony in this case (Exhibits VV 42-43, XX 43). When he became agitated by the questioning by counsel for the nurses, Lato made extremely outrageous and profane remarks on the records. Specifically, when he was admonished for consulting with his attorney while a question was pending, he stated: "I can do whatever I want, okay? Too fucking bad." Not content with this outburst, he characterized opposing counsel as a "cocksucker." (Exhibit XX 234-235).

Once Lato was assigned to the "nurses' case," Spota telephoned Howard Fensterman, Esq. to report on his office's progress and his plans regarding the prosecution. After a meeting in the office to introduce Lato and to discuss the investigation, the participants went out to a lunch paid for by Mr. Fensterman. Lato professed to have paid no attention to what Mr. Fensterman said at the meeting and lunch, but did recollect that Fensterman "threw Felix Vinluan's name around." (Exhibit QQ 67-68, XX 57, 64-65).

Mr. Lato then launched his investigation, obtaining documents from the Avalon facility, which he personally visited. Included in these documents were the April schedules showing the uncovered shifts in the pediatric unit (Exhibit PP 160-163).

Lato personally interviewed a number of the nurses and Felix Vinluan, falsely telling them that the interviews were routine and needed for closing the investigations (Exhibits K 79-80, XX 81). He interviewed Mr. Vinluan, claiming that he decided to make Mr. Vinluan a target of the investigation because Mr. Vinluan allegedly "lied" about driving to Washington D.C. to file the petitions with OCAHO. Lato claimed that Mr. Vinluan stated that he drove to Washington because he did not know the address of OCAHO. Lato characterized this "lie" as so transparent as to be "almost laughable" (Exhibit XX 374-375, 405-406). However, at the Grand Jury, DA Investigator Warkenthein, who was at the same meeting with Lato and Vinluan, acknowledged that Mr. Vinluan said that he drove to Washington, D.C. to ensure that the petitions were properly received by OCAHO.

In addition, plaintiff Jennifer Lampa observed that Lato appeared to be targeting Mr. Vinluan. He asked her whether Mr. Vinluan had asked her to resign. When she said no, Lato and the investigator accused her of covering for Mr. Vinluan. From Lato's facial expression, she could see that he was upset, and when she stated that she was not covering for Mr. Vinluan, Lato stood up and left the interview (Exhibit J 85-87). He continued to investigate Mr. Vinluan at the Sentosa Defendants' behest and uncovered no evidence of wrongdoing. A chart in the District Attorney's file reveals the extent of the investigation into Mr. Vinluan's and his family's businesses (Exhibit KKK). None of these businesses involved recruiting nurses from the Philippines.

Mr. Lato then went further and presented the case to the grand jury, despite the fact that, as he knew, the Department of Education had determined that the nurses did not abandon patients or the facility, and that none of the children was endangered in any way or harmed in any way by the nurses' resignations (Exhibit YY)[6]. He learned this from Mr. Vinluan, who had provided Lato with the findings of the Department of Education at the time of their first meeting, and from the e-mail he received from Thomas Keller of the DOE. Mr. Vinluan's attorney had specifically requested that Mr. Lato present the Department of Education findings to the grand jury, but Lato did not do so.

---

[6] Plaintiffs mistakenly pled, in ¶76 of the amended complaint, that the plaintiffs did not receive notice or the opportunity to testify. Plaintiffs withdraw that allegation.

**The Grand Jury**

The grand jury presentation was fraught with false testimony, misstatements of the law, and refusals by Lato to answer Grand Jurors' legitimate inquiries into areas that would have exonerated the plaintiffs. Moreover, Lato failed present any of the exculpatory evidence that he possessed, or was aware of.

Lato commenced the presentation by telling the grand jurors that this was a case about nurses "abandoning patients." (Exhibit T 1/30 6-8). The grand jurors immediately inquired about the contract dispute. One stated: "I need to know both sides because there is only so much somebody can eat, you know" (Exhibit T 1/30 10). However, Mr. Lato utterly failed to ensure that "both sides" were fairly presented.

As often as possible, Lato stated that the nurses had "walked out." (*See, e.g.,* Exhibit T 1/30 6-7, 8; 2/1 59-60, 61, 62-63, 84-85; 2/8 3, 11-12, 16-18, 30). At the beginning of the presentations, one of the jurors specifically asked about this word usage, stating: "He [Investigator Warkenthein] used the term 'walked out' several times which seems to indicate they walked out in the middle of their shifts. I would like to know if they did in fact walk off the job during their shift" (Exhibit T 1/30, 61). Knowing that the honest answer was that not a single nurse left during his or her shift, Lato declined to clear up the confusion, stating that the jurors would have to "get that from somebody else." *Id.* Thereafter, adding to the prejudice, and creating a false impression, Lato continued to use the term "walked out" frequently when referring to the resignations. This led the grand jurors to use the same