# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

───────────────────

Nº 10-CV-00032 (JFB) (AKT)

───────────────────

JULIET ANILAO, ET AL.,

Plaintiffs,

VERSUS

THOMAS J. SPOTA, III, ET AL.,

Defendants.

───────────────────

**MEMORANDUM AND ORDER**
November 28, 2018

───────────────────

JOSEPH F. BIANCO, District Judge:

Juliet Anilao, Harriet Avila, Mark Dela Cruz, Claudine Gamaio, Elmer Jacinto, Jennifer Lampa, Rizza Maulion, James Millena, Theresa Ramos, Ranier Sichon (the "nurse plaintiffs"), and Felix Q. Vinluan ("Vinluan") (collectively "plaintiffs") brought this action against Thomas J. Spota, III, individually and as District Attorney of Suffolk County ("District Attorney Spota" or "Spota"); the Office of the District Attorney of Suffolk County ("the DA's Office"), Leonard Lato, individually and as an Assistant District Attorney of Suffolk County ("Lato"), and the County of Suffolk (collectively the "County defendants");

Sentosa Care, LLC ("Sentosa"), Avalon Gardens Rehabilitation and Health Care Center ("Avalon"), Prompt Nursing Employment Agency, LLC ("Prompt"), Francris Luyun ("Luyun"), Bent Philipson ("Philipson"), Berish Rubinstein ("Rubinstein"), Susan O'Connor ("O'Connor"), and Nancy Fitzgerald ("Fitzgerald") (collectively the "Sentosa defendants"),[1] alleging that the County defendants and the Sentosa defendants violated plaintiffs' constitutional rights

---

[1] Plaintiffs request that Rubinstein be dismissed from this action. (*See* Pls.' Aff. Opp'n Mot. Summ. J., ECF No. 121 ¶ 2.) Accordingly, the Court dismisses Rubinstein from the action. Moreover, as noted *infra*, the Court previously dismissed defendants O'Connor and Fitzgerald. Thus, for purposes of this Memorandum and Order, the "Sentosa defendants" does not include these three defendants who have been dismissed from the case.

1

pursuant to 42 U.S.C. § 1983 ("Section 1983").[2]

As set forth in more detail below, the claims in this case stem from what was originally an employment dispute between the nurse plaintiffs and the Sentosa defendants. Based upon the undisputed facts, the record demonstrates that Sentosa recruited the nurse plaintiffs to work in the United States, and they were placed at the Avalon facility. Many of the nurse plaintiffs were specifically assigned to work in Avalon's pediatric ventilator unit, a unit whose patients required intensive medical care. The nurse plaintiffs had a number of complaints about their employment conditions. They voiced these complaints several times, beginning at the latest on February 16, 2006. By letter dated March 3, 2006 and addressed to Bent Philipson, an owner of Avalon and Sentosa who was also involved in the management of the facility during the relevant time period, and Susan O'Connor, the Administrator of Avalon, the nurse plaintiffs outlined their complaints. They further stated that, if they did not "have positive results" by March 6, 2006, they would not work until they were "treated with fairness and respect." The nurse plaintiffs also consulted Felix Vinluan, an immigration and employment attorney, about their complaints. Vinluan advised the nurse plaintiffs that, in his opinion, Sentosa breached its employment contract with them and that the nurse plaintiffs were legally free to resign.

On the afternoon of April 7, 2006, the nurse plaintiffs submitted resignation letters to Nancy Fitzgerald, Director of Nursing at Avalon. At the time of their resignation, only one of the plaintiff nurses, Theresa Ramos, was completing a shift at the facility. Ramos finished her shift. None of the nurse plaintiffs returned to work at Avalon after tendering their resignation.

There is a factual dispute as to how difficult (if at all) it was to secure coverage for the post-resignation shifts the nurse plaintiffs had been assigned to before they resigned, as well as whether any of the nurse plaintiffs' patients were ever in danger because of the need to secure coverage. However, it is undisputed that the Sentosa defendants did ultimately secure coverage for these shifts, and no patient was harmed as a result of the resignation.

In response to the resignation, O'Connor filed a complaint with the New York Department of Education and a police report with the Suffolk County Police Department ("SCPD"). The police report states that Avalon "wishe[d] to document that 11 workers . . . walked out of work and never returned without notice." The police did not take any action against plaintiffs in response to O'Connor's police report, and the Department of Education declined to revoke the nurses' licenses.

Sentosa's counsel, Howard Fensterman, secured a personal meeting with the District Attorney of Suffolk County, Thomas Spota. According to Leonard Lato, an assistant district attorney whom Spota later assigned to work on the case, Spota had given Fensterman "an audience" because they

---

[2] One of plaintiffs' claims is that Lato violated their due process rights by allegedly informing them that they were not targets of the Grand Jury (when they in fact were targets), and that this resulted in the plaintiffs' decision not to testify before the Grand Jury. Defendants make a number of arguments as to why this claim should fail. However, by its Memorandum and Order on the motion to dismiss, the Court already ruled that Lato and Spota were entitled to absolute immunity for the conduct underlying this claim, which is related to the Grand Jury. (See Memorandum and Order, ECF No. 31 at 22-23.) Thus, this Court has already dismissed this particular claim.

knew each other. At the meeting, the Sentosa defendants presented information concerning the resignation to Spota and some of his staff, including that the nurse plaintiffs had resigned without notice and that there had been concern on the part of the Sentosa defendants that something horrific could have happened to the patients because of the resignation. At some point, Spota became aware of O'Connor's contact with the SCPD. Spota agreed to investigate the case, and subsequently assigned it to Lato.

In the course of his investigation, Lato visited the Avalon facility twice, and he and investigators from the DA's Office interviewed several of the plaintiffs. Ultimately, Lato decided to present the case to the Grand Jury. According to plaintiffs, in the course of the Grand Jury presentation, several of the Sentosa defendants made false statements. Moreover, plaintiffs assert, among other things, that the Grand Jury was misled to believe that the nurse plaintiffs may have resigned during their shifts (as opposed to at the end of their shifts). On March 6, 2007, the Grand Jury returned an indictment against plaintiffs, charging them with endangering the welfare of a child, endangering the welfare of a physically disabled person, conspiring to do the same, and solicitation.

The prosecution of plaintiffs was halted, however, when the New York State Appellate Division granted plaintiffs' Article 78 petition for a writ of prohibition based upon the fact that plaintiffs were being "threatened with prosecution for crimes for which they cannot constitutionally be tried." *Matter of Vinluan v. Doyle*, 873 N.Y.S.2d 72, 83 (2d Dep't 2009). Specifically, the Appellate Division found that the prosecution sought to punish the nurse plaintiffs for resigning from their employment at will, and to punish Vinluan for providing legal advice to the nurses in connection with their resignation. As such, the court found that the prosecution violated plaintiffs' First and Thirteenth Amendment rights.

After the prosecution of plaintiffs was accordingly prohibited, on January 6, 2010, plaintiffs commenced this action in federal court, alleging that defendants violated their constitutional rights in a variety of respects and seeking to vindicate those rights under Section 1983 and state law.

On March 23, 2010, the County defendants and the Sentosa defendants moved to dismiss the Amended Complaint. (ECF Nos. 14-15, respectively.) On March 31, 2011, the Court granted in part and denied in part the motions. (ECF No. 31.)[3] As to the County defendants, the Court concluded that (1) the individual County defendants were entitled to absolute immunity for conduct in their role as advocates in connection with the presentation of the case to the Grand Jury; (2) the individual County defendants were not entitled to absolute immunity for alleged misconduct during the investigation of plaintiffs[4]; (3) plaintiffs sufficiently pled Section 1983 claims against the individual County defendants for alleged Due Process

[3] The Court also dismissed all claims brought against defendants Spota and Lato in their official capacities. (*See* ECF No. 31 at 2 n.4.)

[4] The Court reached this conclusion because a prosecutor is not entitled to absolute immunity for any alleged violations of due process (including any alleged fabrication of evidence) arising from conduct he performs in an investigative capacity, not

undertaken in preparation for a Grand Jury presentation or in the prosecutor's role as an advocate. (ECF No. 31 at 4.) The Court also concluded that, at that time, it was unable to determine whether the individual County defendants are entitled to qualified immunity for any actions they took in an investigative capacity.

violations in the investigative stage; and (4) plaintiffs sufficiently pled a claim for municipal liability against the County of Suffolk. As to defendants Philipson, Luyun, Rubinstein, Sentosa, Prompt, and Avalon, the Court concluded that (1) plaintiffs sufficiently alleged that they were acting under color of state law; and (2) plaintiffs sufficiently pled claims for malicious prosecution and false arrest under both Section 1983 and state law, as well as a Section 1983 conspiracy claim.[5] The Court dismissed the claims against defendants O'Connor and Fitzgerald.

The County defendants, the Sentosa defendants, and defendant Spota now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF Nos. 115-117.) For the reasons set forth below, the Court grants the County defendants' motion for summary judgment in its entirety. With respect to the Sentosa defendants' summary judgment motion, to the extent that plaintiffs have asserted a Section 1983 conspiracy claim against the Sentosa defendants for conspiring to fabricate evidence in the investigative stage with the County defendants, the motion for summary judgment is granted as to that claim. However, the Court denies the Sentosa defendants' motion for summary judgment on the malicious prosecution and false arrest claims under federal and state law.

The County defendants are granted summary judgment because, as noted above, Spota and Lato are absolutely immune for conduct relating to the Grand Jury proceeding (including the initiation of the charges), and the Court concludes that they are entitled to summary judgment for their other conduct. The Court reaches this conclusion because there is simply no evidence in the record that they engaged in any constitutional wrongdoing in the investigative phase of the case. In particular, plaintiffs' only allegation that pertains to conduct outside the scope of the Grand Jury (and the charging decision itself) is that Lato fabricated evidence. However, this allegation is not supported by any evidence in the record (including any reasonable inferences from the record), and thus it constitutes mere speculation. Because speculation cannot create an issue of fact, Spota and Lato are entitled to summary judgment for their conduct in the investigative phase and, thus, the Court grants the County defendants' motion for summary judgment as to them.

The Sentosa defendants who testified before the Grand Jury are also entitled to absolute immunity insofar as that testimony is concerned. However, as private actors, they do not have the benefit of absolute or qualified immunity with respect to their other conduct in connection with the alleged malicious prosecution and false arrest. They have moved for summary judgment on a number of other grounds. However, construing the facts (and all reasonable inferences from those facts) in the light most favorable to plaintiffs, the Court concludes that there are genuine disputes as to material facts such that summary judgment is not warranted as to the malicious prosecution and false arrest claims against the Sentosa defendants.

As a threshold matter, the Court concludes that plaintiffs have created a

---

[5] The Court reached this conclusion, despite the Sentosa defendants' arguments to the contrary, because the Amended Complaint sufficiently alleged that, as private actors, they engaged in a conspiracy with the state actors to jointly deprive plaintiffs of their constitutional rights. (ECF No. 31 at 5.)

material issue of disputed fact as to whether the Sentosa defendants were willful participants in joint activity with the Suffolk County District Attorney's Office, such that they may be considered state actors for purposes of Section 1983. Construing the evidence in the light most favorable to plaintiffs, a rational jury could find that the Sentosa defendants exerted influence over the DA's Office through Spota, that the Sentosa defendants encouraged the bringing of charges against the plaintiffs, and that the judgment of the Sentosa defendants as to the evidence and as to whether charges should be brought was substituted for the judgment of the DA's Office.

With respect to the malicious prosecution claim, there are disputed issues of fact that preclude summary judgment on each of the elements. First, it is undisputed for purposes of this motion that the prosecution was terminated in plaintiffs' favor. Second, with respect to the "initiation" element, there is evidence that the Sentosa defendants did more than simply supply information and cooperate with the investigation of the DA's Office. Instead, construing the evidence in the light most favorable to plaintiffs (including drawing all reasonable inferences in their favor), the Court concludes that a reasonable jury could find that the Sentosa defendants, through their meetings with Spota and Lato, instigated and actively urged the alleged unlawful prosecution of the plaintiffs. The Court likewise concludes that the evidence could lead a reasonable jury to find that Lato's investigation and decision to bring the case before the Grand Jury was influenced by the Sentosa defendants' conduct, and that the resulting Grand Jury indictment did not sever any chain of causation between the conduct by the Sentosa defendants and plaintiffs' prosecution because it was a continuation of the effects of their conduct.

Third, the Court concludes that there are material issues of fact that preclude summary judgment as to whether there was probable cause to prosecute plaintiffs. The Court reaches this conclusion first by examining whether there is any material issue of disputed fact as to whether the Grand Jury indictment creates a presumption of probable cause. Having reviewed the Grand Jury transcript, the Court concludes that plaintiffs have raised a material issue of disputed fact as to whether there was false testimony in the Grand Jury, whether critical evidence was suppressed in the Grand Jury proceeding, and whether there were other irregularities such that the indictment was the result of bad faith. Upon such a determination, there would be no presumption that there was probable cause to prosecute plaintiffs, and the jury would need to resolve whether probable cause existed independently of the indictment. The Court also concludes that there are material issues of disputed fact on this point because, in light of the evidence in the record that plaintiffs gave notice of their intention to resign, that the Sentosa defendants were able to secure coverage for their shifts, and that the nurse plaintiffs did not "walk off" during a shift, a reasonable jury could determine that there was no probable cause to believe plaintiffs were guilty of endangering the welfare of a child, endangering the welfare of a physically disabled person, conspiring to do the same, or solicitation. Moreover, there are issues of disputed fact that preclude summary judgment on the issue of whether the Sentosa defendants were motivated by malice.

In short, given these factual disputes, the Court denies the Sentosa defendants' motion for summary judgment as to the malicious prosecution claim against them under federal and state law.

Finally, the Court concludes that these same factual disputes also preclude summary judgment on the false arrest claim against the

Sentosa defendants. Construing the evidence in the light most favorable to plaintiffs, a rational jury could conclude that the Sentosa defendants affirmatively instigated, encouraged, and caused plaintiffs' arrest. Accordingly, the Court also denies the Sentosa defendants' motion for summary judgment as to the false arrest claim against them under federal and state law. Thus, the case will proceed to trial against the Sentosa defendants as to the malicious prosecution and false arrest claims under federal and state law.

## I. BACKGROUND

### A. Factual Background[6]

The following facts are taken from the parties' depositions, affidavits, and exhibits, and the parties' respective Rule 56.1 statements of fact.[7] Unless otherwise noted,

the facts are uncontroverted. Upon consideration of the motion for summary judgment, the Court shall construe the facts in the light most favorable to plaintiffs as the nonmoving party, and will resolve all factual ambiguities in their favor. *See Capobianco v. New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2001).

### 1. The Parties and the Avalon Facility

Defendant Avalon operates a private nursing home located in Smithtown, New York, which has multiple nursing units, including a long-term pediatric care center. (Sentosa's 56.1 ¶ 1.) Avalon opened its pediatric unit in or around February 2004, and thereafter opened a pediatric ventilator unit to serve disabled children who required ventilator care. (Sentosa's 56.1 ¶ 2; Dep. Tr. Susan O'Connor ("O'Connor Dep."), ECF Nos. 115-9, 116-4, 123-6.)[8] Defendant

---

[6] The Sentosa defendants devote a significant portion of their 56.1 statement and briefs to the argument that plaintiffs do not have direct knowledge of a conspiracy or joint action between the DA's Office and the Sentosa defendants. (*See, e.g.*, Sentosa's 56.1 ¶¶ 62-76; Sentosa's Repl. Br. 1.) The Court does not repeat that portion of the 56.1 statement here because it is not necessary that plaintiffs possess direct knowledge of a conspiracy or joint action for a Section 1983 claim to proceed against private defendants, as discussed *infra*. Moreover, plaintiffs set forth evidence in their 56.1 statement regarding the details of the background of their employment issues with the Sentosa defendants, as well as the circumstances surrounding the 2006 suspension of Sentosa's license to recruit in the Philippines and its subsequent reinstatement. However, the Court has not summarized those facts because they are not material to the Court's disposition of the summary judgment motion that is the subject of this Memorandum and Order.

[7] Those documents are: Cnty. Defs.' Rule 56.1 Statement ("Cnty.'s 56.1"), ECF No. 115-3; Sentosa Defs.' Rule 56.1 Statement ("Sentosa's 56.1"), ECF No. 116-1; defendant Spota's Rule 56.1 Statement ("Spota's 56.1"), ECF No. 117-2; Pls.' Rule 56.1 Statement ("Pls.' 56.1"), ECF No. 126-1; Pls.' Resp. Cnty. Defs.' Rule 56.1 Statement ("Pls.' Resp. Cnty.'s 56.1"), ECF No. 126-2; Pls.' Resp. Spota's Rule 56.1

Statement ("Pls.' Resp. Spota's 56.1"), ECF No. 126-4; Pls.' Resp. Sentosa 56.1 Statement ("Pls.' Resp. Sentosa's 56.1"), ECF No. 126-3; and Sentosa's Resp. Pls.' 56.1 Statement ("Sentosa's Resp. Pls.' 56.1"), ECF No. 133-1.

[8] In addition to O'Connor's deposition transcript, the following deposition transcripts are referenced herein: Dep. Tr. Philipson ("Philipson Dep."), ECF Nos. 115-21, 116-5, 116-6, 123-15; Felix Vinluan ("Vinluan Dep."), ECF Nos. 115-14, 116-7, 123-2; Dep. Tr. Thomas J. Spota ("Spota Dep."), ECF Nos. 116-10, 124-6; Dep. Tr. Elmer Jacinto ("Jacinto Dep."), ECF Nos. 115-7, 116-17, 121-9; Dep. Tr. Harriet Avila ("Avila Dep."), ECF Nos. 115-16, 116-18, 121-6; Dep. Tr. Rizza Maulion ("Maulion Dep."), ECF Nos. 115-18, 116-19, 122-1; Dep. Tr. Theresa Ramos ("Ramos Dep."), ECF Nos. 115-6, 116-20, 122-3; Dep. Tr. James Millena ("Millena Dep."), ECF Nos. 115-19, 116-21, 122-2; Dep. Tr. Mark Dela Cruz ("Dela Cruz Dep."), ECF Nos. 115-8, 116-22, 121-7; Dep. Tr. Claudine Gamaio ("Gamaio Dep."), ECF Nos. 115-20, 116-23, 121-8; Dep. Tr. Juliet Anilao ("Anilao Dep."), ECF Nos. 115-17, 116-24, 121-5; Dep. Tr. Jennifer Lampa ("Lampa Dep."), ECF Nos. 115-15, 116-25, 121-10; Dep. Tr. Ranier Sichon ("Sichon Dep."), ECF Nos. 116-26, 122-4; Dep. Tr. Howard Fensterman ("Fensterman Dep."), ECF Nos. 116-11, 124-1; Dep. Tr. Nancy Fitzgerald ("Fitzgerald

Sentosa is a company formed to provide shared services among various nursing homes located in the New York metropolitan area, including shared consultants and financial services. (Sentosa's 56.1 ¶ 3; Philipson Dep. 12.) Defendant Philipson has an ownership interest in both Avalon and Sentosa. (Sentosa's 56.1 ¶ 4; Philipson Dep. 9-12.) Philipson was also the chief operating officer of Sentosa and Avalon, and was involved in the management of Avalon during 2005 and 2006, the relevant time period for the instant case. (Sentosa's 56.1 ¶ 5; Philipson Dep. 16.) Defendant Prompt is an agency that provided payroll services to Avalon for nurses it employed, as well as other services to nurses recruited from other countries who worked for Avalon. (Sentosa's 56.1 ¶ 6; Philipson Dep. 63-65.) Defendant Luyun was involved in the recruitment of nurses in the Philippines for employment in nursing homes in the United States, including Avalon. (Sentosa's 56.1 ¶ 7; O'Connor Dep. 28-29.) Defendant O'Connor was the Administrator of Avalon, and oversaw the entire operation of the facility during the relevant time period. (Sentosa's 56.1 ¶ 8; O'Connor Dep. 17.)

Plaintiff Vinluan acted as an attorney and provided legal advice to the nurse plaintiffs in March and April 2006. (Sentosa's 56.1 ¶ 11; Dep. Tr. Vinluan Dep. 24, 27, 43-44, 49-52.) The nurse plaintiffs are nurses who were recruited from the

Philippines to work in the United States by Sentosa. (Sentosa's 56.1 ¶ 10; O'Connor Dep. 20-21; Pls.' 56.1 ¶¶ 1, 3-4.)

2. The Nurse Plaintiffs' Employment and Resignation

As noted, Sentosa recruited the nurse plaintiffs from the Philippines to work in the United States. In the course of recruiting them, Sentosa made various representations to the nurse plaintiffs as to the conditions of employment in the United States. (*See* Pls.' 56.1 ¶¶ 4-16.)[9] Plaintiffs allege that many of those conditions were not fulfilled during their subsequent employment, and they voiced their complaints about this failure on several occasions. (*Id.* ¶¶ 21-22; 28-33.) This included submitting a letter dated February 16, 2006 to Philipson outlining their complaints (Ex. X); a letter dated March 3, 2006 to Philipson and O'Connor that stated that, if they did not "have positive results by Monday, March 6, 2006," the nurse plaintiffs would "have to opt not to work until [they were] treated with fairness and respect" (Pls.' 56.1 ¶ 33; Ex. Y; Ex. Z.)

The nurses also voiced their concerns to the Philippine Consulate in New York, which recommended that the nurse plaintiffs consult with Vinluan, an attorney with experience in corporate and immigration issues. (*Id.* ¶¶ 38-43.) The nurse plaintiffs subsequently consulted Vinluan, and he advised them that, in his opinion, their contract had been

Dep."), ECF No. 122-11; Dep. Tr. Leonard Lato ("Lato Dep."), ECF Nos. 116-12, 116-13, 116-14, 124-8.

Unless otherwise noted, an exhibit is attached to the 56.1 statement cited before it.

[9] Plaintiffs characterize these representations as commitments, while the Sentosa defendants dispute that the brochure submitted as evidence contained any commitments. (Sentosa's Resp. Pls.' 56.1 ¶ 5.) The Sentosa defendants take issue with several of

plaintiffs' contentions regarding the representations made by this brochure. (*See id.* ¶¶ 5-9.)

In addition, plaintiffs note that the brochure provided to the nurse plaintiffs stated that Sentosa was a "direct hire" agency. (Pls.' 56.1 ¶ 6.) Plaintiffs state that this meant that the nurses would be working directly for Sentosa and not for an agency (*id.*), but the Sentosa defendants dispute the legal impact of this statement (Sentosa's Resp. Pls.' 56.1 ¶ 6). These factual disputes are not material to the Court's analysis for purposes of the summary judgment motion.

breached. (*Id.*) Vinluan did not advise them to resign, but he did advise that, if they elected to resign, they would not be liable for the penalties set forth in their contract. (*Id.* ¶¶ 43-44; Ex. BB 28-29, 39-40; O'Connor Dep. 74-75; Ex. H 48-49.) Vinluan further advised that, although the nurse plaintiffs were legally free to resign, they should not immediately do so because he intended to file legal proceedings on their behalf that he hoped might lead to a less drastic resolution of the issues. (Pls.' 56.1 ¶ 45; Ex. BB 46-47.) In addition, Vinluan specifically informed the nurse plaintiffs that, if they chose to resign, they must complete their shifts before leaving their employment. (Pls.' 56.1 ¶ 46; Pls.' Ex. BB 45, 183-84, 202, 235.)[10]

According to plaintiffs and the County defendants, during the relevant time, the nurse plaintiffs were employed by Prompt and assigned to the Avalon facility. (Cnty.'s 56.1 ¶¶ 1-2; Pls.' 56.1 ¶ 23; Pls.' Resp. Cnty.'s 56.1 ¶ 1; Cnty.'s 56.1 ¶¶ 1-2; Pls.' 56.1 ¶ 23; Pls.' Resp. Sentosa's 56.1 ¶ 6.) However, the Sentosa defendants have described the nurse plaintiffs as being employed by Avalon. (Sentosa's 56.1 ¶ 6; Philipson Dep. 63-65.) There is also a factual dispute as to whether all of the nurse plaintiffs were assigned to the pediatric

ventilator unit. According to the County defendants, all nurse plaintiffs worked in the pediatric ventilator unit. (Cnty.'s 56.1 ¶ 2.) According to plaintiffs, plaintiffs Maulion, Ramos, Anilao, Sichon, Gamaio, and Lampa (as well as two non-plaintiff nurses) worked with ventilator patients, while plaintiffs Avila, Jacinto, and Millena (as well as seven other non-plaintiff nurses) worked with non-ventilator pediatric patients, and plaintiff Dela Cruz was assigned to the geriatric units. (Pls.' 56.1 ¶ 24.)[11]

On April 6, 2006, Vinluan filed complaints with the Office of the Chief Administrative Hearing Officer concerning the conditions of the nurse plaintiffs' employment. (Pls.' 56.1 ¶¶ 47-48; Ex. BB 48-49.) The following day, the nurse plaintiffs resigned *en masse* at some point between 3:00 p.m. and 6:00 p.m. (the "resignation").[12] (Sentosa's 56.1 ¶¶ 12, 14; O'Connor Dep. 92; Ex. E, ECF No. 116-8; Cnty.'s 56.1 ¶ 7; Ex. A, ECF No. 115-5; Pls.' Resp. Cnty.'s 56.1 at 3.) They effectuated their resignation by submitting identical resignation letters directly to defendant Fitzgerald, the Director of Nursing Services at Avalon (Sentosa's 56.1 ¶ 9; Philipson Dep. 19), at the Avalon facility.[13] (Sentosa's 56.1 ¶¶ 12, 14; O'Connor Dep. 92; Ex. E, ECF No.

---

[10] The Sentosa defendants dispute this statement, arguing that there is testimony that Vinluan advised the nurses that they could resign immediately. (Sentosa's Resp. Pls.' 56.1 ¶ 45; Sentosa's 56.1 Ex. N 60-61.) However, a review of the deposition pages cited by the Sentosa defendants and the surrounding testimony reveal that the cited materials do not support the Sentosa defendants' assertion.

[11] The Sentosa defendants dispute that Dela Cruz was assigned to the geriatric unit because the cited evidence is not admissible for its purpose. (Sentosa's Resp. Pls.' 56.1 ¶ 24.) "Materials submitted in support of or in opposition to a motion for summary judgment must be admissible themselves or must contain evidence that will be presented in admissible form at trial." *Delaney v. Bank of America Corp.*, 766 F.3d 163, 169-70 (2d Cir. 2014). Therefore, any evidence

submitted that is inadmissible (and does not contain evidence that will presented in admissible form at trial) will be disregarded. In any event, these factual disputes are not dispositive to the Court's analysis for purposes of the summary judgment motion.

[12] Defendants assert that the nurse plaintiffs resigned between 5:00 p.m. and 6:00 p.m. (Sentosa's 56.1 ¶¶ 12, 14.) Plaintiffs, however, assert that they resigned between 3:00 p.m. and 5:00 p.m. (Pls.' Resp. Cnty.'s 56.1 at 2) (asserting the resignation took place between 3:00 p.m. and 4:00 p.m.); Pls.' 56.1 ¶ 55 (asserting the resignation took place between 3:00 p.m. and 5:00 p.m.).

[13] Other nurses, in addition to the nurse plaintiffs, working in other facilities affiliated with Sentosa and employed by Prompt, resigned their employment at or

116-8; Cnty.'s 56.1 ¶ 7; Ex. A, ECF No. 115-5.) The resignation letters stated: "In view of the substantial breach of your company of our contract, I hereby tender my resignation effective immediately." (Sentosa's 56.1 ¶ 14.) April 7, 2006 was six days before Passover began, and one week before Easter weekend. (Sentosa's 56.1 ¶ 13; O'Connor Dep. 108-109; Pls.' Resp. Sentosa's 56.1 ¶ 13.)

Before their resignation, the nurse plaintiffs had discussed whether their simultaneous resignation would impair the ability of Avalon to provide adequate care for its patients. (Cnty.'s 56.1 ¶ 9; Dela Cruz Dep. 148; Pls.' Resp. Cnty.'s 56.1 at 4.)[14] They were aware that it was absolutely necessary to have someone cover shifts after their resignation. (Cnty.'s 56.1 ¶ 23; Jacinto Dep. 136-37.) The children in that unit required 24-hour care and supervision to ensure their health and safety. (Cnty.'s 56.1 ¶ 3; Pls.' Resp. Cnty.'s 56.1 at 2.) A shortage of nurses available to care for the children would be unsafe for the children. (Cnty.'s 56.1 ¶¶ 4-6; Jacinto Dep. 136; Ramos Dep. 118; Pls.' Resp. Cnty.'s 56.1 at 2.) In particular, skilled nurses were necessary because the duties and responsibilities associated with taking care of the children were so great. (Cnty.'s 56.1 ¶ 6; Jacinto Dep. 136; Pls.' Resp. Cnty.'s 56.1 at 3.) There was a minimum staffing requirement of four nurses total for the two pediatric units. (Pls.' 56.1 ¶ 26.) According to plaintiffs, they believed there were staffing options that would enable the Sentosa defendants to avoid any lapses in the patients' care.[15]

None of the nurse plaintiffs walked off during a shift. (Pls.' 56.1 ¶ 57.)[16] None of the nurse plaintiffs covered any of their scheduled shifts after their resignation. (Sentosa's 56.1 ¶ 19; O'Connor Dep. 109.) The Sentosa defendants assert that there was some difficulty in covering their shifts following the resignation, which created a sense of urgency because there was a possibility that patients would be harmed if the shifts were not covered. (Sentosa's 56.1 ¶ 18; Cnty.'s 56.1 ¶ 13; O'Connor Dep. 186-

---

[14] Defendants assert that, during these discussions, the nurse plaintiffs were concerned as to whether Avalon would be able to obtain adequate coverage for their shifts. (Cnty.'s 56.1 ¶ 10; Dela Cruz Dep. 148.) The nurse plaintiffs, however, deny this and assert that they had been repeatedly told by Luyun that many replacement nurses were available to the facility, all of whom were waiting for positions to open. (Pls.' 56.1 ¶ 59; Pls.' Resp. Cnty.'s 56.1 at 4; Ex. H.) Further, plaintiffs state that Avalon had access to nursing agencies that supplied nurses to facilities that needed shifts covered. (Pls.' 56.1 ¶ 58; Pls.' Resp. Cnty.'s 56.1 at 4; Ex. I.) Thus, plaintiffs state, they knew the shifts could be covered after their resignations. (Pls.' Resp. Cnty.'s 56.1 at 4.)

about the same time as the nurse plaintiffs. (Cnty.'s 56.1 ¶ 8; Pls.' Resp. Cnty.'s 56.1 at 3; Pls.' 56.1 ¶ 49.) The County defendants characterize the number of other nurses as "many" (Cnty.'s 56.1 ¶ 8); the nurse plaintiffs dispute this characterization and admit only that other nurses resigned (Pls.' Resp. Cnty.'s 56.1 at 3.)

[15] The nurse plaintiffs also assert that the staffing calendar issued by Avalon had gaps in the schedule for both pediatric units. (Pls.' 56.1 ¶¶ 34-37.) The Sentosa defendants dispute this, arguing that the cited evidence is not admissible. (Sentosa's Resp. Pls.' 56.1 ¶ 35.) This dispute is immaterial for purposes of the Court's decision on the summary judgment motion.

[16] Plaintiff Ramos submitted her resignation letter while on duty and before her shift was scheduled to end, and stayed four hours after the scheduled end of her shift while Avalon secured coverage. (Sentosa's 56.1 ¶¶ 15-16; O'Connor Dep. 92-94; Cnty.'s 56.1 ¶ 36; Pls.' 56.1 ¶ 56.) Plaintiff Maulion was scheduled to work at 7:00 p.m. that evening until 7:00 a.m. the next morning, but did not work that shift. (Sentosa's 56.1 ¶ 17; O'Connor Dep. 99-100.) Maulion had not initially been scheduled to work that shift, but had been told at 7:00 a.m. on April 7, 2006 that she was assigned to cover the shift. (Pls.' 56.1 ¶¶ 50-51.)

89, 197.) Plaintiffs, however, deny that there was real potential that their resignation would impair the delivery of adequate care to the patients, citing Sentosa's ability to cover the shifts. (Pls.' Resp. Cnty.'s 56.1 ¶ 13; Pls.' Resp. Sentosa's 56.1 ¶ 18; Gamaio Dep. 70-73; Ramos Dep. 24; Sichon Dep. 191-93.) Ultimately, the shifts in the pediatric unit were all covered, and no patient was harmed by the resignation. (Pls.' 56.1 ¶¶ 60-61.) Avalon was able to staff the pediatric unit through various means, including by securing nurses from other units, calling staff back from vacation, and obtaining staff from other facilities who they trained on Avalon-specific policies and procedures, including those regarding the pediatric issues and ventilators. (Sentosa's 56.1 ¶ 19; O'Connor Dep. 109.)

3. Post-Resignation Events Preceding District Attorney's Involvement

By letter dated April 10, 2006, O'Connor complained to the New York Department of Education about the resignation and requested that the nurse plaintiffs' licenses and/or limited permits be revoked. (Pls.' 56.1 ¶ 69; Ex. W.)[17]

Shortly after the resignation, Philipson held meetings with Filipino nurses in various facilities. (Pls.' 56.1 ¶ 72; Ex. NN.)[18] At one of those meetings, Philipson stated that "we

already know who misled [the nurse plaintiffs]. We are fully aware. And we are going to go after that person as well." (*Id.*) He went on to say that "we will be contacting the District Attorney tomorrow because what they did is actually a criminal offense, abandoning the patients the way they did. It's irresponsible of them to just walk off." (*Id.*) Philipson allegedly added, "But I feel we can extend an amnesty until tomorrow, as I've said, because after, after that time, I cannot do anything to pull it back. Once we pull the trigger, it's done." (*Id.*)[19]

On April 26, 2006, O'Connor filed a police report with the SCPD regarding the resignation. (Sentosa's 56.1 ¶ 20; Ex. F ("Field Report"), ECF No. 116-9; Cnty.'s 56.1 ¶ 14.; Pls.' Resp. Cnty.'s 56.1 ¶ 14; Pls.' 56.1 ¶ 78.) The report stated that Avalon "wishe[d] to document that 11 workers . . . walked out of work and never returned without notice." (Pls.' Resp. Sentosa's 56.1 ¶ 20.) At her deposition, O'Connor explained that she went to the police department because she "felt what transpired was not right," and she wanted to explore avenues by which the nurse plaintiffs could be held accountable for "creating what was really a very risky situation." (Sentosa's 56.1 ¶ 21; O'Connor Dep. 112-13.) She said that she understood that one of those avenues was to file a police report so that their conduct could

---

[17] Months later, the Department of Education completed an investigation of the resignation and determined that the nurse plaintiffs had not committed any professional misconduct. (Pls.' Ex. MM.)

[18] The Sentosa defendants dispute the assertions concerning this meeting, arguing that the evidence supporting them is inadmissible because it is a typed transcript of a purported conversation. (Sentosa's Resp. 56.1 ¶ 72.) Although plaintiffs assert that the transcript is supported by a recording, they have not articulated how that recording will be authenticated or admitted into evidence. Therefore, the Court has not considered this piece of evidence for purposes of the summary judgment motion. However, as discussed *infra*, there is sufficient evidence apart from this

transcript to preclude summary judgment for the Sentosa defendants.

[19] Plaintiffs assert that, at about the same time, Philipson unsuccessfully attempted to persuade the American Consul General to deport the nurses. (*Id.* ¶ 77; Ex. T 2/1 at 38-39.) As the Sentosa defendants correctly point out, the Grand Jury testimony plaintiffs cite in making this assertion does not directly support this statement, so the Court does not accept this fact. (*See* Sentosa's Resp. 56.1 at 18.)

Citations to "Ex. T" reference the Grand Jury transcript, which was filed under seal by plaintiffs at ECF Nos. 128-1 through 128-7.

be investigated. (Sentosa's 56.1 ¶ 21; O'Connor Dep. 112-13.) Other than the Avalon facility's counsel, O'Connor never discussed filing a police report with anyone. (Sentosa's 56.1 ¶ 22; O'Connor Dep. 113-14.)

The police assigned the complaint to the Crime Control Unit, which took no action against the nurses. (Pls.' 56.1 ¶¶ 79-80; Ex. VV 55-57, 63; Ex. XX 74-75.)[20]

4. The District Attorney's Office's Involvement

Howard Fensterman, counsel for Avalon and Sentosa, subsequently scheduled a meeting with Spota. (Pls.' 56.1 ¶ 81; Ex. VV 48.) On May 31, 2006, Spota, investigators from the DA's Office, Philipson, O'Connor, and Fensterman met at the DA's Office for approximately forty-five minutes. (Sentosa's 56.1 ¶ 23; Philipson Dep. 169-70; Spota Dep. 47-53; O'Connor Dep. 120-24; Fensterman Dep. 76-82; Pls.' 56.1 ¶ 83; Ex. FF 120; Ex. WW; Ex. VV 49.) Plaintiffs also allege that Luyun was present. (Pls.' Resp. Sentosa's 56.1 ¶ 23; Ex. FF.)

At the meeting, the attendees discussed the nurse plaintiffs' simultaneous, unexpected resignation on April 7, 2006, and that the individuals charged with running the Avalon facility were concerned at that time about patient safety given that they needed to cover multiple shifts on the pediatric ventilator unit. (Sentosa's 56.1 ¶ 25; O'Connor Dep. 121-22; Philipson Dep. 171-72; Spota Dep. 50-52.)[21] In particular, according to the defendants, the fact that the nurses resigned without notice and walked out *en masse* was discussed (Philipson Dep. 172), as was the difficulty Sentosa had with staffing due to the holidays and the fact that nurses from multiple facilities resigned immediately (Spota Dep. 51-54). O'Connor was very emotional during the meeting and stated that she had been very concerned that something horrible or horrific could have happened to the patients because of the resignation. (*Id.* at 51-58.) According to the defendants, the attendees did not agree on a specific course of action at the conclusion of the meeting. (Sentosa's 56.1 ¶ 29; O'Connor Dep. 124.) More specifically, Spota, while having some idea as to how the case would progess, did not discuss or communicate how the it would at the meeting (Sentosa's 56.1 ¶ 30; Spota Decl. 60.) No further meetings

---

[20] The County defendants assert that the SCPD did not expressly decline to investigate O'Connor's complaint, and it did not make a determination that no crimes had been committed by the nurse plaintiffs. (Cnty.'s 56.1 ¶¶ 15-16.) Plaintiffs dispute that argument, contending that the police department took no action in response to the complaint. (Pls.' Resp. Cnty.'s 56.1 ¶.) As a threshold matter, the facts asserted in the parties' respective 56.1 statements do not contradict each other. Plaintiffs assert that the police took no action against them; defendants assert they did not expressly decline to investigate the complaint. As such, the Court's analysis remains the same regardless of which description is used.

Also of note is that, at some point in 2006, the Sentosa defendants filed a lawsuit in the New York State Supreme Court, Nassau County, against plaintiffs and Juno Healthcare Staffing Systems, Inc., a former client of Vinluan's that is in the nurse recruitment business. (Pls.' 56.1 ¶ 65; Ex. GG.)

[21] According to the Sentosa defendants, they did not present false information, such as whether any of the nurses walked off during their shifts or whether any of the patients at the facility were ultimately harmed, at that meeting. (Sentosa's 56.1 ¶¶ 26-28; Philipson Dep. 174-75; O'Connor Dep. 198-99; Spota Dep. 58.) Plaintiffs dispute this, asserting that "at least some false statements were made at the meeting," including that one of the participants falsely informed Spota that Vinluan was in the parking lot of the Avalon facility on the day the nurses resigned. (Pls.' Resp. Sentosa's 56.1 ¶ 26.)

were contemplated. (Sentosa's 56.1 ¶ 30; Spota Decl. 60.)[22]

O'Connor later described the meeting as "a follow-up to the police report . . . ." (O'Connor Dep. 123.) At his deposition, Spota stated that he had learned about the complaint to the police department, but he did not remember who had informed him of it. (Spota Dep. 55.) Spota directed investigators from the DA's Office to inquire about the police report, and he learned that the case had been assigned to the Crime Control Unit of the 4th Precinct. (Id. at 56.)

At Lato's deposition, he stated that his understanding was that Fensterman knew Spota and that Spota "gave Mr. Fensterman an audience" in light of their acquaintance, but that he was not aware of any other special consideration given to the case. (Sentosa's 56.1 ¶ 39; Lato Dep. 69.)[23]

Spota oversaw some initial investigative work performed by the DA's Office following the meeting, including requesting that an investigator from the DA's Office speak to the police and an investigator from Department of Education. (Spota Dep. 67.)

In his deposition, Spota testified that, approximately a couple of months after the May 31, 2006 meeting took place, he independently decided that defendant Lato would be appointed to investigate[24] the resignation and determine whether any crime had been committed. (Sentosa's 56.1 ¶ 31; Spota Dep. 60-66.) According to defendants, Spota never contacted any of the Sentosa defendants or their counsel in advance of making this decision to appoint Lato, nor did he seek any input in the decision. (Sentosa's 56.1 ¶ 32; Spota Decl. 67.)

Spota then called Fensterman to report on his office's progress and plans regarding the prosecution. (Pls.' 56.1 ¶ 84; Ex. QQ 67-68; Ex. XX 57, 64-65.) Spota also arranged a meeting to introduce Lato to Fensterman. (Sentosa's 56.1 ¶ 33; Spota Decl. 60.) The meeting was attended by Lato, Fensterman, and the investigators who were assisting Lato. (Sentosa's 56.1 ¶ 34; Spota Decl. 68-69; Decl. Leonard Lato ("Lato Decl."), Ex. I, ECF No. 116-12 at 56-57, 59.)[25] At the meeting, the nature of the case and the fact that Lato would conduct an investigation were discussed. (Sentosa's 56.1 ¶ 34; Spota Dep. 68-69; Lato Dep. 56-57, 59.) However, according to Lato, he "paid little attention" to what Fensterman had to say. (Sentosa's 56.1 ¶ 35; Lato Dep. 58-59.)[26] Fensterman never represented to Lato that any of the patients at

---

[22] Plaintiffs dispute that this "meeting was as simple or straightforward as the Sentosa defendants portray it." (Pls.' Resp. Sentosa's 56.1 ¶ 25.) They also dispute, inter alia, the Sentosa defendants' assertions that no one ever represented that any patient was harmed and that no specific course of action was agreed to at the meeting. (Pls.' Resp. Sentosa's 56.1 ¶¶ 25-30.) Plaintiffs offer no factual evidence that directly contradicts these statements, instead relying (as is permitted) on circumstantial evidence in the record (including statements and conduct by various defendants before, and after, the meeting) to rebut this assertion.

[23] Plaintiffs argue that this testimony contradicts other statements made by Lato, including that Spota personally edited the indictment (Ex. XX 47, 53, 63-64, 103, 164-65, 184, 373-74), and that Lato had been told that Fensterman was "connected" politically (id. at 58; Pls.' Resp. Sentosa's 56.1 ¶ 39).

[24] Plaintiffs take issue with the use of the word "investigate," instead alleging that he was appointed to "indict" the plaintiffs. (Pls.' Resp. Sentosa's 56.1 ¶ 31.)

[25] In his Rule 56.1 statement, Spota states that he did not meet or speak with any of the Sentosa defendants following the May 31, 2006 meeting. (Spota's 56.1 ¶ 4.) However, in his deposition, Spota stated that he met with Fensterman again two or three months after the initial May 31, 2006 meeting. (Spota Dep. 60.)

[26] Plaintiffs dispute the truthfulness of Lato's testimony that he "paid little attention" to what

Avalon had been injured due to the resignation. (Sentosa's 56.1 ¶ 36.) According to defendants, no agreement was made between the parties as to how the investigation should proceed, and no representations were made as to what the ultimate outcome would be. (Sentosa's 56.1 ¶ 37; Spota Dep. 69.) At a later date, Lato paid a shiva call after Fensterman's father died, but that was the only other time that they met. (Sentosa's 56.1 ¶ 40; Lato Dep. 82-83.)

Lato subsequently conducted an investigation into plaintiffs' conduct. (Sentosa's 56.1 ¶ 41; Lato Dep. 62-63.) According to the Sentosa defendants, during that time, the investigation was entirely up to Lato. (Sentosa's 56.1 ¶ 46.) Plaintiffs dispute this, stating that, although Spota testified as such, Lato undermined this claim. (Pls.' Resp. Sentosa 56.1 ¶ 46.)

The investigation lasted six months. (Sentosa's 56.1 ¶ 41; Lato Dep. 62-63; Pls.' Resp. Cnty.'s 56.1 ¶ 17.) During this time, Lato's only contacts with any individuals associated with Avalon were the two visits to the Avalon facility and a fax he received from counsel for Avalon and Sentosa. (Sentosa's 56.1 ¶¶ 42-43; O'Connor Dep. 124-26; Lato Dep. 384; Email, Ex. L (ECF No. 116-15).))

During the first visit to Avalon, Lato met with O'Connor to discuss the facility and the circumstances surrounding the nurse plaintiffs' resignation on April 7, 2006. (Sentosa's 56.1 ¶ 42; O'Connor Dep. 124-26.) At that meeting, Lato told O'Connor that he did not know whether they were going to

continue with the action. (Cnty.'s 56.1 ¶ 30; O'Connor Dep. 125-26; Cnty.'s 56.1 ¶ 31.)[27] The second visit was a follow-up visit to discuss documents that he requested from the facility and to take a tour of the pediatric unit. (Sentosa's 56.1 ¶ 42; O'Connor Dep. 124-26; see Pls.' Resp. Cnty.'s 56.1 ¶ 31.) On another occasion, counsel for Avalon and Sentosa faxed Lato an advertisement that purportedly showed an interest that Vinluan had in a competitor of Sentosa in the Philippines. (Sentosa's 56.1 ¶ 43; Ex. L, ECF No. 116-15.)

Lato's investigation also included multiple meetings, conducted by himself or detectives from the DA's Office, with a number of the nurse plaintiffs and with Vinluan to discuss the circumstances of the nurse plaintiffs' resignation. (Sentosa's 56.1 ¶ 45; Lato Dep. 369-71; Pls.' 56.1 ¶ 85; Lampa Dep. 84-87; Lato Dep. 81.) According to plaintiffs, Lato told the interviewees that the interviews were routine and were needed to close the investigations. (Pls.' 56.1 ¶ 85; Ex. K 79-80; Ex. XX 81.) During that time, Lato controlled the investigation. (Sentosa's 56.1 ¶ 46; Spota Dep. 129-30.) He also kept Spota informed, in both formal and informal meetings, of all of the facts of the case, including the later Grand Jury presentation and indictment. (Pls.' 56.1 ¶ 89; Ex. XX 47, 53, 63-64, 103, 164-65, 184-85, 373-74.)

---

Fensterman said, arguing it is undermined by Lato's statement that Fensterman "threw Felix Vinluan's name around." (Pls.' Resp. Sentosa's 56.1 ¶ 35; see Ex. QQ 67-68; Ex. XX 57, 64-65.)

[27] Plaintiffs contest this characterization. (Pls.' Resp. Cnty.'s 56.1 ¶ 30.) It is not clear with which aspect of

the County's characterization plaintiffs take issue. In any event, this factual issue is not dispositive for purposes of the Court's analysis of the summary judgment motion.

5. Grand Jury Proceeding[28] and Subsequent Events

According to Lato, without any input from the Sentosa defendants, he ultimately decided to present the case to the Grand Jury at the end of January 2007.[29] (Sentosa's 56.1 ¶ 47; Lato Dep. 546-50.)

Plaintiffs have submitted evidence from which they argue that, in the course of the Grand Jury proceeding, individuals affiliated with Sentosa made false statements.[30] In addition to alleging perjurious testimony, plaintiffs assert that there were a number of irregularities in the presentation of evidence. (Pls.' Opp. Br. 35-49.) For example, plaintiffs point out that Lato and Grand Jury witnesses repeatedly used terms such as "walked out" or similar phrases when referring to the nurses' conduct, thereby creating the false impression to the Grand Jury that the nurses walked out during a shift. (*See, e.g.,* Ex. T 1/30 at 7-9; 2/1 at 59-62; 2/8 at 3.) To demonstrate the confusion caused by the phrasing, plaintiffs further note that, at the beginning of the Grand Jury presentation, a grand juror asked a question about the use of that phrase: "He [Investigator Warkenthein] uses the term 'walked out'

---

[28] As discussed *infra*, the Court concludes that the County defendants and the Sentosa defendants are entitled to absolute immunity for their conduct in connection with the Grand Jury proceeding itself. In light of this absolute immunity determination, and because there is no evidence of wrongdoing by Lato or Spota in the investigative stage prior to the Grand Jury proceeding, the Court grants summary judgment in their favor on the claims against them. There is, however, evidence from which a rational jury could find that the Sentosa defendants solicited and encouraged the arrest and prosecution of plaintiffs and provided false and/or misleading testimony in the Grand Jury proceeding in order to achieve that result. The Court, therefore, includes here the relevant facts asserted by plaintiffs from the Grand Jury proceeding as pertains to Sentosa defendants, insofar as they are relevant to certain elements of malicious prosecution and false arrest claims (such as the presumption of probable cause from an indictment), even though the testimony itself is protected by absolute immunity.

[29] Plaintiffs note that Lato provided Spota with a copy of the indictment in draft form, which Spota personally edited, and that personally editing draft indictments was an uncommon practice for Spota. (Pls.' 56.1 ¶ 89; Ex. XX 47, 53, 63-64, 103, 164-65, 184-85, 373-74.) However, as discussed *infra*, Spota is entitled to absolute immunity for his conduct in relation to the Grand Jury proceeding, and, thus, personally editing the draft indictment does not render him liable for any of plaintiffs' claims. Similarly, Lato is absolutely immune for any alleged misconduct concerning whether the Grand Jury was properly instructed on the law regarding the charges that were presented.

[30] According to plaintiffs, these included: (1) Philipson's testimony that the nurses earned more money after February 2006 (Ex. T 2/1 at 11); (2) Philipson's and O'Connor's testimony that there were more shifts available to the nurses than were actually available (T. 2/1 at 48, 72); (3) O'Connor's testimony that Dela Cruz was trained for the vent unit and that there were no other nurses in the facility who ever worked on the vent unit, and that upcoming vacations prevented alternative staffing (*id.* 2/1 at 78); (4) O'Connor's testimony that some of the nurses functioned as supervisors (*id.* 2/1 at 102); (5) O'Connor's claim that the nurses had not requested a meeting with her to air out their complaints (*id.* 2/1 at 67); (6) Luyun's testimony that he dialed at least ten numbers to cover the nurses' shifts after their resignation (*id.* 2/13 at 22); and (7) Luyun's testimony about the significance of "direct hire" (*id.* 2/13 at 16).

The Sentosa defendants dispute those assertions, and counter that, in the course of the events giving rise to this litigation, (1) no one associated with the Sentosa defendants claimed that any patient was injured or that any nurse had walked off during their shift (Sentosa's 56.1 ¶ 44; Lato Dep. 77-78); (2) Fensterman never represented to Lato that any of the patients at Avalon were injured, and it "was clear that they were not" (Sentosa's 56.1 ¶ 36; Lato Dep. 60); (3) at no point between the time she learned she was going to testify before the Grand Jury and the date of her testimony did O'Connor speak to anyone regarding her potential testimony (Cnty.'s 56.1 ¶ 32; O'Connor Dep. 127); and (4) there is no evidence that Lato ever discussed potential Grand Jury testimony with any of the individuals who testified at the Grand Jury during the investigative phase of the case (Cnty.'s 56.1 ¶ 34).

several times which seems to indicate they walked out in the middle of their shifts. I would like to know if they did in fact walk off the job during their shift." (Ex. T 1/30 at 61.) Lato responded that such evidence would have to come from other witnesses. (*Id.*) Plaintiffs also argue that Lato presented excessive and inflammatory evidence regarding the medical conditions of residents in the ventilator and non-ventilator units, including details of the children's conditions along with enlarged color photographs of the children. (Pls.' Opp. Br. 42.) Moreover, plaintiffs assert that Lato incorrectly instructed the jurors that, under New York law, co-conspirators are liable for acts in furtherance of a conspiracy. (*Id.* at 43.) Plaintiffs further argue that Lato gave the Grand Jury misleading instructions regarding the Department of Education laws that defined unprofessional conduct, and did not advise the Grand Jury that the Department of Education had issued a decision exonerating the nurses of any misconduct. (*Id.* at 43-46.)

On March 6, 2007, the Grand Jury returned an indictment against all of the plaintiffs.[31] (Sentosa's 56.1 ¶ 61; Vinluan Dep. 114-17; Jacinto Dep. 94-95; Avila Dep. 97-98; Maulion Dep. 81-82; Ramos Dep. 90; Millena Dep. 96-97; Dela Cruz Dep. 66-67; Gamaio Dep. 91-92; Anilao Dep. 111-12; Lampa Dep. 103-104; Sichon Dep. 139-40; Cnty.'s 56.1 ¶ 37; Pls.' Resp. Cnty.'s 56.1 ¶¶ 37-38.)

On April 22, 2007, plaintiffs surrendered at the Suffolk County Courthouse, where they were arrested, sequestered, fingerprinted, and processed. (Pls.' 56.1 ¶ 91; Ex. BB 117.) They subsequently moved to dismiss on the grounds that the prosecution

violated their constitutional rights and that the evidence before the Grand Jury was insufficient. (Pls.' 56.1 ¶ 92.) The motions were denied. (*Id.*; Ex. BBB.) Plaintiffs then requested that the New York State Governor appoint a special prosecutor. The request was ignored. (Pls.' 56.1 ¶ 92; Ex. CCC.)

Plaintiffs then applied to the Appellate Division, Second Department ("Appellate Division") for a writ of prohibition pursuant to New York C.P.L.R. Article 78. On January 13, 2009, the Appellate Division issued a writ of prohibition enjoining further prosecution of plaintiffs on the ground that the indictment violated their constitutional rights. (Pls.' 56.1 ¶ 93.)

### B. Procedural Background

On May 9, 2016, the County defendants, the Sentosa defendants, and defendant Spota moved for summary judgment and filed their respective memoranda of law ("Cnty.'s Br.," "Sentosa's Br.," and "Spota's Br."). (ECF Nos. 115-4; 116-2; and 117, respectively.) Plaintiffs filed their response in opposition and accompanying memorandum of law ("Pls.' Br.") on September 29, 2016. (ECF No. 128.) The defendants filed their reply briefs on November 21, 2016 ("Cnty. Repl. Br.," "Sentosa Repl. Br.," and "Spota Repl. Br."). (ECF Nos. 132-134, respectively.) Oral argument was held on November 30, 2016. (ECF No. 136.) That day, plaintiffs filed supplemental exhibits with the Court. (ECF No. 135.) The County defendants then filed a supplemental letter with the Court on December 2, 2016, enclosing an opinion issued by the Honorable Sandra Feuerstein in *Kanciper v. Lato*, CV-13-0871. (ECF No. 137.) On May 16, 2017, plaintiffs filed a

---

[31] Specifically, the Grand Jury returned a true bill of indictment against all of the plaintiffs for Endangering the Welfare of a Child, N.Y. Pen. L. § 260.10(1); Endangering the Welfare of a Disabled Person, N.Y. Pen. L. § 260.25, and Conspiracy in the Sixth Degree,

N.Y. Pen. L. § 105.00. (Cnty.'s 56.1 ¶ 37.) The Grand Jury also returned a true bill of indictment against plaintiff Vinluan for Criminal Solicitation in the Fifth Degree, N.Y. Pen. L. § 100.00. (*Id.* ¶ 38.)

supplemental letter containing two Newsday articles (ECF No. 138), and the County defendants responded on May 17, 2017 (ECF No. 139). On October 30, 2017, plaintiffs filed a supplemental letter regarding the indictment of Thomas Spota (ECF No. 140), and the County defendants responded on October 31, 2017 (ECF No. 141). On December 6, 2017, the County defendants filed a supplemental letter, advising the Court that the Second Circuit had affirmed Judge Feuerstein's decision in *Kanciper* (ECF No. 142), and plaintiffs responded on December 7, 2017 (ECF NO. 143). On March 6, 2018, the County defendants filed a supplemental letter regarding the Supreme Court's decision in *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018) (ECF No. 144), and plaintiffs responded on March 9, 2018 (ECF No. 145). The Court has fully considered the parties' submissions.

## II. STANDARD OF REVIEW

The standard for summary judgment is well-settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).

Rule 56(c)(1) provides that:

[A] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48

(emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## III. DISCUSSION

The County defendants, the Sentosa defendants, and defendant Spota each move for summary judgment. Specifically, the Sentosa defendants argue that: (1) the Section 1983 claims fail because the Sentosa defendants were not acting under the color of state law; (2) the Section 1983 and state law malicious prosecution claims fail because the Sentosa defendants did not initiate the criminal proceeding and, in any event, there was probable cause that a crime occurred; and (3) the Section 1983 and state law false arrest claims fail because the Sentosa defendants did not confine plaintiffs. The County defendants argue that: (1) there was no evidence of any wrongdoing by Lato; (2) Spota and Lato are entitled to qualified immunity regarding the investigative stage;

and (3) the *Monell* claims against the County fail because there were no underlying constitutional violations, Lato is a state actor, not a county actor, and the conduct at issue was not caused by a municipal policy, custom, or usage. Finally, defendant Spota argues that plaintiffs have failed to show that Spota was personally involved in any constitutional violations.

### A. The County Defendants

As noted above, in its Memorandum and Order on defendants' motions to dismiss, the Court reached two conclusions concerning whether Lato and Spota were entitled to immunity for their actions. First, the Court concluded that they were absolutely immune from liability on claims based upon their initiation of the prosecution against plaintiffs and their conduct in front of the Grand Jury. (Memorandum and Order, ECF No. 31 at 18.)[32] Second, the Court held that, based upon the allegations in the amended complaint, it was unable to determine at that time whether Lato and Spota were entitled to absolute or qualified immunity for their conduct during the investigative phase. (*Id.* at 22.) In reaching this conclusion, the Court reasoned that plaintiffs sufficiently alleged that wrongdoing occurred during the investigation that caused a deprivation of their constitutional rights. (*Id.* at 21-22.)

The County defendants now move for summary judgment in part on the ground that

---

[32] The Court notes that, although it determined that Lato and Spota are entitled to absolute immunity for their conduct in connection with the Grand Jury proceeding, it has nonetheless reviewed the available evidence concerning that conduct to evaluate whether it supports any of plaintiffs' other claims against them for investigative conduct outside the Grand Jury context. For example, the Court has reviewed the transcript of the Grand Jury testimony to determine whether Lato's conduct creates an issue of material fact as to whether he entered a conspiracy with the Sentosa defendants in the investigative phase, prior to the Grand Jury proceeding, concerning matters outside the scope of the Grand Jury proceeding. However, the Court has concluded that, even when considering the Grand Jury proceedings, no rational jury could conclude that Spota or Lato violated the plaintiffs' constitutional rights in the investigative stage by conspiring to fabricate evidence, or in some other manner unrelated to the Grand Jury proceeding and initiation of charges (for which they are entitled to absolute immunity).

there is no evidence of any wrongdoing by Lato, particularly with respect to the investigation of plaintiffs. Defendant Spota separately filed a motion for summary judgment on the ground that there is no evidence that Spota was personally involved in any constitutional deprivation, even assuming one had taken place. Moreover, both defendants argue that they are entitled to absolute and/or qualified immunity. For the following reasons, the Court concludes that Spota and Lato are entitled to summary judgment because there is no evidence that they violated the constitutional rights of plaintiffs in the investigative stage of the case (and, as previously discussed, they are entitled to absolute immunity with respect to their conduct in connection with the Grand Jury presentation and initiation of charges).

### 1. Legal Standard

"It is by now well established that 'a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution' 'is immune from a civil suit for damages under § 1983.'" *Shmueli v. City of New York*, 424 F.3d 231, 236 (2d Cir. 2005) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 410, 431 (1976)). "In determining whether absolute immunity obtains, we apply a 'functional approach,' looking to the function being performed rather than to the office or identity of the defendant." *Hill v. City of New York*, 45 F.3d 653, 660 (2d Cir. 1995) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)). In applying this functional approach, the Second Circuit has held that prosecutors are entitled to absolute immunity for conduct "'intimately associated with the judicial phase of the criminal process.'" *Fielding v. Tollaksen*, 257 F. App'x 400, 401 (2d Cir. 2007) (quoting *Imbler*, 424 U.S. at 430); *Hill*, 45 F.3d at 661 (same). In particular, "[s]uch immunity . . . extends to 'acts undertaken by a prosecutor in preparing for the initiation of

judicial proceedings or for trial, and which occur in the course of his role as advocate for the State.'" *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (quoting *Buckley*, 509 U.S. at 273). On the other hand, "[w]hen a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent. Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings." *Hill*, 45 F.3d at 661; *see also Carbajal v. Cty. of Nassau*, 271 F. Supp. 2d 415, 421 (E.D.N.Y. 2003) ("[W]hen a prosecutor supervises, conducts, or assists in the investigation of a crime, or gives advice as to the existence of probable cause to make a warrantless arrest—that is, when he performs functions normally associated with a police investigation—he loses his absolute protection from liability." (citation omitted)).

The Second Circuit has noted that "[t]he line between a prosecutor's advocacy and investigating roles might sometimes be difficult to draw." *Zahrey v. Coffey*, 221 F.3d 342, 347 (2d Cir. 2000). Courts, however, may rely on certain established distinctions between these roles. For example, the Supreme Court has explained that "[t]here is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Buckley*, 509 U.S. at 273. In addition, the Second Circuit has identified the juncture in the criminal process before which absolute immunity may not apply. Specifically, "[t]he majority opinion in [*Buckley*] suggests that a prosecutor's conduct prior to the establishment of probable cause should be considered investigative: 'A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to

have anyone arrested.'" *Zahrey*, 221 F.3d at 347 n.2 (quoting *Buckley*, 509 U.S. at 274); *see also Hill*, 45 F.3d at 661 ("Before any formal legal proceeding has begun and before there is probable cause to arrest, it follows that a prosecutor receives only qualified immunity for his acts."). Thus, in interpreting *Buckley*, the Second Circuit has distinguished between "preparing for the presentation of an existing case," on the one hand, and attempting to "furnish evidence on which a prosecution could be based," on the other hand. *Smith*, 147 F.3d at 94. Only the former entitles a prosecutor to absolute immunity. *Id.*

Notably, the mere fact that a prosecutor might later convene a grand jury and obtain an indictment does not automatically serve to cloak his prior investigatory actions with the protection of absolute immunity. As the Supreme Court stated in *Buckley*:

> That the prosecutors later called a grand jury to consider the evidence this work produced does not retroactively transform that work from the administrative into the prosecutorial. A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial . . . .

*Buckley*, 509 U.S. at 275-76. Furthermore, "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity."

*Id.* at 274 n.5; *see Zahrey*, 221 F.3d at 347 n.2 ("All members of the Court [in *Buckley*] recognized . . . that a prosecutor's conduct even after probable cause exists might be investigative.").

If absolute immunity does not apply, government actors may be shielded from liability for civil damages by qualified immunity, *i.e.*, if their "conduct did not violate plaintiff's clearly established rights, or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003); *see also Fielding*, 257 F. App'x at 401 ("The police officers, in turn, are protected by qualified immunity if their actions do not violate clearly established law, or it was objectively reasonable for them to believe that their actions did not violate the law."). As the Second Circuit has also noted, "[t]his doctrine is said to be justified in part by the risk that the 'fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.'" *McClellan v. Smith*, 439 F.3d 137, 147 (2d Cir. 2006) (quoting *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999)).

In considering a defense of qualified immunity to a Section 1983 claim, courts generally "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)); *Zahrey*, 221 F.3d at 346-48 (extending analysis to prosecutors). The right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigative capacity has been established by the Second Circuit. *Zahrey*, 221 F.3d at 349.

### 2. Analysis

As a threshold matter, the Court concludes that Lato and Spota are not entitled to absolute immunity for the investigative stage. Applying the functional approach, it is clear that Spota's and Lato's conduct during this phase was not "'intimately associated with the judicial phase of the criminal process.'" *See Fielding*, 257 F. App'x at 401 (quoting *Imbler*, 424 U.S. at 430); *Hill*, 45 F.3d at 661. Indeed, these acts, including listening to the complaints of the Sentosa defendants, visiting the facility, interviewing the Sentosa defendants, and interviewing the nurse plaintiffs, fall squarely into the category of acts "perform[e]d in . . . investigation not undertaken in preparation for judicial proceedings." *See Hill*, 45 F.3d at 661; *see also Carbajal*, 271 F. Supp. 2d at 421 (E.D.N.Y. 2003) ("[W]hen a prosecutor supervises, conducts, or assists in the investigation of a crime, or gives advice as to the existence of probable cause to make a warrantless arrest—that is, when he performs functions normally associated with a police investigation—he loses his absolute protection from liability." (citation omitted)). Lato's investigation is particularly the type of "searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested" that the Supreme Court and the Second Circuit have explained do not entitle a prosecutor to absolute immunity. *See Buckley*, 509 U.S. at 273; *see also Smith*, 147 F.3d at 94 (interpreting *Buckley* to distinguish between "preparing for the presentation of an existing case" and attempting to "furnish evidence on which a prosecution could be based"). Thus, Lato and Spota are not entitled to absolute immunity for their conduct during the investigative phase.

The Court concludes, however, that Lato and Spota are entitled to summary judgment because, even construing the facts in the light most favorable to plaintiff, no rational jury could find that they knowingly fabricated evidence during the investigation, or otherwise violated plaintiffs' constitutional rights in the investigative phase of the case. Plaintiffs argue that Lato violated their constitutional rights because he fabricated evidence while acting in an investigative capacity, especially "in his zeal to assure that Mr. Vinluan, was indicted along with his clients." (Pls.' Br. 78.) In particular, plaintiffs state that "[i]t is clear that Lato assisted in suborning [] wholly false, and legally inadmissible, testimony." (*Id.* at 80.) Plaintiffs further argue that, at the very least, Lato's conduct raises an issue of fact as to whether the investigative phase included the creation of evidence in an effort to aid Sentosa's prosecutorial goals. (*Id.*)

The County defendants argue that these allegations are wholly unsupported and conclusory, and are exactly the type of evidence that is insufficient to overcome a motion for summary judgment. (Cnty.'s Repl. Br. 7.) They assert that testimony and documentary evidence establish that there was no wrongdoing by Spota or Lato during the investigative phase, and that there is no evidence that Lato presented any false evidence during the presentation to the Grand Jury, nor that he learned of any false evidence (or conspired to create it) during the investigative stage of the case. (*Id.* at 5-13.) As such, they argue, it cannot be said that Lato and Spota violated plaintiffs' constitutional rights. *See Mandell*, 316 F.3d at 385.

Having carefully analyzed the record, the Court concludes that there is no evidence in the record from which a rational jury could find that Spota or Lato violated plaintiffs' constitutional rights during the investigative

phase.[33] Although plaintiffs assert that the evidence shows that Lato participated in manufacturing evidence and fabricated a case (Pls.' Br. 78-79), plaintiffs point to no evidence in the record that would support such assertions. Indeed, the only evidence plaintiffs cite concerns Grand Jury testimony provided by the Sentosa defendants, and an inference cannot be drawn from that testimony alone that Lato or Spota had any involvement in the knowing fabrication of evidence prior to the Grand Jury proceedings, despite plaintiffs' conclusory assertions to the contrary. Plaintiffs appear to draw this conclusion based on the mere fact that the witnesses who allegedly gave this false testimony met with Lato before they testified.[34] (*Id.* at 80.) Plaintiffs argue that, "[a]t the very least, [Lato's] conduct raises an issue of fact as to whether the investigative phase included the creation of evidence in an effort to assure that Sentosa's especial target was included in the indictment." (Pls.' Br. 80.) However, plaintiffs are incorrect. An

issue of fact cannot be created by mere speculation, and plaintiffs' allegations are just that. Plaintiffs have failed to set forth "concrete particulars" showing that a trial is needed, as they are required to do. *See Anderson*, 477 U.S. 247-50. Although the Court recognizes that plaintiffs may rely on circumstantial evidence (and reasonable inferences drawn from such evidence), there is simply insufficient evidence in the record for a rational jury to reasonably infer that Lato and/or Spota conspired with the Sentosa defendants to fabricate evidence during the investigative phase. Thus, their argument fails, and Lato and Spota are entitled to summary judgment for their conduct during the investigative phase because no rational jury could find that their conduct during that phase violated plaintiffs' rights.[35] Moreover, given the absence of any underlying constitutional violation in the investigative stage, no municipal liability can exist against Suffolk County as a matter of law.[36] *See*

---

[33] Further, as discussed *infra*, plaintiffs' allegations that there was a conspiracy to fabricate testimony between Lato and the Sentosa defendants in the investigative phase are not supported by evidence in the record. The evidence they point to is that false testimony was given at the Grand Jury by the Sentosa defendants, and that special consideration was potentially given to the Sentosa defendants by the DA's Office, but this is insufficient to create a material issue of fact as to whether Spota and/or Lato agreed to fabricate evidence in the investigative stage because such a conclusion would be completely speculative in the absence of any other evidence in the record to support such a conclusion. The other wrongdoing alleged by plaintiffs is that Lato falsely told some of the nurse plaintiffs and Vinluan his interviews of them were routine and necessary to close the investigation. (Pls.' 56.1 ¶ 85; Lampa Dep. 84-87; Ex. XX 81.) However, plaintiffs have not established that such a statement (by itself) could rise to a violation of plaintiffs' constitutional rights.

[34] In addition, Lato made two visits to the Avalon facility, during which he spoke with O'Connor. However, plaintiffs have not provided any evidence indicating that Lato (or O'Connor) agreed to fabricate

evidence during those meetings. (Cnty.'s 56.1 ¶¶ 30-33; O'Connor Dep. 125-28.)

[35] The County defendants make the separate argument that Lato and Spota are entitled to qualified immunity for their conduct during the investigative phase on the grounds that officers of reasonable competence could disagree on whether the test for probable cause was met in the instant case and that their actions did not violate clearly established law. (Cnty.'s Br. 22-24.) Having concluded that there is no evidence that Lato or Spota violated plaintiffs' rights, the Court need not address these arguments, or any other grounds raised by the County defendants.

[36] The Court also agrees with the County defendants that Spota and Lato acted as State actors, not County actors, in connection with the decision to present the case to the Grand Jury and initiate charges and, thus, cannot create liability for Suffolk County in connection with that conduct. *See Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988). To the extent plaintiffs seek to establish municipal liability based upon *Walker v. City of New York*, 974 F.2d 293, 296-97 (2d Cir. 1992), there is insufficient evidence in the record for a rational jury to find municipal liability in this case

*Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).

B. The Sentosa Defendants[37]

1. Malicious Prosecution

As set forth below, a malicious prosecution claim involves, *inter alia*, the following elements: (1) the initiation or continuation of a criminal proceeding against plaintiff, and (2) lack of probable cause for commencing the proceeding. Further, to find a private defendant liable for malicious prosecution, plaintiff must show that the defendant was acting under color of state law. The Sentosa defendants argue that plaintiffs' Section 1983 and state law malicious prosecution claims cannot survive summary judgment because there is insufficient evidence in the record to allow plaintiffs to meet these requirements at trial. (Sentosa's Br. 4-22.) For the following reasons, the Court disagrees.

a. Legal Standard

Claims for malicious prosecution brought under Section 1983 are substantially the same as claims for malicious prosecution under state law. *Lanning v. City of Glens Falls*, No. 17-970-cv, 2018 WL 5810258 (2d Cir. Nov. 17, 2018); *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003). "A malicious prosecution claim under New York law requires the plaintiff prove: '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Black v. Race*, 487 F. Supp. 2d 187, 211 (E.D.N.Y. 2007) (quoting *Jocks*, 316 F.3d at 136 (2d Cir. 2003)).

i. Under Color of State Law

The central question in examining the "under color of state law" requirement is whether the alleged infringement of federal rights is "fairly attributable to the State." *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982); *see also Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."); *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) ("A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action.").

It is axiomatic that private citizens and entities are not generally subject to Section 1983 liability. *See Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002); *Reaves v. Dep't of Veterans Affairs*, No. 08-CV-1624 (RJD), 2009 WL 35074, at *3 (E.D.N.Y. Jan. 6, 2009) ("Purely private conduct is not actionable under § 1983, 'no

---

based upon a pattern of deficiencies in the management of the Suffolk County District Attorney's Office in terms of matters such as training and/or discipline. Allegations of such misconduct from newspapers and other judicial proceedings are not a substitute for evidence and, in any event, plaintiffs have failed to articulate how any such alleged misconduct in other cases pertained to the alleged constitutional violations in this case, which clearly hinge upon the decision to prosecute itself (rather than deficiencies in management of the DA's Office).

[37] To the extent that plaintiffs assert a Section 1983 conspiracy claim against the Sentosa defendants for fabricating evidence in the investigative stage with the County defendants, that claim fails to survive summary judgment for the same reasons as the claim against the County defendants fails, as discussed *supra*. However, the Court proceeds to analyze the malicious prosecution and false arrest claims against the Sentosa defendants arising from the initiation of charges against the plaintiffs and their subsequent arrest for which Spota and Lato have absolute immunity, but the Sentosa defendants do not.

matter how discriminatory or wrongful.'" (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999))). However, as the Second Circuit has explained:

> [T]he actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test').

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (citing *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001)). In addition, liability under Section 1983 may also apply to a private party who "conspire[s] with a state official to violate an individual's federal rights." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005) (report and recommendation), *adopted in relevant part by Fisk v. Letterman*, 401 F. Supp. 2d 362 (S.D.N.Y. 2005). A plaintiff "bears the burden of proof on the state action issue." *Hadges v. Yonkers Racing Corp.*, 918 F.2d 1079, 1083 n.3 (2d Cir. 1990).

In this case, plaintiffs have only put forth allegations related to either joint action or a conspiracy between the Sentosa defendants and the County defendants. Under the "joint action" doctrine, a private actor can be found "to act 'under color of' state law for § 1983 purposes . . . [if the private party] is a willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980). "The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the police." *Forbes v. City of New York*, No. 05 Civ. 7331(NRB), 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)). The provision of information to, or the summoning of, police officers is not sufficient to constitute joint action with state actors for purposes of Section 1983, even if the information provided is false or results in the officers taking affirmative action. *See Ginsberg*, 189 F.3d at 272 ("Healey's provision of background information to a police officer does not by itself make Healey a joint participant in state action under Section 1983 . . . [and] Officer Fitzgerald's active role in attempting to resolve the dispute after Healey requested police assistance in preventing further disturbance also does not, without more, establish that Healey acted under color of law." (internal citations omitted)). Similarly, if a police officer's actions are due to the officer's own initiative, rather than the directive of a private party, the private party will not be deemed a state actor. *See Shapiro v. City of Glen Cove*, 236 F. App'x 645, 647 (2d Cir. 2007) ("[N]o evidence supports Shapiro's contention that Weiss-Horvath acted jointly with the Glen Cove defendants to deprive her of her constitutional rights, and ample evidence shows that the Glen Cove officials who searched her house exercised independent judgment rather than acting at Weiss-Horvath's direction."); *Serbalik v. Gray*, 27 F. Supp. 2d 127, 131 (N.D.N.Y. 1998) ("[A] private party does not act under color of state law when she merely elicits but does not join

in an exercise of official state authority." (quoting *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 388 (5th Cir. 1985))). Moreover, "a private party's motivation is irrelevant to the determination of whether that private party acted under color of state law." *Young v. Suffolk Cty.*, 922 F. Supp. 2d 368, 386 (E.D.N.Y. 2013) (citation omitted). Finally, if a plaintiff's only evidence in support of a Section 1983 claim is that the private defendants and a district attorney met and otherwise communicated on several occasions, it is insufficient because there is "'nothing suspicious or improper in such meetings, which are routine and necessary in the preparation of evidence,'" and the "'mere allegation of their occurrence is [not] sufficient to create a material issue of fact as to whether something improper took place during them.'" *Scotto v. Almenas*, 143 F.3d 105, 115 (2d Cir. 1998) (quoting *San Filippo v. U.S. Trust Co.*, 737 F.2d 246, 256 (2d Cir. 1984)).

When the private actor takes a more active role, however, and jointly engages in action with state actors, he will be found to be a state actor. *See, e.g.*, *Lugar*, 457 U.S. at 942 (finding that, when a supplier sought prejudgment attachment of a debtor's property, supplier was a state actor because it "invok[ed] the aid of state officials to take advantage of state-created attachment procedures"); *Dennis*, 449 U.S. at 27-28 (holding that defendants who conspired with and participated in bribery with federal judge acted under color of state law).

Indeed, "a defendant who causes an unlawful arrest or prosecution may be held responsible civilly if he does so by maliciously providing false information." *Friedman v. New York City Admin. for Children's Services, et al.*, No. 04-CV-3077(ERK), 2005 WL 2436219, at *8 (E.D.N.Y. Sept. 30, 2005); *see also Coakley v. Jaffe*, 49 F. Supp. 2d 615 (S.D.N.Y. 1999)

(finding plaintiffs sufficiently pled existence of joint action where private defendants manipulated evidence presented to a grand jury, thereby willfully causing an assistant district attorney to violate plaintiffs' rights). This could include providing authorities with evidence they know to be false or which unduly influenced authorities, particularly when the state actor does not subsequently exercise independent judgment. *See, e.g.*, *Palmer v. Monroe Cty. Deputy Sheriff*, No. 00-CV-6370, 2004 WL 941784 at *8 (W.D.N.Y. Apr. 29, 2004); *Ginsberg,* 189 F.3d at 272 ("Where, as here, a police officer exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not jointly engaged . . . ."); *Manbeck v. Micka*, 640 F. Supp. 2d 351 (S.D.N.Y. 2009) (recognizing an exception to the general rule concerning providing information to police where private actor provides false statements to state actors to intentionally violate constitutional rights); *Merkle v. Upper Dublin School Dist.*, 211 F.3d 782 (3d Cir. 2000) (holding school district may be liable under Section 1983 where police department would not have pressed charges and pursued criminal prosecution without the district's request to do so).

Thus, courts have determined the "under color of state law" requirement can be met as to private defendants where they had a clear objective of influencing the action of the state and fabricated evidence to achieve that objective, *Young v. Suffolk Cty.*, 705 F. Supp. 2d 183 (E.D.N.Y. 2010), where police have arrested individuals based solely on the private defendants' request, without making an independent investigation of the matter, *Fletcher v. Walmart Stores, Inc.*, No. 05 Civ. 1859(WHP), 2006 WL 2521187, at *3 (S.D.N.Y. Aug. 28, 2006), and where they made false statements to the police to invoke the state's power to intentionally violate another's rights, *Weintraub v. Board of*

*Educ.*, 423 F. Supp. 2d 38, 58 (E.D.N.Y. 2006).

Alternatively, to demonstrate that a private party defendant was a state actor engaged in a conspiracy with other state actors under Section 1983, a plaintiff must allege: (1) an agreement between the private party and state actors, (2) concerted acts to inflict an unconstitutional injury, and (3) an overt act in furtherance of the goal. *See Carmody v. City of New York*, No. 05 Civ. 8084(HB), 2006 WL 1283125, at *5 (S.D.N.Y. May 11, 2006) (citing *Ciambriello*, 292 F.3d at 324-25). Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *See Ciambriello*, 292 F.3d at 325 (dismissing conspiracy allegations where they were found "strictly conclusory"); *see also Robbins v. Cloutier*, 121 F. App'x 423, 425 (2d Cir. 2005) (dismissing a Section 1983 conspiracy claim as insufficient where plaintiff merely alleged that defendants "acted in a concerted effort" to agree not to hire plaintiff and to inform others not to hire plaintiff). "A plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy, but the pleadings must present facts tending to show agreement and concerted action." *Fisk*, 401 F. Supp. 2d at 376 (internal citations omitted). "Unsubstantiated allegations of purported collaboration between a state actor and a private party are insufficient to defeat a motion for summary judgment." *Young*, 922 F. Supp. 2d at 386 (*citing Scotto*, 143 F.3d at 115; *Leon v. Murphy*, 988 F.2d 303, 311 (2d Cir. 1993) (affirming grant of summary judgment because plaintiff's allegations of conspiracy were "unsupported by any specifics, and many of them [were] flatly contradicted by the evidence proffered by defendants"). Indeed, because "conspiracies are by their very nature secretive operations," while conclusory allegations of a Section 1983 conspiracy are insufficient, they "may have to be proven by circumstantial, rather than direct, evidence." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).

Private actors may be liable for malicious prosecution even if the state official with whom they have participated in joint action is himself immune from personal liability. *Dennis*, 449 U.S. at 28-29 ("[T]he private parties conspiring with the judge were acting under color of state law; and it is of no consequence in this respect that the judge himself is immune from damages liability. Immunity does not change the character of the judge's actions or that of his co-conspirators."); *Coakley*, 49 F. Supp. 2d at 624.

ii. Initiating a Proceeding

The initiation or continuation of a criminal proceeding can be satisfied by, *inter alia*, showing that the defendant filed formal charges and caused the plaintiff to be arraigned. *Phillips v. DeAngelis*, 571 F. Supp. 2d 347, 353-54 (N.D.N.Y. 2008). It is well settled that "[i]n order for a civilian complainant to be considered to have initiated a criminal proceeding, 'it must be shown that [the complainant] played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Barrett v. Watkins*, 919 N.Y.S.2d 569, 572 (3d Dep't 2011) (quoting *Viza* v. *Town of Greece*, , 463 N.Y.S.2d 970, 971 (4th Dep't 1983)). Importantly, "[m]erely furnishing information to law enforcement authorities, who are then free to exercise their own judgment as to whether criminal charges should be filed, and giving testimony at a subsequent trial are insufficient to establish liability." *Barrett*, 919 N.Y.S.2d at 572.

### iii. Probable Cause

A grand jury indictment gives rise to a presumption of probable cause for purposes of a malicious prosecution claim. *See Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994). However, a showing of "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith" can overcome this presumption. *Id.* (citation omitted); *see also McClellan*, 439 F.3d at 145 (holding that the presumption of probable cause created from a grand jury indictment "may be rebutted by evidence of various wrongful acts on the part of the police," and that, "[i]f plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith") (citing *Colon v. City of New York*, 60 N.Y.2d 78, (N.Y. 1983)); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 421 (S.D.N.Y. 2002) ("An indictment by a grand jury creates a presumption of probable cause that can only be overcome by establishing that the indictment itself was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" (quoting *Bernard*, 25 F.3d at 104)); *Colon*, 60 N.Y.2d at 82-83 ("The presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." (citations omitted)). If, after construing all inferences in the light most favorable to plaintiff, a jury could reasonably find that the indictment was secured through bad faith or perjury, the issue of probable cause cannot be resolved by summary judgment, and it will be left to the jury to determine whether the indictment was secured through bad faith or perjury. *See McClellan*, 439 F.3d at 146; *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003).

In *McClellan*, for example, the following evidence offered by an arrestee against the prosecuting officer, Smith, was found sufficient to allow the case to proceed to a jury on the issue of probable cause, despite a grand jury indictment, because it could be concluded that the officer's "prosecution of the case was impelled solely by a personal animus":

> [Smith] was the instigator of the altercation; may have been intoxicated; lied to the arresting officer about McClellan's responsibility for the altercation; admittedly was displeased with the original grand jury result; supervised the investigation despite his obvious conflict of interest; reassigned the case because the officer originally assigned 'wasn't handling the investigation properly'; urged the District Attorney's office that had employed him (and was to employ him again) to apply for the second grand jury; pressured a prosecutor to make a deal with a putative witness to give testimony in the case against McClellan; eventually procured the sole witness whose testimony enabled the case to be presented to the second grand jury; and altered his testimony before the second grand jury with regard to the placement of the vehicles after speaking with an officer who had been at the scene.

439 F.3d at 146. In addition, the Court noted inconsistencies in the officer's and the arrestee's version of events. *Id.* In *Boyd*, the Second Circuit noted the difference between "a simple conflict of stories or mistaken memories" and "the possibility that the police . . . lied in order to secure an indictment." 336 F.3d at 77.

### b. Analysis

For the following reasons, the Court concludes that the Sentosa defendants' arguments as to why plaintiffs' malicious prosecution claims against them cannot survive summary judgment are unpersuasive.

### i. Under Color of State Law

First, the Sentosa defendants argue that plaintiffs' Section 1983 claims against them fail because they were not acting under color of state law. (Sentosa's Br. 4-18.) Specifically, they argue that discovery has proven that plaintiffs' allegations that the Sentosa defendants pressured the County defendants to act and then agreed to present false testimony to the Grand Jury were wholly conclusory and unsubstantiated, and therefore their Section 1983 claims should be dismissed. (Sentosa's Br. 8.) Plaintiffs contend that, although they lack direct, personal knowledge of the joint activity or conspiracy they allege, there is abundant circumstantial evidence supporting their claim. (Pls.' Br. 54-55.) For the following reasons, the Court denies the Sentosa defendants' motion on this ground.

As noted above, the Sentosa defendants devote a significant portion of their legal argument on this issue and their 56.1 statement to developing the point that plaintiffs have no personal knowledge of any joint activity or conspiracy between the Sentosa and County defendants, and that no documents produced by any party in discovery support conspiracy or joint activity. (Sentosa's Br. 8-11.) For example, defendants assert that none of the nurse plaintiffs were able to identify facts that support claims of joint activity or conspiracy. (Sentosa's Br. 10.) The Sentosa defendants argue that, in the absence of direct, admissible evidence supporting their claims, they fail as a matter of law.

Plaintiffs argue that summary judgment is not warranted because the evidence on which the Sentosa defendants rely in their argument is comprised of "self-serving denials of wrongdoing." (Pls.' Br. 54.) Moreover, plaintiffs assert that there is strong circumstantial evidence supporting their claim, and that is all that is required to prevail. (*Id.* at 54-55.) In particular, plaintiffs argue that the Sentosa defendants are politically powerful and that they used this influence to ensure that the plaintiffs would be prosecuted, even though no patients were harmed, with the goal of deterring other nurses from pursuing their legal rights against Sentosa. (*Id.* at 58, 61.) In support of this argument, plaintiffs point to, among other things, the following pieces of evidence: (1) the Sentosa defendants decided to press the DA's Office to prosecute the nurses at a meeting they were able to secure "with a simple telephone call," (*id.* at 63); (2) after the meeting, Spota separately telephoned Fensterman and invited him to come to the office for another meeting and a lunch (*id.* at 63); (3) the lack of involvement of the SCPD in the investigation; and (4) the manner of the investigation by the DA's Office prior to seeking an indictment from the Grand Jury, and the manner in which the investigation was conducted.[38] Moreover,

---

[38] Plaintiffs also point to a transcript of an alleged recording of statements by Philipson in a meeting with

Filipino nurses in various facilities as further evidence that he and the other Sentosa defendants were not

plaintiffs point to the "egregious perjury" committed by the Sentosa witnesses. (*Id.* at 65.)[39] Plaintiffs argue that, taking all these facts into account, and combining them with the subsequent actions of the County defendants described above after the meeting with the Sentosa defendants, they have created a material issue of fact as to whether the Sentosa defendants acted under color of state law under this theory.

As a threshold matter, the Sentosa defendants' reliance on the lack of personal knowledge by plaintiffs of evidence of a joint activity and/or conspiracy between the Sentosa defendants and the County defendants, and their insistence that direct evidence is required to sustain their malicious prosecution claim, are misguided as a matter of law. First, the Second Circuit has clearly held that circumstantial evidence alone is not only sufficient to sustain a Section 1983 claim, but may be the only evidence available due to the reality that "such conspiracies are by their very nature secretive operations . . . ." *Pangburn*, 200 F.3d at 72. Similarly, no case law requires that plaintiffs have direct knowledge of joint activity or a conspiracy to sustain a Section 1983 claim. Therefore, the Court rejects the Sentosa defendants' arguments on this ground.

Further, the Court must not and does not review whether the alleged false testimony

by the Sentosa defendants in the Grand Jury forms the basis of a malicious prosecution claim. The Supreme Court has expressly held that a grand jury witness "has absolute immunity from any § 1983 claim based on the witness' testimony," even if that testimony is perjurious. *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012). Such absolute immunity applies to witnesses in the grand jury, whether private parties or government officials. *San Filippo*, 737 F.2d at 256. As the Second Circuit has further explained, for a malicious prosecution claim to survive, it must be based on misconduct by defendants outside their perjurious grand jury testimony. *Coggins v. Buonora*, 776 F.3d 108, 113 (2d Cir. 2015).

Turning to the sufficiency of the circumstantial evidence plaintiffs have set forth of state action by the Sentosa defendants (excluding the alleged perjury by the Sentosa defendants in the Grand Jury proceeding), the Court does agree that plaintiffs have not set forth evidence of a conspiracy to fabricate evidence between the Sentosa defendants and the County defendants prior to the Grand Jury proceeding (and, for this reason, has determined that the claims against the County defendants cannot survive summary judgment). However, construing the facts and all inferences in the light most favorable to plaintiffs, a rational jury could find, based upon the entire record, that the Sentosa

---

merely supplying information to the DA's Office, but were insisting that the plaintiffs be charged and arrested. In particular, at that meeting with other nurses, Philipson purportedly stated, *inter alia*, the following: "[W]e will be contacting the District Attorney tomorrow because what they did is actually a criminal offense, abandoning the patients the way they did. It's irresponsible of them to just walk off…. But I feel we can extend an amnesty until tomorrow, as I've said, because after, after that time, I cannot do anything to pull it back. Once we pull the trigger, it's done." (Pls.' 56.1 ¶ 72; Ex. NN.) However, because plaintiffs have not articulated how this recording will be authenticated and admitted, the Court does not

consider it for purposes of this decision. However, plaintiffs may still seek to authenticate and introduce that recording for purposes of trial.

[39] Plaintiffs also request that the Court take judicial notice of instances of corruption allegations involving Spota. As a threshold matter, any unproven allegations of misconduct in other cases by Spota do not constitute admissible evidence in this case, and are not facts of which the Court can take judicial notice. In any event, plaintiffs have provided no link between those allegations and the circumstances surrounding this case.

defendants exerted influence over the DA's Office through Spota, that the Sentosa defendants were actively encouraging the criminal prosecution of the plaintiffs, and that the judgment of the Sentosa defendants as to whether charges should be brought was substituted for the judgment of the DA's Office. Thus, the Court concludes that there is evidence that raises a question of material fact as to whether the Sentosa defendants were willful participants in the joint activity with the DA's Office in the decision to initiate charges against the plaintiffs and to arrest and prosecute them, such that they are state actors for purposes of Section 1983.

Based upon the record in this case, the Court finds inapposite the Sentosa defendants' reliance on case law that holds that, if a plaintiff's only evidence in support of a Section 1983 claim is that the private defendants met with a district attorney, the claim fails because the "mere allegation of [such meetings] is [not] sufficient to create a material issue of fact as to whether something improper took place during them." *Scotto*, 143 F.3d at 115. Although this is correct as a matter of law, plaintiffs have not "merely" made such allegations, as explained above. Thus, the case authority cited by the Sentosa defendants is not at odds with this Court's ruling. Instead, based upon the totality of the evidence in this case, a reasonable jury could determine that the Sentosa defendants had a clear objective of influencing the decision-making of the DA's Office and took a number of affirmative steps, through that influence, to set in motion an unlawful arrest and prosecution of plaintiffs.[40]

Other courts have similarly allowed such claims to proceed, either at the motion to dismiss stage or later stage of the proceeding, where such allegations or evidence are present. In fact, courts have emphasized that a conspiracy is not required for there to be joint action. *See, e.g., Powell v. Miller*, 104 F. Supp. 3d 1298, 1310 (W.D. Okla. 2015) ("Although one way to prove willful joint action is to demonstrate that the public and private actors engaged in a conspiracy, a requirement of which is that both public and private actors share a common, unconstitutional goal, evidence that private persons exerted influence over a state entity, substituted their judgment for the state entity, or participated in the decision leading to the deprivation of rights, is also sufficient to establish joint action in satisfaction of the 'color of law' element of § 1983.") (citations omitted); *see also Harris v. Sec. Co. of 1370 Sixth Ave., B.D.*, No. 94 Civ. 2599 (JGK), 1996 WL 556927, at *3 (S.D.N.Y. Oct. 1, 1996) ("[S]ecurity guards, like all private persons, are considered to act under color of state law if they are willful participant[s] with the State or its agents. When a security guard detains suspects for subsequent arrest by the police, joint activity with the state occurs when the police arrest the suspect solely based on the security guard's request, without making any independent investigation of the matter. To constitute state action there must be more than a general understanding that the security guards can call the police for assistance. The police must allow the security guard's judgment about whether probable cause exists to be substituted for their own.") (quotations and citations omitted).

For example, in *M & D Sportswear, Inc. v. PRL U.S.A. Holdings, Inc.*, No. 02 Civ.

---

[40] In making such a determination, the jury would be able to consider the Sentosa defendants' decisions to pursue various avenues of action against plaintiffs, including by securing a personal meeting with Spota. *See, e.g., Merkle*, 211 F.3d at 793 (finding relevant that

the private defendant made a "telephone call to his friend, the Chief of Police," in which he did not disclose pertinent information and made clear that he desired an investigation and prosecution of plaintiff).

1562(GEL), 2002 WL 31548495, at *3-4 (S.D.N.Y. Nov. 14, 2002), the court allowed a Section 1983 claim to survive a motion to dismiss where there were allegations that manufacturers engaged in "joint action" with the district attorney's office and police department in seizing and destroying a retailer's merchandise. The court, citing the Second Circuit's decision in *Ciambriello*, noted that a private actor could be a willful participant in state action, without necessarily satisfying the elements of a Section 1983 conspiracy claim. *Id.* at *3 (citing *Ciambriello*, 292 F.3d at 324). The court then explained:

> M&D has clearly alleged that the designer defendants were not mere complainants, but were active and indeed controlling participants in the investigation. The Complaint describes in detail the City defendants' reliance on the designer defendants, and the designers' consequent influence on the investigation . . . Indeed, if credited, the allegations in the Complaint could lead a reasonable factfinder to conclude that the designer defendants effectively controlled the investigation, the decision to prosecute, and the failure to retrieve the seized apparel before it was destroyed . . . These detailed allegations, if established, would be more than sufficient to establish joint participation on the parts of the designer defendants and the City defendants in the sequence of events that led to the destruction of the seized apparel.

*Id.* at 4 (citations omitted); *see also Wagenmann v. Adams*, 829 F.2d 196, 211 (1st Cir. 1987) (affirming a jury verdict against a private citizen where jury could rationally find that the citizen was not a mere complainant, but exercised influence over the police, such that, the police "felt *constrained* to jail the plaintiff notwithstanding the absence of any legal basis to do so") (emphasis in original); *Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 369 (E.D.N.Y. 2011) ("Here, plaintiffs have presented evidence that defendants went well beyond cooperation with ACS. Although defendants have presented countervailing evidence that ACS made their decision independently, plaintiffs' evidence, viewed in the light most favorable to them, creates a genuine issue of material fact as to whether defendants conspired with ACS in determining to file a removal petition against Adult Plaintiffs.").

In short, the Court concludes that there is a material question of fact as to whether the Sentosa defendants acted under color of state law, and, therefore, the Sentosa defendants are not entitled to summary judgment on this issue.

ii. Initiation

Second, with respect to the Sentosa defendants' argument as to the initiation of the criminal proceeding, they assert that: (1) the Sentosa defendants did not prosecute plaintiffs; (2) the Grand Jury indictment severed any chain of causation between any actions by the Sentosa defendants and the resulting criminal proceeding; and (3) the exercise of independent judgment by Lato severed the chain of causation. (*See* Sentosa's Br. 19-21.) The Sentosa defendants acknowledge this Court's prior ruling that "the Sentosa defendants cannot hide behind the decision of the DA to prosecute and the subsequent indictment . . . when it was the Sentosa defendants who allegedly spurred the County defendants to act and fed them with false testimony in pursuit of that endeavor." (Memorandum & Order, ECF No. 31 at 43; *see* Sentosa's Br. 21.) However, they state that there is no

evidence that they "spurred" the County defendants to act or that any false testimony was presented either to Lato or to the Grand Jury, and that all evidence is to the contrary. (Sentosa's Br. 21.) The Sentosa defendants point to the depositions that indicate that, other than the initial meeting on May 31, 2006, the only substantive contact that the Sentosa defendants had with Lato's subsequent investigation related to O'Connor allowing Lato to tour the Avalon facility and providing him with documents. (*Id.*)[41]

Plaintiffs argue that the conduct of the Sentosa defendants in this case can be characterized as initiation of a prosecution because they did not merely report allegations of a crime to the police, but instead importuned the District Attorney to prosecute plaintiffs, even after the police refused to act.[42] (Pls.' Br. 71.) Plaintiffs allege that this was done "to make an example of the nurses and their counsel, to assure that none of the other Filipino nurses attempted to follow in the footsteps of the plaintiffs." (*Id.* at 72.) With respect to the Sentosa defendants' argument that any chain of causation between their actions and the resulting criminal proceeding was severed, plaintiffs argue that a chain of causation is not broken where the wrongdoer can reasonably foresee that the actions undertaken would lead to a decision resulting in prosecution of the defendant. (*Id.*) Because Lato's investigation was influenced by pressure exerted by the Sentosa defendants and by the false information they provided, plaintiffs argue, the chain of causation was not broken by that investigation. (*Id.* at 72-73.)

The Court agrees with plaintiffs that there is sufficient evidence of initiation by the Sentosa defendants to survive summary judgment on this issue. First, the Sentosa defendants' argument that they should not be liable for malicious prosecution because they did not prosecute plaintiffs ignores the basic and well-established rule that private actors—although they do not themselves arrest or prosecute individuals—may be held liable for a false arrest or malicious prosecution. This is especially true where, as here, there is evidence that the prosecuting office was influenced to take certain actions due to conduct of the private defendants. *See, e.g.*, *Merkle*, 211 F.3d at 791 (holding that, "[a]lthough the charges against [plaintiff] were filed and the actual prosecution conducted by Detective Han," there was evidence that the police department would not have pursued the criminal prosecution in the absence of the private defendants' conduct). As discussed *supra*, construing the evidence of the meetings and contacts with the DA's Office most favorably to plaintiffs in light of the entire record, there is sufficient evidence that the Sentosa defendants went well beyond supplying information and, instead, were actively encouraging that the plaintiffs be charged and arrested.

Turning to the Sentosa defendants' other arguments, the Court disagrees that the Grand Jury indictment severs any chain of causation between the Sentosa defendants' actions and the resulting indictment as a matter of law. Construing the facts and all inferences in the light most favorable to plaintiffs, a jury could find that the Grand Jury indictment was based on misrepresentations made by the Sentosa defendants themselves, and, therefore, that it

---

[41] The Sentosa defendants do not include here that defense counsel Sarah C. Lichtenstein sent a fax to Lato, although it is not disputed that she did.

[42] Moreover, although not considered in connection with this summary judgment motion (for reasons

discussed *supra*), plaintiffs point to an alleged recording in which they assert Philipson publicly threatened all the plaintiffs with arrest and prosecution, specifically stating that they were going to "pull the trigger" with the District Attorney. (Pls.' Br. at 71-72.)

was a continuation of the effects of the Sentosa defendants' alleged wrongdoing. *See Kerman v. City of New York*, 374 F.3d 93, 127 (2d Cir. 2004) ("The fact that [an] intervening third party may exercise independent judgment in determining whether to follow a course of action recommended by the defendant does not make acceptance of the recommendation unforeseeable or relieve the defendant of responsibility."). Further, the Court concludes that plaintiffs have set forth sufficient evidence to create an issue of material fact as to whether Spota and Lato exercised independent judgment that severs any chain of causation between the Sentosa defendants' actions and the resulting indictment. Despite the fact that Lato stated that his investigation of plaintiffs was conducted independently, he testified that he was aware that the Sentosa defendants' received an audience with Spota due to Spota's relationship with Fensterman, and, when taken into consideration alongside the alleged misrepresentations made by the Sentosa defendants in the Grand Jury, whether Lato's investigation was conducted independently for purposes of establishing a break in the chain of causation is a question for the jury.

### iii. Probable Cause

The Court now addresses defendants' argument that there was probable cause for the prosecution of plaintiffs. First, the Court acknowledges that defendants are correct that the Grand Jury indictment creates a rebuttable presumption of probable cause. (Sentosa's Br. 21-22; Cnty.'s Br. 10-11.) The defendants add that, because there is no

evidence that any of the defendants agreed to provide false testimony, that the Sentosa defendants pressured the County defendants to prosecute plaintiffs, or that Lato committed any wrongdoing, there is no basis to rebut this presumption. (*See* Sentosa's Br. 22; Cnty.'s Br. 11-13.) Plaintiffs contend that the presumption should be rebutted, pointing to, among other things, the following: (1) the blatant perjury by the Sentosa witnesses;[43] (2) the admission of prejudicial evidence; (3) the withholding of exculpatory evidence; (4) the fact that highly pertinent questions by the grand jurors were ignored; (5) the fact that the jurors were led to believe that the nurse plaintiffs walked out during a shift; (6) improper charges on the law; (7) the use of hearsay to indict Vinluan; and (8) Lato's refusal to present the Education Department findings, as irregularities warranting rebuttal. (Pls.' Br. at 73-74.)

With respect to false and/or misleading statements to the Grand Jury, plaintiffs point to, among other things, O'Connor's testimony that gave the impression that the nurse plaintiffs did not communicate their grievances before resigning *en masse*, and Luyun's false statements. In addition, plaintiffs note that the multiple references to the nurses "walking out" may have confused the jurors as to whether the nurses left during their shifts. Moreover, plaintiffs assert that the Sentosa defendants' decision to contact the Department of Education, the SCPD, and the DA's Office about the resignation, and their desire that they be criminally prosecuted as expressed by Phillipson at the meeting(s) he held with other nurses, demonstrates that the Sentosa defendants' misstatements or

---

[43] As discussed in greater detail *infra*, the Court agrees that the Sentosa defendants are entitled to absolute immunity for their testimony before the Grand Jury. *See Rehberg*, 566 U.S. 356. However, grand jury testimony can be used at summary judgment or at trial for a purpose other than for its truth, *Marshall v.* *Randall*, 719 F.3d 113 (2d Cir. 2013), and, obviously, the Court must examine such testimony in the instant case to determine whether the presumption of probable cause could be rebutted. Thus, the Court examines the alleged false testimony here.

misleading testimony in the Grand Jury were made in bad faith.

Construing these facts and all inferences in the light most favorable to plaintiffs as the non-moving party, the Court concludes that a reasonable juror could infer from these facts, when taken together, that the indictment was procured through bad faith and/or perjury based upon the testimony in the Grand Jury, as well as other alleged prosecutorial errors and/or irregularities in the Grand Jury presentation.

Further, plaintiffs have created a material issue of fact as to whether probable cause existed independent of the Grand Jury indictment. There is evidence that the nurse plaintiffs did not walk out on their shifts; that the nurse plaintiffs had provided notice of their intent to resign if issues with their employment were not resolved; and that there were adequate staffing options such that their resignation would not create any safety issues for their patients. Construing these facts and all inferences in the light most favorable to plaintiffs as the non-moving party, a reasonable jury could determine there was not probable cause to prosecute plaintiffs.

In sum, like the question of whether the presumption of probable cause generally applicable to grand jury indictments has been rebutted here, the question of whether there was independent probable cause, is a fact-intensive question which, under the particular circumstances of this case, needs to be resolved by a jury. *See Merkle*, 211 F.3d at 794 ("[W]hether [the private defendant]

acted out of a concern that valuable supplies were being stolen or whether he criminally prosecuted [plaintiff] . . . is a disputed question of fact for a jury and not a question of law for the trial court."). Therefore, the Court rejects the Sentosa defendants' argument that summary judgment on plaintiffs' malicious prosecution claim is warranted because there was probable cause to indict plaintiffs, and defendants' motion for summary judgment on this ground is denied.

\*\*\*

For these reasons, the Court rejects the Sentosa defendants' argument that they should be granted summary judgment on plaintiffs' malicious prosecution claims under federal or state law.[44]

2. False Arrest

The Sentosa defendants also argue that plaintiffs' false arrest claims fail as to them because they did not confine plaintiffs, and because they did not cause the arrest. (Sentosa's Br. 23-24.)

a. Legal Standard

Claims for false arrest brought under Section 1983 are "substantially the same as claims for false arrest . . . under state law." *Jocks*, 316 F.3d at 134 (quoting *Weyant*, 101 F.3d at 852). To prevail under New York law, a plaintiff must prove four elements: "(1) the defendant intended to confine him; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not contest

---

[44] The Court notes that, for purposes of the summary judgment motion, the Sentosa defendants do not argue that there is insufficient evidence with respect to the "favorable termination" or "malice" elements. In any event, the Court concludes that there is uncontroverted evidence of a favorable termination, such that this element is met for purposes of summary judgment. In addition, with respect to malice, it is well settled that a

jury may infer actual malice from the absence of probable cause. *See, e.g., Maxwell v. City of New York*, 554 N.Y.S.2d 502, 505 (1st Dep't 1990). Thus, given the factual disputes about probable cause (as well as the other evidence in the record discussed *supra*), summary judgment on the malice requirement is unwarranted.

the confinement; and (4) confinement was not otherwise privileged." *Conte v. Cty. of Nassau*, No. 06-CV-4746 (JFB)(ETB), 2008 WL 905879, at *8 (E.D.N.Y. Mar. 31, 2008) (citations omitted).

The Second Circuit has explained that "[t]o hold a defendant liable as one who affirmatively instigated or procured an arrest, a plaintiff must show that the defendant or its employees did more than merely provide information to the police." *King v. Crossland Sav. Bank*, 111 F.3d 251, 257 (2d Cir. 1997). Merely identifying a potential culprit or erroneously reporting a suspected crime, without any other action to instigate the arrest, is not enough to warrant liability for false arrest. *Id.* Instead, "a successful false arrest claim requires allegations that the private defendant 'affirmatively induced or importuned the officer to arrest . . . .'" *Delince v. City of New York*, No. 10 Civ. 4323(PKC), 2011 WL 666347, at *4 (S.D.N.Y. Feb. 7, 2011) (quoting *LoFaso v. City of New York*, 886 N.Y.S.2d 385, 387 (1st Dep't 2009)). Thus, where an individual instigates an arrest and does so based on knowingly false information, that individual may be held liable for false arrest. *Weintraub*, 423 F. Supp. 2d at 56 ("Contrary to defendants' argument, even where there is no claim that a defendant actually restrained or confined a plaintiff, a claim of false arrest or false imprisonment may lie where a plaintiff can 'show that . . . defendants instigated his arrest, thereby making the police . . . agents in accomplishing their intent to confine the plaintiff.'" (quoting

*Carrington v. City of New York*, 607 N.Y.S.2d 721, 722 (2d Dep't 1994))).

b. Analysis

The Sentosa defendants' first argument as to why plaintiffs' false arrest claim fails is that they did not confine plaintiffs. (Sentosa's Br. 23.) However, as the Second Circuit has held, individuals can be held liable for false arrest if they affirmatively instigate or procure an arrest. *King*, 111 F.3d at 257.

Here, as discussed in detail *supra*, plaintiffs have created a material issue of fact as to whether the Sentosa defendants affirmatively instigated or procured the arrest. First, as background, they have provided evidence that the Sentosa defendants pursued a number of avenues for redress for the resignation, including by filing lawsuit in the New York State Supreme Court, requesting that the Department of Education revoke the nurse plaintiffs' licenses and/or limited permits, filing a police report with the SCPD, and meeting with Spota when the SCPD declined to take action.[45] Second, based upon the circumstances surrounding the meeting with Spota, as well as the subsequent actions of the Sentosa defendants following the meeting, a rational jury could reasonably infer the Sentosa defendants instigated or procured the nurse plaintiffs' arrest. Therefore, there is no basis to grant summary judgment on this ground.

---

[45] The Court is not suggesting that pursuing redress for perceived wrongdoing is inherently problematic, or that, by itself, it would create a material issue of fact as to whether the Sentosa defendants had instigated plaintiffs' arrest. Indeed, such a conclusion would be contrary to well-established law that merely reporting information to authorities does not constitute actionable conduct for purposes of false arrest claims. However, a jury could infer from the fact that the Sentosa defendants pursued many avenues of redress, including by contacting the DA's Office after the SCPD declined to take action against plaintiffs, when considered alongside other evidence supporting plaintiffs' other assertions, that the Sentosa defendants in fact instigated plaintiffs' confinement and intended such a result.

The Sentosa defendants' second argument as to why this claim should fail is that they did not cause plaintiffs' arrest. (Sentosa's Br. 24.) In particular, they argue that they did not cause the Grand Jury indictment, and that there is no evidence that they "induced" the County defendants to seek a Grand Jury indictment, that they influenced the County defendants in the presentation of evidence to the Grand Jury, that they presented false testimony to the Grand Jury, or that they otherwise induced the ultimate indictment from the Grand Jury. (*Id.*) However, as discussed in detail *supra*, there is circumstantial evidence, when viewed most favorably to the plaintiffs in light of the entire record, that would permit a rational jury to reasonably infer that this is precisely what happened. Given the factual disputes in this case (and the reasonable inferences to be drawn from such facts), it is for the jury to decide what effect, if any, the Sentosa defendants' actions had on the DA's Office decision to initiate charges by seeking a Grand Jury indictment and, consequently, plaintiffs' arrest. Therefore, plaintiffs' false arrest claim as to the Sentosa defendants, under federal and state law, survives the summary judgment stage.

### 3. Attorneys' Fees

The Sentosa defendants request attorneys' fees pursuant to 42 U.S.C. § 1988 ("Section 1988"). Courts, in their discretion, are able to allow prevailing parties in Section 1988 claims reasonable attorneys' fees. 42 U.S.C. § 1988(b); *see also Blum v. Stenson*, 465 U.S. 886, 888 (1984) ("[I]n federal civil rights actions 'the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.'" (quoting 42 U.S.C. § 1988)). However, because the Court has determined that plaintiffs' malicious prosecution and false arrest claims against the Sentosa defendants survive the summary

judgment stage, attorneys' fees are not available at this juncture. Therefore, the Court denies the Sentosa defendants' request for attorneys' fees.

### IV. CONCLUSION

For the reasons set forth below, the Court grants the County defendants' motion for summary judgment. With respect to the Sentosa defendants' summary judgment motion, to the extent that plaintiffs have asserted a Section 1983 conspiracy claim against the Sentosa defendants for conspiring to fabricate evidence in the investigative stage with the County defendants, the motion for summary judgment is granted. However, the Court denies the Sentosa defendants' motion for summary judgment on the malicious prosecution and false arrest claims under federal and state law.

SO ORDERED.

JOSEPH F. BIANCO
United States District Judge

Dated:     November 28, 2018
           Central Islip, NY

\* \* \*

Plaintiffs are represented by James Druker, Kase & Druker, Esqs., 1325 Franklin Avenue, Suite 225, Garden City, NY 11530; Paula Schwartz Frome, Esq., 1325 Franklin Ave., Suite 225, Garden City, NY 11530; and Oscar Michelen, Cuomo LLC, 200 Old Country Road, Suite 2 South, Mineola, NY 11501. Plaintiff Felix Vinluan is also represented by Sherri Anne Jayson, Cuomo LLC, 9 East 38th Street, 3rd Floor, New York, NY 10016. Defendant Thomas J. Spota is represented by Brian C. Mitchell, Suffolk County Dept. of Law, 100 Veterans Memorial Highway, P.O. Box 6100,

Hauppauge, NY 11788 and Garrett W. Swenson, Jr., Esq., 76 Bay Road, Brookhaven, NY 11719. Defendants Leonard Lato and the County of Suffolk are also represented by Brian C. Mitchell. Defendants Sentosa Care, LLC, Avalon Gardens Rehabilitation and Health Care Center, Prompt Nursing Employment Agency, LLC, Francris Luyun, Bent Philipson, and Berish Rubinstein are represented by Matthew Didora, Sarah C. Lichtenstein, and John Scanlan Cahalan, Abrams Fensterman, 1111 Marcus Avenue, Suite 107, Lake Success, NY 11042. Sarah C. Lichtenstein also represents defendants Susan O'Connor and Nancy Fitzgerald.