

MANDATE

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 9th day of March, two thousand twenty-two,

Before:     Robert D. Sack,
            Denny Chin,
            Raymond J. Lohier, Jr.,
                *Circuit Judges.*

_____

Juliet Anilao, Harriet Avila, Mark Dela Cruz, Claudine Gamaio, Elmer Jacinto, Jennifer Lampa, Rizza Maulion, Theresa Ramos, Ranier Sichon, and James Millena,

     Plaintiffs-Counter-Defendants-Appellants,

Felix Q. Vinluan,

     Plaintiff - Appellant,

v.

Thomas J. Spota, III, Individually and as District Attorney of Suffolk County, Office of the District Attorney of Suffolk County, Leonard Lato, individually and as an Assistant District Attorney of Suffolk County, County of Suffolk, Karla Lato, as Administrator of the Estate of Leonard Lato,

     Defendants - Appellees,

Susan O'Connor, Nancy Fitzgerald, Sentosa Care, LLC, Avalon Gardens Rehabilitation and Health Care Center, Prompt Nursing Employment Agency, LLC, Francris Luyun, Bent Philipson, Berish Rubinstein,

     Defendants-Counter-Claimants.

_____

**JUDGMENT**

Docket No. 19-3949

MANDATE ISSUED ON 07/21/2022

The appeal in the above captioned case from a judgment of the United States District Court for the Eastern District of New York was argued on the district court's record and the parties' briefs. Upon consideration thereof,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that the judgment of the district court is AFFIRMED.

For the Court:

Catherine O'Hagan Wolfe,
Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

19-3949-cv
Anilao v. Spota

# UNITED STATES COURT
# OF APPEALS
# FOR THE SECOND CIRCUIT

August Term, 2020

(Argued: December 4, 2020          Decided: March 9, 2022)

Docket No. 19-3949-cv

―――――――――――――――――――――

JULIET ANILAO, HARRIET AVILA, MARK DELA CRUZ,
CLAUDINE GAMAIO, ELMER JACINTO, JENNIFER LAMPA,
RIZZA MAULION, THERESA RAMOS, RANIER SICHON, AND
JAMES MILLENA,

*Plaintiffs-Counter-Defendants-Appellants*,

FELIX Q. VINLUAN,

*Plaintiff-Appellant*,

v.

THOMAS J. SPOTA, III, INDIVIDUALLY AND AS DISTRICT
ATTORNEY OF SUFFOLK COUNTY, OFFICE OF THE DISTRICT
ATTORNEY OF SUFFOLK COUNTY, LEONARD LATO, INDIVIDUALLY
AND AS AN ASSISTANT DISTRICT ATTORNEY OF SUFFOLK COUNTY,
COUNTY OF SUFFOLK, KARLA LATO, AS ADMINISTRATOR OF THE
ESTATE OF LEONARD LATO,

*Defendants-Appellees*,

SUSAN O'CONNOR, NANCY FITZGERALD,
SENTOSA CARE, LLC, AVALON GARDENS REHABILITATION

19-3949-cv
Anilao v. Spota

AND HEALTH CARE CENTER, PROMPT NURSING EMPLOYMENT
AGENCY, LLC, FRANCRIS LUYUN, BENT PHILIPSON,
BERISH RUBINSTEIN,

*Defendants-Counter-Claimants.*[*]

_____

Before:

SACK, CHIN, and LOHIER, *Circuit Judges.*

Ten nurses and their former attorney filed claims under 42 U.S.C.
§ 1983 as well as common-law claims of false arrest and malicious prosecution
under New York law against the defendants, including the District Attorney
of Suffolk County and one of his bureau chiefs. The two principal questions
presented on appeal are whether the individual defendants were entitled to
absolute immunity for the actions they undertook as prosecutors, and
whether there was any admissible evidence showing that they violated the
plaintiffs' constitutional rights during the investigative phase of the case.
Because we agree with the United States District Court for the Eastern District
of New York (Bianco, <u>J.</u>) that the defendants were entitled to absolute
immunity from claims arising from the prosecutorial phase of the case and to
summary judgment on the remaining claims arising from the investigative
phase of the prosecution, we **AFFIRM**.

Judge Chin dissents in a separate opinion.

STEPHEN L. O'BRIEN, O'Brien & O'Brien, LLP,
Nesconset, NY, *for Defendant-Appellee* Thomas J.
Spota, III.

BRIAN C. MITCHELL, Assistant County Attorney,
Suffolk County Attorney's Office, Hauppauge, NY,
*for Defendants-Appellees* County of Suffolk and Karla
Lato, as Administrator of the Estate of Leonard Lato.

_____

[*] The Clerk of Court is directed to amend the caption as set forth above.

19-3949-cv
Anilao v. Spota

> OSCAR MICHELEN, Cuomo LLC, Mineola, NY, *for Plaintiff-Appellant* Felix Vinluan.
>
> PAULA SCHWARTZ FROME (James O. Druker, *on the brief*), Kase & Druker, Esqs., Garden City, NY, *for Plaintiffs-Counter-Defendants-Appellants* Juliet Anilao, Harriet Avila, Mark Dela Cruz, Claudine Gamaio, Elmer Jacinto, Jennifer Lampa, Rizza Maulion, Theresa Ramos, Ranier Sichon, and James Millena.

LOHIER, *Circuit Judge*:

Ten nurses and their former attorney, Felix Vinluan, filed claims under 42 U.S.C. § 1983 as well as common-law claims of false arrest and malicious prosecution under New York law against the defendants — the County of Suffolk, the Office of the District Attorney of Suffolk County (the "DA's Office"), Thomas J. Spota, III, the District Attorney of Suffolk County, and Leonard Lato, an Assistant District Attorney who was at all relevant times the Chief of the Insurance Crimes Bureau at the DA's Office. The plaintiffs allege that Spota and Lato improperly prosecuted them for child endangerment, endangerment of a physically disabled person, and related charges by fabricating evidence and engaging in other improper conduct before a grand jury, in violation of the plaintiffs' federal constitutional rights and New York state law. The state prosecution ended only when a New York state appellate

3

19-3949-cv
Anilao v. Spota

court concluded that the plaintiffs were being "threatened with prosecution

for crimes for which they cannot be constitutionally tried." Matter of Vinluan

v. Doyle, 873 N.Y.S.2d 72, 83 (2d Dep't 2009).  The United States District Court

for the Eastern District of New York (Bianco, J.) found that Spota and Lato

were entitled to absolute immunity for starting the criminal prosecution and

presenting the case to the grand jury, and it dismissed the plaintiffs' claims

arising from any alleged misconduct during that prosecutorial stage.  Anilao

v. Spota, 774 F. Supp. 2d 457, 466–68 (E.D.N.Y. 2011) ("Anilao I").  The District

Court later granted summary judgment in favor of the prosecutors and the

DA's Office as to the remaining claims after concluding that there was

insufficient evidence that Spota or Lato had violated the plaintiffs'

constitutional rights during the investigative phase of the criminal

proceedings.  Anilao v. Spota, 340 F. Supp. 3d 224, 250 (E.D.N.Y. 2018)

("Anilao II").  And "given the absence of any underlying constitutional

violation in the investigative stage," the court concluded, "no municipal

liability can exist against Suffolk County as a matter of law."  Id. at 251.

For the reasons that follow, we affirm the District Court's judgment.

Although Spota and Lato may have unlawfully penalized the plaintiffs for

19-3949-cv
Anilao v. Spota

exercising the right to quit their jobs on the advice of counsel, under our

precedent both of them are entitled to absolute immunity for their actions

during the judicial phase of the criminal process.  As for the plaintiffs' claim

that Spota and Lato fabricated evidence during the investigative phase of the

criminal process, we agree with the District Court that there was insufficient

admissible evidence of fabrication to defeat summary judgment.  We

therefore affirm.

## BACKGROUND

Sentosa Care, LLC ("Sentosa")[1] operates health care facilities

throughout New York and recruited the nurse plaintiffs from the Philippines

to work in various Sentosa nursing home facilities on Long Island, New York.

Each nurse signed an employment contract that required the nurses to work

for at least three years or face a $25,000 penalty.  When they arrived in New

York, the nurses learned that they would be working for an employment

agency, not Sentosa, and that the agency had assigned them to work at

---

[1] Sentosa, Avalon Gardens Rehabilitation and Health Care Center, Prompt Nursing Employment Agency LLC, Francris Luyun, Bent Philipson, Berish Rubinstein, Susan O'Connor, and Nancy Fitzgerald were originally defendants in this case, but they are not parties to this appeal.

5

19-3949-cv
Anilao v. Spota

Avalon Gardens Rehabilitation and Health Center ("Avalon"), a nursing

home for both adults and children.

Following a relatively brief stint at Avalon, the nurses began to

complain about their working and living conditions — longer than expected

work shifts, overcrowded and substandard housing, lower insurance benefits

and pay, and less vacation time than their contracts provided.  The nurses

also voiced their concerns to the Philippine Consulate in New York, which

referred them to Vinluan, an immigration and employment attorney, for

advice.  After speaking with the nurses and evaluating the facts, Vinluan

concluded that Sentosa had breached its contracts with the nurses and

advised them that they were free to resign from their positions without legal

repercussion once their shifts ended.  Based on Vinluan's advice, on April 7,

2006, all ten nurses resigned either after their shift was over or in advance of

their next shift.

Soon after the nurses resigned, Sentosa filed a complaint with the New

York State Department of Education, which licenses and regulates nurses.

The company also filed a complaint in Nassau County Supreme Court to

enjoin the nurses and Vinluan from speaking to other nurses about resigning.

6

19-3949-cv
Anilao v. Spota

It even filed a complaint with the Suffolk County Police Department.  None of

Sentosa's complaints led to any action against the plaintiffs, however, and on

September 28, 2006, the Department of Education closed the case after

determining that the nurses had not engaged in any professional misconduct

or deprived any patient of nursing care.

Unfazed, Sentosa continued its campaign against the plaintiffs.  It

finally found a receptive audience in Spota.  Not long after representatives of

Sentosa met with Spota to urge the DA's Office to file criminal charges

against the nurses for imperiling the health and safety of Avalon's patients,

Spota assigned the criminal investigation to Lato.  Lato then quickly

interviewed the plaintiffs, as well as other witnesses, like Francris Luyun, the

head of Sentosa's recruitment agency.

In defense of the plaintiffs, who were now plainly the targets of a

criminal investigation, Vinluan presented Lato with "significant exculpatory

information."  App'x 55.  Among other things, Vinluan pointed to the fact

that the Department of Education and the New York State Supreme Court

had declined to act against the nurses.  He also provided "information . . .

7

19-3949-cv
Anilao v. Spota

that," contrary to Sentosa's assertion, "none of the Nurse Plaintiffs had ceased work during a shift." App'x 55.

Lato was unpersuaded by Vinluan's arguments and presented several witnesses to a grand jury in Suffolk County. Among the witnesses were several Sentosa employees, an investigator in the DA's Office, a nurse who had also resigned but who is not a party to this appeal, and a nurse who filled in at Avalon immediately after the nurse plaintiffs resigned. The grand jury returned an indictment charging the nurses and Vinluan with (1) conspiracy in the sixth degree, in violation of New York Penal Law (N.Y.P.L.) §§ 105.00 and 105.20; (2) endangering the welfare of a child, in violation of N.Y.P.L. §§ 260.10(1) and 20.00; and (3) endangering the welfare of a physically disabled person, in violation of N.Y.P.L. §§ 260.25 and 20.00. Vinluan was also charged with criminal solicitation in the fifth degree, in violation of N.Y.P.L. § 100.00.

In response, the nurses and Vinluan moved in New York State Supreme Court in Suffolk County to, among other things, dismiss the charges against them. All of them insisted that their conduct was not criminal and that, in any event, the indictment was not supported by sufficient evidence. They also argued that the prosecution violated their constitutional rights. The

8

19-3949-cv
Anilao v. Spota

nurses claimed that the prosecution violated their rights under the Thirteenth

Amendment of the federal Constitution, which, with one exception not

relevant here, prohibits any form of involuntary or forced labor without pay.

Vinluan argued that the prosecution against him violated his First

Amendment rights to free speech and to association in connection with

providing counsel to his clients.

The state court rejected the plaintiffs' claims of insufficient evidence,

holding that "the evidence [was] legally sufficient to support [all] the charges

contained in the indictment" and "that each count of the indictment properly

charges these defendants with a crime . . . ." App'x 814.[2]  The court also

rejected the plaintiffs' constitutional arguments.  With respect to the nurses'

constitutional challenge, the state court concluded that "[t]here is absolutely

no evidence to suggest that this prosecution in any way violates the rights of

any of these defendants under the Thirteenth Amendment to the United

---

[2] The state court also explained that "[i]n the context of a Grand Jury proceeding, legal sufficiency means prima facie proof of the crimes charged," a standard significantly lower than the proof beyond a reasonable doubt required at a criminal trial.  App'x 814–15.  "Under these standards of review," the court said, "there was ample evidence before the Grand Jury to support all counts of the indictment against [the nurses and Vinluan]."  App'x 815.

19-3949-cv
Anilao v. Spota

States Constitution." App'x 815.  As for Vinluan's First Amendment

challenge, the court determined, there was "no basis to disturb" the grand

jury's finding that there was "sufficient evidence that [Vinluan] had entered

into an agreement to perform an act which would endanger the welfare of

children and disabled persons and that an overt act was committed in

furtherance of that agreement."  App'x 819.

Having failed to persuade the state court to dismiss the indictment

against them, the plaintiffs petitioned the New York Appellate Division,

Second Department for a writ of prohibition.  See N.Y. C.P.L.R. § 7803(2).  In

January 2009 the Appellate Division granted the writ, which we describe

further below, after finding that the prosecution of the nurses and of Vinluan

"constitute[d] an impermissible infringement upon [their] constitutional

rights . . . and that the issuance of a writ of prohibition to halt these

prosecutions is the appropriate remedy in this matter."  Vinluan, 873 N.Y.S.2d

at 75.  In its decision granting the writ, the Appellate Division explained that

the nurses had not committed a crime by ending their employment at will,

since they had "resigned after the completion of their shifts, when the

pediatric patients at Avalon Gardens were under the care of other nurses and

10

19-3949-cv
Anilao v. Spota

staff members," id., and that Vinluan's good faith legal advice was likewise

protected from prosecution under the First and Fourteenth Amendments, id.

at 82–83.  But the Appellate Division also explicitly acknowledged that "the

[New York] Penal Law provisions relating to the endangerment of children

and the physically disabled . . . do not on their face infringe upon Thirteenth

Amendment rights by making the failure to perform labor or services an

element of a crime," and that under "exceptional circumstance[s],"

restrictions of an individual's Thirteenth Amendment rights may be

warranted.  Id. at 80–81.  The problem with the prosecution, the court

explained, was that the "District Attorney proffer[ed] no reason why this

[was] an 'extreme case.'"  Id. at 81.

The plaintiffs started this federal litigation in 2010.  The complaint

alleges, among other things, that Spota and Lato acted in concert with Sentosa

to secure an indictment that they knew violated the plaintiffs' constitutional

rights and that they lacked probable cause to bring in the first instance.  In

particular, the complaint asserts that "the Grand Jury was not properly

charged as to the law," was "falsely informed that one or more of the nurses

had resigned and left the facility before completing his or her shift," and was

19-3949-cv
Anilao v. Spota

"not informed that the Education Department had previously determined that the Nurse Plaintiffs had not violated the very regulations which they were indicted for violating." App'x 56.  The complaint also alleges that at Sentosa's behest, Spota and Lato sought to punish the nurses for resigning from their employment at Avalon and discourage others from doing the same.  Finally, the complaint claims that the County is liable under the principles of municipal liability announced in <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978).

The defendants filed a motion to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The District Court granted the motion in part as to any claims arising from Spota and Lato's actions during the non-investigative, prosecutorial phase of their case against the plaintiffs, including the selection of charges, the initiation of the prosecution, and the presentation of testimony and evidence to the grand jury.  As to those claims, the District Court concluded, Spota and Lato were entitled to absolute immunity from suit.  See <u>Anilao I</u>, 774 F. Supp. 2d at 479–81.

But the District Court declined to dismiss on absolute immunity grounds the plaintiffs' claims arising from any alleged prosecutorial

19-3949-cv
Anilao v. Spota

misconduct by Spota or Lato during the investigative phase of the case,

finding instead that the defendants were at most entitled only to qualified

immunity.  Id. at 477, 482.  For that reason, to the extent that the complaint

plausibly alleged that Spota and Lato had violated the plaintiffs'

constitutional rights during the investigative phase, the District Court

decided that the case would have to proceed past the pleading stage to

discovery and summary judgment.  See id. at 485, 493.  After discovery,

however, the District Court granted summary judgment in favor of the

defendants because "there [wa]s simply no evidence in the record that [Spota

and Lato] engaged in any constitutional wrongdoing in the investigative

stage of the case," Anilao II, 340 F. Supp. 3d at 234.  This was so even though

the District Court had previously recognized (in Anilao I) that the case

involved the "highly unusual set of circumstances in which the police not

only lacked involvement in the investigation of [the plaintiffs] but also had

expressly declined to investigate" them.  Anilao I, 774 F. Supp. 2d at 481.  The

District Court then also dismissed the Monell claim against the County

because there was no underlying constitutional violation.  Anilao II, 340 F.

Supp. 3d at 251.

13

19-3949-cv
Anilao v. Spota

This appeal followed.

## DISCUSSION

The two questions presented on appeal are whether Spota and Lato were entitled to absolute immunity for the actions they undertook as prosecutors, and whether there was any evidence showing that they violated the plaintiffs' constitutional rights during the investigative phase of the prosecution, a phase with respect to which they are entitled at most only to qualified immunity.  We address each question in turn.

### I

The doctrine of absolute immunity applies broadly to shield a prosecutor from liability for money damages (but not injunctive relief) in a § 1983 lawsuit, even when the result may be that a wronged plaintiff is left without an immediate remedy.[3]  See Imbler v. Pachtman, 424 U.S. 409, 427 (1976).  Our cases make clear that prosecutors enjoy "absolute immunity from

---

[3] Recognizing that it would be unjust to allow prosecutorial misconduct to go unpunished and that absolute immunity does not render the public powerless, we have pointed to other methods, such as criminal and professional sanctions, to deter and redress wrongdoing.  See Schloss v. Bouse, 876 F.2d 287, 292 (2d Cir. 1989); see also Imbler, 424 U.S. at 429 & n.29.

19-3949-cv
Anilao v. Spota

§ 1983 liability for those prosecutorial activities intimately associated with the

judicial phase of the criminal process."[4]  Barr v. Abrams, 810 F.2d 358, 361 (2d

Cir. 1987) (quotation marks omitted).  The immunity covers "virtually all acts,

regardless of motivation, associated with [the prosecutor's] function as an

advocate."  Hill v. City of New York, 45 F.3d 643, 661 (2d Cir. 1995) (quoting

Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994)).  For example, a prosecutor enjoys

absolute immunity when determining which offenses to charge, initiating a

prosecution, presenting a case to a grand jury, and preparing for trial.  See id.;

Imbler, 424 U.S. at 431 (concluding that a prosecutor is absolutely immune

from a § 1983 suit for damages based on his "initiating a prosecution and . . .

presenting the State's case").  For that reason, we have held that absolute

immunity extends even to a prosecutor who "conspir[es] to present false

evidence at a criminal trial.  The fact that such a conspiracy is certainly not

something that is properly within the role of a prosecutor is immaterial,

_____

[4] To be clear, § 1983 itself does not mention absolute prosecutorial immunity (or, for that matter, any immunity).  It is a judicially created doctrine that has developed over time.

15

19-3949-cv
Anilao v. Spota

because the immunity attaches to his function, not to the manner in which he

performed it." Dory, 25 F.3d at 83 (cleaned up).

"Thus, unless a prosecutor proceeds in the clear absence of all

jurisdiction, absolute immunity [from § 1983 liability] exists for those

prosecutorial activities intimately associated with the judicial phase of the

criminal process." Barr, 810 F.2d at 361 (emphasis added); see Shmueli v. City

of New York, 424 F.3d 231, 237 (2d Cir. 2005). "Conversely, where a

prosecutor acts without any colorable claim of authority, he loses the absolute

immunity he would otherwise enjoy" and is left with only qualified

immunity as a potential shield. Barr, 810 F.2d at 361 (emphasis added); see

Shmueli, 424 F.3d at 237. "[A] limitation upon the immunity," Chief Judge

Hand explained, "[is] that the official's act must have been within the scope of

his powers," but this does not mean that "to exercise a power dishonestly is

necessarily to overstep its bounds." Gregoire v. Biddle, 177 F.2d 579, 581 (2d

Cir. 1949) (L. Hand, C.J.). Instead, "[w]hat is meant by saying that the officer

must be acting within his power cannot be more than that the occasion must

16

19-3949-cv
Anilao v. Spota

be such as would have justified the act, if he had been using his power for any

of the purposes on whose account it was vested in him." Id.

A narrow limitation to the scope of absolute immunity in § 1983 actions

thus exists where the defect is jurisdictional — that is, where the prosecutor

acted well outside the scope of authority, rather than where the defect relates,

as here, to the prosecutor's motivation or the reasonableness of his official

action.  The jurisdictional defect must be clear and obvious.  "In considering

whether a given prosecution was clearly beyond the scope of that jurisdiction,

or whether instead there was at least a colorable claim of authority, . . . we

inquire whether" any relevant criminal statute exists that "may have

authorized prosecution for the charged conduct."  Shmueli, 424 F.3d at 237;

see, e.g., Lerwill v. Joslin, 712 F.2d 435, 440 (10th Cir. 1983) (prosecutor who

initiates prosecution under statutes he is not authorized to invoke is afforded

absolute immunity if he "is arguably empowered to prosecute the alleged

19-3949-cv
Anilao v. Spota

conduct under <u>some</u> statute" and "the statute he incorrectly invokes also

arguably applies to the criminal defendant's alleged conduct").[5]

So "[e]ven if a prosecutor may lose his absolute immunity for

prosecutorial acts for which he has no colorable claim of authority," it is not

lost "immediately upon crossing the technical bounds of the power conferred

on him by local law," or "simply because he acted in excess of his authority."

<u>Lerwill</u>, 712 F.2d at 439; see <u>Ashleman v. Pope</u>, 793 F.2d 1072, 1076–77 (9th

Cir. 1986) (en banc) (unanimously holding that prosecutor was entitled to

absolute immunity after overruling prior Ninth Circuit holding that

prosecutor who "files charges he or she knows to be baseless . . . is acting

outside the scope of his or her authority and thus lacks immunity" (quotation

marks omitted)).  Instead, "absolute immunity must be denied" only where

there is both the absence of all authority (because, for example, no statute

authorizes the prosecutor's conduct) and the absence of any doubt that the

---

[5] If the laws authorize prosecution for the charged crimes, a prosecutor may still be liable if he "has intertwined his exercise of authorized prosecutorial discretion with other, unauthorized conduct."  <u>Bernard v. County of Suffolk</u>, 356 F.3d 495, 504 (2d Cir. 2004).  Cited examples in which officials act clearly outside the scope of their powers include charging decisions that are accompanied by unauthorized demands for a bribe, sexual favors, the defendant's performance of a religious act, or the like. <u>See</u> <u>id.</u>  Presumably <u>no</u> statute would authorize those acts under any circumstances.

19-3949-cv
Anilao v. Spota

challenged action falls well outside the scope of prosecutorial authority.

Bernard v. County of Suffolk, 356 F.3d 495, 504 (2d Cir. 2004).  In the vast

majority of cases "the laws do authorize prosecution for the charged crimes,"

id. (emphasis added), and if the charging decision or other act is within the

prosecutor's jurisdiction as a judicial officer, then absolute immunity attaches

to their actions "regardless of any allegations" that their "actions were

undertaken with an improper state of mind or improper motive," Shmueli,

424 F.3d at 237.  Prosecutors thus have absolute immunity in a § 1983 action

even if it turns out that "state law did not empower [them] to bring the

charges," so long as "they have at least a semblance of jurisdiction" that does

not run far afield of their job description.  Barr, 810 F.3d at 361 (declining to

adopt "a holding that a prosecutor is without absolute immunity the moment

he strays beyond his jurisdictional limits," because doing so would "do

violence to [the] spirit" of the doctrine).

These governing principles of law are well established and are not

questioned by the parties on appeal — so much so that the plaintiffs

recognize that the doctrine of absolute immunity creates a "formidable

obstacle" to their cause of action.  Appellants' Br. at 29 (quotation marks

19-3949-cv
Anilao v. Spota

omitted).  Nevertheless, the plaintiffs contend that the very narrow exception

to absolute immunity for prosecutorial acts that we have just described

applies to the facts of this case.  We disagree.

We start with our decision in Barr.  There the plaintiff had been

questioned by the State prosecutor's office as part of an investigation into

alleged violations of state securities law.  The plaintiff refused to answer any

questions and invoked his Fifth Amendment right to remain silent.  See 810

F.2d at 359–60.  In response, the prosecutors charged the plaintiff with

criminal contempt in violation of New York's penal law.  See id. at 360.  The

contempt charge was eventually dismissed in state court on the ground that

the plaintiff had merely exercised his Fifth Amendment right.  Id.  The

plaintiff then filed a § 1983 civil damages action against the prosecutors,

which the district court dismissed.  On appeal, we held that the prosecutors

were entitled to absolute immunity because they were broadly authorized by

statute to pursue criminal contempt charges — even though they had

trampled the plaintiff's Fifth Amendment rights.  Id. at 362.

Likewise, in Bernard we considered whether county prosecutors were

entitled to absolute immunity for their politically motivated investigation and

20

19-3949-cv
Anilao v. Spota

prosecution of the plaintiffs without probable cause.  See 356 F.3d at 497–98.

The plaintiffs alleged that the prosecutors had sought indictments without

probable cause and "knowingly present[ed] false evidence to, while at the

same time withholding exculpatory evidence from, the various grand juries

that returned the[] flawed indictments."  Id. at 503.  We held that even in the

absence of probable cause, "as long as a prosecutor acts with colorable

authority, absolute immunity shields his performance of advocative functions

regardless of motivation."  Id. at 498, 505; see also id. at 503 (collecting cases

in which prosecutors were absolutely immune for initiating prosecutions

without probable cause and/or presenting false evidence to a grand jury).[6]  In

doing so, we reaffirmed the principle that "[w]here, as in this case, a

prosecutor's charging decisions are not accompanied by any . . . unauthorized

demands," such as for a bribe or sexual favors, "the fact that improper

motives may influence his authorized discretion cannot deprive him of

_____

[6] We therefore reversed the decision of the district court in Bernard, which had
denied the defendants' motion to dismiss as to the advocative misconduct claim on
the ground that an improper political motive could take prosecutorial decisions and
the prosecutor's conduct before the grand jury outside the scope of official functions
shielded by absolute prosecutorial immunity.  356 F.3d at 505.

21

19-3949-cv
Anilao v. Spota

absolute immunity." Id. at 504; see Dorman v. Higgins, 821 F.2d 133, 139 (2d

Cir. 1987) (holding that "absolute immunity spares the official any scrutiny of

his motives" so that allegations of "bad faith or . . . malice [cannot] defeat[ ] a

claim of absolute immunity").

In Shmueli, decided a year after Bernard, we held that absolute

immunity applied to protect local prosecutors who engaged in conduct that, if

it occurred, was nothing short of outrageous. The plaintiff alleged that two

New York County Assistant District Attorneys maliciously prosecuted her for

aggravated harassment of her former domestic partner "despite knowing that

the charges against her were false and that [she] was innocent" of those

charges. 424 F.3d at 233. The plaintiff also alleged that the prosecutors made

several threatening phone calls to her home during the prosecution. Id. at

233–34. The district court rejected the prosecutors' defense of absolute

immunity because they acted "without clear jurisdiction and without any

colorable claim of authority." Id. at 235. We reversed, holding that the

district court had improperly "equat[ed] an allegedly improper prosecutorial

state of mind with a lack of prosecutorial jurisdiction." Id. Absolute

immunity, we explained, shielded the prosecutors' conduct because the

22

19-3949-cv
Anilao v. Spota

indictment contained allegations that, even if completely false, could

authorize the prosecutors to prosecute Shmueli under the New York Penal

Law prohibiting aggravated harassment in the second degree.  Id. at 238–39.[7]

The prosecutors' "jurisdiction . . . to prosecute Shmueli," we said, "depended

on the authority conferred by the New York statutes" — no more, no less.  Id.

at 238.

 We have extended absolute immunity to prosecutorial misconduct that

was arguably more reprehensible than the conduct in Shmueli.  See, e.g.,

Pinaud v. County of Suffolk, 52 F.3d 1139, 1148 (2d Cir. 1995) (granting

_____

[7] Our sister circuits have similarly held that a prosecutor who initiates a prosecution with improper motives and without probable cause is absolutely immune from a claim for damages in a § 1983 action, even where the prosecutor's alleged misconduct during the judicial stage was reprehensible and violated the plaintiffs' constitutional rights.  See, e.g., Jones v. Cummings, 998 F.3d 782, 784–85, 788 (7th Cir. 2021) (prosecutors alleged to have maliciously filed untimely amendment to plaintiff's criminal charges, which increased his term of imprisonment by several decades); Sample v. City of Woodbury, 836 F.3d 913, 915–16 (8th Cir. 2016) (city prosecutors filed criminal charges against plaintiff despite conflict of interest that arose because they represented the alleged victim in other domestic civil actions); Kulwicki v. Dawson, 969 F.2d 1454, 1464 (3d Cir. 1992) (prosecutor entitled to absolute immunity after bringing baseless conspiracy and attempted infant trafficking charges against political rival who merely tried to help family through adoption process); Ashleman, 793 F.2d at 1076–77 (prosecutor allegedly conspired with judge to predetermine outcome of a judicial proceeding); Lerwill, 712 F.2d at 43637 (city prosecutor initiated prosecution based on state felony statute, which he had no authority to enforce).

19-3949-cv
Anilao v. Spota

absolute immunity to prosecutors who improperly sought to increase

plaintiff's bail; made false representations to prompt a plea agreement which

they later breached; manufactured a bail jumping charge; lied to the Bureau

of Prisons; and unnecessarily transferring plaintiff from county to state jail);

<u>Dory</u>, 25 F.3d at 83 (granting absolute immunity to prosecutor who allegedly

participated in a conspiracy to present false evidence at trial).

　　　The lessons and holdings of <u>Barr</u>, <u>Bernard</u>, and <u>Shmueli</u> are hard to

escape in this case.  There is no dispute on appeal that the District Attorney

was authorized by statute to prosecute the plaintiffs for endangering children

and physically disabled persons, for conspiring to do the same, and for

soliciting others to do so.[8] Neither the dissent nor the plaintiffs propose that

---

[8] The dissent suggests that the indictment does not charge any criminal objectives of
the conspiracy.  Respectfully, the suggestion is wrong, as it rests on the indictment's
most innocuous allegations and sidesteps the indictment's most serious allegations
of criminal endangerment, which, under New York law and contrary to the dissent's
view, requires only the threat of harm, not actual harm.  <u>See</u> <u>People v. Hitchcock</u>, 98
N.Y.2d 586, 589 (2002) ("Under Penal Law § 60.10(1), a person endangers the welfare
of a child when '[h]e knowingly acts in a manner likely to be injurious to the
physical, mental or moral welfare of a child less than seventeen years old.'"); <u>see</u>,
<u>e.g.</u>, App'x 1405 ("The defendants pursued their objective without regard to the
consequences that their pursuit would have on Avalon Gardens' pediatric patients.
The defendants agreed that the defendant nurses, including all the available nurses
who cared for children on ventilators, would resign without giving Avalon Gardens
notice.  The defendants did so knowing that their resignations and the prior

24

19-3949-cv
Anilao v. Spota

the state Supreme Court of Suffolk County lacked jurisdiction over the

offense.  Instead, the plaintiffs submit only that the prosecutors in this case

had no power to act as they did — not because they lacked the statutory

authority to do so, but because their conduct violated the nurses' rights under

---

resignations at other Sentosa Care facilities would render it difficult for Avalon Gardens to find, in a timely manner, skilled replacement nurses for Avalon Gardens' pediatric patients, particularly the terminally ill JB, the child NL and the ventilated children NC, BC, TM and TT.").  It is not enough to criticize, as the dissent does, the manner in which the prosecutors performed their "quintessential prosecutorial functions" of evaluating the evidence and initiating a criminal prosecution. Shmueli, 424 F.3d at 237.  As we have already noted, absolute immunity "attaches to [the prosecutor's] function" or task, "not the manner in which he performed it." Dory, 25 F.3d at 83 (quoting Barrett v. United States, 798 F.2d 565, 573 (2d Cir. 1986)); see also Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993) (explaining that a prosecutor's "professional evaluation of the evidence" is protected by absolute immunity); Bernard, 356 F.3d at 505.  And "whether a given prosecution was clearly beyond the scope of the prosecutor's jurisdiction" or function, "and so whether absolute immunity applies, depends on "whether the pertinent statutes may have authorized prosecution for the charged conduct."  Shmueli, 424 F.3d at 237.  In this case, even the Appellate Division acknowledged that, under New York law, "an employee's abandonment of his or her post in an 'extreme case' may constitute an exceptional circumstance which warrants infringement upon the right to freely leave employment."  Vinluan, 873 N.Y.S.2d at 81.  There can be no serious dispute under New York law that the claim of child endangerment was at least a colorable one that the prosecutors had authority to charge.

19-3949-cv
Anilao v. Spota

the Thirteenth Amendment and Vinluan's rights under the First Amendment.

See Appellants' Br. at 33, 42.

In advancing their argument, the plaintiffs take their cue from the state

appellate court's earlier conclusion in this case that "no facts suggesting an

imminent threat to the well being of the children have been alleged."

Vinluan, 873 N.Y.S.2d at 82. They also argue that Spota and Lato knew or

should have known at the outset of the case that their prosecution of the

plaintiffs was constitutionally infirm. But fundamentally, in our view, these

arguments relate to the existence or absence of probable cause — not, as Barr,

Bernard, and Shmueli instruct us to consider, the defendants' statutory

authority to pursue the prosecution in the first place. As already noted,

under our precedent absolute immunity shields Spota and Lato for their

prosecutorial and advocative conduct even in the absence of probable cause

and even if their conduct was entirely politically motivated. See, e.g.,

Shmueli, 424 F.3d at 237–38 (improper motive does not factor into absolute

immunity analysis);[9] accord Bernard, 356 F.3d at 505; see also Buckley v.

---

[9] As we stated in Shmueli:

26

19-3949-cv
Anilao v. Spota

Fitzsimmons, 509 U.S. 259, 274 n.5 (1993) (explaining that a prosecutor's entitlement "to absolute immunity for the malicious prosecution of someone whom he lacked probable cause to indict" is rooted in the common-law).[10]

The Appellate Division's issuance of a writ of prohibition complicates but does not change our decision. The writ, rarely used, applies only to end a prosecution, not to undo what the prosecution has already done. United States v. Hoffman, 71 U.S. 158, 161–62 (1867) ("[T]he only effect of a writ of prohibition is to suspend all action, and to prevent any further proceeding in

---

[A] defense of absolute immunity from a claim for damages must be upheld against a § 1983 claim that the prosecutor commenced and continued a prosecution that was within his jurisdiction but did so for purposes of retaliation, or for purely political reasons. A prosecutor is also entitled to absolute immunity despite allegations of his knowing use of perjured testimony and the deliberate withholding of exculpatory information. Although such conduct would be reprehensible, it does not make the prosecutor amenable to a civil suit for damages. In sum, the nature of absolute immunity is such that it accords protection from any judicial scrutiny of the motive for and reasonableness of official action. These principles are not affected by allegations that improperly motivated prosecutions were commenced or continued pursuant to a conspiracy.

424 F.3d at 237–38 (cleaned up).

[10] The plaintiffs also allege that Lato made false statements and selectively allowed hearsay testimony to be presented when it benefitted him during the grand jury presentation, but in view of the precedent described above, the doctrine of absolute immunity clearly also protects his conduct against a claim of damages under § 1983. See Hill, 45 F.3d at 662.

27

19-3949-cv
Anilao v. Spota

the prohibited direction.").  Under New York law, the prohibition lies "only

when there is a clear legal right" to such relief, and, as relevant here, when the

judicial officer "exceeds its authorized powers in a proceeding over which it

has jurisdiction."  Matter of State of New York v. King, 36 N.Y.2d 59, 62

(1975).  By issuing the writ here, the Appellate Division ended the

prosecution, stopping it from proceeding any further.  But in this case, it did

so because the prosecutors had violated the plaintiffs' rights based on the

specific facts of the case and thus exceeded the jurisdiction conferred upon

them by statute.  See Vinluan, 873 N.Y.S.2d at 81–82.  As we have seen,

however, not even exceeding prosecutorial authority, let alone misusing it, is

enough to lift the immunity under federal law, which requires the clear and

obvious absence of any authority under any set of facts.  Here, the Appellate

Division did not suggest that the prosecutors were incapable of properly

19-3949-cv
Anilao v. Spota

charging the plaintiffs under any set of facts or that they acted clearly and

obviously outside of all jurisdictional bounds.[11]

    This case is practically indistinguishable from <u>Barr</u>, in which the state

court issued a writ of prohibition and dismissed criminal contempt charges

against the plaintiffs, but made clear that "contempt, <u>if properly charged</u>, in

the context of the facts of this case is an underlying act of continuous

concealment directly related to the securities fraud investigation, and

therefore is within the jurisdiction of the Attorney General." <u>Barr</u>, 810 F.2d at

362 (emphasis added). Similarly, the Appellate Division here noted that the

criminal laws relating to the endangerment of children "do not <u>on their face</u>

infringe upon Thirteenth Amendment rights." <u>Vinluan</u>, 873 N.Y.S.2d at 82

(emphasis added). The Appellate Division also reaffirmed an attorney's right

"to provide legal advice <u>within the bounds of the law</u>," <u>id.</u> (emphasis added),

_____

[11] Although a writ may issue where an officer acts "without jurisdiction in a matter over which it has no power over the subject matter," <u>Matter of State of New York</u>, 36 N.Y.2d at 62, the plaintiffs do not contend on appeal that the Appellate Division, in issuing the writ, expressly found that the prosecutors acted "without jurisdiction." We therefore conclude that they have abandoned the argument on appeal. <u>LoSacco v. City of Middletown</u>, 71 F.3d 88, 92–93 (2d Cir. 1995). And in any event, we agree with the District Court that the Appellate Division found only that "the prosecution would be an excess in power." <u>Vinluan</u>, 873 N.Y.S.2d at 78; <u>Anilao I</u>, 774 F. Supp. 2d at 486.

19-3949-cv
Anilao v. Spota

including Vinluan's right to do so "under the circumstances of th[e] case." Id.

at 82. But it did not suggest that a lawyer in Vinluan's position could never

be prosecuted for advising a client to commit a crime. The Appellate

Division, in other words, recognized that the prosecutors had the general

authority to charge the plaintiffs under New York law, even though the

federal Constitution prevented them from doing so under the particular facts

of the case. See id. at 81–82.

The plaintiffs urge us to adopt a new rule under which absolute

immunity would no longer apply to cases "where a prosecution is

unconstitutional" from the start, where the unconstitutional nature of the

prosecution "was evident or should have been evident to the prosecutor from

the facts and the law, and where the prosecution is based upon evidence

deliberately fabricated by the prosecutors." Appellants' Br. at 33. In inviting

us to alter our approach to absolute immunity, the plaintiffs turn our

attention to Fields v. Wharrie, 740 F.3d 1107 (7th Cir. 2014). There, the

Seventh Circuit held that a prosecutor "acting pre-prosecution as an

investigator" was not entitled to absolute immunity because he "fabricate[d]

evidence" and eventually "introduce[d] the fabricated evidence at trial." Id.

19-3949-cv
Anilao v. Spota

at 1113.  "A prosecutor cannot retroactively immunize himself from conduct,"
the Seventh Circuit said, "by perfecting his wrongdoing through introducing
the fabricated evidence at trial."  Id. at 1114.  Fields makes clear that a
prosecutor's action in the <u>investigative</u> stage of a case is not spared from
liability simply because the results of his investigative work are presented at
trial.  See id. (citing Zahrey v. Coffey, 221 F.3d 342, 354 (2d Cir. 2000)).

Our view, and the District Court's, is consistent with Fields.  After all,
the District Court determined that Spota and Lato were absolutely immune
for their conduct as advocates during the judicial phase (initiating the
prosecution, using allegedly perjured testimony during the grand jury, and
making allegedly false statements to the grand jury), but held, as in Fields,
that they were not immune for their conduct during the investigative stage of
the prosecution.  And Barr and Shmueli prevent us from accepting the
plaintiffs' invitation to further extend the exception to absolute immunity
beyond Fields, to situations in which prosecutors during the advocacy phase
bring charges they know violate an individual's constitutional rights.  See
Barr, 810 F.2d at 361; see also Shmueli, 424 F.3d at 238 (prosecutors are
afforded absolute immunity for bringing charges that they knew were false

31

19-3949-cv
Anilao v. Spota

because a contrary ruling would "confuse[] jurisdiction with state of mind").

Because the "postarraignment events" described above "consisted only of the

prosecution" of the plaintiffs "in a court of competent jurisdiction on charges

that were within the [prosecutors'] authority to bring," the prosecutors "are

entitled to absolute immunity against" the plaintiffs' "claims for damages for

those events." Shmueli, 424 F.3d at 239. The evidence that "the charges were

brought for improper purposes do[es] not deprive" the prosecutors of that

immunity. Id.

  We therefore affirm the District Court's dismissal of the claims arising

from the defendants' actions taken in their role as advocates during the

judicial phase of the prosecution. In doing so, "[w]e recognize, as Chief Judge

Hand pointed out, that sometimes such immunity deprives a plaintiff of

compensation that [she] undoubtedly merits." Van de Kamp v. Goldstein,

555 U.S. 335, 348 (2009). "Especially in cases, such as the present one, in

which a plaintiff plausibly alleges disgraceful behavior by district attorneys,

the application of this doctrine is more than disquieting." Pinaud v. County

of Suffolk, 52 F.3d 1139, 1147 (2d Cir. 1995). "[B]ut the impediments to the

fair, efficient functioning of a prosecutorial office that liability could create

19-3949-cv
Anilao v. Spota

lead us to find that [immunity] must apply here." Van de Kamp, 555 U.S. at

348.

II

The District Court concluded from the pleadings that Spota and Lato

were not entitled to absolute immunity for their conduct during the

investigative stage of the prosecution, and that the plaintiffs had stated a

claim for relief that was plausible on its face under § 1983. Anilao I, 774 F.

Supp. 2d at 485, 513. The defendants do not challenge either conclusion on

appeal, and the first conclusion in any event follows from our prior decisions.

See Zahrey, 221 F.3d at 346–47; see also Buckley, 509 U.S. at 273. But the

plaintiffs do challenge the District Court's grant of summary judgment in the

defendants' favor. We therefore turn to whether there is a genuine factual

issue about whether Spota and Lato violated the plaintiffs' constitutional

rights during their investigation.

We review a grant of summary judgment de novo. See Rivera v.

Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 19 (2d Cir. 2014).

"Summary judgment is appropriate only where, construing all the evidence

in the light most favorable to the non-movant and drawing all reasonable

19-3949-cv
Anilao v. Spota

inferences in that party's favor, there is no genuine issue as to any material

fact and . . . the movant is entitled to judgment as a matter of law." Id.

(quotation marks omitted).  The nonmoving party "must do more than

simply show that there is some metaphysical doubt as to the material facts"

and "must come forward with specific facts showing that there is a genuine

issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002)

(quotation marks omitted).  The non-movant cannot rely on conclusory

allegations or denials and must provide "concrete particulars" to show that a

trial is needed.  R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir.

1984) (quotation marks omitted).

    The District Court held that "Lato and Spota are entitled to summary

judgment because . . .  no rational jury could find that they knowingly

fabricated evidence during the investigation, or otherwise violated plaintiffs'

constitutional rights in the investigative phase of this case." Anilao II, 340 F.

Supp. 3d at 250.  Upon review of the record, we agree and affirm the District

Court's grant of summary judgment.

    On appeal, the plaintiffs, like our dissenting colleague, emphasize that

there is at least a factual dispute as to whether Lato conspired with Sentosa to

34

19-3949-cv
Anilao v. Spota

fabricate evidence to present to the grand jury, and in particular whether Lato

conspired with Luyun to testify falsely against Vinluan before the grand jury.

The plaintiffs highlight that Lato had been provided a Philippines-based

advertisement showing that Vinluan was an immigration attorney, not a

nurse recruiter, see App'x 1554–55, but that Lato nevertheless prodded Luyun

to falsely testify that he had seen an advertisement that Vinluan was

recruiting nurses to the United States, see App'x 654.  Because Lato admitted

that he met with all the witnesses who testified in the grand jury proceedings,

the plaintiffs insist that Lato must have met with Luyun and conspired with

him to lie to the grand jury.

    This is, in our view, little more than speculation.  As such it poses no

bar to summary judgment in the defendants' favor.  Speculation aside, the

plaintiffs fail to point to any admissible evidence that could lead a reasonable

juror to conclude that Lato (or Spota) conspired with Luyun to fabricate

evidence.[12]  They had every opportunity to develop the record and to uncover

---

[12] Relying on Morse v. Fusto, 804 F.3d 538 (2d Cir. 2015), our dissenting colleague
points to Lato's failure to disclose to the grand jury the Department of Education's
findings in favor of the plaintiffs, the state court's denial of a preliminary injunction,
and the Nassau County Police Department's decision not to take any action against

19-3949-cv
Anilao v. Spota

the plaintiffs.  With respect, Lato's decision not to present evidence — also available
to the plaintiffs at the time of the grand jury proceeding — of agency or judicial
action or inaction does not come close to the defendant's egregious conduct in
Morse.  There the defendants actively "creat[ed] false or fraudulently altered
documents," and we described the "constitutional violation" as the affirmative
"manipulation of data to create false or misleading documents, knowing that such
information was false or misleading at the time," and then deliberately presenting
the false documents, with the fake facts, to the grand jury.  Id. at 549–50 (quotation
marks omitted) (emphasis in original).  Neither the dissent nor the plaintiffs
describe any similar fabrication of evidence on Lato's part, characterizing Lato's
conduct instead as a wrongful refusal to disclose potentially exculpatory evidence to
the grand jury.  To be sure, Lato's decision not to present that evidence is far less
than ideal in a world where we expect far more from prosecutors in our country; it
would, for example, undoubtedly have violated the internal guidance that regulates
the conduct of federal prosecutors.  See U.S. Department of Justice, Justice Manual,
Title 9, Chapter 11, § 9-11-233 (although not required to do so under federal law,
"when a prosecutor conducting a grand jury inquiry is personally aware of
substantial evidence that directly negates the guilt of a subject of the investigation,
the prosecutor must present or otherwise disclose such evidence to the grand jury
before seeking an indictment against such a person").  On the other hand, the
plaintiffs had a right under New York law, upon waiving immunity, to testify before
the grand jury and to present the same exculpatory evidence that was available to
them.  See People v. Mitchell, 82 N.Y.2d 509, 513–14 (1993) (citing N.Y. C.P.L.R.
§ 190.50)).  None sought to enforce that right.  Ultimately, the dissent's view ignores
that the core function of the grand jury in New York is to determine if the charges
are sufficiently supported by evidence to warrant a trial of the charge.  See People v.
Calbud, Inc., 49 N.Y.2d 389, 394 (1980).  Trial, not the grand jury proceeding, is the
crucible to air and test the full and final contentions of the parties for or against guilt
in New York.  Although, like our dissenting colleague, we might wish that the rule
were otherwise and even share his palpable sense of unfairness, the reality is that a
prosecutor in New York usually has no obligation to present to the grand jury
evidence that is exculpatory.  See People v. Hemphill, 35 N.Y.3d 1035, 1036 (2020)
("Contrary to defendant's claim that the indictment should be dismissed based on
the prosecutor's failure to alert the grand jury to exculpatory evidence that
implicated another, the People were not obligated to present evidence that someone
else was initially identified as the shooter."), cert. granted sub nom. on other
grounds, Hemphill v. New York, 141 S. Ct. 2510 (2021).  New York law clearly

19-3949-cv
Anilao v. Spota

that evidence if it existed.  But during Lato's deposition, for example, when

given the chance to explore the alleged plot, they declined to question Lato

about his meeting with Luyun.  Answers to those questions might have

yielded some firm evidence of the existence of a conspiracy between the two

men, such as whether they ever discussed the contradictory newspaper

advertisements about Vinluan.

The plaintiffs separately rely on the plotline that the police refused to

investigate the nurses despite having been urged to do so by Spota and Lato.

At best, however, this implies that Spota and Lato had a very weak and

decidedly unappealing case against the nurses, not that they conspired with

Luyun to fabricate evidence to present to the grand jury, or that they

otherwise clearly violated the plaintiffs' constitutional rights during the

investigation.

We briefly respond to the dissent's suggestion that racial prejudice

triggered and infects this entire litigation.  Our dissenting colleague

understandably focuses a great deal of attention on the reprehensible conduct

---

permitted Lato to withhold from the grand jury the information that the dissent, like
the plaintiffs, claim he was obliged to disclose to that body.

37

19-3949-cv
Anilao v. Spota

of Sentosa, which may well have been motivated to kickstart the case and to

prompt the criminal prosecution in part because the nurses were Filipino

rather than "White and American citizens." Dissenting Op. at 24. As the

dissent observes, Sentosa has been "found to have violated the rights of

Filipino nurses" it employed, and it recently agreed to pay $3 million to a

class of Filipino nurses in settlement. Id. at 25–26. But the immediate issue

before us involves the conduct and immunity of the prosecutors, not Sentosa.

As to that issue, not even the dissent proposes that the prosecutors were

directly motivated by racial animus, and the plaintiffs' amended complaint

likewise does not allege that the prosecution against them was prompted by

race or national origin discrimination. Nevertheless, our colleague asserts

that "[w]hatever their motivation" for proceeding with the investigation and

ultimately prosecuting the plaintiffs, the prosecutors — Spota and Lato —

were "complicit in Sentosa's effort to deter its Filipino nurses from pursuing

their rights." Id. at 26. That may be true, but the dissent hedges on whether

their complicity was itself racially motivated in the way that Sentosa's

initiating campaign may have been. At best, asserts the dissent, "there is

enough to put the issue" of whether "race played a part in the prosecutors'

38

19-3949-cv
Anilao v. Spota

actions" "to a jury," even if it means that the plaintiffs must resort to a "cat's

paw" theory of manipulation and control usually reserved for Title VII cases.

Id. at 27 n.12.

Whatever its other faults,[13] the most glaring problem with the dissent's

view is that it is not shared by the plaintiffs, who have never embraced it at

any point in this hard-fought and well-counseled litigation — not in the

complaint, not on summary judgment, not even on appeal. "Few principles

are better established in our Circuit than the rule that 'arguments not made in

an appellant's opening brief are waived even if the appellant pursued those

arguments in the district court.'" New York v. Dep't of Justice, 964 F.3d 150,

---

[13] Although our dissenting colleague suggests that Spota and Lato acted with racial
animus, the plaintiffs have repeatedly emphasized that, at worse, Spota and Lato
were politically motivated to pursue the charges against them. See Appellants' Br.
at 42; Oral Arg. Tr. at 5–6. They have not once mentioned that the defendants were
motivated by racial or national origin animus. And we are bound by our prior
holding in Bernard that "racially invidious or partisan prosecutions, pursued
without probable cause, are reprehensible, but such motives do not necessarily
remove conduct from the protection of absolute immunity." Bernard, 356 F.3d at
504. To be sure, the dissent raises strong, even compelling policy concerns that, in
our view, counsel in favor of significantly curtailing the doctrine of absolute
prosecutorial immunity, perhaps across the board, and certainly as it relates to
racially invidious prosecutions. But precedent – Barr, Bernard, Shmueli – limits the
ability of this panel in the present case to modify or abrogate the doctrine. We are
bound by these decisions absent overruling by the Court in banc, an intervening
decision from the Supreme Court, or an act of Congress.

19-3949-cv
Anilao v. Spota

166 (2d Cir. 2020) (Katzmann, C.J., dissenting from denial of reh'g en banc)

(quoting JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V., 412

F.3d 418, 428 (2d Cir. 2005)).  However attractive it might be to us, reaching

the dissent's desired result based on legal arguments that the plaintiffs have

never advanced would veer us far from "the normal rules of appellate

litigation."  Id.  As Justice Ginsburg recently wrote for a unanimous Supreme

Court in United States v. Sineneng-Smith, 140 S. Ct. 1575 (2020), "in our

adversarial system of adjudication, we follow the principle of party

presentation.  [I]n both civil and criminal cases, in the first instance and on

appeal, we rely on the parties to frame the issues for decision and assign to

courts the role of neutral arbiter of matters the parties present."  Id. at 1579

(cleaned up).  Even putting aside the principle of party presentation for a

moment, Bernard binds us to the rule that "[t]he appropriate inquiry . . . is not

whether authorized acts are performed with a good or bad motive, but

whether the acts at issue are beyond the prosecutor's authority."  356 F.3d at

504 (emphasis in original).  For the reasons already explained, the prosecutors

acted within their authority to charge the plaintiffs under New York law.

19-3949-cv
Anilao v. Spota

III

Finally, we turn to the County's liability under Monell v. Department

of Social Services, 436 U.S. 658 (1978).

"Monell does not provide a separate cause of action for the failure by

the government to train its employees; it extends liability to a municipal

organization where that organization's failure to train, or the policies or

customs that it has sanctioned, led to an independent constitutional

violation." Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006). In

other words, a Monell claim cannot succeed without an independent

constitutional violation. See id. "[I]nherent in the principle that a

municipality can be liable under § 1983 only where its policies are the moving

force [behind] the constitutional violation, is the concept that the plaintiff

must show a direct causal link between a municipal policy or custom and the

alleged constitutional deprivation." Outlaw v. City of Hartford, 884 F.3d 351,

373 (2d Cir. 2018) (cleaned up). "[I]f the challenged action is directed by an

official with final policymaking authority, . . . the municipality may be liable

even in the absence of a broader policy." Mandell v. County of Suffolk, 316

F.3d 368, 385 (2d Cir. 2003) (quotation marks omitted). As more directly

19-3949-cv
Anilao v. Spota

relevant here, we have held that "the actions of county prosecutors in New

York are generally controlled by municipal policymakers for purposes of

Monell, with a narrow exception . . . being the decision of whether, and on

what charges, to prosecute." Bellamy v. City of New York, 914 F.3d 727, 758–

59 (2d Cir. 2019) (quotation marks omitted). Under the narrow exception that

we noted in Bellamy, a district attorney in New York "is not an officer or

employee of the municipality but is instead a quasi-judicial officer acting for

the state in criminal matters." Ying Jing Gan v. City of New York, 996 F.2d

522, 535–36 (2d Cir. 1993) (quotation marks omitted).

With these principles in mind, we reject the plaintiffs' first claim that

the County is liable for the individual defendants' conduct, including the

fabrication of evidence, during the investigative stage. As discussed above,

there was no evidence of a constitutional violation by the DA's Office at that

stage, and we agree with the District Court that "the absence of any

underlying constitutional violation arising from the conduct of Spota or Lato

in the investigative stage" means that "no municipal liability can exist against

Suffolk County" based on that conduct. Anilao II, 340 F. Supp. 3d at 251; see

Askins v. Doe No. 1, 727 F.3d 248, 253–54 (2d Cir. 2013).

42

19-3949-cv
Anilao v. Spota

The plaintiffs separately also claim that the County is liable under

Monell for Spota's alleged administrative mismanagement of the DA's Office.

But we agree with the District Court that the plaintiffs have not provided the

"direct causal link" we require under these circumstances between Spota's

alleged mismanagement and the alleged misconduct and constitutional

deprivations involving the plaintiffs.  Outlaw, 884 F.3d at 373; see Anilao II,

340 F. Supp. 3d at 251 n.36.  To the extent the plaintiffs' claim centers on

Spota's decision to prosecute the case rather than his management of the DA's

Office, the claim fails because, in making that decision, Spota was clearly

acting for New York State in a criminal matter, not for the County.  See Ying

Jing Gan, 996 F.2d at 536. [14]

_____

[14] To the extent the County suggests that it cannot be liable for Spota's and Lato's
conduct during the judicial phase because of their absolute immunity, that
argument is squarely foreclosed by our precedent.  See Pinaud, 52 F.3d at 1153
("Since municipalities do not enjoy immunity from suit — either absolute or
qualified — under § 1983, [the plaintiff's] malicious prosecution claim against the
County of Suffolk is not barred by prosecutorial immunity." (quotation marks
omitted)); see also Askins, 727 F.3d at 254 ("[T]he entitlement of the individual
municipal actors to qualified immunity because at the time of their actions there was
no clear law or precedent warning them that their conduct would violate federal law
is also irrelevant to the liability of the municipality.").

19-3949-cv
Anilao v. Spota

We therefore affirm the District Court's grant of summary judgment in

the County's favor.

## CONCLUSION

We have considered the plaintiffs' remaining arguments and conclude

that they are without merit.  For the foregoing reasons, we **AFFIRM** the

judgment of the District Court.

CHIN, *Circuit Judge*, dissenting:

In this case, the Suffolk County District Attorney's Office (the "DA's Office") brought criminal charges against ten nurses and their lawyer for "patient abandonment" because the nurses resigned their positions at a nursing home to protest their work conditions and the lawyer advised them of their rights and filed a discrimination claim on their behalf with the Department of Justice. The Appellate Division, Second Department, took the extraordinary step of issuing a writ of prohibition to *bar* the DA's Office from pursuing the charges, recognizing that the nurses and their attorney were "threatened with prosecution for crimes for which they [could not] constitutionally be tried." *Vinluan v. Doyle*, 873 N.Y.S.2d 72, 83 (2d Dep't 2009) (Eng, *J.*). Indeed, as the Second Department held, "these criminal prosecutions constitute[d] an impermissible infringement upon the constitutional rights of these nurses and their attorney." *Id*. at 75.

Yet, the district court held that the nurses and their lawyer were precluded from pursuing civil rights claims against the prosecutors because they acted within their jurisdiction and were therefore protected by the doctrines of absolute and qualified immunity. This Court now affirms. In my view, however, the complaint plausibly alleged, as the Second Department found, that

the nurses and their lawyer could not be prosecuted for the charged conduct and

thus the immunities do not apply.  In the extraordinary circumstances presented

here, where the prosecutors were "proceeding . . . 'without or in excess of

jurisdiction,'" *Vinluan*, 873 N.Y.S.2d at 77 (quoting N.Y. C.P.L.R. § 7803(2)), they

were not protected by absolute or qualified immunity.  Accordingly, I

respectfully dissent.

## I.

The ten nurses were recruited in the Philippines to work at nursing

homes in New York operated by Sentosa Care, LLC ("Sentosa").  After arriving in

the United States, they commenced employment at the Avalon Gardens

Rehabilitation and Health Care Center ("Avalon Gardens"), a 353-bed private

nursing facility on Long Island.  The nurses soon concluded that Sentosa had

breached certain promises it had made to them and that Sentosa was treating

them in an unfair and discriminatory manner.  They contacted the Philippine

Consulate, which referred them to Vincent Q. Vinluan, an attorney based in New

York.  Vinluan advised them that, in his view, Sentosa had breached its contract

with them and that they could resign to protest their poor work conditions, but

that they should not do so until after completing their shifts.  He filed a claim of

2

discrimination on their behalf with the immigrant and employee rights office of the Civil Rights Division in the Department of Justice in Washington, D.C. The next day, after completing their shifts and each giving notice of 8 to 72 hours, the nurses resigned. *See Vinluan*, 873 N.Y.S.2d at 76.

Sentosa complained to various authorities. In April 2006, it filed a complaint with the Suffolk County Police Department, which declined to take action after investigating the matter. Sentosa also brought suit against the nurses and Vinluan in the Supreme Court of the State of New York, Nassau County, seeking a preliminary injunction. The court denied the motion in July 2006, finding that Sentosa had failed to establish a likelihood of success on the merits. And the Office of Professional Discipline of the State Education Department ("DOE"), the entity with licensing jurisdiction over the nurses, investigated and concluded that the nurses' "conduct did not constitute patient abandonment"; it closed the investigation in October 2006 without taking any disciplinary action. App'x at 1280.

Sentosa then turned to the DA's Office and was able to obtain a personal meeting with then-Suffolk County District Attorney Thomas J. Spota

III.[1]  Although it was clear that the nurses had not engaged in "patient

abandonment" -- the Suffolk County Police Department and DOE had declined

to take action against them, and the state court had determined that Sentosa had

not shown a likelihood of success on the merits of its claims of patient

abandonment -- the DA's Office indicted the ten nurses *and* their lawyer,

criminally charging them with endangering the welfare of patients and

conspiracy to do the same, and also charging Vinluan with criminal solicitation.

        The nurses and Vinluan brought an Article 78 proceeding in state

court seeking a writ of prohibition to stop the prosecutions.  On January 13, 2009,

the Second Department granted the writ -- prohibiting the DA's Office from

proceeding with the prosecutions.  *See Vinluan*, 873 N.Y.S.2d at 83.

        Thereafter, the nurses and Vinluan brought this action below against

the County of Suffolk (the "County"), Spota, and former Assistant District

Attorney Leonard Lato,[2] seeking damages pursuant to 42 U.S.C. § 1983 for

---

[1]      Spota was convicted in December 2019 in the Eastern District of New York on
unrelated charges of conspiracy, obstruction of justice, and witness tampering.  On
August 10, 2021, he was sentenced to five years imprisonment.  He was then denied bail
pending appeal on October 15, 2021.

[2]      Lato died in 2018.  *See* Robert Brodsky, *Officials: Leonard Lato, Defense Attorney,
Ex-prosecutor, Found Dead*, Newsday (Sept. 19, 2018), https://www.newsday.com/long-
island/defense-attorney-leonard-lato-dies-1.21104324.

violation of their constitutional rights. The district court dismissed the claims,

first granting in part defendants' motion to dismiss and second granting their

motion for summary judgment, holding that Spota and Lato both were protected

by absolute immunity to the extent they were acting as prosecutors and by

qualified immunity to the extent they were acting as investigators.

This appeal followed.

## II.

I address first the issue of absolute immunity.

I agree with the majority that prosecutors enjoy broad absolute

immunity from liability for "prosecutorial activities intimately associated with

the judicial phase of the criminal process." *Barr v. Abrams*, 810 F.2d 358, 361 (2d

Cir. 1987). I acknowledge that this protection extends to "virtually all acts,

regardless of motivation, associated with [the prosecutor's] function as an

advocate." *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) (internal

quotation marks omitted). Still, the rule is not without exception. As this Court

has explained:

> A [prosecutor] engaged in advocative functions will be denied
> absolute immunity only if he acts without any colorable claim of
> authority. The appropriate inquiry, thus, is not whether authorized
> acts are performed with a good or bad *motive*, but whether the *acts* at

5

issue are beyond the prosecutor's authority.  Accordingly, where a prosecutor is sued under § 1983 for constitutional abuse of his discretion to initiate prosecutions, a court will begin by considering whether relevant statutes authorize prosecution for the charged conduct.  If they do not, absolute immunity must be denied.  But if the laws do authorize prosecution for the charged crimes, a court will further consider whether the [prosecutor] has intertwined his exercise of authorized prosecutorial discretion with other, unauthorized conduct.  For example, where a prosecutor has linked his authorized discretion to initiate or drop criminal charges to an unauthorized demand for a bribe, sexual favors, or the defendant's performance of a religious act, absolute immunity has been denied.

*Bernard v. County of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004) (internal quotation marks and citations omitted).  Hence, "where a prosecutor acts without any colorable claim of authority, he loses the absolute immunity he would otherwise enjoy."  *Barr*, 810 F.2d at 361; *accord Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005).

Here, the question is whether plaintiffs plausibly alleged in their complaint that Spota and Lato proceeded without any colorable claim of authority.  I believe they did.

As a threshold matter, what does it mean for a prosecutor to act "without any colorable claim of authority?"  I do not think that all a prosecutor need do, to be absolutely immune, is to cite a criminal statute and assert that a defendant violated it.  That is what the majority essentially suggests, as it

6

observes that "[t]here is no dispute on appeal that the District Attorney was authorized by statute to prosecute the plaintiffs for endangering children and physically disabled persons, for conspiring to do the same, and for soliciting others to do so." Maj. Op. at 24. The mere invocation of a statute should not be enough. If that were the case, the exception would be illusory, and no plaintiff could ever invoke it. Under this reasoning, as long as a prosecutor charged the violation of a statute that fell within the prosecutor's jurisdiction, the prosecutor would always be absolutely immune -- even if there was absolutely no factual or legal basis for the charge.

The indictment here charged the nurses and Vinluan with conspiracy in the sixth degree,[3] five counts of endangering the welfare of a child,[4] and six counts of endangering the welfare of a physically disabled person,[5] and it also charged Vinluan with criminal solicitation in the fifth

---

[3] A person commits the offense when "with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct." N.Y. Penal Law § 105.00.

[4] A person commits the offense when he "knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old." *Id.* § 260.10(1).

[5] A person commits the offense when he "knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a person who is unable to care for himself or herself because of physical disability, mental disease or defect." *Id.* § 260.25.

7

degree.[6]  I agree that Spota and Lato had authority to prosecute these *types* of crimes.  But in my view, the DA's Office did not have colorable authority to prosecute the nurses or Vinluan for the charged conduct.  It was beyond the prosecutors' authority to criminally charge the nurses for resigning to protest what they believed to be discriminatory work conditions or their lawyer for giving them legal advice and filing a charge of discrimination on their behalf.

Additionally, the bringing of these charges was beyond the prosecutors' authority, *see Bernard*, 356 F.3d at 504, for as a factual matter the indictment charged only legally permissible conduct.  For example, the indictment alleged that:

> 14.     It was the conspiracy's objective to obtain for the Avalon Gardens' nurses alternative employment and a release from their three-year commitment to Sentosa Care without incurring a financial penalty of $25,000.

> 15.     In pursuit of their objective, the defendant [Vinluan] and the defendant nurses sought to establish that Sentosa Care had breached the contracts and had discriminated against the nurses.

App'x at 1404-05.  These were not criminal objectives.

---

[6]     A person commits the offense when "with intent that another person engage in conduct constituting a crime, he solicits, requests, commands, importunes or otherwise attempts to cause such other person to engage in such conduct."  *Id.* § 100.00.

The indictment charged three "overt acts" in furtherance of this purported criminal conspiracy:

● Vinluan asked the nurses to bring a claim against Avalon Gardens and Sentosa for discrimination and they agreed to bring the claim;

● Vinluan, on the nurses' behalf, filed a claim of discrimination with the Civil Rights Division of the Department of Justice against Avalon Gardens and Sentosa; and

● The ten nurses submitted their resignation letters to Avalon Gardens.

These were not, by any stretch of the imagination, criminal acts.[7] Moreover, while the charges were premised on the claim of patient

---

[7] The majority suggests that I have pointed only to "the indictment's most innocuous allegations and sidestep[ped]" altogether "the indictment's serious allegations of criminal endangerment." Maj. Op. at 24 n.8. Not so. Paragraphs 14 and 15 of the indictment quoted above are the heart of the conspiracy charged in Count One, identifying the "conspiracy's objective" and the actions taken by the defendants "[i]n pursuit of their objective." App'x at 1404-05. The three overt acts cited above are the *only* overt acts alleged in the conspiracy count. Moreover, the endangerment counts do not add any specific factual allegations, but instead rely on the facts alleged in the paragraphs of the indictment identified above. While it is true, as the majority notes, that the indictment contains language tracking the endangerment statute, the critical factual allegation is that the nurses resigned their positions -- conduct that is simply not criminal. And while the indictment also charges that the nurse defendants resigned "knowing that their resignations and the prior resignations at other Sentosa Care facilities would render it difficult for Avalon Gardens to find, in a timely manner,

9

abandonment, DOE -- the agency with licensing jurisdiction over the nurses --

had concluded otherwise, finding that there was no basis even to discipline the

nurses, much less criminally charge them.  The Suffolk County Police

Department had also declined to take action, and the Suffolk County Supreme

Court had concluded that Sentosa had not established a likelihood of success on

the merits of its claim of patient abandonment.  The DA's Office knew *all* this --

and still proceeded to charge the nurses and Vinluan.

> The indictment's charge of patient abandonment was specious.  The

indictment did not allege that the nurses walked out during a shift or that any

patients were actually harmed, or threatened with harm, by the nurses'

resignations, nor could it have.  As the Second Department explained:

> The nurses did not abandon their posts in the middle of their shifts.
> Rather, they resigned after the completion of their shifts, when the
> pediatric patients at Avalon Gardens were under the care of other
> nurses and staff members.  Moreover, . . . coverage [for the patients]
> was indeed obtained, and no facts suggesting an imminent threat to
> the well being of the children have been alleged.  Indeed, the fact
> that no children were deprived of nursing care played a large role in
> [DOE]'s decision to clear the nurses of professional misconduct.

---

skilled replacement nurses," *id.* at 1405, it cannot be criminal for an employee to resign
merely because she knows her employer will have difficulty finding a replacement.

*Vinluan*, 873 N.Y.S.2d at 81-82.  Even assuming that a nurse *could* criminally

endanger her patients simply by resigning from her job, the acts charged in the

indictment did not come close to constituting criminal conduct.

The indictment of Vinluan is particularly outrageous.  Surely a

prosecutor has no colorable authority to bring charges against a lawyer for

giving legal advice to clients and for filing a claim of discrimination on their

behalf.  As the Second Department held, "[a]s charged in the indictment, it is

clear that Vinluan's criminal liability is predicated upon the exercise of ordinarily

protected First Amendment rights."  *Id.* at 82.  The court observed unequivocally

that the prosecution of Vinluan was "an assault on the adversarial system of

justice upon which our society, governed by the rule of law rather than

individuals, depends."  *Id.* at 83; *see also id*. at 82 ("It cannot be doubted that an

attorney has a constitutional right to provide legal advice to his clients within the

bounds of the law.") (collecting cases).  I agree.

The majority observes that the Second Department's decision

"complicates" the decision.  Maj. Op. at 27.  It does more than that; it dispels any

doubt as to whether the prosecutors had colorable authority to criminally charge

the nurses and their lawyer.  As the Second Department concluded, the

11

prosecutors did not. While the court's opinion focused on the constitutionality of the prosecutions, the court squarely held that the conduct of the nurses and their lawyer was not proscribed by the relevant statutes. *See Vinluan*, 873 N.Y.S.2d at 82-83 ("[S]ince the nurses' conduct in resigning cannot, under the circumstances of this case, subject them to criminal prosecution, we cannot agree that Vinluan advised the nurses to commit a crime.").

New York law provides for a writ of prohibition "to prevent a body or officer acting in a judicial or quasi-judicial capacity from proceeding, or threatening to proceed, 'without or in excess of jurisdiction.'" *Id.* at 77 (quoting C.P.L.R. § 7803(2)); *see also id.* (providing that an Article 78 proceeding may be commenced to determine "whether [a] body or officer *proceeded* . . . without or in excess of jurisdiction" (emphasis added)). By granting the writ, the Second Department made clear that Spota and Lato had no colorable authority to bring these charges. And while the majority seeks to distinguish the Second Department's decision on the basis that a writ of prohibition is used only to end a prosecution and "not to undo what the prosecution has already done," Maj. Op. at 27, the Second Department's reasoning applies with equal force here. Spota and Lato did not have authority to commence the prosecution, and "the relevant

12

statutes [did not] authorize prosecution for the charged conduct." *Bernard*, 356

F.3d at 504.

Finally, I note that the issue of absolute immunity arose on

defendants' Rule 12(b)(6) motion. At a minimum, based on the circumstances

described above and viewing all facts in the light most favorable to plaintiffs,

plaintiffs plausibly alleged that the exception to absolute immunity applies here

and they should have been allowed to proceed with their claims. As the majority

acknowledges, the writ of prohibition is "rarely used." Maj. Op. at 27. The fact

that the Second Department took the extraordinary step of issuing the writ here

is most telling.

The majority cites a number of cases barring claims against

prosecutors based on absolute immunity, and, indeed, there are many of them.

What sets this case apart, however, is the Second Department's decision holding

that the prosecutors were "proceeding . . . 'without or in excess of jurisdiction,'"

*Vinluan*, 873 N.Y.S.2d at 77 (quoting N.Y. C.P.L.R. § 7803(2)) -- holding that Spota

and Lato had no colorable authority to indict the ten nurses for resigning to

13

protest work conditions and their lawyer for filing a claim of discrimination on

their behalf.  I would permit the claim to proceed.[8]

### III.

I turn to the question of qualified immunity.

Where a prosecutor acts in an investigative capacity, he enjoys only

qualified -- as opposed to absolute -- immunity from suit.  *See Zahrey v. Coffey*,

221 F.3d 342, 346 (2d Cir. 2000).  "Qualified immunity protects a public official

from liability for conduct that 'does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'"  *Id*. at

347 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see Horn v. Stephenson*,

11 F.4th 163, 168-69 (2d Cir. 2021).  Qualified immunity turns on "the objective

legal reasonableness of the action," *Pearson v. Callahan*, 555 U.S. 223, 244 (2009)

(internal quotation marks omitted), and as the Supreme Court has repeatedly

observed, "qualified immunity protects 'all but the plainly incompetent or those

---

[8]     The cases cited by the majority, *see, e.g.*, *Shmueli*, 424 F.3d at 233, 235, 238-39, emphasize that motivation is irrelevant to the question of absolute immunity.  I do not take issue with that point.  My concern is, as the Second Department concluded, that the prosecutors here simply did not have authority to charge plaintiffs for the conduct in question.

14

who knowingly violate the law.'" *Ziglar v. Abassi*, 137 S. Ct 1843, 1867 (2017)

(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

This Court recognizes a constitutional "right not to be deprived of

liberty as a result of the fabrication of evidence by a government officer acting in

an investigating capacity." *Zahrey*, 221 F.3d at 344. We have explained that

evidence may be fabricated not just through use of false statements, but also

through "omissions that are both material and made knowingly." *Morse v. Fusto*,

804 F.3d 538, 547 (2d Cir. 2015), *cert. denied*, 137 S. Ct. 126 (2016).

In *Morse*, we upheld a jury's award of more than $7 million in

compensatory and punitive damages against a prosecutor and an investigator for

denying a dentist his right to a fair trial in a Medicaid fraud prosecution. *Id*. at

541, 544. The jury found that the defendants had falsified billing summaries by

omitting material information, they did so knowingly and as part of their

investigation, and the "evidence was material to the grand jury's decision to

indict." *Id*. at 543, 548 (internal quotation marks omitted). While we recognized

that prosecutors have no obligation to present exculpatory evidence to a grand

jury, *id*. at 547, we nonetheless held that the defendants were not protected by

qualified immunity:

15

[F]alse information likely to influence a jury's decision violates the accused's constitutional right to a fair trial, because to hold otherwise, works an unacceptable corruption of the truth-seeking function of the trial process.  Information may be false if material omissions render an otherwise true statement false.  For example, . . . we [have] affirmed a verdict against a police officer who was found to have misrepresented the evidence to the prosecutors, or failed to provide the prosecutor with material evidence or information, or gave testimony to the Grand Jury that *was false or contained material omissions*, while knowing that he was making a material misrepresentation or omission by giving false testimony. . . .  [T]he integrity of the judicial process can be unlawfully compromised by a government official's submission of information to a jury that implicates the accused based in part on material omissions.

*Id*. at 548 (cleaned up).  We rejected the defendants' attempt to distinguish between the obligations of prosecutors and those of police officers, as well as their attempt to distinguish between "affirmative misrepresentations and misleading omissions."  *Id.*[9]

---

[9]     The majority contends that the conduct here "does not come close to the defendant's egregious conduct in *Morse*."  Maj. Op. at 36 n.12.  *Morse*, however, squarely involved omissions in the evidence.  There, "the jury found that by making material omissions in the billing summaries, the defendants in effect falsified them, and they did so knowingly and as part of their investigation."  804 F.3d at 548; *see also id*. at 547 ("We conclude that the omissions in this case were properly considered under the rubric of *Zahrey*, under which government officials may be held liable for fabricating evidence through false statements or omissions that are both material and made knowingly."); *accord Ashley v. City of New York*, 992 F.3d 128, 143 (2d Cir. 2021) ("The fabrication element requires only that the defendant knowingly make a false statement or omission.") (citing *Morse*, 804 F.3d at 547).  While there are, of course, differences between the conduct here and the conduct in *Morse*, in my view there was enough for the matter to go to a jury.

16

In my view, in this case plaintiffs presented sufficient evidence to raise genuine issues of fact as to whether Spota and Lato compromised the integrity of the judicial process by knowingly submitting false evidence or information to the grand jury that implicated the nurses and Vinluan, including through material omissions. The omitted information was highly relevant to the grand jury's decision to indict. *Morse*, 804 F.3d at 548; *see also Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) (denying qualified immunity to police officers where a reasonable jury could find they "violated the plaintiffs' clearly established constitutional rights by conspiring to fabricate and forward to prosecutors a known false confession almost certain to influence a jury's verdict").[10]

For example, Lato did not tell the grand jury of DOE's "decision to clear the nurses of professional misconduct." *Vinluan*, 873 N.Y.S.2d at 81-82. DOE concluded that "the nurses' conduct did not constitute patient abandonment." App'x at 1280. Yet, Lato repeatedly referred to the nurses "who

---

[10]     The majority emphasizes that "a prosecutor in New York usually has no obligation to present to the grand jury evidence that is exculpatory." Maj. Op. at 36 n.12. Of course, I do not disagree. My concern here is with the nature and extent of the prosecutor's omissions -- as discussed below, they were so extensive and so material as to seriously compromise the truth-seeking function of the process.

walked out without notice." *Id.* at 380; *see also id.* at 378 (Lato: "On April 7 of [2006], all of the nurses who cared for the children in the pediatric area, without notice, they just came in and said we are out of here.").  In fact, each nurse gave between 8 to 72 hours' notice.  *See Vinluan*, 873 N.Y.S.2d at 76.  Abandonment, of course, was the critical issue for the grand jury, and in his preliminary remarks to the grand jurors, Lato explained that "[t]he only focus to determine whether criminal charges have to be filed is nurses abandoning patients." *Id*. at 377, 379-80.  He specifically referred to DOE and its definition of "abandonment" -- without disclosing that DOE had found that there was *no* abandonment.  *Id*. at 381-82.  Lato did not merely omit this critical information, but he presented evidence that he knew was squarely contradicted by the omissions.

Likewise, Lato also withheld from the grand jury the Nassau County Supreme Court's ruling that Sentosa had failed to show a likelihood of success on the merits of its claims of patient abandonment.  In fact, Lato called Sentosa's lawyer to elicit that she had sued the nurses and Vinluan on Sentosa's behalf.  And yet he did not ask her about the state court's decision some seven months earlier denying Sentosa's motion for a preliminary injunction.

18

Similarly, although Lato spent pages of transcript eliciting testimony from multiple witnesses about the acute conditions of the children, including the death of one child, he withheld from the grand jury that, as the Second Department found, "coverage [for the children] was indeed obtained," and "no children were deprived of nursing care." *Vinluan*, 873 N.Y.S.2d at 81-82.

In his preliminary remarks, Lato explained that "the Education Law says that if a medical professional, doctor or nurse, walks out in the middle of a shift, that would be abandonment." App'x at 381. Whether the nurses walked out during a shift, while perhaps not dispositive, *see id*. at 381-82, was obviously an important factual question. At one point later in the grand jury proceedings, a grand juror asked Lato a question about a witness's testimony, specifically whether the nurses "walked out" during a shift:

> GRAND JUROR: [The witness] used the term "walked out" several times which seems to indicate they walked out in the middle of their shifts. I would like to know if they did in fact walk off the job during their shift.

*Id*. at 434. Lato refused to answer the question. *Id*. And although the witness, an investigator with the DA's Office, was recalled to answer certain questions, Lato chose not to ask him whether the investigator knew or had been told that the nurses had walked out during a shift. *See id*. at 426-32. In fact, as Lato knew (or

19

should have known), none of the nurses walked out during a shift. *See Vinluan*,

873 N.Y.S.2d at 81-82 ("The nurses did not abandon their posts in the middle of

their shifts. Rather, they resigned after the completion of their shifts, when the

pediatric patients at Avalon Gardens were under the care of other nurses and

staff members.").

      While supervisors and others with personal knowledge of what

happened when the nurses resigned were called to testify in the grand jury, Lato

withheld from the grand jurors evidence that the nurses did *not* walk out during

a shift. To the contrary, he permitted one witness to testify that at a different

facility (Brookhaven) the night before, "nine Filipino nurses" resigned at the same

time, three of them during their shifts **[JA 649]**, and that at Avalon Gardens "nine

nurses did the same thing, that they handed [in] their resignation similar to the

resignation[s] . . . in Brookhaven." App'x at 649-50. In fact, one of the nurses,

Theresa Ramos, completed her shift at 7 p.m. and then stayed an extra four hours

until 11 p.m. to ensure there was coverage -- and *still* she was indicted.

      At his deposition in this case, Lato explained that he withheld the

information about DOE's determination because it was hearsay, "misleading,"

and "legally inadmissible." Sealed App'x at 432-33. Reports of a government

20

agency, however, are admissible under New York's common law rule providing a hearsay exception for "official written statements, often called the official entries or public document rule." *Consol. Midland Corp. v. Columbia Pharm. Corp.*, 345 N.Y.S.2d 105, 106 (2d Dep't 1973) (internal quotation marks omitted); *accord Richards v. Robin*, 165 N.Y.S. 780, 784 (1st Dep't 1917).  To the extent there was any doubt, Lato could have called a witness from DOE to lay a foundation for admitting the report.

        In contrast to his withholding of DOE's highly relevant determination, Lato permitted Francis Luyun, the CEO of Sentosa, to testify to rank hearsay:  Luyun told the grand jurors that Vinluan was "trying to recruit his own nurses also to send here in the United States," App'x at 654, and that his knowledge was based on statements purportedly made to him by *unidentified* nurses.  Moreover, plaintiffs presented evidence to show that Luyun's testimony was fabricated and that Lato knew it was false.  Luyun testified in the grand jury that he knew Vinluan was trying to recruit nurses in the Philippines "[b]ecause it's in the newspaper ads he says he's promising them that he can give them a job with good benefits." App'x at 654.  Yet, plaintiffs presented evidence to show that Lato knew, based on his investigation into Vinluan's business, that Vinluan

21

was an immigration lawyer and not a nursing recruiter.  Lato had in his files, for example, a copy of Vinluan's advertisement in a Philippines newspaper offering his services not as a recruiter but as an immigration attorney for individuals seeking to work in the United States.  And when a grand juror asked Lato if Luyun knew "of any of the nurses that left and went to work for Vinluan's organization," Lato responded "[y]es."  App'x at 658.  No details of the new employment were provided, and although Lato knew that some or all of the nurses had obtained new employment, it does not appear that he asked his investigators to contact the new employers to determine whether they were connected to Vinluan.  Moreover, Lato permitted Luyun to testify as he did even though the Nassau County Supreme Court had ruled six months earlier that Sentosa had no likelihood of success on the merits of its claim that Vinluan had interfered with its contractual relationship with the nurses.  A reasonable prosecutor would have known of this ruling.

Taken together, all of these omissions unlawfully compromised the integrity of the judicial process by implicating the nurses and the lawyer based in part on material omissions.  *See Morse*, 804 F.3d at 548.

Finally, Lato's actions must be considered against the larger context: the DA's Office indicted ten Filipino nurses who believed they were being unfairly treated for resigning their jobs. The prosecutors indicted the nurses' lawyer for giving them legal advice, and for filing a claim of discrimination on their behalf. They did so even though the agency with licensing authority cleared the nurses of any professional misconduct. And the prosecutors indicted the nurses even though they gave notice of their resignation, arrangements were made for coverage, they did not "walk out" during their shifts, and no patients were jeopardized. As the Second Department concluded in taking the extraordinary step of granting a writ of prohibition, this prosecution never should have been brought.

The qualified immunity doctrine protects all but the "plainly incompetent." *Ziglar*, 137 S. Ct. at 1867. This is one of the rare cases where the government officials indeed were "plainly incompetent." In my view, a jury could very well find on this record that no reasonable prosecutor would have indicted the ten nurses and their lawyer in the circumstances here or omitted the material information discussed above.

Beyond plain incompetence, the record also suggests bad faith. While Lato was the lead prosecutor on the case, the record contains ample evidence that Spota was intimately involved. Lato testified at his deposition that "I went through everything with Mr. Spota, how I saw the case, the complaints of the nurses and the complaints of everyone else." App'x at 1373. Lato "was to report to [Spota] on this," and while Lato was "running" the investigation, Spota was "ultimately in charge." *Id*. at 1364, 1368-69. Spota reviewed and edited a draft of the indictment, even though it was "unusual" for him to do so. *Id*. at 1379-80. Moreover, at the request of Howard Fensterman, Sentosa's attorney, Spota personally met with Sentosa's representatives to discuss the matter. *Id*. at 1340-42. And both Spota and Lato went to lunch with the representatives of Sentosa. *Id*. at 1369. Hence, triable issues of fact exist as to whether Spota is protected by qualified immunity. *See Arteaga v. State of New York*, 72 N.Y.2d 212, 216 (1988) (New York law grants government officials qualified immunity on state law claims, including false arrest claims, if their actions entail "making decisions of a judicial nature," unless "there is bad faith or the action taken is without a reasonable basis."); *see also Lore v. City of Syracuse*, 670 F.3d 127, 166 (2d Cir. 2012) ("In contrast to the federal standard, which is objectively reasonable

reliance on existing law, the New York standard for entitlement to qualified immunity has both objective and subjective components." (internal quotation marks and citations omitted)).

Finally, the district court dismissed the claims against the County because it rejected the claims against Spota and Lato. As I would vacate the dismissal of the claims against Spota and Lato, I would also vacate the dismissal of the claims against the County.

* * * * *

The ten nurses and their lawyer were subjected to an outrageous criminal prosecution, and I cannot help but think that race and national origin were a factor. Sentosa employs many Filipino nurses, not just the ten plaintiffs, and, in pursuing these criminal charges, it clearly was sending a message to its Filipino nurses and others in the Philippines thinking of coming to the United States that they dare not challenge their work conditions.[11] It is hard to imagine that the ten nurses would have been prosecuted for resigning their jobs if they had been White and American citizens. *See Vinluan*, 873 N.Y.S.2d at 81

---

[11] At one point, Bent Philipson, one of the owners of Sentosa, told the grand jury that these nurses "were all brought over from the Philippines," and now that nurses were quitting, "we have to make sure this thing doesn't happen anywhere else." App'x at 458.

25

("Accordingly, the prosecution has the practical effect of exposing the nurses to

criminal penalty for exercising their right to leave their employment at will. The

imposition of such a limitation upon the nurses' ability to freely exercise their

right to resign from the service of an employer who allegedly failed to fulfill the

promises and commitments made to them is the antithesis of the free and

voluntary system of labor envisioned by the framers of the Thirteenth

Amendment.").[12]

Significantly, while we must assume for purposes of this appeal that

the nurses were indeed treated in a discriminatory manner as they alleged

below, *see* App'x at 1169-70 (in letter to Avalon Gardens, nurses complained of

discrepancies in pay and hours and asked to be "treated with fairness and

respect"), Sentosa has in fact been found to have violated the rights of Filipino

---

[12] The issue of the exploitation of Filipino nurses has been the subject of attention. *See generally* Heather McAdams, *Liquidated Damages or Human Trafficking? How A Recent Eastern District Of New York Decision Could Impact The Nationwide Nursing Shortage*, 169 Univ. Pa. L. Rev. Online 1 (2020) (discussing how predatory staffing agencies exploit Filipino nurses and offer labor contracts that enable human trafficking-like conditions); Dan Papscun, *Filipino Nurses Win $1.56 Million in Trafficking Victims Case*, Bloomberg Law (June 1, 2021), https://www.bloomberglaw.com/bloomberglawnews/%20daily-labor-report/XBRBTCH8000000?bna_news_filter=daily-labor-report; *see also* Paulina Cachero, *From AIDS to COVID-19, America's Medical System has a Long History of Relying on Filipino Nurses to Fight on the Frontlines*, Time (May 30, 2021), https://time.com/6051754/history-filipino-nurses-us/.

nurses. A group of Filipino nurses successfully sued Sentosa in the Eastern

District of New York for violations of the Trafficking Victims Protection Act, 18

U.S.C. § 1589 *et seq.* and for breach of contract. The district court denied Sentosa's

motion to dismiss the complaint, *see Paguirigan v. Prompt Nursing Empl. Agency

LLC*, 286 F. Supp. 3d 430 (E.D.N.Y. 2017), and thereafter granted summary

judgment in *favor* of plaintiffs on liability, *see Paguirigan v. Prompt Nursing Empl.

Agency LLC*, No. 17-CV-1302, 2019 WL 4647648, at *1, *21 (E.D.N.Y. Sept. 24,

2019), *aff'd in part and appeal dismissed in part*, 827 F. App'x 116 (2d Cir. 2020)

(summary order). The district awarded compensatory damages of $1,559,099.79.

*See Paguirigan v. Prompt Nursing Empl. Agency LLC*, No. 17-CV-1302, 2021 WL

2206738, at *1, *8 (E.D.N.Y. June 1, 2021). And recently, the court preliminary

approved a class action settlement pursuant to which Sentosa will pay $3 million

to the nurses in the class. *See* Order Granting Preliminary Approval of Class

Action Settlement, *Paguirigan v. Prompt Nursing Empl. Agency LLC* (E.D.N.Y. Nov.

22, 2021) (No. 17-1302).

For whatever their motivation, the prosecutors were complicit in

Sentosa's effort to deter its Filipino nurses from pursuing their rights.[13]  One of

the grand jurors even asked Lato during the grand jury whether Sentosa was

---

[13]     The majority contends that my dissent "hedges on whether [the prosecutors'] complicity was itself racially motivated in the way that Sentosa's initiating campaign may have been."  Maj. Op. at 38.  That race played a part in the prosecutors' actions is, in my view, certainly plausible.  "[C]lever men may easily conceal their motivations," *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1043 (2d Cir. 1979) (internal quotation marks omitted), and here, where there is, as the majority seems to acknowledge, a "palpable sense of unfairness," Maj. Op. at 36 n.12, there is enough to put the issue to a jury.  *See Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1187 (2d Cir. 1992) (noting that even if there is no "smoking gun," "a thick cloud of smoke" is enough to require defendant to "convince the factfinder that, despite the smoke, there is no fire") (cleaned up).  In addition, even assuming the prosecutors did not act out of a discriminatory motive, they may have been manipulated into taking action by parties with such a motive.  *Cf. Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 271-73 (2d Cir. 2016) (adopting a "cat's paw" theory of liability that may be used to support a Title VII claim for retaliation).  While the majority argues that plaintiffs "never embraced" race as a motivating factor, Maj. Op. at 39, plaintiffs' briefs on appeal and their amended complaint below contained repeated references to the nurses being Filipino, the nurses being from the Philippines, the unfair treatment of Filipino nurses, and the violation of the nurses' civil rights under the Thirteenth and Fourteenth Amendments.  Indeed, plaintiffs' reply brief explicitly argues that "the Sentosa Defendants demonstrated that their purpose in contacting the District Attorney[] and their insistence on a prosecution was to intimidate the Filipino and other foreign nurses remaining in their employ."  Appellants' Reply Br. at 9.  Moreover, we have the discretion to consider an issue not raised below "when we think it is necessary to remedy an obvious injustice."  *United States v. Stillwell*, 986 F.3d 196, 200 (2d Cir. 2021).  Finally, while the majority emphasizes that motivation is not relevant to the question of absolute immunity, Maj. Op. at 39 n.13, it may be relevant to the question of qualified immunity.  *See Ziglar*, 137 S. Ct. at 1867 ("qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law'") (citation omitted).

"using the District Attorney as a bargaining chip" to prevent nurses from leaving

despite poor work conditions:

> GRAND JUROR:   Does [Philipson] plan on going back to the Philippines and doing anymore recruiting?
>
> LATO:        Why would that --
>
> GRAND JUROR:   Because if he's using the District Attorney as a bargaining chip.
>
> LATO :        If he's using --
>
> GRAND JUROR:   I'm just saying now, during contracts, if he's going to say, listen, if you fail to show up there could be criminal charges against you.
>
> LATO:        I can't ask him that question because it's not pertinent.  I understand what you are saying.  That's the type of thing that would pre-suppose there is some type of arrangement between the District Attorney's office and him.  I'll have to have Tom Spota testify, which is not going to happen, you know.  So.

App'x at 483-84.  Of course the question was pertinent.

> The nurses and their lawyer should be permitted to pursue their

claims for damages on the merits.  I dissent.